Kathryn N. Nester (Utah Bar No. 13967)
Robert Hunt (Utah Bar No. 5722)
Daphne Oberg (Utah Bar No. 11161)
Office of the Federal Public Defender
46 W. Broadway, Ste. 110
Salt Lake City, Utah 8106
Telephone: (801) 524-4010
*Attorneys for Claud R. Koerber*

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>CLAUD R. KOERBER,<br><br>    *Defendant.* | **MOTION TO SUPPRESS ATTORNEY-CLIENT PRIVILEGED LETTER**<br><br>*Oral Argument Requested*<br><br>Case No. 2:17-CR-37<br><br>District Judge Frederic Block |

In July of 2005, Mr. Koerber began consulting with his legal counsel about changing the manner in which the Franklin Squires companies engaged with their investors.  At his attorney's request, Mr. Koerber created a rough draft of a letter to investors in order to provide his attorney with an opportunity to review it and provide him with legal advice and suggestions.  Mr. Koerber created the rough draft on his computer, and then asked his clerical assistant to proofread it, and deliver it to his attorney.  Mr. Koerber never mailed the letter to anyone but his attorney, Ross K. Moore.  Mr. Moore never approved the letter and no one else ever mailed or delivered the letter to any investors, potential investors or outside third parties. Mr. Koerber consulted with Mr. Moore and several other attorneys about the letter's contents. Between July 20, 2005 and October 2005, the letter was revised and

1

reworked, but it was never mailed or delivered to anyone outside the protection of the attorney-client privilege.

This letter, which came to be known as the "To Our Lenders" letter, along with an electronic version of the letter (from Mr. Koerber's computer), ultimately fell into the hands of the government in mid-2007 and was produced again in response to a grand jury subpoena in March of 2008. After several years of heated dispute and litigation in this case about how the government intercepted the letter, whether or not the letter was protected by attorney-client privilege and whether the government should be allowed to possess or utilize the letter, the Court ruled that the letter in all its forms was indeed privileged and no waiver of the attorney-client privilege had occurred.

In August of 2011, the Court granted Mr. Koerber's motion for a protective order and ordered the government to return to Mr. Koerber all hard copies and electronic copies of the letter and to delete them from all government databases.[1] As the case proceeded and more evidence came to light about how prosecutors built their evidentiary case and their use of the "To Our Lenders" letter, Judge Waddoups revised and expanded his 2011 findings in a new order dated August 14, 2014.[2]

---

[1] *United States v. Koerber*, 2:09-cr-00302 CW (*Koerber I*), Order dated June 2, 2011 (Doc. 165), p. 20.
[2] *Koerber I*, Order dated August 14, 2014 (Doc. 472), pp. 12-13 ("The court also acknowledges that it has found that the Government had inappropriately based the [November 2009] superseding indictment in substantial part on attorney-client privileged information…the court found this troubling at the time but viewing it now in the context of this case's five-year prosecution history, it fits into a larger pattern justifying dismissal with prejudice.") This was troubling, in part because the use was after indictment, after Sixth Amendment protections attached, and after prosecutors had received notice of Mr. Koerber's claim of privilege and after prosecutors expressly promised to sequester the privileged letter. Thus, the use was in violation of the Federal Rules of Evidence, Rule 502; Rule 26(b)(5)(B) of the Federal Rules of Civil Procedure and an ethical violation. See *Koerber I*,

Judge Waddoups' revised opinion concluded: 1) the government "refused to admit that it had relied upon Defendant's attorney-client privileged information in obtaining the initial May 26, 2009 indictment"[3] 2) "it continued to use Defendant's privileged information even after it promised to sequester it, specifically incorporating that information into the superseding indictment filed November 10, 2009"[4] and 3) the letter "provided prosecutors with a roadmap of whom to interview and what documents to obtain and focus on. The prosecution's approach, relying on a privileged document and violating rules of professional conduct and due process, has fundamentally compromised this case and is certainly prejudicial to Defendant."[5]

To date, no rulings addressed the suppression of this privileged material or the fruits arising from the letter.[6]  Mr. Koerber now seeks to suppress any and all versions of the "To Our Lenders" letter and all evidence obtained and derived therefrom.

---

Order dated June 2, 2011 (Doc. 165), p. 12 ("[T]he government could not ethically use the relevant documents until a court determined otherwise.")

[3] *Koerber I*, Order dated August 14, 2014 (Doc. 472), p.12.

[4] *Id*.

[5] *Id*. at p.16.

[6] In the district court's 2011 order, Judge Waddoups says, "As a practical matter, however, the motion in this case is in effect a motion to suppress evidence, since a conclusion that the materials are privileged precludes use of the document at trial." *Koerber I*, Order dated June 2, 2011 (Doc. 165), p. 9. However, no remedy has addressed the fruits issue, especially in light of Judge Waddoups' amended factual finding in 2014 that prosecutors used the "To Our Lenders" letter post-indictment as a roadmap. *Koerber I*, Order dated August 14, 2014 (Doc. 472), pp. 12, 16.

## History of the case and relevant facts

Between June 4, 2007 and July 18, 2007, Mr. Koerber responded to expansive IRS summonses, delivering approximately 200,000 pages (57 boxes) of scanned files, including the inadvertent production of approximately 74 pages of legal files that had been set-aside as part of a privilege screen.[7] Within this production, unbeknownst to Mr. Koerber or his attorneys until October 2009, was the draft of the "To Our Lenders" concept letter, which was included in a file folder labeled "Legal: Holding Funds" and preceded with a cover letter from Mr. Koerber, addressed to his attorney, seeking legal advice related to the contents of the letter. Judge Waddoups reviewed the content *in camera*, conducted evidentiary hearings and heard argument from the government's "filter team."[8]

In February 2008, after the Utah Attorney General ultimately decided not to file a case against Mr. Koerber, the U.S. Attorney's office agreed to take over the prosecution the case.  In approximately March of 2008, the government issued a secret grand jury subpoena to Mr. Koerber's clerical assistant.  The subpoena required her to turn over, among other things, copies of the electronic files that she had removed from Mr. Koerber's company computers (without his knowledge).  The copied files that she had maintained in her possession included a Microsoft Word version of the "To Our Lenders" letter.

---

[7] *See Koerber I*, Doc. 35 and Doc. 165.
[8] *See Koerber I*, Doc. 165.

On May 26, 2009, the grand jury returned the original indictment in this case.  Despite having ethical and legal obligations[9] to inform Mr. Koerber immediately of its possession or use of attorney-client privileged documents, prosecutors waited until five months after the original May 2009 indictment to notify Mr. Koerber via email October 30, 2009, that he had inadvertently produced attorney-client "privilege[d]" material.[10] Importantly, in its October 2009 disclosure, the government did not disclose its prior use and reliance upon the "To Our Lenders" letter during the grand jury process to obtain the indictment, nor did it disclose that Mr. Koerber's clerical assistant had produced electronic versions of the letter in response to a grand jury subpoena.[11]  In fact, the government withheld producing notice of its possession or the content of the digital data produced by Mr. Koerber's assistant until an evidentiary hearing on the privilege issue in May 2010, and only certified that "it had provided all required discovery to Defendant" on August 31, 2010.[12]

As soon as Mr. Koerber and his counsel became aware the government was in possession of attorney-client privileged documents, Mr. Koerber's counsel asked the government to set aside the privilege documents and not review them any further.[13] Prosecutors assured Mr. Koerber, after he formally invoked Rule 26(b)(5)(B), that

---

[9] Utah State Bar Ethics Op. 99-01, Utah Rules of Professional Conduct, Rule 8.4(d), and Federal Rule of Civil Procedure 26(b)(5)(B).

[10] *Koerber I*, Doc. 165, p. 12.

[11] *Koerber I*, Doc. 472, p. 12 ("The government also refused to admit that it had relied upon Defendant's attorney-client privileged information in obtaining the initial May 26, 2009 indictment.")

[12] *Id*.

[13] *Koerber I*, Doc. 165, p. 12.

they had sequestered the inadvertently produced privileged materials, including the version of the "To Our Lenders" letter sent to the attorney, and promised they would not use the contents of those communications.[14] Despite these assurances, prosecutors returned to the grand jury to seek a superseding indictment less than a week later and added charges of securities fraud, multiple counts of wire fraud, money laundering and an additional tax count, expressly relying upon and quoting from the privileged "To Our Lenders" letter.[15]

After disagreements with the government about the privilege issue, Mr. Koerber filed a motion for protective order seeking the immediate return of the documents.[16] The government appointed a "filter team" to sequester and review the privileged materials.[17] The privilege issue was first litigated before the United States Magistrate Judge and then before the District Court Judge. The government continued to withhold any notice or disclosure of their possession of the electronic versions of the "To Our Lenders" letter until May 3, 2010.[18]

Ultimately, on June 2, 2011, Judge Waddoups issued an Order and Memorandum Decision finding that *all* versions of the "To Our Lenders Letter" were privileged and that at no time did Mr. Koerber waive that privilege.[19] Yet,

---

[14] *Koerber I*, Doc. 165, p.12 ("[T]he government could not ethically use the relevant documents until a court determined otherwise[.]"); ("And it [the Government] continued to use Defendant's privileged information even after it promised to sequester it, specifically incorporating that information into the superseding indictment filed November 10, 2009.")

[15] *Koerber I*, Doc. 472, p. 12 (The Government "continued to use Defendant's privileged information even after it promised to sequester it, specifically incorporating that information into the superseding indictment filed November 10, 2009.")

[16] *Koerber I*, Doc. 35.

[17] *Koerber I*, Doc. 48.

[18] *Koerber I,* May 3, 2010 Hr. Tr. at 114 (*see* Doc 67)

[19] *Koerber I*, Doc. 165.

prosecutors continued to use Mr. Koerber's privileged material as a "roadmap of whom to interview and what documents to obtain and focus on" through August 2014.[20]  Despite being ordered by the Court on June 2, 2011 to return or delete all of the privileged materials referenced above, and having certified to having done so, the government continued to maintain multiple copies of the privileged "To Our Lenders" in its discovery file through at least July 16, 2017, available and accessible to anyone working on the case in the United States Attorney's Office, including paralegals and new AUSAs.[21]

On July 21, 2017, Judge Shelby briefly revisited the issue of the "To Our Lenders" letter in the context of whether the government's conduct rose to the level to justify a dismissal of the indictment.[22] Without considering the modified and expanded factual findings made by Judge Waddoups in 2014, Judge Shelby declined to dismiss the indictment.  However, Judge Shelby did not address the issue of whether the "To our Lenders" letter and the fruits derived therefrom should be suppressed.

During the entire history of this case, despite the findings of privilege chronicled above, despite the prior Court orders, despite the government's repeated assurances to the defense and to the Court that it has been acting in good faith and respecting Mr. Koerber's attorney-client privilege, the government continues to possess in its discovery files (as of April 2018), and continues to use and publish on

---

[20] *Koerber I*, Doc. 472, p. 16.
[21] *See United States v. Koerber, 2*:17-cr-00037 DN (*Koerber II),* Doc. 87 and Doc. 93.
[22] *Koerber II*, Doc. 140.

its official websites (as of June 1, 2018) detailed descriptions of the contents of Mr. Koerber's privileged "To Our Lenders" letter, including verbatim quotations from that privileged document – for all government attorneys, staff, witnesses and the public-at-large to read and access without limit.[23] As of today, there has never been an order formally suppressing the "To Our Lenders" letter, or the fruits therefrom, despite clear legal authority (cited below) supporting that remedy.  The government has conveyed to defense counsel that they do not intend to introduce the letter at the second trial and undersigned counsel respectfully accepts that representation. However, the government has made no representation about the fruits that followed from the exposure to the privileged information contained in the letter. Undersigned counsel's recent review of the prior trial transcript and the discovery produced in January and February 2018, revealed multiple ways in which the fruits from the "To Our Lenders" letter continue to taint these proceedings.  Judge Waddoups' finding that the letter constituted a "roadmap" to the government's case becomes evident when examining the government's influence over the witnesses who were exposed to the letter, specific questions asked of key government witnesses before and during trial, and key documents used in the presentation of the government's case.

---

[23] There are a multitude of documents in the government's case files and discovery files that reference the To Our Lenders letter quotes and excerpts.  Additionally, as of June 1, 2018 the government continues to publish Mr. Koerber's privileged communications from the To Our Lenders letter on the following official government sources:

1) https://archives.fbi.gov/archives/saltlakecity/press-releases/2009/slc052609.htm;

2) https://securities.utah.gov/dockets/cr0042602.pdf ;

3) https://securities.utah.gov/dockets/cr0042601.pdf

Mr. Koerber now asks this Court to hold Judge Waddoups' finding of privilege, which remains unchallenged by the government,[24] as sufficient grounds to require suppression of the letter itself and the fruits therefrom.

### Legal Analysis

### A. Fifth Amendment

The government's possession and use of Mr. Koerber's draft "To Our Lenders" letter was significant from the beginning. During testimony at prior evidentiary hearings, Mr. Koerber generally described the letter as a "conceptual" approach to Founders Capital that was never implemented, based upon the advice he received from his attorneys.  Nevertheless, the confidential communications between Mr. Koerber and his attorney form the basis for the "scheme and artifice" theory connected to the fraud counts. The "To Our Lenders" letter was used in crafting the structure (originally including multiple verbatim quotes) of the "scheme and artifice" section of the government's Ponzi-scheme theory from the outset.  The letter was also introduced at least once to the grand jury, through government witness Paul Bouchard.[25]  The contents of the "To Our Lenders" letter and the other

---

[24] The government did not appeal the 2011 order, it did not seek reconsideration of the order or its findings, and it did not appeal the modified and amended privilege and fruits findings made by Judge Waddoups in 2014.

[25] After Mr. Koerber was indicted in May 2009, prosecutors returned to the grand jury in August 2009, and used the "To Our Lenders" letter to elicit testimony from Paul Bouchard concerning representations Mr. Koerber allegedly made to investors about how money loaned to Founders Capital would be used.  The transcript reveals the difficulty the government was having until it used the letter. Mr. Bouchard testified that it was not correct for the government to describe the opportunity Defendant presented as one to "invest in real estate" (GJ-PB-009:23 thru 010:1); that Defendant "wouldn't solicit funds or ask for money in any way" at public meetings (GJ-PB-010:12-13); and Bouchard could not say how he came to his understanding that money he loaned to Defendant's company would be used (GJ-PB-014:7-016:8).

privileged documents inadvertently disclosed to the government were relied upon so often by government prosecutors and investigators that the government's taint team was forced to turn back over to the defense "29 disks" of privileged files, and "25 printed copies" of the "To Our Lenders" letter along with "6 sealed envelopes" in addition to the multiple versions that were "destroyed, or digitally deleted."[26]

On May 17, 2017, Mr. Koerber's new attorneys (appointed in April 2017) were surprised to discover multiple copies of the "To Our Lenders" letter still in the government's possession (as Bates number IRS-09-2885 through IRS-09-2889) - six years beyond the district court's prior order on the issue. Prosecutors immediately filed a new notice of compliance on June 1, 2017, explaining that these additional copies of the To Our Lenders letter were "inadvertently not deleted" previously, but assured the Court that no one had looked at or taken advantage of the privileged documents over the last six years.[27]

Prosecutors went on to explain, however, that a staff paralegal doing a basic search of the government's files was able to identify still more versions of the letter in the government's possession as of July 2017 (Bates numbered IRS-04-00313 thru IRS-04-00317 and IRSMOI-00946 thru IRSMOI-00950). Prosecutors once again promised that all of these versions of the letter were deleted.[28] Yet, as described above, even today the content and communications of the protected "To Our

---

[26] *See Koerber I*, Doc. 165 (Memorandum Decision), Doc. 172 (Order) and Doc. 177 at 1-5 (Notice).
[27] *See* analysis of *United States v. Lin Lyn Trading, supra.*
[28] *Koerber II,* Doc. 83 at 3.

Lenders" letter remain in multiple places throughout the government's discovery and are still being referenced and published online.

It is beyond dispute that government agents and/or prosecutors possessed and used Mr. Koerber's attorney-client privileged "To Our Lenders" letter starting in mid-2007 and obtained the electronic version via grand jury subpoena in March 2008. It is further undisputed that the prosecutors reviewed the letter with multiple government witnesses pre-indictment (including e.g. Ms. Taylor and Mr. Isom) and quoted from the letter extensively in the "scheme and artifice" section of the May 2009 indictment. The government also used the letter post-indictment including showing it to witness Paul Bouchard in a post-indictment grand jury proceeding in August 2009.   The government waited to disclose its possession of the inadvertently-produced paper version until October 2009. Even then, prosecutors promised to sequester the letter in October 2009, along with other documents over which privilege was claimed, but did not reveal that it had already used and relied upon the letter or that it had the electronic versions.[29]

After these occurrences, and after the district court's order concluding that the "To Our Lenders" letter was indeed privileged and protected, *see Koerber I,*, Doc. 165, and after the court made clear again on June 16, 2011 that "the government's use" of the "To Our Lenders" letter would be impermissible,[30] the district court conducted several additional evidentiary hearings. Following these

---

[29] *Koerber I,* Doc. 472, p.12. ("The government also refused to admit that it had relied upon Defendant's attorney-client privileged information in obtaining the initial May 26, 2009 indictment."). *See also* May 3, 2010 Hr. Tr. at 114 (*see* Doc 67).
[30] *Koerber I,* Doc. 172 at 2.

hearings, the district court revised and amended its prior factual findings, concluding explicitly that the "To Our Lenders" draft letter had been used by prosecutors and investigators as a "roadmap of whom to interview and what documents to obtain and focus on[,]" and that this approach of prosecutors "relying on a privileged document...has fundamentally compromised this case and is certainly prejudicial to Defendant."[31]

When the government re-indicted Mr. Koerber in 2017, it resisted re-producing its case files through discovery but was, nevertheless, ordered to do so, *see e.g.* Doc. 6 (Feb. 16, 2017). Because of the government reproducing the discovery to Mr. Koerber's new attorneys in 2017, it became clear that the government's prior certification that it no longer had access to the "To Our Lenders" letter, was not accurate.[32] Mr. Koerber's attorneys discovered in June of 2017 that prosecutors had unauthorized access to this critical, and previously controversial and important privileged communication for six years. Prosecutors represented to the Court that the continued possession was inadvertent.

Indeed, the government certified they had "conducted a review of existing files to insure no further copies of the letter" remained in its possession, and further certified that the "IRS and FBI both confirm … they have no hard copies of the letter or other privileged documents in their file…[and] [a]ny other items subject to the Court's order have been destroyed, or digitally deleted…[following] a thorough

---

[31] *Koerber I,* Doc. 472, p.16
[32] *See Koerber I,* Doc. 87 and Doc. 93.

review of all digital and hard copies of the relevant files."[33]  Later, prosecutors

advised the Court that the "To Our Lenders" letter was in fact discoverable in the

government's files and that within 24 hours, a staff paralegal had found, identified

and deleted several additional copies.[34] Further, these copies were not in

unexpected places or from new sources; neither was the existence of the letter in

one isolated location, it existed in at least 10 different locations within the

government's files.[35]

The Tenth Circuit case of *United States v. Lin Lyn Trading*, provides

guidance to the Court in fashioning a remedy in situations where the government

continues to maintain possession of privileged documents after being notified of the

purported privilege.[36]  In *Lin Lyn Trading,* the government had seized several

items, including a yellow notepad, approximately 3 ½ years before the indictment

was returned. The yellow notepad contained handwritten notes prepared by the

defendant for discussion at meetings with his attorneys in connection with an

ongoing investigation of his business, and these notes had been "prepared at the

suggestion" of the defendant's attorneys.[37] Information from the yellow notepad

"became the subject of specific counts in the Indictment", and was thoroughly

---

[33] *Koerber I*, Doc. 177 at 1-5.

[34] Doc. 83 at 3.

[35] FBI302-080-003 to 0392; 2) FBI302-144-0030 to 0059; 3) IRS-04-00297 to 0458; 4) IRS-09-02885 to 2889; 5) IRSMOI-00912 to 0999; 6) FBI302-080-003 to 0392 (second copy in separate location); 7) FBI302-144-0030 to 0059 (second copy in separate location); 8) IRS-04-00297 to 0458 (second copy in separate location); 9) IRS-09-02885 to 2889 (second copy in separate location); and 10) IRSMOI-00912.

[36] 925 F. Supp. 1507 (D. Utah 1996), aff'd in part, rev'd in part and remanded, 149 F.3d 1112 (10th Cir. 1998).

[37] *Id*. at 1508.

reviewed by federal investigators.[38] The government was told by the defendant that the "notepad contained confidential communications between himself and his attorneys."[39]  Nevertheless, investigators continued to review the information, and keep the notepad concluding that they would use it, while "the issue of privilege could be determined at some future time, if necessary."[40]  In a timely fashion, the attorneys for the defendant in Lin Lyn Trading demanded the return of the notepad "because of the attorney-client privilege."[41]  The AUSA who was handling the case advised that "the notepad and copies of it and the other documents...were placed in a sealed envelope" and the "notepad and supposedly all copies of it…remained in the custody" of the government until the sealed envelope was "delivered to Magistrate Judge Samuel Alba, who examined the notepad and other documents *in camera* and conducted an evidentiary hearing[.]"[42] The magistrate judge ruled that the notepad was privileged, and because it had not been returned upon the demand of the defense attorney's claiming privilege, it was "unlawfully seized" as a matter of law and referred the matter to the district court judge who granted "defendant's motion for return of the yellow notepad[.]"[43]

In *Lin Lyn Trading*, similar to events in Mr. Koerber's case, other copies of the privileged communication remained in the government's possession despite the district court's order and these copies were "available to [federal] agents at all

---

[38] *Id*.
[39] *Id*.
[40] *Id*.
[41] *Id*.

[42] *Id*. at 1509.
[43] *Id*.

times," but the federal agent in charge denied "[k]nowledge of the contents of" the retained files and denied "any use of the documents[.]"[44]   The lead investigative agent who had charge of the case for approximately 5 years testified "that he had never seen the yellow notepad or any copies of it…that he never learned about the contents of the notepad…that he had not learned" anything material "as a result of information contained in the notepad" or anything "referred to in the notepad."[45] Further, at an evidentiary hearing approximately 5 years after the notepad had originally been seized and copied by the government, the lead agent testified "he did not notice" the additional versions of the privileged information that had remained in the government's possession, and that "he was so 'inundated'" with a new case "that he did not take the opportunity to even open the folder or to take notes of its contents" once it was discovered.[46]

Several striking similarities exist between *Lin Lyn Trading* and Mr. Koerber's case.  First, in both cases, the government knew or should have known, before or during its use of the privileged material that it was subject to a claim of privilege, and they used the information anyway, including use in furtherance of their investigation. Second, in both cases, the government made copies of the privileged communication, and kept copies of the privileged document, and federal agents had had access to the privileged communications – even after the district

---

[44] *Id.*
[45] *Id.*
[46] *Id.* at 1510 ("The folder laid idle for approximately two years and I never took the opportunity to review its contents.")

court had ordered the privileged materials returned. Third, both district courts determined that the "investigation was inextricably connected with information contained in the yellow notepad and that the interviews and evidence obtained thereafter related to such matters was tainted "fruit from a poisonous tree[.]"[47]

Ultimately, the court in *Lin Lyn Trading* granted both suppression and dismissal.  The Tenth Circuit reversed the dismissal order but upheld the district court's order suppressing the privileged material and all fruits derived therefrom. The Circuit noted that the suppression of the privileged material and all its fruits was justified, "on the theory that the illegally seized notepad became a 'roadmap' for the case investigation."[48]

The Circuit recognized the district court's use of a *Kastigar*-like evidentiary hearing to determine the extent and effect of the taint, and upheld the district court's finding that "the government had not shouldered its burden of showing independent sources for the information in the indictment[.]"[49] Finally, the Tenth Circuit noted that when the government not only refused to return the privileged material, but continued to use the material as an integral part of its investigation, "'[u]nder the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained *directly or indirectly* through the exploitation of police illegality.'" (*internal quotation omitted, emphasis added*).  The Tenth Circuit also upheld the specific

---

[47] *Id*. at 1514. ("References in the yellow notepad constituted leads which were followed, investigated and became pervasively and inextricably connected with the prosecution of this case.")
[48] United States v. Lin Lyn Trading, Ltd., 149 F.3d 1112, 1114 (10th Cir. 1998).
[49] *Id*. at 1116.

remedy of suppression stating, "suppression of all evidence obtained after March 29, 1991, would appear to be an adequate remedy" and "[b]y suppressing the evidence acquired as a result of the illegal seizure, the prosecution ***is unable to benefit*** from the government's unconstitutional conduct. On the other hand, there is nothing to forbid the government from ***beginning a new investigation, using the evidence legitimately acquired prior to March 29, 1991, and conducted by personnel—both investigatory and prosecutorial—untouched by the taint*** of the yellow notepad."[50]

The pervasive taint of the "To Our Lenders" letter throughout the case from March 2008 onward, justifies suppression of the letter and all fruits derived therefrom. However, leaving aside for a moment, the government's mishandling of the privileged documents occurring before the 2011 privilege order, the government's post-indictment, post-order possession and use after 2011, is sufficient to justify suppression; the taint of the document has now influenced over a decade of this litigation and continues to do so, even today.

### B. Fourth Amendment

The government's pre-indictment and post-indictment possession, access to, concealment of and integral reliance on Mr. Koerber's privileged "To Our Lenders" letter – remains un-remedied in the present case. Prosecutors violated Mr. Koerber's rights protected by the Fourth Amendment, when the electronic versions of the privileged letter were seized in violation of legal and ethical rules via grand

---

[50] *Id*. at 1118 (*emphasis added*).

jury subpoena in March of 2008.  After October 2009, there was a bona-fide claim of privilege and a promise to sequester by the government.  Any use thereafter is both unethical and a violation of Federal Rules of Evidence, Rule 502 and Rule 26(b)(5)(B) of the Federal Rules of Civil Procedure which require "[a]fter being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; [and] must take reasonable steps to retrieve the information if the party disclosed it before being notified[.]"

After 2011, the government was prohibited by the Court from even possessing the privileged material.  Yet still, as late as 2014, the prosecutors used the letter as a roadmap, and an integral part of the government's investigation and ultimately to its trial presentation in 2017.  Thus, because the investigation "was inextricably connected with information contained in" the "To Our Lenders" letter, after the government knew it could not keep or rely upon it – the Court must remedy this intrusion, and suppress "all evidence obtained by the government after the privileged [document] was illegally seized" because it was "tainted[.]"[51]  In such situations, "any doubt is to be resolved in favor of taking all necessary steps to remove the taint."[52]

## C. Sixth Amendment

---

[51] *Lin Lyn Trading*, 925 F. Supp. at 1517.
[52] *Maldonado v. New Jersey ex rel. Admin. Office of Courts-Prob. Div.*, 225 F.R.D. 120, 137 (D.N.J. 2004).

"[T]he introduction of evidence obtained *either directly or indirectly* through interference with the attorney-client relationship is a paradigm example of the kind of prejudice that warrants finding a denial of the right to counsel." *Clutchette v. Rushen*, 770 F.2d 1469, 1472 (9th Cir. 1985) (Emphasis added.) *See also United States v. Irwin*, 612 F.2d 1182, 1185 (9th Cir. 1980) ("It is clear that government interference with a defendant's relationship with his attorney may render counsel's assistance so ineffective as to violate his Sixth Amendment right to counsel and his Fifth Amendment right to due process of law.") After considering the application of this doctrine by all other federal circuits, the Tenth Circuit "fashion[ed] a rule." *Shillinger v. Haworth*, 70 F.3d 1132, 1141 (10th Cir. 1995). The beginning of the rule requires an acknowledgment that the Circuit "necessarily recognize[s] the right to counsel in order to secure the fundamental right to a fair trial guaranteed" by due process. *Id.* Giving effect to this principle, the Tenth Circuit holds that "a prosecutor's intentional intrusion into the attorney-client relationship constitutes a direct interference with the Sixth Amendment rights of a defendant, and because a fair adversary proceeding is a fundamental right…we believe that absent a countervailing state interest, such an intrusion must constitute a *per se* violation of the Sixth Amendment." *Id.* at 1142 "In other words, we hold that when the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial

process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct." *Id*.

The government's use of the privileged letter while interviewing and prepping their witnesses also created a violation of Mr. Koerber's Sixth Amendment right to confront witnesses against him.  At the trial, the government questioned several of the witnesses about representations made to them by Mr. Koerber about the nature of their investments.  Because the "To Our Lenders" letter was privileged and inadmissible, Mr. Koerber was prevented from cross-examining the witnesses on whether their memories about Mr. Koerber's representations to them were affected by their review of the privileged letter showed to them by the government.  Mr. Koerber faced a Hobson's choice of either impeaching the witnesses' memories on a key element of the fraud counts or waiving his right to attorney-client privilege.  Therefore, he was denied a full and fair opportunity to cross-examine the witnesses against him, in violation of the Sixth Amendment.

Thus, unless the government can show at a *Kastigar*-like hearing, that none of the trial evidence it plans to introduce derives from a source untainted by the government's continued use and possession of the privileged To Our Lenders letter, dismissal is the appropriate remedy.[53]

---

[53] *See, e.g., United States v. Danielson,* 325 F.3d 1054, 1074 (9th Cir. May 2003) (The government "must show that all of the evidence" it plans to use at trial "was derived from independent sources, and that all of its pre-trial and trial strategy was based on independent sources. Strategy in this context is a broad term that includes, but is not limited to, such things as decisions about the scope and nature of the investigation, about what witnesses to call (and in what order), about what questions to ask (and in what order), about what lines of defense to anticipate in presenting the case in chief, and about what to save for possible rebuttal."); *Cf. United States v. McDaniel*, 482 F.2d 305,

**<u>Requested remedy</u>**

The only remedy that will sufficiently protect Mr. Koerber's Fourth Amendment right to be free from unreasonable seizure, his Fifth Amendment guarantee to due process of law and his Sixth Amendment right to counsel and right to confront witnesses against him - while still providing disincentives to law enforcement to violate the attorney-client relationship while intentionally seeking protected information - is to prohibit the government from benefitting from the evidence obtained in violation of their ethical, regulatory, statutory and constitutional duties.

Mr. Koerber asks this Court to suppress the "To Our Lenders" letter, along with any fruits derived by the government therefrom.  In the alternative, should the Court require more information from the government about the fruits prior to trial, Mr. Koerber requests this Court hold a *Kastigar*-type hearing to determine what evidence, if any, was derived from independent sources of the illegally-retained letter.

Respectfully submitted on this the 4th day of June, 2018.


*<u>/s/ Kathryn N. Nester</u>*

---

311 (8th Cir. 1973) (government failed to satisfy burden of proving independent source for evidence adduced at trial).