# EXHIBIT A

1    A.   I can't.  I don't recall.  But I was -- I was

2  bringing in other money from other individuals.

3    Q.   Okay.

4    A.   Yes.

5    Q.   Is it -- is it your understanding that the

6  promissory note contains the terms of the agreement that

7  you would have had with Franklin Squires governing this

8  loan?

9    A.   Yes.

10    Q.   Is there anywhere in there that it says that it

11  would -- that restricts how Franklin Squires Companies

12  can use the money that you are loaning to them?

13    A.   Restricts on how they could use it?

14    Q.   Yeah.

15    A.   No.

16    Q.   Okay.  If that was a material term to the

17  agreement that you had, wouldn't you expect to see it in

18  the note itself?

19    A.   It was represented here with this property on

20  here, and then the addendum to the promissory note, that

21  there would -- that would be -- that property would be

22  used as collateral for it.  So my assumption in receiving

23  it that way is that there would be real estate backing it

24  up.

25    Q.   Okay.  So that's your assumption, right, but

1    you're not here to suggest to the jury that Mr. Koerber

2    made that representation to you, are you?

3        A.   He represented that it would be used for real

4    estate, purchases of property, yes.

5        Q.   Okay.  Now, you said that -- you referred to the

6    two properties on this as being used for collateral.  You

7    don't think that Mr. Koerber's companies just bought

8    those properties with the proceeds of this loan, right?

9        A.   I don't know.

10       Q.   Well, how could he -- how could he already --

11   how could he state it as collateral if you haven't given

12   him the money for it yet?

13       A.   Yeah.  Good point.

14       Q.   He already owned it, right?  He already owned

15   those two properties, right?

16       A.   I would hope so, if he was going to pledge them

17   as collateral.

18       Q.   Well, have you ever heard or seen anything

19   contrary --

20       A.   No.

21       Q.   -- to that?  Were these notes ultimately

22   superseded by others?

23       A.   Yes.

24       Q.   Did those -- did the terms of those notes change

25   regarding the statement of security and collateral?

1      Q.   So by mid-2005, or so, you had converted all of

2   your loans over to Founders Capital?

3      A.   Correct.

4      Q.   Okay.  And there would be a note associated with

5   those loans?

6      A.   Correct.

7      Q.   And that note would contain the -- you know, the

8   terms of the agreement between MIWE Holdings and Founders

9   Capital regarding that money, right?

10      A.   Correct.

11      Q.   Okay.  And -- and that --

12           Eric can we into scroll up a little bit to the

13   paragraph that begins "security collateral."

14           This is the paragraph that you were referring

15   to, is it not?

16      A.   Yes.

17      Q.   Okay.  And that was the -- and are you saying

18   that that restricted how Founders Capital could use the

19   proceeds of this loan?

20      A.   Restricted the use of it?  I don't understand

21   what you're saying.

22      Q.   Yeah.  Did it define how Founders Capital could

23   use the money that MIWE Holdings was loaning to it?

24      A.   I don't think it restricted it, but it was

25   always represented to me that it would be used to

1    purchase real estate, and then it had this paragraph in

2    here that there would always be real property in the

3    amount of this note available for the amount invested.

4        Q.   Okay.  So are you saying this paragraph was

5    consistent or inconsistent with what you understood to be

6    the representation that Mr. Koerber made to you at the

7    time?

8        A.   Consistent.

9        Q.   And it's consistent because he's saying there's

10   going to be collateral for this note equal to the

11   relative portion of the total equity of real estate --

12   real property estate holdings of borrower, right, to be

13   held by borrower?

14       A.   Correct.  Real estate collateral.

15       Q.   Are you at any point suggesting that -- that --

16   that  Mr. -- that -- that Mr. Koerber didn't live up to

17   this -- this -- this term in the note agreements that

18   MIWE Holdings had with Founders Capital?

19       A.   I don't know what you're asking me.  Am I

20   suggesting?  What does that mean?

21       Q.   Well, are you suggesting to this jury that

22   Mr. Koerber and Founders Capital did not have a total

23   equity of real property estate holdings of the borrower

24   to cover the amount of the loan?

25       A.   I don't know.  I never -- I never received it.

1       A.   Yes.

2       Q.   Okay.  And MIWE -- MIWE Holdings never purchased

3  any real estate; is that right?

4       A.   Correct.

5       Q.   Besides that first one that may have -- may have

6  gotten -- that you may have used it for back in 2004

7  before any of this started?

8       A.   Correct.

9       Q.   Okay.  And did Rayhar buy real estate?

10      A.   No.

11      Q.   So -- so you represented to the people that were

12  lending you money that their money was being used to

13  purchase real estate; is that right?

14      A.   Yes.

15      Q.   But you acknowledge right now that MIWE Holdings

16  and Rayhar Capital never purchased any real estate,

17  right?

18      A.   Correct.  We represented that the money would be

19  used in the Equity Mill of the Franklin Squires

20  Companies.

21      Q.   Okay.  So, is it true or false, then, to say --

22  if you represented to those people that their money would

23  be used to buy real estate, and MIWE Holdings didn't buy

24  real estate, is that true or false?

25      A.   Well, the way you're asking it, it would be

1  false, but we were -- we told them what MIWE Holdings was

2  doing with the money and they knew that it was going to

3  Founders Capital to be used in the Equity Mill process.

4  That's why they invested in it.

5      Q.   Okay.  And so if Founders Capital used the money

6  in the Equity Mill process but didn't directly purchase

7  real estate with it; is that true or false?

8      A.   I don't know what you're asking right now.

9      Q.   Well, you're testifying today that Mr. Koerber

10 told you that the money that was being loaned from MIWE

11 to Founders Capital would be used to buy real estate or

12 would be used to participate in the Equity Milling

13 process?

14     A.   Both.  It was one of the same thing to me.

15     Q.   Okay.

16     A.   The Equity Mill Process was a process to

17 purchase and sell real estate.

18     Q.   Okay.  So would that make the representations

19 that you made to your people, who were borrowing you

20 money, true or false, then, from MIWE Holdings?

21     A.    It was always represented by MIWE and Rayhar

22 that the money would be used in the Equity Mill process

23 to buy and sell real estate.

24     Q.   Okay.  How is that different, if it is

25 different, from the representation that you say

1    Mr. Koerber made to you about what Founders Capital would

2    do -- would do with the money?

3        A.   It sounds like it's the same thing to me.

4        Q.   Okay.  So, if Founders Capital borrowed it to

5    New Castle and Hill Erickson and obtained from them

6    their -- the value of the equity portfolios that those

7    companies held, would that be true or false?

8        A.   I don't know what you're asking me.

9        Q.   Well?

10       A.   Would what be true or false?

11       Q.   Would the representations that you're talking

12   about be true or false, about being used -- money being

13   used to make hard money loans in the Equity Milling

14   process?

15       A.   I don't know.  As long as -- I don't know what

16   you're asking me.

17       Q.   As long as -- I think you were about to say, as

18   long as Mr. Koerber's companies held equity in excess of

19   what his outstanding liabilities were, his representation

20   to you would have been true, right?

21       A.   That's correct.

22       Q.   Let's go to Exhibit 112 if we can.

23            Can we pull that up.

24            You testified you remember receiving this,

25   right.

1    document, then, the balance sheet, that Founders Capital

2    has over $124 million in assets at this time, right?

3         A.   That's what it shows, yes.

4         Q.   Okay.  And what's the total liabilities that it

5    has at the time?

6         A.   It says total liabilities 42 million.

7         Q.   Okay.  Would that be consistent with the

8    representation that was made in the note regarding the

9    collateral?

10        A.   I don't know.  I don't know what you're asking.

11        Q.   Okay.

12        A.   What is this in relation to?

13        Q.   What's that?

14        A.   What is this in relation to?

15        Q.   Well, we were just talking before this about the

16   representation that was made, that Mr. Koerber would

17   always have assets backed by real estate to exceed his

18   liabilities, right?

19        A.   Uh-huh.

20        Q.   So is this consistent with that or not?

21        A.   I don't know if it is.

22        Q.   What would you need -- what would you need to

23   know -- what more would you need to know to find that

24   out?

25        A.   I'm confused by what you're asking me.

1    Q.   Okay.  You're saying I don't know, right?

2    A.   Yeah I don't know.  I don't know what you're

3  asking me, either.

4    Q.   And I'm asking you, okay, what would you need

5  to -- what would you need to learn to be able to answer

6  my question?

7    A.   Which is?  What's your question.

8    Q.   My question is, was this consistent or

9  inconsistent with the representation made in the note,

10  that the collateral of Founders Capital would always have

11  collateral that was backed by real estate that would

12  exceed the value of its obligations?

13    A.   Well, this shows total assets of 124 million.

14    Q.   Okay?

15    A.   And total liabilities of 42 million.  I don't

16  know what the total liabilities were.  I know the amount

17  of money that MIWE had invested was over $20 million.

18    Q.   Okay, you don't know where that 21 million is in

19  this balance sheet?

20    A.   It would be part of that liability.

21    Q.   Okay.  So -- so let's -- let's -- let's put that

22  20 million on top of the 42?

23    A.   Okay.

24    Q.   Would it still be fair to conclude that

25  Mr. Koerber's company has more assets, backed by real

1    estate, to cover its liabilities?

2        A.    According to that document, yes.

3        Q.    Okay.  Any reason to question this document that

4    you know of?

5        A.    Just that there hasn't been any money come from

6    it since then.

7        Q.    Okay.  You understand the real estate market

8    fell pretty hard in the 2007 through 2009 time period,

9    right?

10       A.    Correct.

11       Q.    Okay.  Did you ever hear Mr. Koerber talk about

12   liquidating or needing to liquidate the real estate

13   assets?

14       A.    Yes.

15       Q.    Did you ever help him in that?

16       A.    No.

17       Q.    Why not?

18       A.    Why didn't I help him in it?

19       Q.    Yeah?

20       A.    Well, I did what I could as far as the Spykers

21   and anything that he asked me to, yeah.  And he told me

22   that he was working on it diligently, doing everything he

23   could to liquidate it.

24       Q.    Okay.

25       A.    There was never an opportunity to.

1    A.    Yeah, but, Mr. Mumford, the difference in this

2    right here and why this was so confusing to me and to

3    MIWE, was that it was presented that the only assets that

4    were being offered were properties that had all this

5    liability against them versus properties that were free

6    and clear, which, if the cash was used for the purposes

7    that it was represented, there would be all these

8    properties that wouldn't have liens against them, versus

9    just a small amount of equity in them.

10    Q.    Okay.  You're saying -- you're saying -- you're

11    assuming that the representation was made that -- that --

12    that Founders Capital and its related companies held

13    property free and clear?

14    A.    Until they could get a preferred buyer on it and

15    pull the cash out and then have that cash available

16    again, yes.

17    Q.    Okay.

18    A.    These all have a preferred buyer or some sort of

19    a lien against them.

20    Q.    Did you --

21    A.    So what happens -- so, if this is the case, if

22    cash was used for this estimated liability, then what

23    happened to all the other -- all the other cash?  You

24    know, the hundred million dollars?  What happened to all

25    that?  What happened to the money of MIWE of over $20

 1  million.

 2       Q.   Okay.

 3            We can go to page 17 if you want.

 4            Did you ever get that far?

 5       A.   Yes.  I did look through the whole document.

 6       Q.   Okay.  Well, you see here in page 17 where it

 7  says:  Note 5.  Schedules 1-A, B, and C and totals.

 8  Doesn't this answer the question that you just asked?

 9       A.   What is this?

10       Q.   So this is going through all the Note 4, 3-A and

11  3-B and 3-C, Note 5 regarding the properties held by Hill

12  Erickson, New Castle, and New Castle.  This is the total.

13  And this is the total that reflects the total of those

14  properties is over $128 million, right, the total

15  estimated liabilities associated with those properties is

16  over $94 million, leaving an estimated equity of over 31

17  million?

18       A.   But then there should be a fourth column with

19  all the cash that was sent in to Founders Capital, which

20  would be, at least from MIWE, over $20 million.  Where is

21  that column with that cash?  Where did all that money go?

22       Q.   Well, that assumes -- that assumes that your

23  testimony is true, right?

24            MR. CLARK:  Objection, Your Honor.

25  Argumentative.

1          THE COURT:  Overruled.

2     Q.   BY MR. MUMFORD:  Now, you knew these properties

3   were liened, right?

4     A.   Correct.  But where's all the cash that they

5   pulled out from them to be able to pay back these notes?

6     Q.   But you understand this is a balance sheet,

7   here, right?

8     A.   Correct.

9     Q.   Okay.  So maybe if we can go back to page 8.

10  Let's go back to page 8.  What is the figure that you're

11  looking for here, sir?  Is it the cash figure, $405,000

12  in cash?

13    A.   I think it would be -- I think it would be

14  where -- where is the -- where is the difference between

15  the total assets and the liability of the total over a

16  hundred-million dollars that was brought in or at least

17  the 20 million that MIWE had sent in?  And are you

18  telling me it's the difference between the liabilities

19  and the assets, the value of the properties at the time?

20    Q.   I'm saying the representation that was made on

21  the notes was that, at all times, Founders Capital would

22  have assets, the value of which would exceed the amount

23  of liabilities that it held, right?

24    A.   Assets minus liabilities, and that number would

25  be greater than the amount that had been loaned to it.

1    Q.   So your testimony now is that it would have two

2   times the --

3    A.   Assets that weren't liened, yes.

4    Q.   Sure, the equity that's what you're talking

5   about, right?

6    A.   Yeah, equity.

7    Q.   Equity in excess of the amount that it was

8   obligated?

9    A.   Correct.

10    Q.   Right?  But you'll agree with me the obligations

11   of Founders Capital include the money that -- that it

12   borrowed to Hill Erickson and New Castle, right?

13    A.   One more time?

14    Q.   I'm trying to figure out how to make this

15   simple?

16    A.   Yeah.  I'm really confused.

17    Q.   Your testimony.  Is it your testimony that

18   Founders Capital didn't have assets in excess of its

19   liabilities in this time period?

20    A.   It was always represented to me that they did.

21    Q.   Okay.  In fact, that's what this shows, right?

22    A.   That's what that shows, yes.

23    Q.   Okay.  Any reason to doubt this number?

24    A.   Well, I doubt it because there's this big $124

25   million number, but then there's all these liabilities

1    preferred buyer, I don't know the whole process of how

2    those came together, but a preferred buyer would come in

3    and purchase it using their credit so they could mill the

4    equity out of it.

5        Q.    Okay.  Now, here's the question for you.  Where

6    did Hill Erickson -- where did you understand Hill

7    Erickson was getting the money to do this?

8        A.    Founders Capital.

9        Q.    So Founders Capital was using the proceeds from

10   loans to, in turn, loan it to Hill Erickson, right?

11       A.    Yes.

12       Q.    So that Hill Erickson could acquire properties

13   and make money when they sell them, right?

14       A.    Correct.

15       Q.    And New Castle had a role in this, too?

16       A.    Yes.

17       Q.    Because New Castle would enter into contracts

18   with preferred buyers, right?

19       A.    To do the lease.

20       Q.    To do the leases on it?

21       A.    Yes.

22       Q.    Is that the leasing you were talking about

23   earlier?

24       A.    Yes.

25       Q.    Where did New Castle get its money to do that

1    from?

2        A.    Well, my understanding is that New Castle would

3    then lease the property to someone to be able to make the

4    monthly payments on it.

5        Q.    Yeah.  And my question was, where did New Castle

6    get its money from?

7        A.    Well, according to what Rick stated afterwards,

8    from Founders Capital.

9        Q.    You stated afterwards.  He represented that to

10   you the whole time, right?

11       A.    He represented to me that the money that MIWE

12   sent up would be used to purchase the properties, to pay

13   cash for them.

14       Q.    You're going back to that again, aren't you?

15       A.    Excuse me.

16       Q.    You're going back to that again, aren't you?

17            MR. CLARK:  Objection, Your Honor.

18   Argumentative.

19            THE COURT:  Sustained.  This probably is a

20   good -- well, go ahead and finish this line.

21            MR. MUMFORD:  Thanks.  I'll just finish it.

22       Q.    BY MR. MUMFORD:  But you concede that all of

23   these -- this relationship, this buying and selling, is

24   part of the Equity Mill, right?

25       A.    Correct.

 1      Q.   And so -- and so it wouldn't be inconsistent

 2  with any representation that money was being used to

 3  acquire properties in the Equity Mill, right?

 4      A.   Correct.

 5      Q.   Okay.  Thank you.

 6          THE COURT:  All right.  We'll take our lunch

 7  break here then for 45 minutes.

 8          Members of the jury, thank you.

 9          Ms. McNamee.

10          MS. MC NAMEE:  All rise for the jury, please.

11          (Whereupon the jury leaves the courtroom.)

12          THE COURT:  Mr. Isom, you're again welcome to

13  step down.  I'll instruct you not to talk to anyone

14  except your lawyer about your testimony.

15          JUROR 12:  Okay.

16          THE COURT:  Thank you.

17          Counsel, have a seat, we have the question about

18  Exhibit 25-C.

19          Mr. Clark, it's not ordinarily my practice to

20  receive into evidence what are essentially demonstrative

21  aids, which is what I think that exhibit is.

22          MR. CLARK:  Your Honor, actually I understand

23  this to be a statement of Mr. Koerber's.  It is what

24  Mr. Isom saw Mr. Koerber transcribe on a white board, and

25  there is no way to get that statement but by depicting

1       A.   Correct.

2       Q.   Is that right?  And it came in the context of a

3  rather substantial document like the document I'm

4  holding?

5       A.   It did come with a substantial document, yes.

6       Q.   Yeah.  And you put it together with your

7  attorneys?  Is that what you said?

8       A.   Yes.

9            MR. MUMFORD:  Your Honor, I move to some admit

10  Exhibit 409, please.

11           MR. CLARK:  Objection, Your Honor.  Hearsay.

12           THE COURT:  Overruled.  We will receive 409.

13       (Government's Exhibit 409 received in evidence.)

14       Q.   BY MR. MUMFORD:  And so this -- what was the

15  purpose of this document, Mr. Isom?

16       A.   The whole purpose, once again, was to make this

17  a legitimate business instead of just offering a

18  promissory note, but offering the disclosures to an

19  investor so we wouldn't run the risk of having it

20  ended -- ending.

21       Q.   I'm sorry?

22       A.   Ending.  Having it ending, not end.

23       Q.   And the date on this is October, 2006; is that

24  right.  I think it's at the bottom of the -- the -- the

25  page there.

1      A.   The date that this document was put together.   I

2   don't know the date that it was presented to the

3   Bartetzkos, but, yes.

4      Q.   Okay.  But the information was as of the date of

5   October 30, 2006?

6      A.   Yes.

7      Q.   Okay.  And this contains representations that

8   you made to Bartetzkos and other lenders to your company;

9   isn't that right?

10      A.   Yes.

11      Q.   In fact, if we go to I think it's page 9 of the

12   document.

13           Can we go to that?  Go to the next page.  Thank

14   you.  This, at the top, can you just highlight the first

15   paragraph that starts Rayhar Legacy, LLC.

16           This is how you described your company to your

17   investors; isn't that right?

18      A.   Yes.

19      Q.   And it says:  The company will engage in the

20   business of making short-term real estate loans and small

21   business loans throughout the United States.

22      A.   Correct.

23      Q.   And is that a true and accurate statement of

24   what your business Rayhar Legacy was at the time?

25      A.   Yes.

1          Q.    So -- so, in other words, you told your

2    investors that their money would be used for both

3    short-term real estate loans and small business loans?

4          A.    I told them, yes.  The document says this, and

5    we emphasized the Equity Mill.  Yeah.  That's -- it's the

6    reason they put the money in there was so it could be put

7    to use up at the Equity Mill, the Franklin Squires

8    Companies.

9          Q.    You said that's the reason.  I'm not asking you

10   what their motivations were.  I'm asking you what you

11   told them.

12         A.    I told them that their money would go up and be

13   used.  It would go to MIWE, and MIWE would lend it to

14   Founders Capital to be used to purchase real estate in

15   the Equity Mill.

16         Q.    So, let me get this straight.  Did you make a

17   representation to your investors that was consistent or

18   inconsistent with what you wrote to them on October,

19   2006?

20         A.    I believe it was consistent with making

21   short-term real estate loans, yes.

22         Q.    And small business loans?

23         A.    If they were to invest and do small business

24   loans.

25         Q.    You mean if Founders Capital was to?

```
1      A.    No.  If MIWE was.

2      Q.    Okay.

3      A.    Or Rayhar was, excuse me.

4      Q.    Okay.  But, just so we're clear, this is what

5  was disclosed to your investors, right?

6      A.    That is correct.

7      Q.    And then, in the next paragraph --

8            Could we go to the next paragraph.  You told

9  them they were unsecured creditors of the company; is

10  that right?

11      A.    Yes.

12      Q.    So, to the extent you suggest in your testimony

13  that you told them that their investment would be secure,

14  that was inconsistent with this, right?

15      A.    I told them that MIWE was told that there would

16  be enough equity in real estate to back up its

17  investment.

18      Q.    Where does that say that in this document, sir?

19      A.    It does not.

20      Q.    So that's not what you told them when you gave

21  them this document, right?

22      A.    Ask me that one more time, please.

23      Q.    So that's not what you told them when you gave

24  them this document.  When you gave them this document,

25  you told them what was in the document, right?
```

1    A.    I told them what was in the document, yes, and

2    then I told them what they were doing with the money,

3    what MIWE was doing with the money.

4    Q.    And is it your position that MIWE was making

5    small business loans outside of the money that it was

6    sending -- that it was loaning to Founders Capital?

7    A.    No, that it was to be used in the Equity Mill

8    for the purchase of real estate.

9    Q.    So MIWE was making small business loans through

10   Founders Capital?

11   A.    If you want to call it a small business loan.

12   Q.    That's not my words, it's yours.

13   A.    (Laughs.)

14   Q.    You laugh, but they are your words, right?

15   A.    I don't know what you're asking me.

16   Q.    This is what you told your lenders in October,

17   2006, right?

18   A.    That's when the document was printed.  That's

19   not when the Bartetzkos received it, I don't believe.

20   We'd have to look at the date that they  --

21   Q.    Okay.

22   A.    -- received it.

23   Q.    Did you ever tell your investors that their

24   investment with you was risk free?

25   A.    No.

1      Q.   Did you say that Mr. Koerber described the

2   investment as being risk free?

3      A.   No.  I told them that it would be backed by real

4   estate.

5      Q.   Well, in fact you told them something different

6   than that, didn't you.

7         Go to page 4.  It's three pages -- three pages

8   from here.  Next page.  At the bottom it should say page

9   4.  Right there.  Number 3.  Highlight paragraph number

10   3.

11         In fact, you told them, you told your investors

12   at the time that this investment involves a high degree

13   of risk.  Right?

14      A.   That is correct.

15      Q.   And that is consistent with what Mr. Koerber

16   told you regarding your relationship with Founders

17   Capital.  It involves a high degree of risk.  Right?

18      A.   No.  He never told me that.

19      Q.   Okay.  So you're saying -- you want this jury to

20   believe that Mr. Koerber didn't tell you that but you

21   told that to your investors even though Mr. Koerber told

22   you something different?

23      A.   Yes.

24      Q.   So, who told you to put that language about risk

25   in this document?

1     A.    The attorneys that drafted this document.

2     Q.    Okay.  And you still believe that that was

3   inconsistent with what Mr. Koerber told you?

4     A.    Yes.

5     Q.    Okay.  What did you tell them, your noteholders,

6   about their ability to participate in the management of

7   the company?  Do you recall?

8     A.    No I do not.

9     Q.    Okay.

10          Let's go to the next page, 3.3.

11          Did you tell them that noteholders do not have

12   the right or power, the second sentence there, the power

13   to take part in the management of the company?

14     A.    It's in the document, but I don't remember

15   having that conversation with people, no.

16     Q.    Did you have conversations with -- with your

17   lenders to make sure they read -- read this document?

18     A.    Yes.

19     Q.    That's the responsible thing to do, right?

20     A.    Yes.

21     Q.    Now, sitting here today, do you -- do you

22   understand that your noteholder relationship with

23   Founders Capital would give you the right or power to

24   take part in the management of Founders Capital?

25     A.    Did I know that it would give me the opportunity

1    to?  Is that what you're asking me?

2        Q.   Did you think that it did?

3        A.   No.

4        Q.   Either the right or power?

5        A.   No.

6        Q.   Did you -- did you send this language to

7    Mr. Koerber for his approval to make sure that he was

8    copasetic with it?

9        A.   With Rayhar's language?

10       Q.   Yeah.

11       A.   I don't -- I don't recall if I did or not.

12       Q.   Let's depart from this for just a second.

13            Can we show the witness only 541, please.  Can

14   you put up next to it 541-A -- or I'm sorry -- 541-B I

15   believe it's called.

16            I'm showing you what's been marked as 541 and

17   541-B, Mr. Isom.  Do you recognize it?

18       A.   I'm having to read the whole thing.  Sorry.

19       Q.   You know what, this wasn't quite the document I

20   thought it was.  If we can -- I'll come back to this, if

21   that's okay.

22       A.   Okay.

23       Q.   Let's go back to -- to 409, please.

24            Go to -- at the bottom of it, it says 09196.

25   Thanks.

1          Mr. Isom, you see where it says risk of loans to

2     small businesses there?

3          A.   Yes.

4          Q.   Do you recall describing to your investors at

5     the time that making -- how making loans to small

6     businesses is significantly different and risky than

7     making real estate loans?

8          A.   Yes.

9          Q.   And is it your testimony that that is different

10    from what Mr. Koerber told you regarding the riskiness of

11    small business -- making small business loans?

12         A.   That's a great question.  Prior to the interest

13    stopping, he never told me about doing that, about

14    Founders Capital lending money to small businesses.

15         Q.   Okay.  Now -- but you've told other people that

16    Mr. Koerber did tell you that; isn't that right?

17         A.   After the interest stopped, yes.

18         Q.   Well -- and, in fact, didn't you tell others

19    that that's why -- because he told you that is why you

20    wrote it in your documents, that the money would be used

21    for real estate and for loans for small business; is that

22    right?

23         A.   I don't -- I don't believe so, no.  I don't

24    recall having that conversation --

25         Q.   Okay, so you didn't tell --

1      A.    -- prior to that.

2      Q.    For example, you didn't tell Jim Kindred that

3  Mr. Koerber told you that the money -- and that you wrote

4  in your documents that the money would be used for real

5  estate and bridge loans for small businesses?

6      A.    I don't recall telling him that, no.

7      Q.    Okay.

8           Can we play -- can we please play -- this is

9  audio clip -- and this is 5 -- 550 -- 567?  552-A,

10  please.

11          THE COURT:  Well, hold on just a moment.

12  Mr. Mumford, let's meet at side bar.

13   (Discussion among the Court and counsel at the bench.)

14      Q.    BY MR. MUMFORD:  Mr. Isom, do you recall having

15  a conversation with Jim Kindred in probably the 2008,

16  latter part of 2008 time period?

17      A.    Yes.  I had conversations with Jim Kindred

18  during that time.

19      Q.    And do you recall what you and Mr. Kindred would

20  have discussed in that time?

21      A.    I don't remember the details, but I do remember

22  talking about the money that he had invested In Rayhar.

23      Q.    And did you talk about, in that time period,

24  what Mr. Koerber would have represented to MIWE or to

25  Rayhar?

1    A.   I don't recall the details, and, if it's okay,

2    some of this information I have been able to review, it's

3    9, 10, 11, 12 years old.  So some of it I have been able

4    to review.  And information that you're presenting to me,

5    I haven't been able to review or refresh my memory.  And

6    for years I have done everything I could possibly could

7    to suppress this and forget about it just so I could stay

8    alive.  So please bear with me on this.  And I'm happy to

9    look at anything to refresh my memory.

10    Q.   Well, let me ask you this.  Did you -- would you

11    have told -- well, your testimony today is that

12    Mr. Koerber never told you he was using it for -- using

13    the money for anything other than real estate loans,

14    right?

15    A.   Prior to the interest stopping, yes.

16    Q.   Uh-huh.  So would you have told the people

17    loaning money to you that, of course, Mr. Koerber told us

18    that some of it was going to small business loans because

19    that's why we wrote it in our documents.

20    A.   No.  The Rayhar documents was a general form

21    investment document that an attorney put together to use

22    with something -- for something like this.

23    Q.   Well, okay.

24         Can we pull up for the witness only Exhibit 403,

25    please.

1          Mr. Isom, what's this?

2     A.   This is a letter written February 11 to the

3    noteholders of Rayhar.

4     Q.   When you say "written," who wrote it?

5     A.   Typed up.  Myself and Joe Alevas.

6     Q.   Okay.  What was the purpose of this document?

7     A.   To inform them.

8     Q.   Inform them what?

9     A.   Let me read it just a moment, and I'll tell you.

10         THE COURT:  Mr. Isom, the exhibit is not in

11   evidence yet, so don't provide testimony about what's in

12   the exhibit.  You're welcome to review it and refresh

13   your memory.

14         JUROR 12:  Okay.  Thank you.

15         It was the update.  It's a letter updating

16   noteholders of Rayhar.

17    Q.   And when was it sent?

18    A.   February 11, 2008.

19    Q.   Okay.

20         Your Honor, I'd move to admit.

21         MR. CLARK:  It's hearsay, Your Honor.

22         THE COURT:  Is it hearsay, Mr. Mumford.

23         MR. MUMFORD:  Oh, no.  It's just offered for

24   what's -- the substance of what was said, regardless of

25   whether it was true or not.

1          THE COURT:  Hold on.  I'll receive it.

2        (Government's Exhibit 403 received in evidence.)

3          MR. MUMFORD:  Thank you.  May we publish, then?

4     Q.   BY MR. MUMFORD:  So starting with the paragraph

5   that begins, "As outlined in the private placement

6   memorandum," is that the document that we were just

7   referring to as Exhibit 409?

8     A.   Yes.

9     Q.   Okay.  So, in 2000 -- in other words, in

10  February, 2008, in other words, you're referring your

11  lenders back to this document Exhibit 409, right?

12    A.   Correct.

13    Q.   Okay.  And you're saying that Rayhar is in the

14  business of what?

15         MR. CLARK:  I'm sorry, Mr. Mumford.  I think

16  you're referring to Exhibit 403.

17         MR. MUMFORD:  No.

18         MR. CLARK:  No?

19         MR. MUMFORD:  What's shown on the screen is 403.

20  He's referring back to the PPM at 409.

21         MR. CLARK:  My apologies.

22         THE COURT:  Your question again, Mr. Mumford?

23    Q.   BY MR. MUMFORD:  You wrote to your noteholders

24  that Rayhar is in the business of making real estate and

25  business loans, right?

1      A.   That is correct.

2      Q.   Okay.  And that would have been -- and that

3   would have been what you attributed to a statement coming

4   from Mr. Koerber, right, telling you:  Hey, no.  Founders

5   Capital is in the business of making real estate and

6   business loans.

7           Right?

8      A.    Correct.  And this letter is dated February 11,

9   and we learned on February 8, in some of those recordings

10   we heard earlier of him, this pie chart meeting, of where

11   the money had went.  That's why we were referring back to

12   this at that time.

13      Q.   So your testimony today is that you didn't know

14   that Founders Capital was making small business loans

15   until February, 2008?

16      A.   I don't know the exact date, but I know there

17   was new information in this meeting at that time of that.

18      Q.   Well, give us a time frame.  When was this

19   meeting?

20      A.   I believe it was February 8 of 2008.

21      Q.   Okay.  So then why are you referring to:  As

22   outlined in the private placement memorandum, Rayhar is

23   in the business of making real estate and business loans?

24      A.   Based off of the new information that we had

25   received about what he told us they had done with the

1    money.

2    Q.   But we just covered that 409 was -- was --

3    was -- was dated as of October 30, 2006, right?

4    A.   Correct.

5    Q.   So your statement today is, and you want this

6    jury to believe that you told -- you told your Lenders in

7    2006 that you were in the business of both real estate

8    and business loans, but you didn't find out anything

9    about Founders Capital being in the business of business

10   loans until February, 2008?

11   A.   It's because it was always represented,

12   Mr. Mumford, that the money was going to be used for real

13   estate and that there would always be enough real estate

14   equity to back up the investment to protect the

15   investors.

16   Q.   Anything written -- anything in writing that

17   you're referring to where you say:  No.  In writing

18   Mr. Koerber said it was only for -- to purchase real

19   estate and not to -- and not to make small business loans

20   to.

21   A.   No.  Nothing in writing.

22   Q.   Okay.  In fact, you have previously said to your

23   investors that -- that because Mr. Koerber told you he

24   was making business loans, in addition to real estate

25   loans, that's why you put it in the documents, right?

1      A.   I don't recall telling them that, no.

2      Q.   Okay.  Would that be consistent or inconsistent

3   with your testimony today, if you did?

4      A.   That would be inconsistent.

5           MR. MUMFORD:  Okay.  Your Honor, I would move to

6   be able to play that audio clip at this time, then.

7           THE COURT:  Is this clip 1?

8           MR. MUMFORD:  Yes.

9           THE COURT:  Go ahead.

10          MR. MUMFORD:  Thank you.

11                  (Audio clip played.)

12     Q.   BY MR. MUMFORD:  Okay.  Mr. Isom, that's your

13   voice, right?

14     A.   Yes.

15     Q.   And do you recall having that conversation with

16   the Kindreds?

17     A.   I do now, yes.

18     Q.   And you -- when you were talking about, he told

19   us, you're talking about Mr. Koerber, are you not?

20     A.   Yes.

21     Q.   So you told Ms. Kindred that Rick Koerber told

22   you, and you wrote in our documents -- you wrote in your

23   documents that it would be used for real estate and

24   bridge loans for small businesses, small business bridge

25   loans, right?

1    A.    Correct.

2    Q.    And that was back in 2008?

3    A.    Yes.

4    Q.    And what's changed between back in 2008 and --

5    and -- and now to make you testify that it was -- that

6    Mr. Koerber never told you prior to that time that it was

7    going to small business loans?

8    A.    Again, the attorneys wrote in that document in

9    2006, that we used at the beginning of 2007, that

10   language of real estate loans and small business loans,

11   but it was never represented to me prior to that, until

12   after the interest stopped, that it would be used for

13   small business loans, but that that was just how they

14   formulated those documents when they put one out that it

15   could be used for those purposes.  So we never

16   communicated it that way until after we found out that he

17   had used it for that purpose.

18   Q.    Isn't it true, Mr. Isom, that the only thing

19   that has changed is you plead.  You plead guilty and are

20   being sentenced, and pursuant to your sentence -- your

21   sentence is going to be based on how cooperative you are

22   with the government.

23   A.    I don't know what you're asking me.

24   Q.    Isn't that the big thing that's changed between

25   then and now?

1       A.   What do you mean?

2       Q.   In 2008 you told your investors that Mr. Koerber

3   told you it was going into small business loans and real

4   estate loans and that's why you wrote it in your

5   documents that are dated October of 2006, right?

6       A.   Correct.  And I told you why.  Because of what

7   we had found out after the interest had stopped.

8       Q.   But the interest didn't stop before you put

9   Exhibit 409 together?

10      A.   That's correct.

11      Q.   And the big thing that's changed between now and

12  then is -- is you've been waiting sentencing for five

13  years, right?

14      A.   I have been awaiting sentencing, yes.

15      Q.   And that sentence turns on, in large part, what

16  the recommendation of the government is, right?

17      A.   They are -- they have agreed to make a

18  recommendation for me, yes, as part of the sentencing.

19      Q.   Based on how cooperative you are?

20      A.   Correct.

21      Q.   Is -- is -- is that your first time trying to

22  seek a deal, cooperating with -- with the government when

23  things go wrong?

24      A.   No.

25      Q.   When else has it happened?

1        A.    It happened when Horizon Financial and Dee

2   Randall was accused for a Ponzi scheme, and I cooperated

3   with the Securities and Exchange department.

4        Q.    Okay.  And that did you get in return?

5        A.    What's that?

6        Q.    What did you get in return for your cooperation

7   at that time?

8        A.    A fine was fined.

9        Q.    Instead of?

10       A.    I don't know what instead of.

11       Q.    Prosecution or worse?

12       A.    I didn't -- I didn't -- I didn't agree to doing

13   anything wrong in that.  I just cooperated with them.

14       Q.    Has there been other times when you have

15   cooperated with the government to get yourself out of a

16   spot?

17       A.    No.

18       Q.    How about with Polatis?

19       A.    Nothing ever happened with that.

20       Q.    Okay.  When you say nothing ever happened with

21   that, explain.

22       A.    Nothing ever happened with that.  I was never

23   called in to testify or give information or be a witness

24   or anything on that.

25       Q.    Okay.  Were you told that you were identified as

1      Q.    Okay.  Let's finish up with this 409 document

2   here if we can.

3            Can we go to -- back to 409.  The bottom of the

4   page says 09198, please.

5            Do you see in this paragraph where it talks

6   about the formation of Rayhar Legacy and such?

7      A.    Yes.

8      Q.    You see where it says:  Additionally, the

9   company will provide financial services, including loans

10  and consulting to small businesses?

11     A.    Yes.

12     Q.    So that's another instance of you disclosing to

13  your investors that their money would be used for things

14  besides real estate loans, right?

15     A.    It is true that it says that in there, but that

16  was not the emphasis of that document, no.

17     Q.    I'm not asking you what the emphasis of it was,

18  but you agree that it's the totality of this document

19  that governs your relationship with your investors; isn't

20  that right?

21     A.    Correct.

22     Q.    And, in fact, continuing on down with that, on

23  the last sentence of that page, it's describing you as

24  having many years experience in not only real estate

25  finance but also business management, right?

1       A.   Correct.

2       Q.   Okay.  And the next page is -- is -- the next

3  paragraph -- or the first full paragraph, rather,

4  sorry -- is spelling out how you are going to direct and

5  have primary responsibility for how the company loans

6  money and how it invests its money, right?

7       A.   Correct.

8       Q.   It doesn't mention Mr. Koerber there at all,

9  right?

10      A.   Correct.

11      Q.   And next paragraph, 6.3.  Again, you're talking

12 about during the years that Mr. Isom has been employed in

13 real estate investment and lending -- and lending to

14 small businesses, right?

15      A.   Yes.

16      Q.   So you're not limiting yourself there to any

17 real estate-only type of lending, right?

18      A.   That's correct.  They were classifying the notes

19 previous to this to Founders Capital as lending money to

20 that business for the purposes of real estate, so it tied

21 the two together.

22      Q.   I'm sorry?

23      A.   This is in reference to MIWE having loaned money

24 to Founders Capital, which is a small business, for the

25 purpose of real estate through the Equity Mill.  That's

```
 1   what its referencing.
 2        Q.   Okay.  I'll show you what --
 3             Let's show this to the witness only.
 4             -- what's been marked as 404.
 5             It's two pages.  Can you put them side-by-side.
 6             Mr. Isom, I'll just ask you, do you recognize
 7   this?
 8        A.   Yes.
 9        Q.   What is it?
10        A.   It's another letter written from Rayhar to its
11   noteholders.
12        Q.   And -- and -- and what's the date on this one?
13        A.   March 24, 2008.
14        Q.   Okay.  And you wrote this?
15        A.   I did.  I wrote it with Joe Alevas and received
16   some direction from Rick on it also.
17        Q.   Okay.  When you say you received some direction
18   from Rick on it, how did that happen?
19        A.   Just based off of my communications with him and
20   him helping me communicate with the investors of Rayhar
21   what to communicate and how to communicate with them.
22        Q.   Okay.  But, at no point, however, did
23   Mr. Koerber say:  Hey, those investors of Rayhar are my
24   investors.
25             Right?
```

1      A.   He did not say that, no.  He was very clear

2   about trying to protect himself, especially at this time.

3   He was very careful in his words.

4      Q.   Okay.

5           And, Your Honor, I'd move to admit.

6           MR. CLARK:  No objection Your Honor.

7           THE COURT:  It's received.

8      (Government's Exhibit 404 received in evidence.)

9      Q.   BY MR. MUMFORD:  And you see at the bottom of

10  the first page there where it says:  Rayhar Legacy and

11  its officers have diligently sought to educate its

12  noteholders about the connection to Founders Capital.

13     A.   Yes.

14     Q.   And you're saying although this connection is

15  indirectly through MIWE Holdings as a lender to Founders,

16  there have been other smaller business and financial

17  decisions which did not involve Founders Capital?

18     A.   Correct.

19     Q.   And that involves that investment that you just

20  mentioned in that Marker Company, right?

21     A.   Correct.

22     Q.   And you're saying -- so you're saying -- in

23  other words, who was it that made that investment

24  decision, was that MIWE Holdings or was that Rayhar

25  Legacy?

1        A.      MIWE.

2        Q.      And who was associated with the Marker Company?

3        A.      What do you mean?

4        Q.      I mean, who was -- who were the individuals who

5    ran that company?

6        A.      The main person was Ron Wade.

7        Q.      Okay.  And was that a real estate investment,

8    then?

9        A.      Yes.

10       Q.      Got ya.  So when you say each of these decisions

11   has been in accordance with the stated business

12   activities of the company, which can be found throughout

13   your prospectus, you're again referring to, are you not,

14   the Exhibit 409 document that was written in October,

15   2006?

16       A.      That's correct.

17       Q.      Okay.  And you say a substantial amount of

18   Rayhar's funds were loaned to Founders Capital through

19   MIWE Holdings, right?

20       A.      Yes.  More than what had been brought in from

21   the investors, total investors.

22       Q.      Okay.  And that's counting the return of the

23   accumulation of interest, right?

24       A.      I don't know what you're asking.

25       Q.      When you say the total amount, you're referring

1    to the total amount that includes the accumulation of

2    interest?

3        A.    You asked me if all the amount of money that was

4    brought in by all the individual investors.

5        Q.    I didn't ask you that.  I asked you if a

6    substantial amount of Rayhar's funds were loaned to

7    Founders Capital through MIWE Holdings, right?

8        A.    That's correct.

9        Q.    And that means, does it not, that some of

10   Rayhar's money went elsewhere, right?

11       A.    It went to MIWE Holdings and then MIWE Holdings

12   made the decision of what to do with it.

13       Q.    Well, did a portion of Rayhar's funds go places

14   other than MIWE Holdings?

15       A.    That's a good question.  I don't know without

16   looking.

17       Q.    Okay.  You'd have to look at your bank accounts,

18   then?  Is that what you're saying?

19       A.    I guess so, yes.

20       Q.    Have you looked at your bank accounts since the

21   2008, 2009 time frame?

22       A.    No.

23       Q.    Now, you were asked, in your opening testimony,

24   to talk about -- to talk about the bank records of

25   Founders Capital.  Do you recall that?

1    received from Founders Capital that wouldn't be on these

2    books?

3        A.   No.  Other than the agreement of reinvesting the

4    monthly interest after that that was owed.

10:07:26  5        Q.   Okay.  And what is the date that you last -- that

6    MiWe Holdings last loaned money to Founders Capital?

7             I'll just direct you to June 7th, 2007, and ask you

8    if you see any loans made after that to Founders Capital.  Do

9    you see that?

10:08:09  10        A.   June 7th?

11        Q.   Yeah.

12             (Time lapse.)

13             THE WITNESS:  No.  No other ones.

14        Q.   BY MR. MUMFORD:  And how much was that loan on

10:09:20  15    June 7, 2007?

16        A.   400,000.

17        Q.   Okay.  And you previously testified, did you not,

18    that you -- that you collected money and sent all that money

19    to Founders Capital; right?

10:09:50  20        A.   That I collected money and sent it all to Founders

21    Capital?

22        Q.   Yeah.

23        A.   That I had -- I testified that I had collected --

24    that I had a note with Founders Capital greater than the

10:10:05  25    amount than I had collected.

970

1    Q.   Okay.  But didn't you tell -- didn't you testify on

2    direct examination that you told all your investors that their

3    money would be used to go to the Equity Mill at Founders

4    Capital; right?

10:10:22  5    A.   That's correct.

6    Q.   Doesn't this very -- this very paper show otherwise

7    in June of 2007?

8    A.   No.

9    Q.   In particular, on June 4th, 2007, you, MiWe,

10:10:39 10  received $100,000 from Value Capital; right?

11   A.   Yes.

12   Q.   And on June 6th, 2007, MiWe received $700,000 from

13   Rayhar Legacy; right?

14   A.   Correct.

10:11:02 15  Q.   But on June 7th, 2007, MiWe only loaned 400,000 to

16   FranklinSquires.

17   A.   That's correct.

18   Q.   That's because you kept the other 400,000 to cover

19   the operational expenses of MiWe Holdings?

10:11:23 20  A.   Yes.

21   Q.   Despite the fact that you told your investors that

22   their money would be -- would all go to, be invested in the

23   Equity Mill at Founders Capital?

24   A.   I knew that I -- I knew that MiWe Holdings had more

10:11:38 25  invested greater than the amount that was collected, and so in

1       Q.   BY MR. MUMFORD:  Why did you testify yesterday that

2   it wasn't until 2008 that you learned there were liens on some

3   of these properties?

4       A.   I don't know that I testified to that yesterday.

11:11:29   5   Q.   I don't mean to misstate.  Please explain what my

6   question doesn't accurately reflect in your testimony

7   yesterday.  What was it?

8       A.   What part of my testimony are you saying that I

9   made yesterday that you're asking me to verify?

11:11:44  10   Q.   Okay.  I'm referring to, as we were going through

11   the list of properties; right?

12       A.   Yes.

13       Q.   And you said, I didn't know until 2008 there were

14   liens on some of those properties.

11:11:53  15   A.   No.  That document was handed to me in 2007, and I

16   saw it at that time.

17       Q.   Okay.  But you didn't know until November 2007 that

18   those properties had liens on them?

19       A.   I knew how the Equity Mill worked because I had

11:12:11  20   some of those properties in my name, so I knew they had liens

21   on them.  I don't remember saying I don't remember that none

22   of them had liens on it.  My statement was that I thought the

23   cash in the -- that was being sent from MiWe to Founders

24   Capital would be used to pay cash for a property so they could

11:12:31  25   get a little lower price, and then a preferred buyer would

994

1    come in, purchase it using their credit, frame back up all

2    that cash to then go buy another property.  So, yes, I

3    understood that the property would ultimately have a lien on

4    it.

5    11:12:45        Q.   You knew that they all had liens on them; right?

6             A.   No, I did not know that.

7             Q.   Didn't you ever say, I knew they all had liens on

8    them of some sort?

9             A.   No.  I don't know -- I don't remember ever saying

11:13:02 10  that I knew they all had liens on them.  How would I know that

11   all the properties that FranklinSquires controlled had liens

12   on them?

13            Q.   Well, because you understood how the Equity Mill

14   worked; right?

11:13:15 15       A.   Ultimately, if they took it all the way through the

16   Equity Mill process, yes, they would end up with a lien on

17   them.  But then all that cash would still be available.

18            Q.   Okay.  Unless the market fell.

19            A.   Or they used the cash for something other than real

11:13:32 20  estate.

21            Q.   Okay.

22            Your Honor, may we play clip Number 3 that was --

23   that we marked for yesterday?

24            THE COURT:  Give me just a moment.

11:13:46 25       (Time lapse.)

1          THE COURT:  You may.

2          MR. WHEELER:  Is it 552C?

3          MR. MUMFORD:  552C, yes.

4          (Whereupon, Clip Number 3 was played.)

11:15:51 5     Q.   BY MR. MUMFORD:  That was your discussion with

6     Mr. and Mrs. Kindred in December 2008?

7          A.   I don't know when it was.  But, yes, that was a

8     discussion I had with them.

9          Q.   It was well after the February 2008 meeting where

11:16:06 10   you said you learned it was a fraud; right?

11         A.   Correct.

12         Q.   So as of -- so even after this meeting where you

13    said, you're now saying that you learned it was a fraud, you

14    were still telling people it wasn't a fraud; right?

11:16:26 15   A.   I was still in hopes that there would be money that

16    would come from those properties in some way based off the

17    promises that Rick was continuing to make to me, holding out

18    for something.

19         Q.   Well, you had -- you had personal experience with

11:16:45 20   the blood bath of the market in the 2008?

21         A.   Correct.  There was still a question in my mind

22    which was based off of how the Equity Mill worked.  If they

23    paid $200,000 for a home and then financed it through the

24    Equity Mill with long-term financing for, say, 250,000 and

11:17:07 25   pulled out 50,000, what happened to that 250,000 from the