JOHN W. HUBER, United States Attorney (#7226)
AARON B. CLARK, Assistant United States Attorney (#15404)
RUTH J. HACKFORD-PEER, Assistant United States Attorney (#15049)
TYLER MURRAY, Assistant United States Attorney (#10308)
Attorneys for the United States of America
111 South Main, Suite 1800
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:17-CR-00037-FB |
| Plaintiff, | : | |
| | : | TRIAL BRIEF |
| v. | : | |
| CLAUD R. KOERBER, | : | Judge Frederic Block |
| | | Magistrate Judge Paul M. Warner |
| Defendant. | : | |

---

The United States, by the undersigned Assistant United States Attorneys, files its Trial

Brief in the above captioned case.

## ANTICIPATED FACTS

Because the court is aware of the allegations of the Indictment due to the substantial motion

practice that has occurred, the United States will not review those allegations in this brief.

The case the United States anticipates presenting will be predicated upon three essentials:

(1) that the Defendant obtained approximately $100,000,000 in funds placed with his businesses,

Franklin Squires and Founders Capital, and money from more recent investors was used to pay the

interest payments (profits) to previous investors; (2) that the investment opportunity was presented as one where investors' money would be used in "an equity mill" to provide short-term bridge loans for the acquisition of real-estate, when in fact substantial portions of the money were not used for the advertised purpose; and (3) that the Defendant in 2005 and 2006 expended money acquired from the investors for himself, which, when coupled with the fact that he did not file tax returns for those years, resulted in his attempted evasion of income taxes.

The United States will present its case through several categories of witnesses.  One category will be individuals who placed money into Franklin Squires, and then Founders Capital when it was created in 2005.  These people include Matson Magleby, Paul Bouchard, Michael Isom, Peter Hansen, Dale Clarke, Jerel Clark, and others.  It is anticipated that these witnesses will testify that each understood that he was placing funds, his own and funds received from other individuals, into the Founders Capital "equity mill."  The equity mill will be described as a program, largely created by Mr. Koerber, that was designed to "mine equity" through real estate transactions.  According to a recorded conversation Mr. Koerber had with Michael Isom and other individuals associated with Isom, the role of Founders Capital was to make short-term bridge loans to Hill-Erickson—an entity associated with Founders Capital and Franklin Squires—so that Hill-Erickson could acquire real estate at prices lower than the market value of the property.  As alleged in the Indictment, Mr. Koerber was responsible for spending money in substantial amounts, not for the equity mill, but for other business and personal purposes.

A second category of witnesses will be people who worked in the Franklin Squires companies headquartered at 85 Eastbay Blvd., Provo, Utah.  Foremost among these witnesses will be Forrest Allen, who was the head bookkeeper for the Franklin Squires businesses.  Mr. Allen

2

was the registered agent for these businesses when, in 2007, the Internal Revenue Service issued a summons for the records.  The United States will attempt to introduce many of the records from these businesses as business records provided by Mr. Allen.  In addition, as bookkeeper, Mr. Allen was responsible for documenting the receipt of investors' money in Franklin Squires and Founders Capital, as well as seeing that accounts payable were paid.  Mr. Allen also questioned Mr. Koerber about whether Founders Capital was being operated as a Ponzi scheme.  Mr. Koerber said  that a Ponzi scheme was not illegal under Utah law.

Another category of witnesses will be expenditure witnesses.  These witnesses will testify that Mr. Koerber spent money on luxury automobiles, the production of a movie, provided funding for Iceberg restaurants, and other ventures.  Mr. Koerber's personal expenses were also paid with funds placed in Founders Capital.  Mr. Koerber was spending approximately $15,000 a month on life insurance policies, paid over $40,000 for dental work, and paid thousands of dollars in adoption expenses.  Mr. Koerber also spent approximately $250,000 to pay back investors from a failed business venture in Wyoming.  In his seminars and other materials, Mr. Koerber talked frequently about how he had a failed business venture in Wyoming, that he declared bankruptcy, that he was absolved from paying back the Wyoming investors, but that he did so with six percent interest. However, the payments that went to the Wyoming investors came to a great degree from money placed with Founders Capital.

The United States will also present three expert witnesses.  IRS agent Steve Roberts will categorize and total monies spent on personal items by Mr. Koerber.  Although the United States could attribute all of the money taken in in 2005 and 2006 which Mr. Koerber had control of as

income obtained by fraud, the United States will limit its theory of income to those amounts of money spent on Mr. Koerber personally or for his personal purposes.

FBI financial analyst Angela Mennitt will summarize the books and records of Franklin Squires and Founders Capital, showing the flow of funds between and among various entities. She will present charts showing not only the flow of funds but bank balances of various accounts from which money was spent. As a summary witness, she will use the Quickbooks records, bank records, and information provided by Forrest Allen to present a picture to the jury of where the money came from and where the money went. She may also provide expert testimony on whether the receivables Defendant touts as demonstrating that Founders Capital had more than $100 million in assets, were actually collectible.

Real Estate expert Lori Chapman will define real estate terms such as "Equitable title" and "Lease Option" to assist the jury in understanding those terms as they hear and evaluate the evidence.

I.      Legal Issues

A. The Privity Defense

The United States anticipates that much of the defense will be predicated on the idea that Mr. Koerber had no disclosure obligations to many of the people who place money into Founders Capital. During the relevant time period, 2004–2008, Mr. Koerber told many people, both orally and in writing, that Founders Capital was structured so that only "partners" who could directly place investment money into the company. The evidence, however, will show that Mr. Koerber accepted investment money from others who were not partners. Additionally, even if the structure of Founders exempted the company from filing a registration statement, as long as the investment

4

in Founders was a security, it was not exempted from the anti-fraud provisions of the securities laws, including Section 77q(a) of the 1933 Act.  As the Supreme Court stated in *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 692 (1985), "Furthermore, although § 4(2) of the 1933 Act, 15 U.S.C. § 77d(2), exempts transactions not involving any public offering from the Act's registration provisions, there is no comparable exemption from the antifraud provisions. Thus, the structure and language of the Acts refute respondents' position."  *Landreth*, 471 U.S. at 692.  *Landreth* followed on the heels of *United States v. Naftalin*, 441 U.S. 768, 778 (1979) (quoting S. Rep. No. 47, 73d Cong., 1st Sess., 4 (1933).

> The act subjects the sale of old or outstanding securities to the same criminal penalties and injunctive authority for fraud, deception, or misrepresentation as in the case of new issues put out after the approval of the act. In other words, fraud or deception in the sale of securities may be prosecuted regardless of whether the security is old or new, or whether or not it is of the class of securities exempted under sections 11 or 12.

> *Id.*

Thus, while the Defendant may not have had to make affirmative disclosures in a registration statement to the other owners of Founders Capital, that in no way exempted him from refraining from the fraud alleged in the Indictment.

Of course, the fact that Mr. Koerber considered himself not to be in "privity" with so called "downline" investors provides no shield to the wire fraud counts.  Foremost, the focus of the law is on the actions of the defendant:

> The focus of the language defining a scheme to defraud is on the violator, not the victim. The definition provides the fact-finder with a standard for determining from the accused's actions whether the accused possessed the requisite mens rea from his actions. *See Gusow v. United States,* 347 F.2d 755, 756 (10th Cir.1965). In our review of the cases employing this definition, we find that courts use the definition to determine whether an accused's actions were "calculated to deceive." *See, e.g., id.* (using definition and noting "[d]irect proof of willful intent is not necessary");

*White,* 673 F.2d at 302 (focusing on mental state of accused). We do not find any cases using the definition to determine whether the accused targeted the proper victim. We find no precedent supporting Drake's position that a scheme to defraud is a violation only if it would deceive a reasonably prudent person. *But cf. Lindsey v. United States,* 332 F.2d 688, 690 (9th Cir.1964) (sufficient that defendant sought to induce action by misrepresentation and actual reliance by intended victim is immaterial). To accept Drake's argument would require us to hold that a party who fully intends to deceive a victim may avoid criminal liability by designing a scheme sufficiently unusual that the law would deem it unbelievable by a reasonably prudent person. We do not find this position persuasive.

*United States v. Drake*, 932 F.2d 861, 864 (10th Cir. 1991).  Thus, if Mr. Koerber knowingly deceived potential investors, no matter who they were, and the wires as alleged were used in execution of the fraud, he may be convicted of wire fraud, regardless of whether he thought he was in contractual privity with non-partners.  Of course, the United States anticipates proving that Mr. Koerber knew many "non-partners" were putting substantial money into Founders Capital.  In fact, Mr. Koerber personally took money from non-partner investors.  And the United States expects to prove that Mr. Koerber created and ran a "Ponzi" scheme, that deceptive practice alone is sufficient for the jury to convict.

However, the evidence will present additional deceptive practices over and above the Ponzi scheme aspect.  Mr. Koerber, or rather Founders investors, in part, financed Creative Real Estate Lifestyles magazines, which contained Franklin Squires ads, including one on "How to Safely Earn 1-5% on your money."  Various issues of this magazine also touted the success and lavish lifestyle of Mr. Koerber, as well as the success of one of his partners, Gabriel Joseph.  These magazines were made available to potential investors.  Even though there were no out and out specific investment solicitations, the magazines, and the show of success Mr. Koerber promoted, put deceptive practices directly on his doorstep.  As the Tenth Circuit explained in *United States v. Themy*:

6

> However, an advertisement is not to be read like a refrigerator repair manual. A good advertisement delivers its message by suggestion as clearly as by literal statement….a pattern of material and false representations intended and used as a "come-on" to obtain money from the public through the mails, establishes a criminal scheme under 18 U.S.C. § 1341 regardless of whether the defendant hopes that responding members of the public will be satisfied with the product or service offered, and regardless of whether some members of the public are in fact satisfied.

*Themy*, 624 F.2d 963, 967–968 (10th Cir. 1980).

B.  Representations made by Associates and other Investors Are Admissible

Much of the money invested in Founders Capital came from individuals who placed money with a partner of Founders, who then invested the individual's money through the "partner's" pass-through entity. The United States will seek to introduce representations individuals who directly invested made to persons who invested through them. Of course, such representations are not hearsay because they are not offered for the truth of what was said, but to show what the investors were told that caused them to part with money. "An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay." *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993); F.R.E. 801. In fact, many of the representations are false and/or offered to prove the existence of the scheme, and, therefore, cannot be offered for the truth of the matter asserted. *United States v. Krohn*, 573 F.2d 1382, 1386 (10th Cir. 1978); U*nited States v. Feldman*, 825 F.2d 124, 128–29 (7th Cir. 1987).  The question then is one of relevance, are they probative of Mr. Koerber's scheme to defraud?

A leading case setting forth the requirements to establish relevance in such situations is *United States v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977)  *Amrep*, and other cases form the basis for the Tenth Circuit's opinion in *Krohn*, *supra.*, that court's leading opinion on this question. In *Krohn* the court wrote:

> Furthermore, statements and representations by salesmen which are expressly or impliedly authorized or ratified by the person against whom they are offered may be admitted, although the salesmen are not alleged to be parties to the fraudulent scheme. See *Beck v. United States,* 305 F.2d 595, 600-601 (10th Cir. [1962]), cert. denied, 371 U.S. 890, 83 S.Ct. 186, 9 L.Ed.2d 123; *United States v. AMREP Corp.,* supra, 560 F.2d at 545.  And the authorization by the defendant of such statements by a salesman may be found in the circumstances of the particular case, in the scope of the plan or scheme, or from other pertinent facts. *Beck v. United States*, supra, 305 F.2d at 600; *Fabian v. United States*, 358 F.2d 187, 191-92 (8th Cir.), cert. denied, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58.

*Krohn*, 573 F.2d at 1386.  Similarly, in *Reistroffer v. United States*, 258 F.2d 379, (8th Cir. 1958), the court stated:

> Where the scheme to defraud included making sales by means of certain false representations conveyed through salesmen, proof of the same misrepresentations being made at widely different places to different persons by numerous agents in the same period, tends to prove that the scheme existed and that the particular salesman was carrying it on. As in the case of a conspiracy in operation the acts and declarations of each participant are admissible against all.

*Id.*  258 F.2d at 387.  A leading Tenth Circuit case on this issue is *United States v. Taylor*, 832 F.2d 1187, 1193 (10th Cir. 1987), where the court wrote:

> Where intent is shown by acts or representations made by agents of the defendant, rather than the defendant himself, however, "the prosecution must show that the [defendant] 'expressly or impliedly authorized or ratified' the representations." *United States v. Gibson,* 690 F.2d 697, 701 (9th Cir.1982), *cert. denied,* 460 U.S. 1046, 103 S.Ct. 1446, 75 L.Ed.2d 801 (1983) *quoting Krohn,* 573 F.2d at 1386.

The United States anticipates the evidence at trial will show that the Defendant is responsible for the representations of others made to Founders Capital investors, even though these investors may not have dealt directly with Mr. Koerber.  First, Mr. Koerber created The Franklin Squires empire.  Franklin Squires sponsored seminars on obtaining financial freedom, at which the Defendant was usually the primary speaker, and the basis of many of the seminars was real estate investing.  Investors, including partners with Mr. Koerber in FranklinSquires and Founders

8

Capital, will testify that he sold the equity mill as a safe and lucrative investment. Several witnesses will testify that Mr. Koerber knew that money invested in Founders came from other than partners. And significantly, Mr. Koerber determined how the money in Founders was spent, thereby ratifying the representations of others made to investors.   Certainly, by accepting substantial amounts of money over a two plus year period from people whom he knew were getting money from others, Mr. Koerber impliedly ratified the representations of his followers.

   C.   The United States may Prove Misrepresentations not listed in the Indictment.

      An Indictment is sufficient if it contains the elements of the offense, fairly informs the defendant of the charges against which he must defend, and enables him to plead an acquittal or conviction and bar further prosecutions for the same offense. *United States v. Stoner*, 98 F.3d 527, 531 (10th Cir. 1996).  In fraud cases, the scheme "must be described with particularity.... It is necessary that the "nature of the schemes or artifices is identified or described, including the particular pretenses, representations or promises claimed to have been false.'" *United States v. Schuler*, 458 F.3d 1148, 1152 (10th Cir. 2006).  The Defendant Koerber has waived any challenge to the sufficiency of the Indictment.  Fed. R. Crim. P. 12(a)(3).  The Indictment in this case is sufficiently plead.  Therefore, the question before the Court is whether evidentiary detail not specifically alleged in an otherwise valid Indictment may be admitted.

      he United States contends that there is no requirement that all aspects of a fraudulent scheme be specifically pled.  If the Indictment is sufficient, the "further details fall in the category of evidence on which the case would rest, which the Indictment is not obliged to state." *United States v. Radetsky*, 535 F.2d 556, 565 (10th Cir. 1976), *abrogated on other grounds by United States v. Daily*, 921 F.2d 994 (10th Cir. 1990).

9

For example, in *United States v. Roylance*, the defendant claimed that the "trial judge erred in allowing the prosecution to introduce evidence concerning investors who were defrauded in non-interstate transactions." *United States v. Roylance* 690 F.2d 164, 167-68 (10th Cir. 1982). (Presumably these intrastate investors were not "count investors" in the Indictment).  The 10th Circuit affirmed the admission of that evidence because it went to proof of the scheme.  The Court stated "In view of the liberal policy regarding the admission of evidence to prove intent in mail fraud cases, we conclude the trial judge properly exercised his discretion in admitting the challenged evidence."  *Id.*

Assuming that the evidence sought to be introduced is different from that alleged in the Indictment, such an issue is examined under the rules pertaining to variance.  *See, United States v. Stoner*, 98 F.3d 527, 532 (10th Cir. 1996); *United States v. Morris*, 623 F.2d 145, 149 (10th Cir. 1980).  One court that has analyzed a specific objection regarding variance in a fraud case is the Eighth Circuit in *United States v. Begnaud*, 783 F.2d 144, 148–49 (8th Cir. 1986).

In that case, *Begnaud* alleged that there was a fatal variance because the Indictment alleged only two specific misrepresentations and the trial court allowed the jury to consider other misrepresentations made by the defendant.  Since the Indictment was sufficient to inform the defendant of the charges against him, the variance required reversal only if it prejudiced the defendant.  The Eighth Circuit found the defendant's assertion that he was only prepared to defend against the two allegations in the Indictment "simply without merit."  *Id.*

The 10th Circuit in *Stoner, supra,* applied that principle to a conspiracy Indictment.  The defendant's contention that the Indictment did not allege an overt act of the conspiracy within the

statute of limitations and, therefore, the United States was precluded from introducing evidence of overt acts within the statute of limitations.  The court stated:

> In contrast [to those instances where an Indictment does not allege any conduct constituting the conspiracy occurred within the statute of limitations], in instances in which the Indictment does contain allegations that the conduct constituting the conspiracy occurred within the statute of limitations, we will apply the simple variance analysis adopted by several other circuits.  Accordingly, in those instances the [United States] may prove at trial overt acts other than those alleged in the Indictment, and the defendant's conviction should be upheld unless the variance between the overt acts alleged proved affected the defendants substantial rights.

*Stoner, supra,* at 533.  A variance can prejudice the substantial rights of a defendant if it is one that "occurs when the accused could not have anticipated from the Indictment what evidence would be presented at trial."  *United States v. Pinto,* 838 F.2d 426, 433-34 (10th Cir. 1988).  Mr. Koerber has not been so prejudiced in this case.

In looking at the Indictment in *Stoner,* many allegations were made regarding the solicitation of investments in Stem Genetics by Sukumo sales representatives.  Paragraph 3 of the Second Superseding Indictment described Sukumo and said that salespersons used high pressure tactics to sell securities in United States companies.  Paragraphs 13 and 14 of the Indictment alleged that it was part of the scheme and artifice to defraud that the defendants and Sukumo marketed Stem Genetics stock to overseas investors and solicited overseas investors to invest in Stem Genetics.  Paragraphs 19, 20, 21, 22, 23 and 24 all alleged solicitation of specific investors by sales representatives with Sukumo.

Likewise here, the Defendant Koerber clearly could and should have anticipated evidence of the representations made by Isom, Freestone, Magleby, and other first line investors would be admitted in this trial, especially in light of the complete discovery furnished him and their testimony in the initial trial.

11

Tenth Circuit case law supports the idea that Mr. Koerber will not be prejudiced and was in fact on notice that the type of evidence sought to be admitted.  In *Pinto, supra,* Ms. Pinto was charged in a conspiracy to hide income from the sale and distribution of marijuana and to evade payment of taxes on that and other income.  *United States v. Pinto,* 838 F.2d at 434.  Ms. Pinto was not charged with conspiring to sell drugs yet the court stated, "she could anticipate from the Indictment what evidence would be presented at trial, in particular her involvement in the alleged overt act of possessing, selling and distributing marijuana.  *Id*. at 433-34.

In *United States v. Cardall*, 885 F.2d 656, 669-70 (10th Cir. 1989), the United States introduced evidence of a predecessor fraud to the one charged in the Indictment.  Three defendants complained about the introduction of that evidence on appeal.  The court analyzed the variance issue and held that there was no prejudicial variance against the defendants because the language of the Indictment put the defendants on notice that evidence of predecessor fraud would likely be introduced.

In sum, there is no requirement that all aspects of a crime be alleged in an Indictment.   If the evidence that is introduced constitutes a variance of the evidence from the Indictment, the introduction of such evidence is problematic only if that evidence constitutes a variance that prejudices the rights of the defendant.  In this case, because the Indictment sufficiently put the Defendant Koerber on notice of what the United States would attempt to prove, no prejudice will inure to the defendant and such evidence should be admitted.

## II.   EVIDENTIARY ISSUES

### A.   Authentication of Documentary Evidence

As a condition precedent to the admission of evidence, the proponent of that evidence must satisfy the requirements for authentication under Federal Rule of Evidence 901.  The "minimal" requirement of authentication requires that the United States introduce "evidence sufficient to support a finding that the matter in question is what [the United States] claims."  Fed. R. Evid. 901(a); *United States v. Meienberg*, 263 F.3d 1177, 1181 (10th Cir. 2001).  The most common way to authenticate a piece of evidence is through testimony by a witness with sufficient knowledge that the matter is what it is claimed to be.  Fed. R. Evid. 901(b)(1).  Many of the documents the United States will seek to introduce will be authenticated through that method.

### B.  Business Records

Many of the exhibits the United States will introduce are business records of the various businesses run by the Mr. Koerber.  As the Court is aware from other filings, the Internal Revenue Service summonsed records from Franklin Squires and related entities.  Forrest Allen, a witness who will be called by the United States, was the designated agent for production of those records. The records have been in the custody of the Internal Revenue Service.  To the extent that Mr. Allen may not remember the contents of the records, or the form in which they were produced, the United States will supplement his testimony with the testimony of Mark Vespucci, the IT specialist for IRS Criminal Investigation Division, who can testify that the records have been maintained by the IRS.

There is a presumption of regularity that attaches to the official acts of public officers. *United States v. Lee,* 502 F.3d 691 (7th Cir. 2007); *United States v. Thomas*, 294 F.3d 899, 905

(7th Cir. 2002).  Thus, absent affirmative evidence of tampering, it will not be presumed that investigators have tampered with items in official custody.  *United States v. Johnson*, 977 F.2d 1360-1368 (10th Cir. 1992), <u>cert</u>. <u>denied</u>, 506 U.S. 1070 (1993).  The fountainhead of this doctrine is found in *United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926), "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  Because the evidence has been in official custody at all times and there is no evidence of tampering, the presumption of proper handling arises.  *United States v. Thomas*, 294 F.3d 899, 905 (7th Cir. 2002).

To satisfy Rule 803(6), a document must "(1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; (3) be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant;" and "(4) not have involved sources, methods, or circumstances indicating a lack of trustworthiness."  *United States v. Gwathney*, 465 F.3d 1133, 1140 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 2151 (2007).  According to the Court, "'the rationale behind the business records exception is that such documents have a high degree of reliability because businesses have incentives to keep accurate records.'"  *Id.*

*Defendant's Quickbooks Records*

The financial evidence will, of course, include bank records and summaries of bank records.  The evidence will also include information from the Quickbooks accounting system used by Defendant and his companies.  This evidence is found in Exhibits 19-24a and 161-171a.  This consists of accounting records, stored in a software program called Quickbooks, and printouts of reports automatically generated from the data in Quickbooks.  At the prior trial, Defendant's

bookkeeper, Forrest Allen, provided testimony showing that these records were authentic and qualified as business records under Fed. R. Evid. 803(6).  Mr. Allen testified that he would use Quickbooks to record payments, create invoices, and record assets, liabilities, expenses, and other standard procedures.  Trial Tr. 1040-41.  He made clear that it was the regular practice of the companies to keep the Quickbooks records, that he and others in the company regularly relied on these records to be accurate and to make decisions (i.e. these were made in the regular course of business), that accounting transactions were timely input into Quickbooks (usually withing 24 hours), that he took steps to insure that the entries made into Quickbooks were accurate.  *Id.* at 1040-42.  He further testified that when he left his bookkeeping duties, he made a copy of the Quickbooks files, and then ultimately gave those files to law enforcement.  *Id.* 1043-45.  The United States sought to admit Quickbooks files from five companies at the last trial (Founders Capital (Ex. 19 and 19a); Franklin Squires Investment (Ex. 20 and 20a); Founders Capital Investments (Exhibits 22 and 22a); Hill Erickson (Exhibits 23 and 23a); and New Castle (Exhibits 24 and 24a).  The court admitted the Quickbooks, and the reports generated from those files, without objection from Defendant. Trial Tr. 1045, 1048.  The United States will seek to admit those same records at the upcoming trial, and will seek to admit the Quickbooks files for a number of other companies, kept by Mr. Koerber's own bookkeeper in the same way as those already admitted. (Exhibits 161-171a).

Defendant, however, has thus far refused to stipulate to the admission of his Quickbooks records.  He may contend that the Quickbooks have some error, or may be inaccurate in certain respects.  But such issues go the weight of the evidence, not its admissibility.  *United States v. Catabran*, 836 F.2d 453, 457 (9th Cir. 1988) ("Any question as to the accuracy of the printouts,

whether resulting from incorrect data entry or the operation of the computer program, as with inaccuracies in any other type of business records, would have affected only the weight of the printouts, not their admissibility.") *United States v. Meienberg*, 263 F.3d 1177, 1181 (10th Cir. 2001) (same).

### *Defendant's Daily Financial Summaries*

In addition to the Quickbooks records, the United States will also offer daily financial summary spreadsheets, prepared by Mr. Allen at Mr. Koerber's direction.  (Exhibits 157a-157u). Defendant himself laid the foundation for such documents at the prior trial, and he offered them as exhibits (Def. Ex. 419a, 419b, 419c, and 419d).  Defendant testified that they kept a "balances" spreadsheet related to cash, and that this was kept as part of his books and records, that it was updated daily (and sometimes multiple times each day), and that he used it to make decisions based on where the cash accounts were at and to "make day-to-day decisions on how to use resources for the benefit of the company."  Trial Tr.  3690-91; 3728.  Given that these documents were made by Defendant's agent (Forrest Allen) in the scope of his employment; that Defendant authorized his bookkeeper to prepare these documents for Defendant's review; and Defendant  manifested his belief in their truth by reviewing them and relying on them to make business decision, these records are admissible as business records under Fed. R. Evid. 803(6) and as an admission by a party opponent under Fed. R. Evid. 801(d)(2)(A)-(D).

### C.     Admissions of Agents

Pursuant to F.R.E. 801(d)(2)(D), statement of agents, made within the scope of the agency, are admissible against a defendant who was a principal of the declarant.   See, *United States v.*

*Shunk*, 881 F.2d 917, 920 (10th Cir. 1989).  In *United States v. Young*, 736 F.2d 565, 567-68 (10th Cir. 1984 ), *rev'd on other grounds*, 470 U.S. 1 (1985), the court considered the foundation for admitting statements of a corporate employee corporate officer under this rule.  Admission depends on the relationship between the employee and the officer.  *Id*. Because the evidence will show that Mr. Koerber made the business decisions for every relevant entity involved in this case, and governed the decisions for the employees he hired, the United States will be able to establish an appropriate foundation for these admissions.  See also, *United States v. Agne*, 214 F.3d 47, 55 (1st Cir. 2000).

### D.   Adopted Non-Hearsay

As an alternative to admissibility, the United States may also seek to admit prior statements of witnesses as adopted non-hearsay.  The Advisory Committee Notes to Rule 801 point out that "when a witness, on the stand and under oath, acknowledges that a prior statement is his own statement and is truthful, the witness adopts the prior statement as his present testimony and there is no hearsay problem."  *See Amarin Plastics, Inc. v. Maryland Cup Corp.*, 946 F.2d 147, 153 (1st Cir. 1991); *United States v. Borelli*, 336 F.2d 376, 391 (2nd Cir. 1964).  The Tenth Circuit applied the same principle in *Tripp v. United States*, 295 F.2d 418, 424–25 (10th Cir. 1961), although in more limited circumstances.  In both *Tripp* and the case of *United States v. Harmon,* 199 F.2d 34, 36 (4th Cir. 1952), the courts indicated that when a witness is recalcitrant or has given an inconsistent statement on the stand, the doctrine referred to may be applied.  That limitation, however, no longer seems to be the law pursuant to <u>*Amarin*</u> and the Advisory Committee Notes.

E.  Admission of Lay Opinion

The United States intends to ask the investors in Founders Capital whether he or she would have placed money with Founders if he or she had known that his money would be used to pay prior investors, that other investors' money would be used to pay interest payments, or that he would have invested had he known that his money would be used for personal expenditure for Mr. Koerber, or would be used to invest in a movie, a school, for funding for Iceberg restaurants or to purchase expensive automobiles.  The Court of Appeals for the First Circuit held such questions to be appropriate in *United States v. Ranney*, 719 F.2d 1183, 1187–89 (1st Cir. 1983), in the context of an investment fraud.

In that case, investors were asked on direct examination whether each would have made the investment had he or she known that the representations were made to him or her were false. The Court of Appeals held that such evidence tended "to show the existence of a scheme to defraud in the deceptive nature of the defendant's solicitations."  As long as the questions are based upon the firsthand knowledge of the witness, such questions call for permissible lay opinion under Fed. R. Evid. 701.

The Tenth Circuit Court of Appeals has similarly allowed such questioning in *United States v. Freeman*, 514 F.2d 1184, 1191 (10th Cir. 1975).  In that case, a witness was asked whether he would have recommended approval of a loan if the value of the equipment collateralizing the loan was not as high as represented.  The Court of Appeals concluded that as long as the answer to the question was based upon the witness's personal knowledge of the facts, the trial court was within its discretion to allow such a question.  In *Eisenberg v. Gagnon*, 766 F.2d 770, 781 (3rd Cir. 1985),

18

the Court of Appeals for the Third Circuit held that a question posed to a lawyer as to whether certain disclosures were adequate was proper as calling for a lay opinion under Rule 701.

### F.      Evidence of Common Knowledge

Finally, the United States anticipates that several witnesses will testify that it was commonly discussed that the business of Founders Capital was to place money into the "equity mill."   Such evidence is relevant to show why the investors placed money into Founders Capital and knowledge on the part of the Defendant that such was the expected use of the money invested. Several courts have upheld the admission of analogous evidence.  For example, in *United States v. Saccoccia*, 58 F.3d 754, 779–80 (1st Cir. 1995), an agent testified that "that ninety-nine percent of the money that money-launderers deal in Bogota comes from narcotics proceeds."  Dismissing a challenge to the evidence as irrelevant, the First Circuit Court of Appeals stated that although courts are "sometimes cautious about admitting abstract data as proof of what actually happened in an individual case", the force of that evidence satisfied the requirements of Fed. R. Evid. 401.

In *United States v. Ford*, 632 F.2d 1354, 1377-78 (9th Cir. 1980), the trial court admitted evidence of a code of ethics and other information designed to show that the defendants, charged with offenses relating to schemes to enrich themselves at the expense of trusts, had knowledge that what they were doing was illegal.  The court concluded that the district judge did not abuse his discretion in deciding that the evidence was relevant because "the sources of information clearly tended to make the existence of appellant's criminal intent more probable than it would be without such evidence." *United States v. Debright*, 730 F.2d 1255, 1259 (9th Cir. 1984) *overruled* on other grounds.  Similarly, in <u>*United States v. Maistrow,*</u> 451 F.2d 1342, 1343 (2nd Cir. 1971), the United States introduced evidence that of the practice of hiring others to cash winning racetrack tickets

was widespread and well known in order to establish the defendant's knowledge and intent in a charge of aiding and assisting the preparation of a false information return form 1099.  In this case, the United States will present substantial evidence from a number of witnesses about the practices in existence at the company during 2004–2007.

G.  Rule 106 Issues

The United States intends to introduce both recorded statements made by Defendant (video and audio) and prior testimony from Mr. Koerber.  Under Fed. R. 106, Defendant may seek the introduction, at that time, "of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time."  But this rule does not require the admission of irrelevant material.  *United States v. Garrett*, 716 F.2d 257, 272 (5th Cir. 1983) ("This "completeness doctrine," . . . does not require introduction of portions of a statement that are neither relevant to nor explanatory of the admitted passages.").  The portions sought to be admitted must: (1) explain the admitted evidence; (2) place the admitted portion in context; (3) avoid misleading the trier of fact; and (4) ensure a fair and impartial understanding of the evidence.  *United States v. Haddad*, 10 F.3d 1252, 1258-59 (7th Cir. 1993).  The burden is on the party seeking admission to demonstrate the portions of the statement to be rebutted or explained and what unadmitted portions explain or rebut.  *See, e.g., United States v. Littwin*, 338 F.2d 141, 146 (6th Cir. 1964).

Here, the United States has provided notice of the recorded statements and testimony it intends to use.  Defendant, however, has thus far failed to identify and portion of the recording he thinks necessary to properly explain the context.  In anticipation of the upcoming trial, Defendant has not yet identified any Rule 106 Completeness issues.

## CONCLUSION

This brief summarizes the issues that may arise at the trial of this case and the legal authorities that govern those issues.  The United States will provide additional briefing on specific issues as the need may arise.

Dated this day of 23rd day of August, 2018.

JOHN W. HUBER
United States Attorney

*/s/ Tyler L. Murray*
Tyler Murray
Aaron Clark
Ruth Hackford-Peer
Assistant United States Attorneys