Kathryn N. Nester (#13967)
Robert Hunt (#5722)
Daphne Oberg (#11161)
Jessica Stengel (#8915)
Office of the Federal Public Defender
46 W. Broadway, Ste. 110
Salt Lake City, Utah 8106
Telephone: (801) 524-4010
*Attorneys for Claud R. Koerber*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>CLAUD R. KOERBER,<br><br>    *Defendant.* | **Defendant's Motion for Mistrial**<br><br>*Oral Argument Requested*<br>Case No. 2:17-CR-37<br><br>District Judge Frederic Block |

"[F]undamental conceptions of justice which lie at the base of our civil and political institutions" cannot be "deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial...by the presentation of testimony known to be perjured."  *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Goertz v. Chrisman*, 722 Fed. Appx. 842, 847 (10th Cir. 2018) (unpubl.) ("due process bars the prosecution from knowingly using perjured testimony to convict a defendant").

The government elicited and relied upon false testimony in its case-in-chief. The United States called Austin Westmoreland to testify on Friday, 7 September 2018.  The United States affirmatively elicited testimony from Mr. Westmoreland wherein he claimed to have invested directly with Mr. Koerber and Founders Capital.  The bulk of Mr. Westmoreland's testimony was fabricated – and prosecutors knew or should have known of the falsehoods.  In fact, all three prosecutors knew or should have known that Mr. Westmoreland was offering false testimony, and each had a duty to correct it.  However, when the false testimony started to come in, the government continued to elicit more false testimony. Additionally, prosecutors failed to correct Mr. Westmoreland's false statements.

The situation on Friday, September 7, with Mr. Westmoreland testifying falsely, and with prosecutors continuing to elicit false and misleading testimony support this Court declaring a mistrial.

Individually, and taken together as a whole, the false statements elicited by the prosecution constitute "a corruption of the truth-seeking function of the trial process" *United States v. Bagley*, 473 U.S. 667, 678-80 (1985) (internal citation omitted).  Cross-examination alone can only minimize the taint, but it cannot remove the false narrative, false characterizations and false inferences that could still reasonably affect the jury's deliberations.  Before the taint of this misconduct is allowed to further compromise the fairness of these proceedings, a mistrial is in order.

**Mr. Westmoreland's False Testimony**

This motion focuses on the portions of Westmoreland's testimony that the government prosecutors knew or should have known was false and constitutionally impermissible. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("A prosecutor who knowingly presents false evidence violates due process, regardless of whether the evidence is relevant to substantive issues or to witness credibility only."); *United States v. Caballero*, 277 F.3d 1235, 1243–44 (10th Cir. 2002 ("In order to establish a due process violation…[a defendant], must show that (1) [the offered] testimony was in fact false, (2) the prosecution knew it to be false, and (3) the testimony was material.")

**1)  Westmoreland Never Gave Money to Mr. Koerber.**

Mr. Westmoreland testified he 'took out $25,000' against his home, and "gave it to Mr. Koerber."  The Court clarified and asked, "so you gave it to Mr. Koerber?"  Mr. Westmoreland responded, "Yes."  The Court asked, "he" - meaning Mr. Koerber, "offered you 4% interest on the money you gave him?" Westmoreland answered, "Yes."

These statements were not true.  Prosecutors knew they were false because Mr. Westmoreland had given his money to Paul Bouchard and Hunters Capital, Inc. Specifically, prosecutors knew:

> • On June 28, 2017, IRS Special Agent Nielsen, IRS Special Agent Marker, AUSA Walz, AUSA Murray, AUSA Aaron Clark, AUSA Hackford-Peer all met with Paul Bouchard of Hunters Capital, Inc., in preparation for his testimony in this case.  During that interview, Bouchard confirmed to prosecutors that Westmoreland was a Hunters Capital, Inc., investor not a

Founders Capital, LLC investor.  *See* Ex. B, (attached hereto with all other lettered exhibits).

- In 2009, Prosecutors questioned Paul Bouchard during Grand Jury proceedings and learned that Westmoreland had lent his money to Hunters Capital, Inc., and not to Mr. Koerber or his companies directly.

"Q. There is a name here of Austin Westmoreland.  Who was that?"
"A. He was one of the people that lent money to Hunters Capital."

*See* Ex. C.

- Prosecutors were also informed by Bouchard that the payments to Westmoreland came from Hunters Capital, Inc., not Franklin Squires or Founders Capital, LLC via "ACH account set up with the bank where [BOUCHARD] could put the money in, the amounts and send a one-time transaction and it would be wired or ACH to their account." *See* Ex. C.[1]

- Westmoreland had previously provided state investigators an email he received from Hunters Capital, not from Mr. Koerber or his company, dated May 16, 2007, with the subject line "Hunters Capital Update" confirming that "all interest payments" made to Hunters Capital investors had come "from Hunters Capital[.]" *See* Ex. D. *See also* Ex. E, ¶ 25.

## 2) Westmoreland Was Awarded $270,000 in Restitution from Bouchard.

In response to direct examination by the government, and the Court's

subsequent questioning, Westmoreland falsely testified that besides four $1,000

interest payments he received nothing more. Westmoreland's testimony on this

point was not only false, but prosecutors knew it was false as follows:

- Westmoreland had told IRS and FBI agents on May 2, 2018 that in the State of Utah's criminal prosecution of Bouchard, Westmoreland was "awarded $270,000" in restitution from Bouchard, and that Westmoreland

---

[1] This is also significant because the final portion of Westmoreland's testimony was in response to the Court questioning him on where the $1,000 interest checks, or deposits came from, that were deposited into his account. Westmoreland lied to the Court and said he did not know. When the Court asked him if the money came from Santa Clause, Mr. Westmoreland testified falsely again and stated that he thought the money had come from Mr. Koerber's company.  Below, citations are made to multiple prior statements of Westmoreland and other evidence that show the government knew Westmoreland's answer to the Court was false and misleading.

receives a restitution check "every month" and has been receiving restitution payments for the last 133 months (11 years) for his investment with Hunters Capital. *See* Ex. F.

### 3) Westmoreland knew he Sent Wire Transfers to Hunters Capital, Inc.

Westmoreland testified on Friday, September 7, 2018, that when he made his wire transfers he thought it was going to Rick Koerber and his company. However, when Westmoreland testified, the government knew Westmoreland had already told investigators *he knew* he was wiring the money to Hunters Capital Inc.

- Westmoreland had previously told state investigators that he "decided to invest on January 12, 2007 by wire transferring $25,000 to Hunters Capital's bank account from his Washington Mutual account." *See* Ex. E, ¶25.

- Westmoreland also told state investigators that "on May 4, 2007 he wire transferred a total of $130,000 to Hunter's Capital bank account, $20,000 from his Mountain America account, and $110,000 from his Zions Bank account." *See* Ex. E ¶29.

- Westmoreland provided state investigators with a wire receipt showing that his initial $20,000 was sent to "Hunters Capital, Inc." *See* Ex. G.

- Westmoreland, prior to his testimony, had provided investigators with an email between Westmoreland and Bouchard, dated May 4, 2007 at 9:23 AM. In the email to Bouchard and Hunters Capital, Westmoreland states: "I just sent off a total of $130,00 into your 711551010 account." *See* Ex. H.

### 4) None of Westmoreland's Money Went to Mr. Koerber or Founders Capital.

Westmoreland falsely testified that he thought all of his money was invested in and had gone to Rick Koerber and his company. Specifically, during one exchange with the Court, Westmoreland claimed he had taken another $100,000+ out of the mortgage on an investment home he built and "gave that money to Mr. Koerber." However, the government knew Westmoreland was providing false

testimony. Westmoreland also falsely testified that he thought Paul Bouchard had "funneled" all of his money to Rick Koerber and Founders Capital. When defense counsel asked Westmoreland on cross-examination if he had any proof of his investments with Mr. Koerber, Westmoreland testified that he had given that proof to the "State of Utah."  Prosecutors knew Westmoreland was perjuring himself because *Westmoreland had previously told investigators that his money, including specifically this second $100,000+ investment, never made it to Mr. Koerber or Founders Capital*:

> • "Westmoreland said that on October 16, 2007 he called Bouchard and asked Bouchard what he did with his money and where had it gone. Westmoreland said that Bouchard told him that some other investors wanted out [of Hunters Capital] so Westmoreland took over their position and Bouchard [used Westmoreland's money and] paid them off."  *See* Ex. E, ¶30.

### 5) Westmoreland Lied About His Communications with Koerber.

Westmoreland testified thoroughly and extensively that his primary communications about his investments, happened initially with Mr. Koerber. Westmoreland also claimed that <u>the promise of a 4% interest return was made by Mr. Koerber</u> and that Mr. Koerber met with him first, and later introduced him to Bouchard, as his employee or agent. Westmoreland also testified that he "gave the money" – referring to the initial $25,000 to Mr. Koerber. But, this testimony was false, and the government knew it was false because:

> • Westmoreland previously told state investigators that "while he worked at Franklin Squires he would hear people talk and would have conversations with random people" and this was how "he knew that Koerber took money from investors and investors were receiving a good payout." *See* Probable Cause Affidavit of Investigating Agent Jonathan Stewart, Dec. 4, 2007, Utah District Court, Utah County, Case No. 071404196; Ex. E ¶23.

- Westmoreland previously told state investigators that he had "heard people talk about returns around 3-3.5% per month…[and] Westmoreland heard about Paul Bouchard and that he was accepting new investors." Ex. E, ¶23.

- Westmoreland also previously explained to state investigators that it was Bouchard who "told Westmoreland he could pay 4% per month on any money invested." Ex. E, ¶24.

- Westmoreland also previously explained that it was "according to conversations with Bouchard" that "the interest rate on his second investment was also 4% per month." Ex. E, ¶29.

- Westmoreland previously admitted to state investigators that "he decided to invest on January 12, 2007 by wire transferring $25,000 to Hunters Capital's bank account from his Washington Mutual Account[.]" Ex. E, ¶25; however, on September 7, 2018, during trial he testified he gave the money a month earlier during a meeting at Franklin Squires.

- "Westmoreland said that on May 4, 2007 he wire transferred a total of $130,000 to Hunter's Capital's bank account" Ex. E, ¶29.

- "Westmoreland said that on October 16, 2007 he called Bouchard and asked Bouchard what he did with his money and where it had gone" and "Bouchard told him" that Bouchard used Westmoreland's money to pay-off other Hunters Capital, Inc. investors.  Ex. E, ¶30.[2]

### 6) Every Westmoreland Financial Transaction Involved Hunters Capital.

Finally, at the end of his testimony, Westmoreland was shown (by defense counsel) the promissory note issued to him by Hunters Capital, Inc.  Westmoreland was asked on cross-examination, "Did you loan to Hunters" and Westmoreland

---

[2] At another point in trial, Mr. Westmoreland told the Court that he had given an additional $125,000 to Mr. Koerber – and prosecutors knew this was an outright lie.  The government knew Mr. Westmoreland had long ago admitted, and state prosecutors long ago confirmed, that Mr. Westmoreland's money was used by Paul Bouchard and Hunter's Capital, Inc. The Court also asked Mr. Westmoreland how much money he had invested in total; Mr. Westmoreland said, "$270,000" but he had previously only told investigators about approximately $155,000 ($25,000 + $130,000). The $270,000 is how much Westmoreland was awarded as restitution, a fact he omitted on the stand, and that prosecutors failed to correct.

answered, "No, I don't know what Hunters is." The Court stepped in and asked
Westmoreland, "What is Hunters Capital?" The court also asked, "Did you send
money to Hunters Capital?" Westmoreland refused to answer or answered unclearly
so as to avoid the issue and stated he had "never" seen the promissory note.
Nevertheless, prosecutors knew that 1) Westmoreland had a promissory note from
Hunters Capital; 2) that Westmoreland had wired money to Hunters Capital on at
least two occasions, 3) that Westmoreland had received payments/deposits for the
$1,000 interest payments from Hunters Capital on four separate occasions in 2007;
4) that Westmoreland had repeatedly communicated with Hunter Capital; and 5)
that Westmoreland had received official legal notices from attorneys for Hunters
Capital.

### Argument

Each of the above instances is a violation of due process. *See United States v.
Bagley*, 473 U.S. 667, 678 (1985). ("The knowing use of false or perjured testimony
constitutes a denial of due process if there is any reasonable likelihood that the
false testimony could have affected the judgment of the jury.")  The government not
only allowed the testimony to come in, but also repeatedly elicited the false
testimony.  Due process does not tolerant such perversions of justice that a
conviction rests upon testimony the prosecution knows to be false.  A mistrial is in
order.

A mistrial is appropriate when "(1) the prosecution used perjured testimony;
(2) the prosecution should have known or actually knew of the perjury; and (3) there

was a reasonable likelihood that the perjured testimony could have affected the jury's verdict." *United States v. Espinoza*, 684 F.3d 766, 780 (8th Cir. 2012). Perjury alone does not suffice; there is an additional element of intent – the false testimony must have been given with the "willful intent" to offer such lies. *Id.* "If there is any reasonable likelihood that the government knowingly relied on perjury to obtain a guilty verdict, reversal is required if there is <u>any</u> reasonable likelihood that the false testimony could have affected the jury's decision." *Knighton v. Mullin*, 293 F.3d 1165, 1174 (10th Cir.2002); *United States v. Gale*, 314 F.3d 1, 4 (D.C. Cir. 2003) ("the prosecution's knowing use of false testimony entails a veritable hair trigger for setting aside the conviction.")

In *Napue*, the Supreme Court stated "A lie is a lie, no matter what its subject, and, if it is in any way relevant to the case, the district attorney has the responsibility and duty to correct what he knows to be false and elicit the truth." 360 U.S. at 269-70 (internal quotation omitted). "*Napue* applies whenever a prosecution "'knew or should have known that the testimony was false." *Jackson v. Brown*, 513 F.3d 1057, 1075 (9th Cir. 2008). In affirming the California Supreme Court, the Ninth Circuit noted that prosecutors[3] "should have known" of the perjury and "had a constitutional obligation to correct the false testimony." *Id*.

There is reasonable likelihood Westmoreland's testimony will affect the jury's decision and a mistrial is in order.

---

[3] It is of no moment that many of Mr. Westmoreland's statements were made to state investigators. Knowledge from the State of Utah investigation is reasonably imputed to federal prosecutors as the federal proceedings would not and could not have existed but for the state's efforts. *See* IRS Memorandum of Conversation, November 27, 2007 (attached as Exhibit A).

## Conclusion

A mistrial is the appropriate and necessary remedy in light of the false testimony that the government affirmatively elicited and failed to correct.

Dated this 11th day of September 2018.

*/s/Kathryn N. Nester*
Attorney for Claud R. Koerber