JOHN W. HUBER, United States Attorney (#7226)
AARON B. CLARK, Assistant United States Attorney (#15404)
RUTH J. HACKFORD-PEER, Assistant United States Attorney (#15049)
TYLER MURRAY, Assistant United States Attorney (#10308)
Attorneys for the United States of America
111 South Main, Suite 1800
Salt Lake City, Utah  84111
Telephone:  (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No.  2:17-CR-00037 |
| Plaintiff, | : | **UNITED STATES SENTENCING MEMORANDUM** |
| v. | : | |
| CLAUD R. KOERBER, | : | Judge Frederic Block |
| | : | Magistrate Judge Paul M. Warner |
| Defendant. | : | |

The United States respectfully submits this Memorandum regarding the sentence the Court should impose upon Mr. Koerber.

**SUMMARY**

A recurring theme in Defendant Rick Koerber's life is deception.  Over the past 20 years, he not only perpetrated the gigantic fraud for which he was convicted, preying on friends and fellow church members, but he has also engaged in other multiple deceits.  His conduct merits a sentence of 240 months (20 years), as explained below.

As shown at trial, to raise investment money, Defendant Rick Koerber falsely portrayed himself as a successful real estate businessman.  He enticed investors with promises that he would use their money in real estate transactions, that he would pay a five percent monthly return, and

that an investment with him was safe because it would be backed by real estate.  Koerber was able to gain the trust of his investors, in part, because he appeared to be a faithful Mormon, and he used vocabulary and concepts designed to appeal to a Mormon audience.  Koerber's pitch of high but safe returns, combined with Mormon ideology, enabled him to obtain nearly $100 million from investors.

In truth, Koerber ran a massive Ponzi scheme.  He used a huge portion of the investors' money to make payments to other investors.  He spent another large portion of the money on his own vanity projects in an attempt to project an image of success.  He also spent investor money on himself, buying expensive sports cars, living in large houses, and minting his own coins.  When the scheme collapsed, investors lost $45,258,892.09.

The jury convicted Koerber of multiple counts of Securities Fraud, Wire Fraud, and Money Laundering.  Given this loss amount, and the other factors associated with Koerber's crimes, the Federal Sentencing Guidelines, as calculated by the United States Probation Office, suggest a minimum of 235 months and a maximum of 293 months in federal prison.

Given Koerber's history of dishonesty, the need to deter him and others from committing similar crimes, the need to avoid unwarranted sentencing disparity, and the need to address the other 18 U.S.C. § 3553 factors, the Court should sentence Koerber to 20 years (240 months) in federal prison, three years of supervised release, and order restitution in the amount of $45,258,892.09.

## FACTS

**The Koerber Illusion**

*The Rags-to-Riches Story*

In the mid-2000s, Koerber promoted himself as a rags-to-riches real estate genius.

According to his self-created legend, after a failed attempt to run an Internet company in Wyoming, he packed his belongings and came to Utah.[1] He read some books on real estate investing, bought a house with no money down, and then started to teach others about real estate investing.[2] From these beginnings, he touted that he was able to create a real estate empire, based largely on what he termed the "equity mill." He told people that he had gone from nothing to practically a billionaire.[3] He bragged that he was generating hundreds of millions in revenues ($111 million in 2005 and $500 million in 2006),[4] that he was profitable,[5] and that he was able to pay back all the investors who lost money in his failed Wyoming venture.[6] He offered seminars to teach others the supposed secrets of real estate wealth and prosperity he had learned.[7]

As part of these seminars, he advertised that his students could learn how to earn 5% or more a month on their cash.[8] The vehicle for making these returns was largely through investment in an entity Koerber created called Founders Capital.[9] Founders Capital supposedly made money as a "hard money lender for real estate transactions."[10] Multiple witnesses testified at trial that they were enticed by the possibilities of earning these high returns.[11]

---

[1] Govt. Trial Ex. 32, p. FS183176 (attached as Ex.1).

[2] *Id.* at FS183185.

[3] Michael Isom 6/17/09 Interview Report, 5 (FBI-02740) (attached as Exhibit 2); Adam Sessions 7/16/08 Interview Report, 2 (FBI-000995) (attached as Ex. 3); Transcript of Rick Koerber at 9/13/2007 St. George Meeting, 47 (FBI-07000861) (attached as Ex. 4); Kelly Christensen 5/6 & 12/2009 Interview Report, 5 (FBI302-028-0005) (attached as Ex. 5); James Speth 6/16/2009 Interview Report, 4 (IRS-15-00008) (attached as Ex. 6); Koerber purportedly wrote an essay titled "How I became a Billionaire from Scratch in under 5 years." RK-Email-013292 (attached as Exhibit 7).

[4] Govt.Trial Exs. 32 at p. FS183189 (Ex. 1) and 175(c) (audio excerpt of interview, played at trial, where Koerber describes that his companies made $111 million in revenue in 2005 and just over $500 million in 2006.)

[5] Govt Trial  Ex. 42 (video excerpt played at trial in which Koerber says "Oh, I'm profitable.  I make more profit every day than I ever made in a year prior to this year.  That's not an exaggeration, because I never knew how to profit.  I generate more revenue in a month than any year I ever had in my life before now.").

[6] *Id.*; Govt Trial Ex. 32 at FS183189 (attached *infra* as Ex. 1).

[7] Govt. Trial Exs. 1, 26, 35, 36, 89 (attached as Exs 8, 9, 10, 11, and 12).

[8] *Id.*

[9] Some early 2005 investments were made in FranklinSquires and 2007 investments were made in an entity called Founders Capital Investments.  For the purposes of the scheme, all these entities performed the same function as Founders Capital.

[10] Govt. Trial Ex. 61, p. FS096913 (attached as Ex 13).

[11] *See generally* Trial Testimony from Craig Carroll, Matson Magleby, Dale Clarke, Peter Hansen, Garth Allred, Jeff

*The Mormon Connection*

What made Koerber's story about himself and investing in Founders Capital even more enticing was that he promoted it as a way for people to live their faith. Koerber knew his audience well. They were, for the most part, members of the Church of Jesus Christ of Latter-day Saints ("Mormons"). Koerber took concepts and vocabulary familiar to Mormons, combined them with his investment and real estate pitch, and then used them in a calculated way to get people to invest.[12]

For example, Mormons have a strong belief in self-reliance. The Mormon Church's website explains that Mormons "have always believed strongly in taking care of their own needs and the needs of their families. Being temporally self-reliant is part of our culture."[13] Koerber capitalized on this belief and integrated the concept of self-reliance into his story about Founders Capital. As he told investors at a September 2007 St. George Meeting:

> The very first core value of mine is self-reliance. And the whole purpose of Founders Capital wasn't to eliminate self-reliance. It was to be kind of like Miracle Gro, that if you were willing to live by these principles, and you were to network with other people who are committed to live by these principles, exchange creates wealth.[14]

Mormons also have a core set of beliefs called the Thirteen Articles of Faith.[15] These 13 statements, written by Mormon founder Joseph Smith, explain the basic tenets of the Mormon

---

Goodsell, and Michael Isom.

[12] Koerber also used similar concepts and vocabulary to entice and mislead his employees, many of whom were young, inexperienced, or otherwise unsophisticated.

[13] What is Self-Reliance—Really?, available at  https://www.lds.org/topics/pef-self-reliance/live/what-is-self-reliance?lang=eng&old=true (last visited April 23, 2019).

[14] Transcript of Rick Koerber at 9/13/2007 St. George Meeting, 32 (FBI-07-000846) (attached as Ex. 14); *See also* Govt Trial Ex. 29, p. 90 (CREL-01-00410) (attached as Ex. 15)("Rick Koerber is a freedom-loving entrepreneur who values self-reliance, economic independence, and financial freedom."); Govt. Trial Ex. 61, p. FS096902 (attached as Ex. 13) (Koerber wrote "[t]he principle contained in the expression of 'self-reliance' is at the core of the world's grand conflict.").

[15] https://www.mormon.org/beliefs/articles-of-faith (last visited April 23, 2019).

faith.  Koerber often compared himself to Joseph Smith,[16] and likewise created his own 13 statements, which he called the "13 Principles of Prosperity."  These statements explain Koerber's version of the principles involved in creating wealth.[17]

Koerber further capitalized on the Mormon connection by creating a book for his followers called the "Primer," which included essays from former Mormon leaders Brigham Young and Ezra Taft Benson, among others.[18]  Similarly, Koerber boasted about the fact that a former prominent and well-known leader in the Mormon Church, Hartman Rector, Jr., was one of his investors.[19] As described by one former employee, Koerber would "use Hartman Rector routinely in conversation" and that such conversations were "always in conjunction with establishing himself and why people should trust him with their money."[20]

Mormons also at times share what they call "testimony" in a monthly church service.  In such meetings, Mormons express their belief in God, or in the principles of their faith.  There is a familiar message and syncopation to these testimony meetings.  Often, testimony sharers will use phrases like "I know God lives" or "I know this church is true."  Koerber capitalized on this language and used it to bolster his story that what he was doing with Founders Capital was inspired by God.  He told his followers, in front of a pulpit similar to those in Mormon church houses, and in a tone familiar to any who have attended a Mormon testimony meeting, that "I am telling you with all the soberness I can muster, though this is not a church pulpit, I know that what we are doing is being inspired by God."[21]  In short, Koerber infused his seminars and writings with a

---

[16] Patrick Poyfair 2/15/2008 Interview, p. FBI302-100-0007 (Attached as Ex. 16).
[17] Govt. Ex. 32, p. FS183189 (attached as Ex.1).
[18] Primer, Table of Contents (attached as Ex. 17).
[19] Patrick Poyfair 2/15/2008 Interview, p. FBI302-100-0006 (attached as Ex. 16).
[20] Eric S. Peterson, *Free Capitalist Rick Koerber, Friends in High Places:  Indicted businessman Rick Koerber counted a former LDS General Authority as an Investor-and let everyone know it*, SALT LAKE CITY WEEKLY, Sep. 30, 2009, available at https://www.cityweekly.net/utah/free-capitalist-rick-koerber/Content?oid=2140782.
[21] Govt. Trial Ex. 45 (video excerpt played at trial).

religious tone designed to appeal to a Mormon audience.[22]

Koerber's efforts to link an investment in Founders Capital with the Mormon faith worked. One person explained that investing with Franklin Squires [predecessor to Founders Capital] was like a "religious experience for a lot of people."[23]  Many of Koerber's earliest investors, including Clavell Anderson, Peter Hansen, Jeff Goodsell, Gabriel Joseph, and Steve Freestone, were members of Koerber's local Mormon congregation (usually called a "ward").   Koerber's bookkeeper, Forrest Allen was also a member of that congregation.[24]  Likewise, when Koerber moved into a different ward, a member of his new ward, Garth Allred, invested in Koerber through Vonco.[25]

One victim impact statement explained the significance of Koerber's purported religious values on the victim's decision to do business with Koerber:

> Many of these individuals, (Koerber included), were members of the predominant religious organization in the area, noted for a standard of honesty and trustworthiness.   Some held high positions.   Whether intentional or not, this association lent confidence in and validity to Koerber's programs.  Our Dad does not deal deceitfully and doesn't expect it in others.  This experience has taken the wind out of his sails.[26]

Another victim, J.S., explained how Koerber preyed on religious associations and a desire for self-reliance:

> Rick used neighborhood friends, political figures, and religious leaders to gain other peoples' trust.  Rick used these people to validate that he was a [sic.] honest person and a good person.  Rick also emphasized his positions within the church as

---

[22] *See, e.g.,* Govt. Trial Ex. 61 p. FS096902 (attached as Ex. 13) (In the introduction to this strategic plan for 2006, Koerber wrote "If we are united in this effort my friends, "we all things can do" which is a direct quote from a Mormon hymn called "Ye Elders of Israel."   https://www.lds.org/music/library/hymns/ye-elders-of-israel-men?lang=eng&_r=1.  Similarly, he liberally quotes from former Mormon leader Ezra Taft Benson in this document).

[23] Adam Sessions 7/16/2008 Interview, ¶ 18 (FBI-000997) (attached as Ex. 3); *see also* April 30, 2008 Clavell Anderson Interview, p. IRSMOI-00341, ¶¶ 28-29 (attached as Ex. 18).

[24] *See* Forrest Allen Trial Testimony

[25] *See* Garth Allred Trial Testimony

[26] F.B. Victim Impact Statement (attached as Ex. 19).

validation that he was a trustworthy and sincere person. Rick created an elaborate scam based on religious associations and apparently sound business practices, and a desire to help his fellow man be financially independent.[27]

## *"Posturing" for Success*

Ultimately, in response to Koerber's religion-laden pitch for money, investors gave him $98.6 million. Koerber was not shy about spending it. One former Koerber employee said that Koerber spent money like no one they had ever seen.[28] Koerber once told a filmmaker for whom Koerber was financing a creative project that "If it can be solved by money, it's not a problem."[29]

Investors testified that they thought their money was to be used to invest in real estate, but Koerber actually spent a large portion of investor money to engage in what he called "posturing"— i.e. perpetuating the illusion that he was a successful real estate mogul. Kelly Christensen, Koerber's business partner in Iceberg restaurants, said "Posturing is how you present yourself. A specific example would be for people to believe you are successful, you have to look successful."[30] Koerber's bookkeeper, Forrest Allen, when asked about whether he recalled anything about Koerber's conduct that was dishonest or deceptive, explained that Koerber's postured, meaning "you tend to posture to make yourself look perhaps better than you really are or to draw a picture that somebody may not otherwise see" and that Koerber did this through "vehicles, lifestyle, the perception that people might have."[31]

Indeed, Koerber lived in large houses, including a massive "cabin" near Heber City, Utah; he bought exotic cars, including Spykers and Ferraris; he spent thousands on dental work for himself and an employee (who later became his wife); and he minted his own vanity gold and

---

[27] J.S. Victim Impact Statement (USAOUT-02-00066 – USAOUT-02-00067. (attached as Ex. 20)
[28] Patrick Poyfair 2/15/2008 Interview, p. 7 (FBI302-100-0007) (attached as Ex. 16).
[29] RK-Email-047274 (attached as Ex. 21).
[30] 2017 Koerber Trial Tr. 1806 (attached as Ex.22).
[31] 2017 Koerber Trial Tr. 1425-26 (attached as Ex. 23).

silver coins.[32]  He also spent a significant amount to fund a variety of investments, like hamburger restaurants and a trashy horror movie, none of which had anything to with real estate.[33]

Koerber also "postured" the safety of an investment in Founders Capital, claiming that the investments were backed by real estate.  Perhaps Koerber's biggest act of "posturing" was paying returns to Founders Capital investors of 5% per month, or 60% per year.  These payments, which were largely made from new investment money and not returns generated by his businesses, helped sustain the illusion that his program was as wildly successful as he claimed.  As shown at trial, Dale Clarke borrowed against his house and quit his job based on these payments; Matson Magleby maxed out his credit cards to invest based on these payments; others borrowed money from friends and family members to invest based on these payments.  They were attracted by the promise of these high returns, because they believed payment of the returns meant Founders Capital was profitable.  These payments enabled Koerber to create the illusion of success.

**The Koerber Reality**

The reality of Founders Capital was very different from Koerber's illusion.  The reality was that, despite Koerber's claims that he was generating hundreds of millions in revenue and that he was profitable, his businesses were losing millions.[34]  The reality was that rather than spending money to invest in real estate, as he had represented, he spent most of the money for things other than real estate.  He used almost half of the investors' money to make Ponzi payments.[35]  He spent nearly a third of the money to "posture" by buying fancy cars, investing in non-real estate ventures, repaying his Wyoming investors, minting his own coins, and funding a movie.[36]

---

[32] Govt. Trial Ex. 142 (attached as Ex. 24).
[33] *Id.*
[34] *Id.* 142, slides 17-19; Govt Trial Ex. 146, clips 1 and 6 (audio played a trial where Koerber admitted in an FBI interview that his companies, including Founders Capital and Franklin Squires were not profitable on an annualized basis and that "it hasn't been pretty from the beginning.")
[35] Govt. Trial Ex. 142, Slides 12-13.
[36] *Id.* at slides 12-14

He spent only about twenty percent of the investment money on real estate related ventures. This real estate supposedly "backed" the notes Koerber issued in exchange for investments in Founders Capital.  But the reality was that neither Koerber nor his companies had fee title to many of these properties; instead, Koerber typically had only an option to purchase the properties, meaning that he would need come up with additional cash to actually buy these houses.  These houses therefore offered no security for the investors.[37]

In June 2007, when Koerber ran out of money and was unable to make interest payments, he scrambled to prop up his illusion.  Drawing on what he learned from his problems with the Wyoming Department of Securities, he tried to distance himself from his investors (ostensibly trying to limit the number of investors he had), by sending them an email stating that, "for a number of very important reasons" (which Koerber never explained to them) they were to consider their investment to have been made in other entities, and not Founders Capital.[38]

He also tried to cobble together a Private Placement Memorandum, attempting to transform the money he *borrowed* from investors into an *equity* investment.  Koerber tried, but failed, to get CPA Clark Wilkinson to sign off on the balance sheet Koerber created that purported to transform the money Koerber *spent* through his various companies into receivable "*asset*s."[39] [40]  But despite Koerber's efforts to prop up his illusion, his Ponzi scheme inevitably failed.

[37] Govt. Ex. 142, Slides 23-25; *See also* April 30, 2008 Clavell Anderson Interview, p. IRSMOI-00339, ¶ 18 (attached as Ex. 18) (Clavell Anderson, head of New Castle, explained to investigators that New Castle generally only held equitable title to the properties and New Castle could only transfer equitable title to the property in a sale. New Castle needed to exercise their option and convert their equitable title to an all-inclusive trust deed in order to truly sell the property); Trial testimony from real estate expert Lori Chapman, who explained the difference between having an option to purchase real property and holding fee title to real property.

[38] *See, e.g,* Govt. Trial Ex. 93 (attached as Ex. 25).

[39] Govt. Trial Ex. 105 (attached as Ex. 26); Trial Testimony of Clark Wilkinson; Govt. Trial Ex. 142, slides 3-4 and 19 (reflecting that Koerber spent large amounts of investor money through Hill Erickson, New Castle, and Franklin Squires, and recorded those amounts as loans from Founders Capital which were purportedly to be repaid by those entities.  In reality, those companies lost money, had no wherewithal to repay the loans, and largely failed to pay any interest or principal due on those loans).

[40] During his scheme, Koerber kept a tight hold on financial information about his companies—only he and his bookkeeper, Forrest Allen, saw their financial status.  It is obvious why Koerber did not share financial information:

9

**The Effect of Koerber's Crimes**

Koerber's scheme crashed like a wrecking ball through the lives of his investors.  People lost their homes; their savings; their credit; and their ability to meet their obligations.  Some declared bankruptcy; others had to postpone (or come out of) retirement. Others struggled just to put food on the table.  One victim explained that as a result of the financial hardship arising from her losses, that her children "10 and 11 years old, were growing up and needed more food.  They felt very hungry.  Up to this day my sons remember how they figured out if they would drink water and go to sleep, that they wouldn't feel hunger."[41] Similarly, victim F.B., before succumbing to Koerber's scheme, was retired after a successful career with money in savings and a house that was paid for.  After dealing with Koerber, he had no savings, a mortgage on his house, and had to rely on church assistance to pay his bills.[42]  Koerber took money that his victims should have been able to use to support their families or retire and spent it to feed his ego-driven facade of success and prosperity.

Though the financial devastation Koerber caused was terrible; the emotional devastation was even worse.  Koerber preyed on people's faith and desire for self-reliance. He rewarded their trust in him, and his supposed piety, with disillusionment, anxiety, loss of confidence, and loss of hope.  As one family put it, they "see no future."[43]  Koerber's fraud will likely affect these victims for the rest of their lives and impact families for generations.

---

the books showed enormous operating losses, poor cash and equity positions, and excessive debt.  Similarly, the balance sheet Koerber provided as part of his PPM was deceptive, purporting to show millions in assets which were, in truth, simply a reflection of money he had spent, and his hollow promise that one his companies would repay another.  Govt. Trial Ex. 142, slides 26-32.

[41] D.J. and S.J. Victim Statement (attached as Ex. 27).

[42] F.B. Victim Impact Statement (attached as Ex. 19).

[43] C.P. and J.P. Victim Impact Statement, USAOUT-02-00048- 00050 (attached as Ex. 28).

# ARGUMENT

**Legal Standard**

"In sentencing defendants, district courts exercise a guided discretion within a range specified by Congress.  As Justice Cardozo wrote, a "'judge … is to exercise discretion informed by tradition, methodized by analogy, disciplined by system, and subordinated to the primordial necessity of order in the social life.'"  *United States v. Smart*, 518 F.3d 800, 809 (10th Cir. 2008) (citation omitted).

Under USSG § 6A1.3, "[i]n determining the relevant facts, sentencing judges are not restricted to information that would be admissible at trial. Any information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy." *See United States v. Pawelski*, 651 Fed. Appx 750, 780 (10th Cir. June 2, 2016) (unpublished).

**The 18 U.S.C. § 3553 FACTORS SUPPORT A SENTENCE OF 20 YEARS**

As the Court is well aware, in fashioning an appropriate punishment for Koerber, it is required to consider the factors set forth in 18 U.S.C. § 3553(a).  Applied here, those factors support a 20-year custodial sentence.

*1.   Nature and Circumstances of the Offense and History and Characteristics of the Defendant*

The circumstances of Koerber's offense and his history of dishonesty merit a lengthy sentence.  Koerber's offense was not a one-time lapse in judgment, or a crime born of desperation or addiction.  Instead, from 2005-2007 Koerber engaged in repeated, massive deceptions.  This self-appointed prophet of prosperity aggressively promoted himself and his scheme through magazines, seminars, billboards, and his radio program.  He set himself up as the leader of a movement.  He used concepts and language that members of the Mormon faith hold dear and

twisted them to obtain investment money.   He lived a lifestyle—financed by other people's money—that gave the impression of success.   In his magazines and standing behind his pulpit, he told potential investors he was profitable; that he was generating hundreds of millions in revenue; that the "Lord saw them coming;" and that what he was doing with Founders Capital was "inspired by God."[44]   In truth, he was running one of the biggest Ponzi schemes in Utah history, funding his extravagant lifestyle with investor money, and otherwise using the money for purposes not disclosed to his investors.

*Koerber's Prior False Statements to Wyoming Investors*

Indeed, dishonest behavior is a hallmark of Koerber's history and character. For example, starting around February 2000, Koerber dishonestly raised investor money in Wyoming for a company called National Business Solutions, LLC ("NBS"). The Wyoming Securities Division found, among other things, that he failed to inform many investors how he would spend their money (i.e. he failed to inform them that he would use their money to pay sales commissions and to pay past or current operating expenses), that his financial statements were not prepared in accordance with Generally Accepted Accounting Principles, and that the financial information he gave to investors "either contained untrue statements of material fact or omitted to state a material fact," in violation of Wyoming securities laws. [45]

*Koerber's Testimony in a Divorce Proceeding Was Not Credible*

In 2015, Koerber again showed his penchant for dishonesty when he attempted to convince a divorce court that his wife had made a required payment, when in truth, she had made no such payment.   Specifically, Koerber's wife was required to pay certain medical expenses required by

---

[44] Govt Trial Exs. 32 (attached as Ex. 1) and 45 (video played at trial where Koerber asserts that what he was doing was inspired by God.).
[45] Def. Trial Ex. 516, pp. 91-95 (attached as Ex. 29).

the Court as part of a prior divorce, and Koerber testified that he arranged for payment through a credit union.   In support of his testimony, Mr. Koerber also offered extrinsic evidence of payment—screenshots from Mountain America Credit Union—that appeared to show a financial transaction reflecting the payment at issue.   Mr. Koerber did not submit a cancelled check nor did he provide any confirmation by the credit union that payment was actually sent.   Mr. Koerber's testimony was contradicted by the testimony of an assistant comptroller from the opposing counsel's law firm, which conclusively showed that the supposed payment had never been made. The Court then found "Mr. Koerber's testimony regarding payment was not credible" and held Mr. Koerber's wife in contempt of court for willfully failing to make the payment she owed.[46]

### Koerber's Involvement in an Attempt to Deceive the Federal District Court in Oregon

In 2016, Koerber again was involved in an attempt to deceive a court.   This time, it involved his work as a paralegal on a criminal trial in Oregon.   The lawyer for whom he was working apparently wanted Koerber at counsel table during the trial, but also wanted to call Koerber as a fact witness.   The court had invoked the exclusionary rule, so Koerber was listed on the witness list as "Claud R. Koerber," but he attended the trial proceedings using the name Rick Koerber. Despite attending the entire trial (in violation of the exclusionary rule) Koerber was then proffered as a fact witness.   The court ruled that Koerber could not testify, and this deception was part of an Order to Show Cause proceeding against the lawyer for whom Koerber was working.[47]

---

[46] Fish v. Fish, Civil No. 034903679, Contempt Trial Order and Findings of Fact & Conclusions of Law, (Feb. 24, 2015) at pp. 10-11 (attached as Ex. 30).
[47] *United States v. Bundy*, 3:16-cr-00051, ECF No. 2069 at p. 2 (Attached as Ex. 31).  Ultimately, this lawyer agreed that his pro hac vice admission be withdrawn and that he would never again apply for pro hac vice admission in the District of Oregon.   *In re Marcus Mumford*, Case No. 3:17-mc-00348, ECF No. 35.

*Koerber's Other Acts of Deception*

In other circumstances, Koerber has similarly used different variations of his name in an attempt to deceive others about his past and distance himself from his Ponzi scheme.  For example, he currently performs work as a paralegal using the name "Rick Franklin."[48]  He likewise used the name "Rick Franklin" on his Mormon social media account.[49]  And when he created LLCs called Corvus Administration and Management, LLC, American Land Run, LLC, and AK Industrial Machine, LLC, he used a false name, Derrick O Roebuck (which appears to be a reorganization of the letters from his name), rather than his real name, apparently in an attempt hide his involvement in these entities from government entities, creditors, or others with whom he deals.[50]

Koerber's personal life is also riddled with instances of dishonesty.  In 2011, he was involved in a dispute with a landlord.  In trying to avoid eviction, Koerber lied about sending an email to the landlord, backdated utility checks in an attempt to show he had timely paid for utilities, and submitted a false invoice to the landlord for contractor work on the home—even though the contractor was non-existent and the work had never been performed.[51]  In a dispute with another landlord, Koerber failed to timely pay his rent, and when he was asked to leave, he caused an estimated $21,000 in damage to the home, leaving dog urine and feces in the basement and holes in the walls.  He failed to return shower heads, keys, and the garage door openers.[52]

Through all of this, Koerber refuses to take responsibility for his actions.  For example, despite setting up a network of feeder funds to take in investor money, and then spending this money, Koerber consistently distanced himself from his investors when they wanted to know what

---

[48] SkousenLaw PLLC Website Screenshot (Attached as Ex. 32).
[49] This account is no longer active.
[50] 3/4/2019 Investigative Report regarding Koerber LLC's (attached as Ex. 33)
[51] Sean Egan Interview Report (attached as Ex. 34).
[52] Tahna Elwood Interview Report (attached as Ex. 35).

happened to their money.  Koerber wrote to one victim, who invested through Paul Bouchard and Hunters Capital, stating "I have nothing whatsoever to do with the money you loaned to Paul.  I do not know what he did with that money and have no power or decision making authority over Hunters."[53]  Koerber said this despite the fact that he provided office space to Paul Bouchard, provided forms for Bouchard to use in raising money, and told another employee, that even though Bouchard "was acting like an idiot by getting people to refinance their homes and give it to Hunters Capital (Bouchard's LLC) to give to Founders Capital," Koerber's Founders Capital "sure needed that money" and "it was good when Bouchard brought it in."[54] [55]

Other victims, K.S and S.S., likewise described how Koerber attempted to distance himself from them:  "I have contacted Rick but he said he didn't have a contract with me.  I disagreed because the paper trail leads directly to Founders Capital which he owns."[56] Another victim, J.S., described how Koerber used a web of associates and LLC's in an attempt to shield himself from those who gave him money: "When Rick's lies finally caught up to him, he used his associates as a buffer between him and the people whose money he could not return . . . Rick believed he had no moral or legal obligation to the people his associates borrowed money from even though the money was passed on to him.  Rick was only concerned about Rick.  Rick has used legal posturing and layers of business LLC's to shield himself.  In my opinion, Rick deliberately set up this structure knowing this business was fraudulent.  His previous securities violations lend support to this theory."[57]

---

[53] Koerber Email Correspondence with Trevor Howard, RK-Email-047329-047332 (attached as Ex. 36).
[54] April 9, 2009 IRS MOI of Clavell Anderson, IRSMOI-00217-IRSMOI-00222, ¶ 9 (attached as Ex. 37)
[55] 2017 Trial Tr. 1959-1963 (attached as Ex.38)
[56] K.S and S.S Victim Impact Statement, at p. FBI302-111-007 (attached as Ex. 39).
[57] J.S. Victim Impact Statement at p. USAOUT-02-00066 (attached as Ex. 20 )

In December 2007, after Koerber stopped making interest payments, Koerber again expressed his intent to avoid responsibility when he told investor Garth Allred that "if I go down this time, I'm going to survive and everyone else is going to lose their money."[58]  Such a statement reflects a high level of selfishness and deceit.  The nature of Koerber's crimes, and his deceptive character, merit a sentence of 20 years.

2. **The need for the sentence imposed to: (a) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, (b) afford adequate deterrence to criminal conduct; (c) protect the public from further crimes of the defendant;  (d)  provide the defendant with needed educational or vocation training, medical care, or other correctional treatment in the most effective manner**

**Deterrence for Koerber**

As set forth above, Koerber's crimes were extensive and pervasive.  He took money from his investors and spent it to aggrandize himself, leaving the investors' finances in tatters.  Koerber deserves a harsh punishment to deter him from committing future crimes.  He has been involved in raising money for a business twice, and both times he has failed to be honest with his investors.  He has been dishonest with courts, both in his work as a paralegal and in his personal family and landlord/tenant legal matters.  His past actions and character demonstrate that, given the chance, he will continue to use lies and deceit in an effort to avoid responsibility.  A 20-year sentence is necessary to deter Koerber from future crimes of deceit and to protect the public from him.

**General Deterrence**

Moreover, there is a particular need here in Utah to deter others from committing similar crimes.  The Eleventh Circuit identified economic crime as a prime candidate for deterrence because it is "'more rational, cool, and calculated than sudden crimes of passion or opportunity.'" *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ((quoting Stephanos Bibas, White-

---

[58] Garth Allred Interview, p. FBI 302-004-0007 (attached as Ex. 40).

Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)). Specifically, the cost-benefit analysis engaged in by white collar defendants is susceptible to influence through "serious punishment." *Id.*

Utah has earned a reputation as a hotbed for fraud and white collar crime.[59]  The Wall Street Journal named Salt Lake City as the "Fraud Capital of America."[60]  Utah has suffered "a tsunami of Ponzi operations, pyramid schemes, mortgage and bank fraud and other financial crimes that helped propel Utah to infamous heights nationally."[61]  News reports show that the loss figures in Utah fraud cases exceed many cases out of large metropolitan areas.[62] Fraudsters often find success in Utah because "they appear to be good and honest people with an outgoing, attractive personality."[63]

Some investigators estimate that white collar scams have cost thousands of Utah victims billions of dollars in recent years.[64]  The FBI recently ranked Utah as one of the top five states for white-collar fraud in America.[65]  Utah is the only state with a dedicated regional Securities and Exchange Commission office that services no other location.  In fact, Utah's fraud epidemic has reached such significant proportions that state lawmakers recently approved the nation's first-ever

---

[59] THE ECONOMIST, Affinity Fraud, Fleecing the flock: The big business of swindling people who trust you, January 28, 2012 ("The state thought to have the most affinity fraud per head is Utah. . . ."); Byline: In Our Opinion for the Deseret News, *Fraud Registry*, DESERET MORNING NEWS, May 19, 2015 ("The new fraud registry is unique in the country, but so is the prominence of such crime in our community."); Janice Peterson, *Investment fraud rampant in Utah County*, DAILY HERALD, Feb. 28, 2010.

[60] Robert Brazell, *Shyster Extraordinaire*, DEEP CAPTURE, Dec. 29, 2015.

[61] Tom Harvey, *FBI agent has seen Utah through flood of fraud*, THE SALT LAKE TRIBUNE, June 24, 2012.

[62] *Id.* (quoting FBI S.A. James Malpede) ("The amount of fraud is so great that the FBI in Utah largely concentrates only on cases involving investments of $10 million or more.")

[63] *Id.*

[64] Eric S. Peterson, *Uncle Scam*, SALT LAKE CITY WEEKLY, Dec. 9, 2010 ("In June, state and federal investigators announced that Utahns may have lost as much as $1.4 billion in fraud in 2009. 'Utah is supposedly the fraud capital, and that's our urban folklore,' [Salt Lake County Sheriff Jim] Winder says. 'But whatever we've been doing here, it hasn't been hugely effective.'")

[65] *See* Ben Winslow, *Feds, Utah Leaders Launch Campaign to Educate People about Fraud Problem*, FOX13 NEWS, *available at* http://fox13now.com/2017 /04/05/feds-utah-leaders-launch-campaign-to-educate-people-aboutfraud-problem.

white collar crime offender registry, which includes photos, names and aliases of Utah's fraudsters.[66]

Koerber's crimes are emblematic of the fraud that occurs here in Utah. Koerber leveraged his affiliation with the Mormon faith to fraudulently extract nearly $100 million from investors to run one of the largest Ponzi schemes in Utah history. Likeminded potential fraudsters must be deterred through an expectation of just punishment should they follow Koerber's footsteps. A sentence of 20 years for Mr. Koerber will be critical in this effort.

### 3. The Kinds of Sentences available; the Sentencing Guidelines themselves; and the need to avoid creating unwarranted sentencing disparity

The jury convicted Koerber of four counts of Securities Fraud, which provides that a guilty defendant can be fined up to $10,000 or imprisoned not more than five years, or both. 15 U.S.C. § 77x. The jury also convicted Koerber of nine counts of Wire Fraud, which provides that a guilty defendant can be fined up to $250,000 or imprisoned up to 20 years, or both. 18 U.S.C. § 1343; 18 U.S.C. § 3571. Finally, the jury convicted Koerber of two counts of Money Laundering, which provides that a guilty defendant can be fined up to $250,000 or imprisoned up to 10 years, or both. 18 U.S.C. § 1957(b)(1).

Given these multiple convictions, the loss and suffered by Koerber's victims, and the other sentencing enhancements applicable to Koerber's conduct, the Sentencing Guidelines put Koerber at an Offense Level of 38, and a recommendation of 235 to 293 months of imprisonment.

The unwarranted disparity factor requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Koerber's conduct ensures he is in the upper

---

[66] Wendy Leonard, *White Collar Crime Registry First in Nation*, DESERET MORNING NEWS, March 14, 2015.

echelon of fraudsters—both in this District and elsewhere.  He swindled nearly $100 million of investment money, causing investment losses of $45.7 million.  By way of comparison, after a jury trial, another Court in the District of Utah sentenced a defendant who ran a Ponzi scheme and caused an investment loss of $15.2 million to 225 months imprisonment, and the Tenth Circuit affirmed this sentence.  *United States v. Holloway*, No. 2:11-cr-984-RJS (D. Utah), ECF No. 248 (judgment sentencing defendant to 225 months imprisonment); ECF No. 282 (mandate from Tenth Circuit affirming judgment). Other fraudsters from around the country have received similar sentences after a trial   For example, in a remarkably similar case, the Ninth Circuit upheld a 300-month sentence for Randall Treadwell for his role in a Ponzi Scheme where victims similarly lost about $44 million. *United States v. Treadwell*, 593 F.3d 990, 993 (9th Cir. 2010). Like Koerber, Treadwell had no criminal record, came from humble beginnings, had school-aged children, and had parents suffering from health problems. *Id.* at 1010.  Similar sentences have been handed out for cases that involved far lower loss amounts.  In an unpublished per curium opinion, the Fifth Circuit upheld a 200 month sentence on a health care fraud case, where loss amounts were approximately $34 million. *United States v. Ezukanma*, 2018 WL 6264232, at *1 (5th Cir. 2018) (unpublished). The Eleventh Circuit similarly upheld a 200-month sentence where loss amounts were only $3.5 million. *United States v. Mathauda*, 680 Fed. Appx. 805 (11th Cir. Feb. 21, 2017) (unpublished).  The Eleventh Circuit also upheld a 240-month sentence for two individuals who conspired to defraud the Internal Revenue Service, committed wire fraud, and aggravated identity theft where the loss amount was $2.9 million.  *United States v. Wilmore*, 625 Fed. Appx 366 (11th Cir. Aug. 18, 2015) (unpublished).  Finally, the Seventh Circuit upheld a 211-month sentence in a mail fraud and money laundering case where losses were over $20 million.  *United States v. Payne*, 62 Fed. Appx. 648 (7th Cir. March 19, 2003) (unpublished).

19

Moreover, Gabriel Joseph, one of Koerber's close associates and a front line investor in Founders Capital, received a 78 month sentence after a jury convicted him of wire fraud, bank fraud, money laundering, and failure to file a tax return in connection with a mortgage fraud scheme. *United States v. Gabriel Seth Joseph*, 2:15-cr-103, ECF No. 173 (Judgment imposing sentence of 78 months). Mr. Joseph used the proceeds of his mortgage fraud to invest in Founders Capital. Given that Mr. Joseph was one of Koerber's students, Koerber should receive a harsher sentence than Mr. Joseph.

Accordingly, a sentence of 20 years (240 months) is in line with the kinds of sentences available for Koerber's conduct, the sentencing guidelines, and the sentences of similarly situated defendants.

### 4. *The Need to Provide Restitution to Victims*

The Court should order Koerber to pay restitution of $45,258,892.09 to the list of victims provided to probation. Both restitution and a significant period of incarceration are important components of justice in this case.

### CONCLUSION

Rick Koerber ran an enormous Ponzi scheme and lied to his investors about how he would spend their money. His actions resulted in a loss of $45,258,892.09. The jury convicted him of securities fraud, wire fraud, and money laundering. Given these facts, the Court should impose a sentence consisting of 20 years (240 months) in prison, three years of supervised release, and an order restitution in the amount of $45,258,892.09. Such a sentence would be at the low end of Mr. Koerber's suggested guideline range, and should be sufficient, but not greater than necessary, to satisfy the 18 U.S.C. § 3553 factors.

DATED this 24th day of April, 2019.

JOHN W. HUBER
United States Attorney


/s/ *Tyler Murray*_____
TYLER MURRAY
AARON CLARK
RUTH HACKFORD-PEER