# **Exhibit 18**

# Internal Revenue Service
# Criminal Investigation

## Memorandum of Interview



---

**In Re:** CLAUD RODERICK KOERBER  **Location:** United States Attorney's Office
185 S. State St.
Salt Lake City, UT 84111

**Investigation #:** 880620094
**Date:** April 30, 2009
**Time:** Approximately 10:15 AM – 12:45 PM
**Participant(s):** Jamie Zenger, Federal Public Defender's Office
Clavell Anderson, Subject
Trey Mayfield, Assistant United States Attorney
Stew Walz, Assistant United States Attorney
Ron Marker, IRS Special Agent
Cameron Saxey, FBI Special Agent

On the above date and time, Assistant United States Attorney (AUSA) Stew Walz (Walz); AUSA Trey Mayfield (Mayfield); IRS Special Agent (SA) Ron Marker (Marker) and FBI SA Cameron Saxey (Saxey) met with Clavell Anderson (Anderson) and his attorney, Jamie Zenger. AUSA Walz told Anderson and Zenger that they were still operating under the proffer previously provided, that the same rules still apply, and that they are free to leave at any time. Anderson provided the following information:

1. At one point, FRANKLIN SQUIRES controlled the entire building located at 85 East Bay in Provo, Utah which encompassed approximately 42,000 square feet. Kimber Academy occupied approximately 10,000 square feet. CLAUD RODERICK KOERBER (KOERBER) allowed VIP MEDIA and Peter Hansen (Hansen) to occupy a portion of the building rent free. Approximately $187,000 was spent installing a sound studio in the building. Approximately $500,000 was spent renovating the entire building.

2. Anderson did not know who owned FRANKLIN SQUIRES INVESTMENTS, LLC (FSI) but believes that it was KOERBER and his wife, Michelle. FRANKLIN SQUIRES COMPANIES, LLC (FSC) was owned by FSI (51%) and seven other partners. FSC had approximately 32 entities under it.

3. Anderson attended weekly Board of Director (BOD) meetings at FRANKLIN SQUIRES. One of the original seven owners named Mike Ballard (Ballard) left the organization early on in 2005. Anderson believed that Ballard may have moved to Montana. Anderson is only aware of four or five BOD meetings attended by Ballard.

4. FRANKLIN SQUIRES originally had a three fold purpose:

    a. Education. This consisted of the FRANKLIN SQUIRES INSTITUTE which eventually became AMERICAN FOUNDERS UNIVERSITY.

    b. Membership. This ultimately became the FREE CAPITALIST PROJECT.

    c. Real Estate. This consisted of several entities, including HILL ERICKSON, LLC (HILL ERICKSON); NEW CASTLE HOLDINGS, LLC (NEW CASTLE); and LUCENT REAL ESTATE, LLC (LUCENT). Anderson believes that FSI owned 51% of LUCENT.

5. KOERBER purchased several companies over the years. Anderson is not aware of KOERBER ever consulting anyone at FRANKLIN SQUIRES before purchasing any other companies. KOERBER would simply say that he acquired another company at meetings. Anderson believes that purchasing additional companies was posturing and an attempt to make FRANKLIN SQUIRES look like it was profitable when it was not. Anderson believes that KOERBER was the only one who ever had complete access to all of the books to all of the companies.

6. Several other business ventures developed over the years such as a partnership with Richard Dutcher and Main Street Movie Group, the Beit-Lehi project in Israel, and Iceberg Restaurants. Kelly Christensen told Anderson that FRANKLIN SQUIRES owned 51% of Iceberg. There were also several other entities that were planned but never came to fruition, such as Federal REO Liquidators and Greystone. A new Limited Liability Company (LLC) was established for each new business venture and it seemed as though everyone at FRANKLIN SQUIRES had a title like Vice President.

7. KOERBER initially raised money through meetings at ENGENUITY. KOERBER and Steve Freestone (Freestone) held a meeting with ENGENUITY clients that generated several hundred thousand dollars. Anderson believes that KOERBER attended at least a couple of similar meetings at ENGENUITY.

8. The money that FRANKLIN SQUIRES received from lenders originally went to FSI. FOUNDERS CAPITAL was created to take in the money from lenders. FOUNDERS CAPITAL was originally owned by FSI and THE MCGUIRE GROUP.

9. KOERBER told Anderson that KOERBER had spoken with an attorney who had told KOERBER that a promissory note was not a security. As such, all of the money brought in through FOUNDERS CAPITAL was done so via a promissory notes so that FOUNDERS CAPITAL didn't have to comply with securities laws. Anderson later discovered that this was not true during the investigation conducted by the Utah Department of Securities (UDOS) in 2006. Anderson did not remember the name of the attorney.

10. KOERBER knew that a lot of people had invested in FOUNDERS CAPITAL through other people because that was the holding company model. KOERBER routinely asked the question: who has more money, you or other people? The whole idea behind creating a holding company was to become your own private bank.

11. FOUNDERS CAPITAL had a lot of unaccredited investors. Anderson believes that KOERBER knew that he had to deal with the unaccredited investor problem. There was a rumor going around that the easiest way to deal with the unaccredited investor problem was to create a company and make the unaccredited investors partners in the new company. KOERBER created RICK KOERBER, LLC and moved unaccredited investors from FOUNDERS CAPITAL to RICK KOERBER, LLC. This way, KOERBER could honestly answer UDOS questions about FOUNDERS CAPITAL. Several other companies were created in an attempt to bring the unaccredited investor problem up to legal standards. The BOD had disbanded by this point and there was little conversation about what was going on. KOERBER didn't discuss the details of what he was doing with anyone and only spoke in generalities.

12. Anderson believes that the FRANKLIN SQUIRES model would have worked if it had been done correctly. However, most of the money that was invested in FOUNDERS CAPITAL was never used to purchase properties. Instead, much of the money was used to cover FRANKLIN SQUIRES operating expenses, including: mortgages and utilities on more than 200 properties (Anderson believes that house payments alone ran between $200,000 and $300,000 per month); wages for more than 300 employees; and interest payments to people who loaned money to FOUNDERS CAPITAL. FOUNDERS CAPITAL only funded a handful of loans. The majority of money invested in FOUNDERS CAPITAL was used to keep FRANKLIN SQUIRES going.

13. HILL ERICKSON received loans from other hard money lenders such as Harbor Capital to purchase properties. Anderson believes that outside hard money lenders were used to purchase properties because FOUNDERS CAPITAL already had too many obligations and too much money loaned out.

14. Anderson believes that several people knew that FOUNDERS CAPITAL was not really using investor money to make hard money loans by July 2007, including: KOERBER; Forrest Allen (Allen) because he saw the books; and probably Dayton because she was in charge of setting up loans from other hard money lenders. Anderson didn't know if Dayton's assistant at the time, Deanna Mason (Mason), knew.

15. Anderson believes that some of FRANKLIN SQUIRES' Acquisition Representatives (AR) may have also been Preferred Buyers (PB), but generally speaking, AR's usually had no money and bad credit, whereas PB's did have money and good credit. Jason Vaughn (Vaughn) generally taught the AR course, unless it was being taught at an event, in which case it was taught by KOERBER.

16. Most Acquisition Representatives (AR) were students of the FRANKLIN SQUIRES INSTITUTE or AMERICAN FOUNDERS UNIVERSITY. The AR course cost approximately $1,900. The AR course consisted of teaching students how to acquire real estate with no money down, how a lease option worked, how to get a property under contract, and how to fill out a Real Estate Opportunity Evaluation (REOE) and Seller Qualification Form (SQF). The REOE was used to assess a property. The SQF was used to determine a person's motivation for selling a property. The AR was tasked with finding properties with at least 20% equity. Once the AR found a suitable property, the AR would take the following steps: (1) secure an appraisal; (2) schedule a home inspection; (3) draft a letter of intent; and (4) get the property under contract using a Real Estate Purchase Contract (REPC). The property would then be submitted to HILL ERICKSON for approval. HILL ERICKSON would review the documents and conduct a desk review of the appraisal. If the property met prescribed HILL ERICKSON requirements, the AR would assign the contract to HILL ERICKSON. HILL ERICKSON would then purchase the property with funds received from FOUNDERS CAPITAL or an outside hard money lender and pay the AR a fee based on the REOE. Once HILL ERICKSON had purchased the property, the property would then be sold to a Preferred Buyer (PB). A PB was an individual who had been introduced to the FRANKLIN SQUIRES model, either through a seminar or forum, with good credit and sufficient income to purchase a property on their own. The PB would purchase the property from HILL ERICKSON with a 100% appraised value loan which the PB secured on their own from an outside lender. The PB would then sell the property to NEW CASTLE for more than 100% appraised value, usually via a lease option. NEW CASTLE would also pay the PB a lease option consideration fee to cover the PB's down payment and closing costs. NEW CASTLE would then pay the PB enough to cover their mortgage payment every month, along with $50 extra. NEW CASTLE was then supposed to find an end buyer for the property, preferably using lease option or seller finance. However, that part of the model never functioned correctly, and NEW CASTLE only ended up selling three or four of the properties.

17. NEW CASTLE ultimately only sold three or four properties to end buyers, and KOERBER chewed Anderson out for every one. KOERBER was upset with the fact that NEW CASTLE had to come to the table with some money to complete the sale, despite the fact that NEW CASTLE ultimately made money on each transaction. KOERBER said that they should never have to pay to sell a house.

18. Anderson felt there were several possible reasons for not selling the properties: (1) KOERBER didn't want to sell the properties; (2) no one wanted to buy the properties because they were upside down and had more liabilities attached to them than they were worth; (3) KOERBER said that UDOS told him that he couldn't sell the properties; (4) NEW CASTLE generally only held equitable title to the properties and NEW CASTLE could only transfer equitable title to the property in a sale. NEW CASTLE needed to exercise their option and convert their equitable title to an all-inclusive trust deed in order to truly sell the property; and (5) at a seminar, someone said something about the assets in FOUNDERS CAPITAL being secured by real estate. If the properties were sold, they may not generate enough proceeds to pay back FOUNDERS CAPITAL. However, if the properties weren't sold, the properties could remain on the books as having enough assets to cover FOUNDERS CAPITAL. For example, FRANKLIN SQUIRES purchased a custom cabin in Heber City, Utah for approximately $2 million. However, the property was appraised for approximately $19 million, despite the fact that no one was going to pay $19 million for it.

19. No one was ever put in charge of selling the properties until at least the summer of 2006 when Bill Young (Young) was brought in to try and sell them through LUCENT. Young's hands were tied from the start because no one ever developed a workable formula for determining property values. Anderson doesn't think Young ever sold any properties. Vaughn and Robert Switzenberg (Switzenberg) were also approached by KOERBER to put together a viable 21 day sale process. Anderson, Vaughn and Switzenberg submitted a proposal to KOERBER, but a year passed with no word back from KOERBER. Ross Moore (Moore) was also brought in to try and convert all the lease options to seller finances or all inclusive trust deeds. KOERBER never seemed that interested in selling the properties. KOERBER taught that FRANKLIN SQUIRES could still make money without finding an end buyer because the organization was still making money through investing HILL ERICKSON'S profit in FOUNDERS CAPITAL.

20. Anderson didn't believe that it was in NEW CASTLE'S best interest to purchase properties from HILL ERICKSON because NEW CASTLE was just loosing more and more money with every transaction, but he had no say in the matter. Anderson spoke to KOERBER dozens of times about how much money NEW CASTLE was losing, but KOERBER would simply tell Anderson that he knew it was a problem and he was working on it. Anderson tried to say no to the purchase of several properties, but everyone just laughed and KOERBER went ahead with the deal anyway.

21. KOERBER said that he needed to set-up the companies within FRANKLIN SQUIRES as independent entities or he'd be breaking the law. However, none of the entities were really independent because KOERBER ran them all. If NEW CASTLE was really a separate entity, how would it know what to offer a PB for a property? How would NEW CASTLE know what the PB paid for the property or how much the PB needed out of the sale? No PB ever negotiated the sale of a property with NEW CASTLE. All of the negotiation took place between FRANKLIN SQUIRES and HILL ERICKSON. Paperwork was simply presented to Anderson and he was told to sign it on behalf of NEW CASTLE.

22. NEW CASTLE has a multi-million dollar note with FOUNDERS CAPITAL but Anderson never signed it. Anderson initially learned about this note through a conversation he had with Allen, which was later confirmed when he saw the FOUNDERS CAPITAL rescission offering. The related companies that FOUNDERS CAPITAL lent money to, like NEW CASTLE, had no way of paying the money back. These related companies simply moved money around without any legitimate business transactions. Many of these companies are not even real companies. Anderson never knew where the money for NEW CASTLE'S budget came from.

23. Initially, every property accepted by HILL ERICKSON was approved by KOERBER. However, at some point, the approval process was transferred to Lindsey Dayton (Dayton) under KOERBER'S supervision. Dayton was also in charge of the PB program and maintained a list of PB's that were waiting to purchase a property. Dayton trained the PB's on the fly without any formal training or instruction and was under immense pressure to perform. Everything Dayton learned about real estate she learned through KOERBER and her employment at HILL ERICKSON.

24. Anderson started to dig a little deeper into the whole FRANKLIN SQUIRES operation near the end of 2007 when Mason approached him and told him that she felt as though there was a lot of dishonesty within the organization. Mason asked Anderson if she could be his assistant after being fed up with what she felt was dishonesty on Dayton's part. Mason quit soon after this conversation.

25. Dayton initially worked as a receptionist at FRANKLIN SQUIRES. She got on KOERBER'S good side and began getting assigned things directly from KOERBER. This snowballed into eventually being in charge of HILL ERICKSON. Anderson believes that Dayton thought that Anderson spoke his mind too freely and that associating too closely with Anderson may damage her relationship with KOERBER.

26. Anderson and Dayton disagreed with KOERBER and FRANKLIN SQUIRES purchasing so many high end cars. Anderson felt that it was simply posturing. McGuire said that that the day he started making real money was the day he bought a Carrera because people started looking to give him money.

27. Right around the time that KOERBER stopped making payments on the properties, Anderson was removed from NEW CASTLE and Kenny Snarr (Snarr) was placed in charge. Anderson spent approximately the next two months assessing the viability of a KOERBER owned company named AMERICAN TIMBERCRAFT HOMES (ATH) in Ogden, Utah. ATH's primary business was constructing modular log homes. KOERBER had previously purchased ATH sometime around 2006 against Anderson's direct recommendation. Another KOERBER controlled entity named MODULAR MANUFACTURING actually purchased ATH, and MODULAR MANUFACTURING was owned by another company named R.R. KOERHOFF. KOERBER and Roger Hoffman (Hoffman) were partners in R.R. KOERHOFF. KOERBER put a lot of money into ATH. ATH never made any money and was losing approximately $80,000 per month. KOERBER eventually shut ATH down at Anderson's behest.

28. Many of KOERBER'S seminars lasted several hours. These seminars would routinely start at 9:00 AM and run until 6:00 PM or 7:00 PM. Other seminars would be scheduled for an hour and a half and would last six or seven hours. People couldn't get enough of the seminars and would refuse to leave. Attendees ranged from a few dozen to several thousand (Grand America and Provo Marriott). Several seminars were also held out of state in areas such as Las Vegas, Arizona, and Chicago. Seminars were usually recorded.

29. KOERBER and Les McGuire (McGuire) held a special invitation only event at the Grand America hotel in which they discussed all of the books they've read that shaped their perspective on life and how they tied into Latter Day Saints (LDS) doctrine. A couple of LDS General Authorities attended this special event, including Hartman Rector, Jr. (Rector). KOERBER introduced Rector to the crowd. Rector may have added to the conversation, but he didn't give a speech. Rector may have also invested in FOUNDERS CAPITAL. This special event was not recorded.

30. KOERBER was involved with a gold mine in Montana with Ray Mowen. Anderson believes that someone eventually outbid KOERBER for the rights to the mine at auction. Anderson doesn't know exactly how much KOERBER spent on the mine, but believes that it may have been around $1 million. Anderson believes that KOERBER eventually received most of his investment back due to an ensuing court order.

31. The Equity Mill was an idea based on gold milling which was used to describe a method of extracting a property's equity. This was the name for the process, but HILL ERICKSON was the actual entity that purchased the properties.

32. Anderson didn't have anything to do with the FOUNDERS CAPITAL rescission offering. KOERBER and David Kirby (Kirby) worked on the rescission offering together.

33. Anderson had some philosophical differences with KOERBER. The 13 Principles of Prosperity was the driving force behind the organization, but Anderson didn't agree with some of the culture. Specifically, Anderson disagreed with KOERBER'S assertion that there was no such thing as a victim. Anderson also didn't agree with KOERBER'S view of self-interest.

*Ronald A. Marker, Jr.*
Ronald A. Marker, Jr.
Special Agent

I prepared this memorandum on May 1, 2009, after refreshing my memory from notes made during and immediately after the interview with Clavell Anderson.

*Ronald A. Marker, Jr.*
Ronald A. Marker, Jr.
Special Agent