# Exhibit 37

# Internal Revenue Service
# Criminal Investigation

# Memorandum of Interview



| | | | |
|---|---|---|---|
| **In Re:** | CLAUD RODERICK KOERBER | **Location:** | United States Attorney's Office<br>185 S. State St.<br>Salt Lake City, UT 84111 |

**Investigation #:** 880620094
**Date:** April 9, 2009
**Time:** Approximately 10:15 AM – 1:45 PM
**Participant(s):** Clavell Anderson, Witness
Jamie Zenger, Federal Public Defender's Office
Stew Walz, Assistant United States Attorney
Trey Mayfield, Assistant United States Attorney
Cameron Saxey, FBI Special Agent
Ronald Marker, IRS Special Agent

On the above date and time, Clavell Anderson (Anderson) and his attorney, Jamie Zenger (Zenger) met with Assistant United States Attorney (AUSA) Stew Walz; AUSA Trey Mayfield (Mayfield); Federal Bureau of Investigation (FBI) Special Agent (SA) Cameron Saxey (Saxey); and Internal Revenue Service (IRS) SA Ronald Marker (Marker). AUSA Walz provided Anderson and Zenger with a proffer letter. Anderson and Zenger reviewed the letter and signed it (Attachment 1). AUSA Walz explained the contents of the proffer to Anderson and Zenger. Anderson provided corrections to an FBI Form FD-302 dated May 14, 2008 (Attachment 2). Anderson also provided the following additional information:

1. AUSA Walz showed Anderson a letter dated August 13, 2007 (Attachment 3). Anderson was on vacation at Disneyland when the letter was issued. Anderson believes that RICK KOERBER (KOERBER) discussed selling all of the properties as much as 18 months prior to the letter being issued. KOERBER previously partnered with Bill Young (Young) and formed Lucent Real Estate with the intent of having Lucent Real Estate serve as the selling arm of FRANKLIN SQUIRES. KOERBER told Young that he wanted to list all of the properties, but Anderson doesn't believe that any of the out of state properties were ever listed. Young was continually trying to figure out a way to come up with listing prices for the properties, but Anderson never received a workable formula that could be used to determine listing prices for the properties. Multiple attempts were made to come up with a system to sell the properties, and several people attempted to develop a viable system for selling the properties, including: Jason Vaughn (Vaughn); Kenny Snarr (Snarr); Robert Switzenberger (Switzenberger); and maybe a couple of others. KOERBER

assigned personnel to sell the properties, but nothing ever happened. Anderson didn't know if Lindsey Dayton (Dayton) was ever assigned to sell the properties, but if she was, it would have been near the end of 2007 or the beginning of 2008.

2. Anderson believes that FRANKLIN SQUIRES had more of a profit problem than a cash flow problem. Anderson never saw a balance sheet or income statement for any FRANKLIN SQUIRES related companies, but it just seemed like common sense that a company couldn't sustain itself when it has 300 employees, huge expenses, and the majority of money it has coming in is borrowed. Some parts of the business may have been making a profit like Hill Erickson, but the business as a whole couldn't be sustained when it was making $200,000 per month and paying out $1.5 million per month in expenses.

3. Anderson originally created Mountain Peaks Investment Group (MPIG) in the 1990's as a limited partnership which he used to purchase 14 acres of land in Spanish Fork, Utah. The land was subsequently sold to an adjoining real estate developer. Anderson later converted MPIG to a single member Limited Liability Company (LLC). MPIG LLC was created to do all kinds of commerce. It was never the purpose of MPIG LLC to collect investment money. Anderson never solicited any investors. People approached Anderson and offered to lend him money when they saw what he was doing, such as attempting to acquire an Iceberg Drive-In franchise.

4. Anderson believes he met Kelly Christensen (Christensen), the owner of Iceberg Drive-Ins, at a potential franchisee meeting at the Grand America Hotel. Anderson eventually purchased the rights to the Spanish Fork, Springville, and Meridian (OH) Iceberg Drive-In franchises. However, Iceberg subsequently took the franchises back. Anderson believes that FRANKLIN SQUIRES INVESTMENTS or another FRANKLIN SQUIRES related company purchased a 51% stake in Iceberg Drive-ins.

5. MPIG loaned FOUNDERS CAPITAL approximately $500,000. MPIG loaned this money to FOUNDERS CAPITAL for several reasons. First, MPIG received a significant return on the money it loaned to FOUNDERS CAPITAL. Second, Anderson was 100% behind the FRANKLIN SQUIRES vision at the time and he wanted to do help further the potential of the business.

6. FOUNDERS CAPITAL provided MPIG with promissory notes and received a 5% return per month for any money it loaned to FOUNDERS CAPITAL, which was the typical return FOUNDERS CAPITAL provided to most investors. Anderson knew that FOUNDERS CAPITAL used this money for short term bridge loans because that was part of what KOERBER taught at his seminars. Anderson considered this to be common knowledge.

7. Anderson was not involved with FOUNDERS CAPITAL in any way except for the fact that he loaned them money. Anderson's conversations with people who loaned him money had nothing to do with FRANKLIN SQUIRES or FOUNDERS CAPITAL.

8. Anderson wasn't certain if KOERBER knew that the money MPIG loaned to FOUNDERS CAPITAL came from people who had loaned money to MPIG. However, Anderson believes that KOERBER knew for sure from the beginning that the money for FOUNDERS CAPITAL was coming from other people because the entire model was based on KOERBER'S teachings. One of KOERBER'S seminars was based on creating a holding company and using it to become a bank. It was understood that the seminars were simply teasers to create your own LLC and loan FOUNDERS CAPITAL money. At these seminars, KOERBER would say things like: who has more money, you or other people; you have to loan out other people's money to make money; and lots of people here have relationships with FOUNDERS CAPITAL and make money.

9. KOERBER knew that Dayton, Vaughn, Mike Isom (Isom), and Paul Bouchard (Bouchard) were getting money from other people to invest in FOUNDERS CAPITAL. KOERBER told Anderson that he didn't know what Bouchard was thinking when he started offering investors a finder's fee. KOERBER also told Anderson that Bouchard was acting like an idiot by getting people to refinance their homes and give it to Hunters Capital (Bouchard's LLC) to give to FOUNDERS CAPITAL, but that FOUNDERS CAPITAL sure needed that money and that it was good when Bouchard brought it in. Anderson had similar conversations with KOERBER on several occasions after Bouchard came under scrutiny by the Utah Department of Securities (UDOS).

10. Anderson attended a meeting with KOERBER, Jon Lowry (Lowry), and Steve Freestone (Freestone) sometime in 2005 or 2006. At this meeting, KOERBER stated that an attorney had told KOERBER that promissory notes were not securities. This attorney was not present at the meeting, and Anderson did not remember the attorney's name, although Anderson believes that the attorney was a male and located somewhere in Provo, Utah.

11. KOERBER funded or help fund lots of political campaigns via contributions. KOERBER told Anderson that he controlled multiple entities and that each entity could donate to political campaigns. Although the donations came from multiple entities, the politicians knew that KOERBER was the one orchestrating the donations. KOERBER controlled companies made hundreds of thousands of dollars in donations to Parents Choice in Education.

12. KOERBER had breakfast with Utah Attorney General (AG) Mark Shurtleff (Shurtleff) during the state investigation. KOERBER told Anderson that Shurtleff had assured him that the AG's office would not rubber stamp anything Wayne Klein (Klein) and UDOS brought down to Shurtleff's office.

13. Anderson and KOERBER had a falling out when KOERBER told Anderson that they needed to create an Emerald City. Anderson took this to mean that KOERBER wanted to create a ruse or scam. Anderson confronted KOERBER at a subsequent meeting in the media room at the 85 East Bay building in Provo, Utah (Media Room Meeting). KOERBER, Lindsey Dayton, Jake Dayton, Jewel Kimber, Glen Kimber, Kenny Snarr, David Kirby, Jason Vaughn, Randy Bradley, Forrest Allen, and Don Sills were all present at this meeting. KOERBER was in the middle of describing his new vision for FRANKLIN SQUIRES when Anderson interrupted him and said that it sounded like Satan's plan, and he was trying to compel people to do something that they really didn't want to do. Randy Bradley (Bradley) also had a heated exchange with KOERBER at this meeting. Bradley has hundreds of hours of recordings of meetings he had with KOERBER and other people at FRANKLIN SQUIRES. Anderson thought that everyone knew that Bradley recorded all of his conversations. Bradley is currently in trouble with state regulators and would likely want some help with his state problems in exchange for the recordings.

14. KOERBER often said that loyalty was more important than ability. As such, KOERBER created what he referred to as his Fab 5 after the Media Room Meeting (See paragraph 13). The Fab 5 consisted of David Kirby, Jewel Kimber, Kenny Snarr, Lindsey Dayton, and Steve Freestone.

15. Anderson confronted KOERBER outside Anderson's office one day around April of 2007 about using investor money to make interest payments. KOERBER told Anderson that he can't make the interest payments without using capital and that every business goes through a period of capitalization when it starts out. According to Anderson, when KOERBER refers to capitalization, he's referring to using borrowed money to pay back loans.

16. Anderson wrote KOERBER an e-mail in which he detailed what he thought was going on in the company and what he had a problem with. KOERBER responded to the letter sentence by sentence and corrected Anderson's thinking. Anderson's original e-mail was approximately 3 pages long and KOERBER'S response was approximately 8 to 12 pages long. Anderson believes that he provided KOERBER'S response to Zenger, but he could not find a copy of his original e-mail.

17. KOERBER has almost a David Koresh type of control over people and maintains every element of a cult minus the compound. During a meeting at KOERBER'S home on Fort Canyon in Alpine, KOERBER issued attendees a marked and numbered dollar bill which KOERBER signed and folded in a specific manner that was to serve as a type of pass to get into future meetings.

18. Vaughn didn't have anything to do with the going-ons of any of the FRANKLIN SQUIRES entities. Vaughn was initially hired to run the FRANKLIN SQUIRES INSTITUTE, which later became known as AMERICAN FOUNDERS UNIVERSITY. Vaughn could get very volatile very fast and was all about the philosophy of what FRANKLIN SQUIRES was trying to do. Vaughn became more and more verbal and disruptive at business meetings as time went on.

19. KOERBER has an excellent memory almost to the point of total recall. Ayn Rand has had a big influence on KOERBER'S life.

20. Anderson does not know who wrote the rescission offering dated November 15, 2007 but he believes that it was at least edited by KOERBER as it contains a lot of his language (Attachment 4). Anderson didn't have anything to do with the preparation of the rescission offering as it was a FOUNDERS CAPITAL thing and he had nothing to do with FOUNDERS CAPITAL. Anderson does not remember who gave him a copy of the rescission offering, but believes that it may have been Kirby. Anderson did not know how the market values for the properties were determined for the rescission offering, but believes that some type of formula using a percentage of appreciation per year was used. Forrest Allen (Allen) or Lindsey Dayton would have a better idea of how the property values were determined. Anderson believes that Allen was uncomfortable with listing leased properties as assets on the rescission offering, but KOERBER may have convinced Allen to do it anyway. Anderson didn't think that the accountant, Brad Wilkinson, agreed with the property valuations or to list the leased properties as assets.

21. Anderson believes that KOERBER routinely utilized stall tactics when it came to accounting as follows: (1) KOERBER would hire a new accountant; (2) The accountant would tell KOERBER that something needed to be changed or that they need more information; (3) KOERBER would refuse to provide additional information or say that the accountant was incompetent; (4) KOERBER would hire another accountant after 4 or 5 months. All the while, KOERBER would tell people that the accountants were working on it. This bought KOERBER a lot of time.

22. KOERBER absolutely knew what properties were going through the preferred buyer program and every property purchased by Hill Erickson had to be approved by KOERBER.

23. AUSA Walz showed Anderson an e-mail dated August 24, 2007 to Frank Breitenstein (Breitenstein) (Attachment 5). Anderson agreed that he probably wrote the letter but did not specifically remember it. Anderson had received dozens and dozens of complaints by this point as a result of the letter dated August 13, 2007 (See Attachment 3). Anderson did not know that KOERBER was going to stop making payments when the August 13, 2007 letter was sent out, but he knew that it was coming because the loan interest payments had already stopped. Anderson received all his information from KOERBER and had no control over any funds. The only time Anderson had access to any money is when KOERBER gave it to him. Whatever information Anderson provided to Breitenstein was information he received from KOERBER or was passed along from KOERBER. Anderson believes that the business was salvageable at this point, even with its problems, and didn't really know of the impending doom until the August 13, 2007 letter was sent out.

Anderson and Zenger stated that Anderson had a lot more information to provide and would need another meeting at least as long as this one to get to it all. AUSA Walz agreed to another meeting at 10:00 AM on April 21, 2009 at the United States Attorney's Office.

*Ronald A. Marker, Jr.*
Ronald A. Marker, Jr.
Special Agent

I prepared this memorandum on April 13, 2009, after refreshing my memory from notes made during and immediately after the interview with Clavell Anderson.

*Ronald A. Marker, Jr.*
Ronald A. Marker, Jr.
Special Agent