Kathryn N. Nester
(Utah Bar No. 13967)
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467

Robert Hunt (Utah Bar No. 5722)
Daphne Oberg (Utah Bar No. 11161)
Jessica Stengel (Utah Bar No. 8915)
Office of the Federal Public Defender
46 W. Broadway, Ste. 110
Salt Lake City, Utah 8106
Telephone: (801) 524-4010

*Attorneys for Claud R. Koerber*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> CLAUD R. KOERBER, <br><br> *Defendant.* | **DEFENDANT'S SUPPLEMENTAL OBJECTIONS TO SECOND AMENDED PSR** <br><br> Case No. 2:17-CR-37 <br><br> District Judge Frederic Block <br> Chief Magistrate Judge Paul M. Warner |

Claud R. Koerber, by and through undersigned counsel, hereby submits his supplemental objections to the Second Amended Presentence Investigation Report (hereafter "PSR") filed on April 30, 2019, in the above-styled case.

On March 22, 2019, Mr. Koerber timely filed his original objections to the PSR dated March 4, 2019. On April 1, 2019, the US Probation Office (hereafter "USPO") filed an Amended PSR (Doc. 556) and a First Addendum to the PSR (Doc. 556-1). Contained within the First

Addendum was a recitation of Mr. Koerber's unresolved objections.  On April 26, 2019, ten years after the first indictment in this case, six months after the conviction and two weeks before the scheduled sentencing hearing,  the government produced a new list of  96 " confirmed victims." At the same time, the government produced victim statements and supporting documents from approximately 15 of these newly "confirmed" victims. On April 30, 2019, the USPO filed a Second Amended PSR (Doc. 562) and a Second Addendum (Doc. 562-1).   The Second Addendum relied upon the newly produced list of victims and increased the victim count in the PSR to above 50, resulting in a significant increase to Mr. Koerber's previously recommended guideline range.  In the week that defense counsel have had to review the new list, it is not possible to determine the facts surrounding many of these newly confirmed victims.  As of this date, complete documents supporting the claimed losses of all of the new victims have not been provided to counsel.  Instead, in most of the victim statement packages, the government has only produced a promissory note between these victims and individuals other than Mr. Koerber and handwritten witness statements where the witnesses claim they lost money.

Mr. Koerber fully incorporates and resubmits all of his original objections to the PSR contained within the First Addendum filed on April 1st.  (Doc. 556-1) Additionally, Mr. Koerber lists below his supplemental objections to the Second Amended PSR and the Second Addendum filed on April 30, 2019.  (Doc. 562 & 562-1) The objections involve complex factual disputes not addressed at trial, which require an evidentiary hearing in order to determine which facts define the appropriate guideline range and support subsequent variations from the guidelines. *See* Defendant's Motion for Evidentiary Hearing (Doc. 560).

## OBJECTIONS #1- #10

Mr. Koerber hereby incorporates and resubmits his Original Objections numbered 1-10 contained in the First Addendum to the First Amended PSR. (Doc. 556-1)

## OBJECTION #11

Mr. Koerber objects to Paragraphs 48, 57 and 97 of the Second Amended PSR filed on April 30, 2019. (Doc. 562-1)  Mr. Koerber further objects to the Second Addendum filed on April 30th and moves that it be stricken from the PSR.  These objections are based on the inclusion of impermissible "victims" as defined by the United States Sentencing Guidelines and federal common law.  Defendant submits there were less than 50 victims in this case, as originally stated in the PSR and First Amended PSR.  Therefore, the four-level enhancement contained in Paragraph 48 should be reduced to a two-level enhancement pursuant to USSG 2B1.1(b)(2)(A).  The total offense level should be reduced accordingly.  Defendant respectfully offers the points and authorities below in support of this objection.

### The PSR Method of Identifying Victims is Unreasonable

Under the 2007 Guidelines, Application Note 1 of § 2B1.1 a "victim" is "any person[1] who sustained any part of the actual loss" calculated under §2B1.1(b)(1), and "actual loss" means "the reasonably foreseeable pecuniary harm[2] that resulted from the offense." 2007 U.S.S.G. §2B1.1, Application Note 3(A)(i).  Thus, in order to be considered a "victim" for

---

[1] The definition clarifies that "person" includes "individuals, corporations, companies, associations, firms, partnerships, societies, and joint stock companies."  2007 U.S.S.G. §2B1.1, Application Note 1 "Victim."

[2] "Pecuniary Harm" is defined as "harm that is monetary or that otherwise is readily measurable in money." §2B1.1, Application Note 3(A)(iii).  "Reasonably Foreseeable Pecuniary Harm" is separately defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." Id., at §2B1.1, Application Note 1(A)(iv).

sentencing purposes, a person must satisfy two fundamental tests.  First, the person must have

suffered "pecuniary harm" that is part of the "actual loss" calculated under §2B1.1(b)(1).

Second, the pecuniary harm suffered by the person, must have been the result of the offense (and

the defendant must have known, or under the circumstances should have known, that the

pecuniary harm was a potential result of his offense.)

Applying this first test, whether or not a person suffered pecuniary harm – the PSR's

method of determining victims is fundamentally flawed.  The Second Amended PSR and the

Second Addendum to the PSR reference or identify victims in six separate instances.  *See*

Doc.562 at p. 4, ¶4; pp. 7-12, ¶¶20-41; p. 12 at ¶48; p. 23, ¶93; p.25, ¶110 and Doc. 562-1. None

of these references undertakes to define "victims" under the Guidelines definition provided

above. Instead, the PSR includes the government's claim to as many as 600 indirect victims

(Doc. 562 at p. 8, ¶23), describes by name 59 "victims" (Doc. 562 at pp. 8-11, ¶26-40), and then

expressly states "[f]or purposes of guideline calculations, only the first line investors (38) are

considered in "number of victims" pending further confirmation by the government of additional

victims." *Id.*, at p. 12 at ¶41.  The Addendum goes on to claim "the number of confirmed victims

now currently exceeds 50," without any additional information about how this "confirmation"

occurred.  The Addendum appears to rely upon less than 15 new victim impact statements

produced by the government, all of which are dated years before Mr. Koerber's trial and appear

to be addressing the fraud of others.  Although neither the Second Amended PSR nor the Second

Addendum expressly describe how they reached the conclusion that each identified "victim" falls

within the Guidelines definition, the First Amended PSR does claim to rely on representations

from the United States. *See* Doc. No. 556-1 at p. 3 ("The United States identified investors, the

amount investors gave to Koerber and the amounts he paid back to them by extracting this

information from Koerber's bank accounts, his accounting records, and from the promissory

notes he issued.")


**1. PSR includes "Victims" Who Suffered No Pecuniary Loss.**

Despite Mr. Koerber's original objection to the PSR's method for determining "victim"

status by unreasonably and impermissibly including as "victims" those who suffered no

pecuniary loss, the Second Amended PSR filed on April 30, 2019, took no steps to remedy that

problem.

a. *Trial Testimony of Investors*.  The Second Amended PSR continues to list

several victims by name who have previously testified that they suffered no pecuniary loss.  For

example:

- The Second Amended PSR lists **Peter Hansen** (Hansen House

Investments) as a victim.[3]  However, Mr. Hansen was the government's first purported "victim"

witness as the first Koerber trial, and prosecutors asked Mr. Hansen directly, "Did you ever

receive repayment of the principal amount that you put into Founders Capital?" *See* Koerber

2017 Trial Transcript, Day 2 at pp. 79.  In reply, Mr. Hansen was clear and direct, "over the term

of the activity of the program, yes, I received more back than I had invested." *Id*.

- The PSR lists **Matson Magleby** as a victim.[4] Mr. Magleby holds

an MBA, is a business owner, is a financial advisor and is a former mortgage broker.  In other

words, he is not financially unsophisticated.  He was questioned directly on this point and

admitted he had suffered no pecuniary loss.  *See e.g.* Koerber 2017 Trial Transcript, Day 3 at pp.

---

[3] *See* Doc. No. 562 at p. 7, ¶20.
[4] *See* Doc. No. 562 at p. 8, ¶27.

364 ("Q. So if most of the balance, principal balance is rollover interest, doesn't that mean that you were ultimately at the end of the net paid more from Founders than you directly put in? A. Yes…Q. So out of pocket, it's fair to conclude you received more money from Founders Capital than you put in; right? A. Yes."). This admission by Mr. Magelby is consistent with the contemporary financial analysis done at the time (August 2007) where official company records showed that despite his promissory note outstanding balance, Mr. Magelby had already received $93,813.21 in cash payments, more than the total principal amount that he had invested. *See* Skousen Testimony, Koerber Trial 1, Day 25 beginning at p. 4565.

- The PSR lists **Brad Colovich** as a victim.[5] Unlike Mr. Hansen and Mr. Magelby, the United States never called Mr. Colovich as a trial witness. Further, prosecutors have not submitted a declaration or affidavit from Mr. Colovich claiming any pecuniary loss. However, at the most recent trial, the defense called Mary Colovich, the wife of Brad Colovich, and she testified clearly and unrebutted - that she and her husband invested together, referenced the same promissory note, and that they had actually profited and not suffered a pecuniary loss as a result of their investment. The contemporaneous records of the company also show that as of August 2007 the Colovichs had received a net gain of $49,801.91 in cash received back, beyond the total principal amount they invested. The defense intends to call Russ Skousen as a witness at the evidentiary hearing to introduce these company records.

- The PSR lists **Frank Breitenstein** as a victim.[6] The PSR states that Mr. Breitenstein "invested with the defendant through a company called Vonco Holdings, LLC." *Id*. However, Mr. Breitenstein testified that he initially invested $40,000 with Vonco.  No

---

[5] *See* Doc. No. 562 at p. 7, ¶20.
[6] *See* Doc. No. 562 at p. 8, ¶26.

evidence has been produced in either trial or in discovery, that Vonco ever invested Mr. Breitenstein's money with Founders Capital or any other Koerber related company. Further, Mr. Breitenstein testified that after repeatedly re-investing his interest checks from Vonco, his note balance was about $83,000 by the time his interest payments from Vonco stopped, and that by this point he had already received approximately $70,000 in returns. The PSR nevertheless states that "because of the investment" Mr. Breitenstein lost his savings, had to max out his credit cards, and for a time, relied on his church to provide him funds to pay his medical bills." However, there is no evidence these consequences were the result of the investment with Vonco or connected to Founders Capital in any way.  Instead, the PSR appears to be comingling two other real estate investment losses related to the foreclosure of two investment properties Mr. Breitenstein had purchased.  Those purported real estate losses have not been proven and in any event are not the result of any illegal activity or wrongful conduct by Mr. Koerber. *See e.g. United States v. Frith*, 461 F.3d 914, 917–18 (7th Cir. 2006) ("[W]here losses are attributable to relevant conduct, the relevant conduct must be criminal or unlawful conduct."); *United States v. Schaefer*, 384 F.3d 326, 329 (7th Cir. 2004) ("[T]o be relevant conduct, [it] had to be unlawful.")

- The PSR lists **Jerel Clark (JD Clark Enterprises/Atlas)** as a victim.[7]  However, Mr. Clark testified at both trials and stated clearly that after he received a transfer of real estate in January 2008, he suffered no pecuniary loss.

The government reported to Probation, and both the United States and the PSR included these above-named individuals as "victims", even though prior trial testimony from the witnesses themselves established that none of these individuals suffered pecuniary loss.  This is a

---

[7] *See* Doc. 562 at p.7, ¶20.

significant reason for the court to find the method employed in determining the number of victims is unreasonable.

   b. *PSR Prima Facie Insufficiency*. Besides the trial testimony issues previewed above, the PSR itself wrongly includes several individuals who are not alleged to have suffered pecuniary harm as a result of the offense conduct at issue. For example, Amber Hobdy and James Speth are included as victims because somehow (no explanation is offered) they experienced a divorce as an apparent consequence of unidentified investment activity. *See* Doc. 5 at p. 11, ¶40.

   c. *Claimed losses inconsistent with company records*. Despite the PSR's claims to the contrary, an accounting analysis using Quickbooks and Promissory Notes showed the following PSR "victims," in addition to the others specified elsewhere in our objection, did not suffer a pecuniary loss but instead experienced a financial gain.

> Anderson Graphics/Nexus Capital/Steve Anderson; Cody Moore/HLV Investments, Hooper Financial/Aspectus LLC/Ray Hooper, JTH Publishing/Todd Huff, Katheryn Bowen, Michael Kipp, Mountain Peaks Investments/Clavell Anderson, Silas Bennett, Strategic Innovations/Dan Raether, Temuco LLC/Jerem Eyre, Tin Cup Investments LLC/Dale Densley, Valerio Investments/Carey Valerio.

The defense is prepared to call their accounting expert to explain these inconsistencies in purported loss amounts.

  **2.** **The Second Amended PSR Unreasonably Disregards Legal Entities, Investment Instruments, and Investor Timing to Inflate the Number of Victims.**

   The PSR disregards fundamental facts regarding the entity individuals invested with, the type of investment made, and the timing of individual investments, resulting in a significant distortion and inaccuracy in the victim count.

The PSR errs in both its generality, by referencing the government's unsupportable claim of hundreds of victims in this case, and in its specificity, by creating a list of what it terms 38 "first line" victims.  In both approaches, the PSR's method used to identify victims is built upon the unreasonable presumption that investors can be linked together without regard to fundamental facts.  The law does not support or allow this kind of haphazard approach to defining victims. *See e.g. United States v. Orr*, 567 F.3d 610, 617 (10th Cir. 2009) (Loss for purposes of counting victims, requires proof by a preponderance, set forth before the trial court.); *United States v. Leach*, 417 F.3d 1099, 1107 (10th Cir. 2005)(Requiring loss calculation for each purported victim individually, rejecting a victim count of 200 and finding only "eight discernable victims" in a mail fraud conviction where no evidentiary showing was made for the 200 purported victims loss as part of the actual loss "determined under subsection (b)(1)[.]"); *United States v. Abiodun*, 536 F.3d 162, 169 (2d Cir. 2008) (Rejecting the victim count put forth because "[t]he Guidelines' adjustment for the number of victims refers to the victims who sustained losses as determined by the loss calculation Guideline.")

       *a.   The Second Amended PSR continues to miscount the number of victims*

Despite Mr. Koerber's original objections, the Second Amended PSR continues to claim that there are 38 "first line" investors/victims.  *See Doc. No*. 562 at p. 7, ¶20. This number contradicts the government's trial evidence.  For example, at trial the government introduced Gov't Ex. 21, showing that as of May 18, 2017 there were 10 active promissory note holders/investors with Founders Capital. [Gov't Trial Exhibit 21 at p. 1.]

Nevertheless, without explanation as to why this new list of 38 is reasonable or accurate, the PSR (and the United States) provides this assortment of investor names.[8]  *See* Doc. No. 562 at p. 7, ¶20.  Beyond this list, the PSR also claims that sub-investors (meaning those who invested with "first line" or "second line" or "third line" investors, etc.) also suffered pecuniary loss – and expands the total number of victims to [several hundred].  Both calculations, however, are unsupported exaggerations in light of the fundamental facts.  Indisputably, for example, the list of 38 supposed "first line" investors (created by the United States and provided in the PSR) is not the list of investors used by the Founders Capital in 2007, and is not reflected in any trial evidence. As a consequence, when the PSR aggregates these 38 investors – and when it presumes other "second line" and "third line" investors can be lumped into an aggregated whole without essential specific factual details - it also comes with serious complications making the whole PSR's victim count, unreasonable and unreliable.

### Example 1: McGuire Group, LLC

Gov't Exhibit 21 shows that as of May 18, 2007, Les McGuire's company McGuire Group, LLC was a direct investor and promissory note holder of Founders Capital, LLC. However, without explanation and contrary to the explanation offered in the PSR (Doc. No. 562 at p. 7, ¶17), the PSR omits and disregards McGuire Group – entirely. Instead, without explanation, the PSR singles out a few McGuire Group note holders as "victims": Alan Shields Construction (Alan Shields); Brad Colovich; Carroll Investments, LLC (Craig and Ron Carroll); Dale Clark; Hooper Financial/Aspectus LLC (Ray Hooper); Silas Bennett; Strategic Innovations/Dan rather; Thomas Pisciotta; and Valerio Investments (Carry Valerio).

---

[8] Although the PSR states it is listing "38" first line investors, counting the names actually listed shows only 37 investors.

A quick look at Gov't Exhibit 21 shows that not all McGuire Group, LLC note holders were singled out – and these nine individuals who held McGuire Group notes as of May 2007 (rather than Founders Capital notes) are inaccurately listed in the PSR as "first line" investors. Whatever the motivation behind this approach, it results in fundamentally unsupportable conclusions for calculation of loss and determination of victim status under the Guidelines.  Such an approach also results in the following problems listed below.

First, contemporaneous Founders Capital financial records show that McGuire Group, LLC suffered no pecuniary loss, and is therefore no "victim" for Guidelines purposes.  Instead, as of August 2007, the fact is that Founders Capital paid $2,669,301.70 on the then outstanding McGuire Group, LLC promissory note - above the total principal invested by McGuire Group, meaning McGuire Group, LLC did not suffer a loss.[9]

Second, the analysis relied upon by the PSR does not include a complete set of bank records or business financials from McGuire Group, LLC or its principals, such as Les McGuire, McGuire Financial, LLC, or McGuire Investing, LLC, and none has been provided to the defense. So, in singling out these individual McGuire Group note holders (and doing so without describing the total amount invested, with what entity, when, etc., and the total amount paid back to the investor, when, and by which entity), it is unclear how much of any particular McGuire Group, LLC's note holder/investor money was subsequently loaned to Founders Capital versus put to some other use.  It is also unclear how the United States or the PSR reached any conclusion as to the total net gain/loss of any individual McGuire Group, LLC note holder/investor.  This approach is unsupportable. *See e.g. United States v. Orr*, 567 F.3d 610,

---

[9] The defense is prepared to present Russell C. Skousen and David Hardman as witnesses to support these figures at an evidentiary hearing.

617 (10th Cir. 2009) (Loss for purposes of counting victims, requires proof by a preponderance, set forth before the trial court.); *United States v. Leach*, 417 F.3d 1099, 1107 (10th Cir. 2005)(Requiring loss calculation for each purported victim individually, rejecting a victim count of 200 and finding only "eight discernable victims" in a mail fraud conviction where no evidentiary showing was made for the 200 purported victims loss as part of the actual loss "determined under subsection (b)(1)[.]");

Third, a review of Founders Capital records shows that the following individual McGuire Group, LLC note holders/investors had received a net positive return (no pecuniary loss) even before looking at repayments from other McGuire Group related accounts: Brad Colovich (addressed above); Carroll Investments, LLC/Ron and Craig Carroll (Net positive $69,934.26[10]); Silas Bennett (Net positive $11,500); Strategic Innovations/Dan Raether (Net positive $390,888.97); Valerio Investments (Net positive $16,216.43).

Taken together, these three examples of plain flaws in the PSR's method of identifying victims by taking sub-investors out of an actual "first line" investor, without facts detailing the financial realities of each investor's conduct (and the "first line" investors use of each investor's proceeds) renders the conclusions reached through this approach unreasonable and unsupported.

### Example 2: Atlas Capital / Wade Sleater

The PSR does not include Atlas Capital (Wade Sleater) ("Sleater") as a first line victim or name Sleater as a victim at all.  This omission is correct as far as it goes, Sleater was not a victim. However, in 2005 Sleater was a "first line" promissory note investor with Founders Capital, and in 2006 his note with Founders Capital was retired, in exchange for a new note in McGuire Group, LLC.  In 2006, his total note balance with McGuire Group, LLC reached

---

[10] The defense is prepared to call David Hardman as a witness to establish these figures.

approximately $2 million.  As per the terms of his note, Sleater was paid through the end of 2006 when, after receiving his October 2006 interest payment, he terminated his relationship with McGuire Group, LLC and requested liquidation of the full face value of his note.  On December 6, 2006, Sleater received a check from McGuire Group, LLC retiring the total note balance then outstanding of $1,782,000.[11]

All of this factual context is essential (although it is omitted in the PSR) because like McGuire Group, LLC itself, Sleater was not a victim, and made a substantial profit on his investment. Atlas Capital, LLC had a sole member and sole manager, and it was Wade Sleater.[]Mr. Koerber was not a manager or signer for Mr. Sleater's company, and Mr. Sleater continued to operate Atlas Capital independently – including by taking in new investors and new investor money - after his McGuire Group note was paid in full, as agreed.

The United States did not call Wade Sleater or any representative of McGuire Group, LLC as a trial witness in either trial, but the PSR nevertheless asks the court to overlook the above facts, and conclude – without evidence or explanation that although McGuire Group did not suffer pecuniary loss, and although Atlas Capital (through Sleater) did not suffer pecuniary loss – by disregarding these entities, for some unspoken reason known only to prosecutors, the claimed losses of Atlas Capital investors should be attributed to Mr. Koerber, and Atlas Capital's investors should be considered Mr. Koerber's victims.  The law prohibits this kind of unsupported victim linking, without a showing of "actual loss" that was "reasonably foreseeable" as a result of the instant offense. 2007 U.S.S.G. §2B1.1, Application Note 3(A)(i).  Nevertheless, the PSR includes the following Sleater investors as victims (and several related victim impact statements have been submitted from Sleater investors):

---

[11]The defense is prepared to call David Hardman as a witness to establish these figures.

- **Debra LeBaron**. According to the PSR, Ms. LaBaron invested $100,000 "through a feeder fund called Atlas Capital" and subsequently "lost her home" etc. *See* Doc. No. 562 at p. 8, ¶29. However, Ms. LeBaron filled out an investigator's questionnaire in March 14, 2008, wherein she claimed she was first approached by Atlas Capital/Sleater in "approximately March 2007." *See* UTDOC-17-01249 thru 257. This is significant because by this point Sleater was no longer a Founders Capital investor and had been paid in full by Founders Capital. Therefore, any money Ms. LeBaron invested after this point, clearly did not get loaned by Sleater to Founders Capital. Further, in her questionnaire, Ms. LeBaron explained she was sold her investment by a person named "Will Colten" who has no association with Mr. Koerber or any of his companies, and that the invest was for "areas such as real estate, the medical and insurance fields[.]" *Id*. Ms. LeBaron stated that she first invested with Sleater on July 25, 2007. *Id*. and no pecuniary loss suffered by Ms. LeBaron could not have been the result of Mr. Koerber's conduct. Ms. LeBaron's entire questionnaire is void of any reference to Mr. Koerber, Founders Capital or any of Mr. Koerber's other companies, seminars, books, materials, etc. *Id*.

- **Christine and John Petersen**. According to the PSR, the Petersen's invested $146,500 "with Atlas Capital, a feeder fund run by Wade Sleater. The PSR notes "this was their life savings" and as a result the Petersen's "see no future." *See* Doc. Doc. 562 at p. 9, ¶31. According to investigation records, the Petersens invested with Sleater because they had a son (Ian Petersen) who worked for Sleater and were solicited by Kyle Nelson (a Sleater employee entirely unaffiliated with Mr. Koerber or his companies). *See* UTDOC-17-01768 thru 776. The Petersen's were promised their investment would be used for "real estate and Dish Network Marketing", *id*., which is significant since Dish Network Marketing was Sleater's main business enterprise. The Petersens were also told that "Wade Sleater and Kyle Nelson" were the ones who would manage "the investment or real estate projects" and that the investment had a personal guarantee from Sleater and Nelson. *Id*. <u>The entirety of the Peterson's questionnaire is void of any reference to Mr. Koerber,</u> Founders Capital or any related publication, seminar, training, etc. After receiving interest for about a year, totaling approximately $29,198.72, the Petersons emailed Atlas on Feb. 2, 2007 and requested that their balance be liquidated. In response, Atlas told the Petersens about a new Atlas program (again unrelated to Mr. Koerber or Founders, and after Atlas had been fully paid and ceased doing business with Founders Capital), and the Petersens chose to continue in the new Atlas program. This pattern continued throughout 2007, where none of the Petersens money was invested in McGuire Group, LLC or Founders Capital, and after the Petersens explicitly "studied the new model" and elected to reinvest. *See* UTDOC-17-01784 through 789. The Petersens finally elected to liquidate their full investment with Sleater in October/November of 2007 – a full year after Sleater had moved on from doing business with Founders Capital, McGuire Group, and from Mr. Koerber. *Id*. The Morris' explained to investigators that they lost their money when they "put Atlas Capital into involuntary bankruptcy" during the Spring of 2008. *See* FBI-08-00363.

- **Michael and Susan Morris**. According to the PSR, the Morris' are "victims" who have suffered "extreme financial hardship[.]" *See* Doc. 562 at p. 11. However, the PSR does not offer any other details. It appears, that the Morris' invested with Atlas Capital

("Sleater") after talking with Kyle Nelson and other Atlas related employees.  See FBI-08-00362 thru 373.  The Morris' were interested in investing, apparently, to cover a life insurance policy that had been sold to them.  *Id.*, at 365.  The investment was apparently sold by Mr. Nelson. *Id*., at 366. The Morris' were promised they were investing in "real estate" and "Atlas Marketing, which sells satellite dishes" among other things, and that all investments were in "businesses and projects in which [Atlas] had control" including representations that "Atlas Capital controlled Atlas Marketing/Atlas Dish…[and] they had hired someone who used to work for D.H. Horton[.]". None of this has anything to do with Mr. Koerber or his companies, and according to the Morris' statement, no mention was made of Mr. Koerber or his companies. *Id*.  The Morris' made their first investment on November 9, 2006, and signed their investment documents on December 13, 2006, after Sleater had already terminated his investing with McGuire Group, LLC (and long after he had terminated his relationship with Founders Capital), and after Sleater had been paid in full, as described above.  Thus, none of Morris' money was invested in McGuire Group or in Founders Capital, and Mr. Koerber never had anything to do with the gains or losses experienced by the Morris'.

**Example 3:  Five Pillars Investments, LLC/Steve Freestone**

The PSR lists Five Pillars Investments, LLC (owned and operated by Steven A. Freestone) ("Five Pillars") as a 'first line' investor with Founders Capital, and counts Five Pillars as a victim under §2B1.1 along with several Five Pillars investors.  However, there are several factual problems with this inclusion.

First, at trial, the government's evidence showed that as of the time of this loss calculation, Five Pillars was not a "first line" investor with Founders Capital, but was a note holder with Franklin Squires Companies, LLC (thus making Five Pillars a second line or second tier investor and a Franklin Squires owner and executive).  Second, the government never called Mr. Freestone to testify at either trial, so there is no evidence of what Mr. Freestone understood, believed or agreed to in terms of his investment.  There is no evidence that Mr. Freestone, for example, expected the money Five Pillars invested with Franklin Squires (or earlier with Founders Capital) was going to be used exclusively for real estate.  This omission is particularly relevant here because Mr. Freestone was a longtime Franklin Squires board member, executive vice-president, and deeply involved in the daily operations of Franklin Squires. Other individuals

15

similarly situated have testified that they were not defrauded and that the money they invested was not mishandled, and they were not misled about profitability, e.g. Hansen, Anderson, Snarr.

Second, the government has failed to show what, if any, money invested with Five Pillars was sent to Franklin Squires or Founders Capital.  Without this proof, it is impossible to identify how much money was paid back by Five Pillars to its investors in order to determine whether they have suffered a pecuniary loss.

Third, like Hunters Capital, and MIWE Holdings, discussed above, Mr. Koerber had no decision-making role in Five Pillars, was not a signer on the Five Pillars account, and did not control what money was paid back to third tier Five Pillars investors or how third tier Five Pillars investment money was used.

All of this is particularly significant because using the approach described by the United States, and incorporated into the PSR (meaning, using the business records – including Quickbooks records and promissory notes) Five Pillars was paid $1,442,355.88 more that its total principal invested. Thus, Five Pillars did not suffer pecuniary harm. In order to argue that Five Pillar investors suffered pecuniary harm that was reasonably foreseeable by Mr. Koerber there must be evidence that a) these investors suffered pecuniary harm, and b) that Mr. Koerber played a significant role in these investors not getting paid back in full given the $1,442,355.88 surplus earned by Five Pillars.[12]

---

[12]   The above deficiencies and significant facts directly challenge the PSR's inclusion of Steve Camp as a victim, who is reported to have invested "$110,000" with a "friend named Make Hugentobler." Mr. Hugentobler had a company named AM Property Investments, LLC – and this was apparently the company that issued a promissory note to Mr. Camp.  This company was registered with the Utah Department of Commerce in 2006, but Mr. Camp's investment apparently took place between April and May 2007.  It is unclear (since there is no evidence) what AM Property Investments, LLC did with investor money, how much AM Property Investments, LLC sent to Five Pillars (or to Mr. Hugentobler himself) or whether AM Property Investments was a third-tier or fourth tier investor of Five Pillars, which would make Mr. Camp a forth tier or fifth tier investor – without any way of discerning whether he suffered pecuniary loss as a result of any of Mr. Koerber's conduct – based upon the lack of evidence provided. The PSR does not describe what was promised to Mr. Camp, or by whom, or when, or how that $110,000 was related to Mr. Koerber or his companies, nor is there any description of accounting records or bank statements, or promissory

Thus, as these examples illustrate, to identify a victim merely by associating an individual and their investment with a person or entity that at one point in time was associated with Mr. Koerber or one of his companies is a flawed and unsupportable methodology for determining loss.  Proof of the essential elements of the investment, nature of the investment, and actual pecuniary loss is essential.

> b. *The Court Cannot Presume 3rd Party Money Was Sent to Founders Capital.*

The example with Atlas Capital and Wade Sleater above, shows that it is legally insufficient to identify a person as a "victim" under §2B1.1 just because an investor claims to have invested and lost money with a person or entity that also - at some point – invested money with Founders Capital.  The flaw in the PSR's approach, however, goes even further.  Because, even in circumstances were entities did maintain investments with Founders Capital, the issue of "pecuniary loss" and the requirement of reasonable foreseeability of loss – remain at issue.

### Example 1: Hunters Capital, Inc.

The PSR accurately lists Hunters Capital, Inc. as a 'first line' investor with Founders Capital, and accurately counts Hunters Capital as a victim under §2B1.1.  However, the PSR goes on to include several Hunters Capital investors as "victims" without providing any significant factual support for individual investors having suffered "pecuniary loss" as a result of

---

notes or representations as to the intended use of this money.  There is no accounting as to when this investment was made, how much Mr. Camp received back from Mr. Hugentobler or Five Pillars, etc.  Apparently, Mr. Camp requested liquidation of his promissory note with AM Properties, LLC at some point  after Mr. Freestone had already agreed to convert Five Pillar's Franklin Squires note, after Mr. Freestone declined rescission and liquidation of his Five Pillars note, and after he had already agreed to Franklin Squires converting its note to equity in Founders Capital, and after full disclosure by the PPM. 7. See IRS-04-00749 thru 766.  At some point after this Mr. Camp became an owner in AM Properties. See UTDOC-13-01326. Mr. Camp also apparently refused to file a formal complaint in 2007/2008.  See UTDOC-13-01390.

Mr. Koerber's activities or relevant conduct. This is untenable, because it was revealed both before and after trial, that Paul Bouchard and Hunters Capital did not make specific promises to investors regarding how their investment money would be spend, and most important, Paul Bouchard did not always send Hunters Capital investment money to Founders Capital. For example: Hunter's Capital investor **Austin Westmoreland** was one of the government's trial witnesses (although he is not listed specifically as a victim in the PSR). The government presented Mr. Westmoreland as a victim at trial. Mr. Westmoreland testified, *inter alia*, that he "took out $25,000" against his home, and "gave it to Mr. Koerber." The court clarified and repeatedly asked Mr. Westmoreland if he had given money directly to Mr. Koerber. Mr. Westmoreland repeatedly responded, "Yes." The court also sought to clarify that it was Mr. Koerber who had offered Westmoreland "4% interest on the money you gave him?" Mr. Westmoreland again answered, "Yes." These statements were misleading because Mr. Westmoreland had given his money to Paul Bouchard and Hunters Capital, Inc., not directly to Mr. Koerber.[13] Further, in trying to ascertain whether Mr. Westmoreland suffered any pecuniary loss, Mr. Westmoreland has admitted that he received monthly interest payments from Hunters Capital for a period of time, and after Hunters Capital interest payments stopped, Westmoreland was "awarded $270,000" in restitution and has received a restitution check "every month" for approximately the last 133 months (11 years). *See* IRSMOI-01728. As it relates to Mr. Koerber

---

[13] On June 28, 2017, IRS Special Agent Nielsen, IRS Special Agent Marker, AUSA Walz, AUSA Murray, AUSA Aaron Clark, AUSA Hackford-Peer all met with Paul Bouchard of Hunters Capital, Inc., in preparation for his testimony in this case. During that interview Bouchard confirmed to prosecutors that Westmoreland was a Hunters Capital, Inc., investor not a Founders Capital, LLC investor. *See* FBI-016-0012. *See also* GJ-PB-037 (Grand Jury Testimony of Paul Bouchard, p. 37); UTDOC-12-00731; IRS-04-00530 at p. 8, ¶ 25.

and Founders Capital, Westmoreland told investigators that none of his money went to Rick Koerber or his company, because BOUCHARD had used it to "pay off old investors" in Hunters Capital, *see* IRS-04-00529 at p. 7, ¶21g. "Westmoreland said that on October 16, 2007 he called BOUCHARD and asked BOUCHARD what he did with his money and where had it gone. Westmoreland said that BOUCHARD told him that some other investors wanted out [of Hunters Capital] so Westmoreland took over their position and BOUCHARD [used Westmoreland's money and] paid them off." *See* IRS-04-00531 at p.9 ¶30.  Finally, Mr. Westmoreland informed investigators that he knew, and had received documentation to the effect that "the proceeds of his loan will be used for the general business purposes of Hunters Capital, Inc.,…and that no other companies, parties, investments, products, business plans, investment pans or any other use of funder are related to this agreement." *See* UTDOC-12-00491.

Trial evidence and related documents provided by both Mr. Bouchard and his investors, demonstrate that Hunters Capital did not make promises to each investor that their money would be sent to Founders Capital, and further establish that not all of Hunters Capital investor money was invested with Founders Capital. As a result, the court has no reason to accept the presumptions in the PSR, that any particular Hunters Capital investor lost money because of Founders Capital, or Mr. Koerber.  Further, without facts showing the amount of money invested and when, by any Hunters Capital investor, and corresponding facts regarding how much money Hunters Capital had paid in return to that particular investor, there is no factual basis to presume pecuniary loss – let alone reasonably foreseeable pecuniary loss resulting from Mr. Koerber's conduct.

The same deficiencies apply to **Arthur and Aileen Parks**, who are listed in the PSR as victims due to their purported investment of $110,000 with Hunters Capital. (Doc. No. 562 at p.

9, ¶30)  No explanation is offered as to when this was made, any proof that this money was subsequently intended for and received by Founders Capital, and without any proof as to how much money the Parks' received in return or since.  Further, bank records (Mountain America Credit Union – Receipt for Wire Transfer Request, 12/01/05) show that Arthur and Aileen did not invest directly with Hunters Capital, but instead sent their investment money to Provident Ideas, LLC.  Similarly, Mr. Bouchard has provided bank records for Provident Ideas, LLC showing that he spent considerable amounts of money deposited into this account on non-investment related items.

The same deficiencies apply to **Dan Schmedler**, who is listed in the PSR as victims due to his investment with Hunters Capital of $50,000.  *See* Doc. No. 562 at p. 9, ¶32  A victim impact statement dated June 16, 2010 was produced to Mr. Koerber for the first time on April 28, 2019. The statement does not include any explanation as to why this investment was made or any proof that this money was subsequently intended for and received by Founders Capital.  Furthermore, the statement fails to identify how much money Mr. Schmedler received in return or since 2010. It is highly possible that he has received significant restitution payments from Paul Bouchard since 2010.

**Paul and Brooke Bouchard**, are listed in the PSR as victims (*see* Doc. No. 562 at p. 10, ¶37) without any indication that the Bouchards invested any money, and without mentioning that Mr. Bouchard kept between 1 and 2% per month of the Hunters Capital interest payments, causing Mr. Bouchard to achieve a financial gain rather than a pecuniary loss.  No evidence pertaining to the Bouchards' personal loss has been provided to the defense.  Further, the PSR does not include any explanation as to when this investment was made, any proof that this

money was subsequently intended for and received by Founders Capital, and the PSR lacks any proof as to how much money the Bouchards received in return.

The same deficiencies apply to **Dallas Arnell**, who is listed in the PSR as a victim due to him being "Behind on retirement goals". *See* Doc. No. 562 at p. 10, ¶38. A victim impact statement was submitted to the defense for the first time on April 30, 2019.  Mr. Arnell claims to have invested $35,000 directly with Hunters Capital in September of 2006 pursuant to a promissory note stating that the general loan was for the "general business purposes of Hunter's Capital."  However there is no documentation whatsoever revealing how much Mr. Arnell received back from Hunter's Capital following his investment.  He claims to have lost his "principal amount" but remains silent as to how much money he received in interest payments, leaving open the possibility that he was paid out more than he invested.

Finally, Mr. Bouchard has admitted in a related administrative action that he did not use all of the proceeds Hunters Capital received from Founders Capital to pay Hunters Capital investors, and that he used some of the money to pay 10 individuals' commissions.

### Example 2: MIWE Holdings, LLC.

Separating out MIWE Holdings, LLC investors, and singling out individuals two and three steps down an unexplained investor chain suffers from the same problems as described above. For example, the PSR includes "Adam Sessions" as a MIWE related victim (see Doc. No. 562 at p. 11, 39), without explanation, but MIWE's proprietor Mr. Isom was convicted of misinforming MIWE investors as to how their money was being invested and used.  This is significant for the reasons being outlined here, because Mr. Sessions admits that he invested with a company called "Vanderslice Holdings" in July 2007, and that the proprietor of that company, Kurt Vanderslice

"told Sessions that he had used the $175,000 Sessions gave him to pay other investors" rather than investing in MIWE or Founders Capital, etc.  *See* IRSMOI-01136 thru IRSMOI-01140.

    *c.   The PSR Impermissibly Counts Victims Who Were Not Exposed to Fraud*

  When condensed to its essential parts, the fraud for which Mr. Koerber was convicted at trial is relatively simple and straightforward.  At trial, the government presented, and Mr. Koerber was convicted upon, a theory that he defrauded investors through the misuse of Founders Capital funds.  There were two parts to this presentation.

  First, the United States alleged that Mr. Koerber committed securities fraud and wire fraud through his "equity milling" scheme by promising Founders Capital investors that money they loaned on promissory notes would be used for real estate purchases. Instead, the majority of the money was used for other things, such as cars, restaurants, dental work, a movie, gold, adoptions, etc.  The government put on evidence that of approximately $100 million only about 20% of the money loaned to Founders Capital was spent directly on real estate.  *See e.g.* Doc. 559 at 9.

  Second it was alleged by the United States that Mr. Koerber committed securities fraud and wire fraud, through his "equity milling" scheme by creating a false aura of success, including making false statements about his income, or omitting to make statements, regarding the unprofitability of his Franklin Squires and Founders Capital related enterprises, and by subsequently using approximately 50% of the $100 million borrowed by Founders Capital to pay out monthly interest payments to its note holders. *Id.* at 8.  Significantly, several Founders Capital investors did testify that they were not promised that the money they invested would be used only for real estate, and testified that there was no restriction at all on the appropriate use of funds by Mr. Koerber.  Further, several investors testified that they had not been misled at all.

This creates an issue related to defining "victims" and calculating "loss" because, as already outlined above, only those individuals who suffered loss as a result of the "fraud" at issue can be counted as "victims" and only loss that resulted from the illegal activity at issue - can be included in the loss amount.

The PSR includes investors Snarr, Moore, Vaughn, Andreason, and individuals who invested with them, even though Snarr, Moore, Vaughn, Andreason, et al. testified that they never understood there would be a restriction on funds and were not otherwise misled. *See e.g. United States v. Frith*, 461 F.3d 914, 917–18 (7th Cir. 2006) ("[W]here losses are attributable to relevant conduct, the relevant conduct must be criminal or unlawful conduct."); *United States v. Schaefer*, 384 F.3d 326, 329 (7th Cir. 2004) ("[T]o be relevant conduct, [it] had to be unlawful.");

> d. *The PSR Impermissibly Counts as Victims, Investors Who Did Not Suffer Loss Prior to Accepting the Founders Capital Equity Exchange Offer because thereafter the Loss was caused by the Downturn in the Real Estate Market.*

At trial, it was established that from 2004 to early 2005, investor money was loaned to Franklin Squires Companies, LLC. The initial investors were Franklin Squires owners and a group of Engenuity referred individuals and entities.[14] These investors received simple one or two page promissory notes that defined a high interest, paid monthly and the right to request liquidation of the notes at any time.

In May of 2005, Mr. Koerber (on behalf of Franklin Squires) and Les McGuire (on behalf of McGuire Group, LLC) started a new business - Founders Capital, LLC to consolidate investment and interest payment activity of note holders. Early Franklin Squires promissory notes were transferred to new notes issued by Founders Capital, LLC. The number of note

---

[14] [Isom, Bouchard, Magelby, Carroll, Bartholomew, Mooring, Kipp, Long, etc.]

holders subsequently increased and decreased between 2005 and 2007.   New investors were

added, and some investors had their promissory notes paid in full and as agreed.[15] Founders

Capital, LLC promissory notes were standardized in 2005, and as Founders Capital investors

increased or decreased the amount of money invested, addendums were issued increasing or

decreasing the note balance and corresponding change in monthly interest amount to be paid.

One feature of the standardized Founders Capital, LLC promissory notes was a

"Security/Collateral" paragraph, detailing a provision promising investors that the promissory

note principal balance was secured by a relative portion of real estate equity.

In June 2006, McGuire and Hooper died in a plane accident. In approximately December

2006, Mr. Koerber hired former Chase Bank executive David Kirby. In January 2007 a new

entity named Founders Capital Investments, LLC was set-up with Mr. Kirby as the President,

with Mr. Koerber as the manager and ultimate decision maker (now that Les McGuire was

deceased), and old Founders Capital, LLC notes were converted to Founders Capital

Investments, LLC notes, which notes were otherwise materially the same as the prior notes.

As of May 18, 2007, the total number of Founders Capital note holders was 10.[16]

In approximately June/July 2007, Founders Capital was unable to pay monthly interest payments

on its promissory notes.  By this time, the enterprise had acquired and held real estate title in

several hundred single-family residential homes throughout the United States. However, by

June/July 2007 the enterprise lacked cash resources necessary to continue normal operations.

---

[15] Defense expert Dave Hardman can testify these included Sleater, Miller, Stehrenberger, Martin, Choules, among others.

[16] *See* Gov't Trial Ex. 21.

Between November and December 31, 2007, with the aid of several attorneys including Russell C. Skousen, Mr. Koerber made a formal rescission offering to each Founders Capital note holder, and also assisted and oversaw Franklin Squires Companies, LLC, McGuire Group, LLC, Rick Koerber, LLC and Aespectus, LLC in making an identical rescission offer.  This written rescission offer gave each note holder the option of requesting the liquidation of their promissory note for payment representing 100% of unpaid principal plus 12% statutory interest. Any note holder who elected to rescind would be paid back from the liquidation of real estate held by the enterprise.  No Founders Capital note holder elected to rescind.[17] At approximately the same time as the recession offers, Mr. Koerber also offered note holders in each of these same entities the new opportunity of exchanging their notes, at 100% of the amount owed on their promissory note balance, for ownership shares in Founders Capital Investments, LLC.

Accompanying these rescission and exchange offers, Mr. Koerber also circulated a voluminous disclosure document, a Private Placement Memorandum ("PPM").[18]  In the PPM, Mr. Koerber explained inter alia that his business enterprise had become illiquid, and that the plan going forward was to try and save the enterprise and accomplish investment returns for Founders Capital note holders and new owners by the possible liquidation of Franklin Squires and Founders Capital related assets (real estate and non-real estate).

---

[17] Nevertheless, after November 2007, a multitude of real estate interests were successfully liquidated including the Mississippi mansion testified to by defense witness Kenny Snarr, the property transferred to Ray Hooper's widow Danita Hooper, H street/ Wyoming, Iowa street/Wyoming, 3 properties to David Kirby's dad (see June 16, 2011 memo), two Springville properties, and Vonco lawsuit properties.

[18]  See Gov't Trial Exhibits 598 (FC Rescission Offer Letter), 516 (Rescission Offer Document).

Included in the PPM, Mr. Koerber provided broad disclosure, including his balance sheet records for Founders Capital, the records of prior money loaned by Founders Capital, the disclosure of his prior consent decree in Wyoming, and a description of the planned use of proceedings including non-real estate uses, personal uses, and payments to investors.

At the time of the PPM, all but ten Founders Capital promissory note holders had been paid in full, according to the terms of the note, or had exchanged their Founders Capital promissory note for a note issued by another company.[19]  As of December 31, 2007, all but three Founders Capital note holders signed the election to exchange their promissory note for ownership in Founders Capital Investments, and by exchanging their promises of monthly interest and on-demand liquidation, these investors had a new ownership investment with no monthly payments, and no guaranteed return.

As of January 1, 2008, of the three remaining Founders Capital promissory note holders (Hunters Capital (Bouchard); Matson Magleby; and Michael Kipp) only Hunters Capital had an outstanding principal balance, which was $6,289,173.28).

Mr. Koerber's illiquidity, rescission offer, exchange offer, and subsequent asset liquidation efforts all took place amidst the largest, unpredicted real estate meltdown and related financial market and credit industry collapse in modern history.  This crash is exceptionally significant in the context of sentencing, because the entire real estate portfolio then held by Mr. Koerber's companies (as documented in the PPM) had a fair market liquidation value of

---

[19]  *See* Gov. Trial Ex. 21 ("Accelerated Capital Inv., LLC (David Kirby); AKL, LLC (Clyne Long); Franklin Squires Companies, LLC; HIJ Investments, LLC (David Bartholomew); Hunters Capital, LLC (Paul Bouchard); Matson Magelby; McGuire Group, LLC (Les McGuire/Cody Moore); Michael Kipp; MIWE Holdings, LLC (Michael Isom); and Strategic Holdings (Jamie Mooring).

$31,850,372.09. This value was not able to be liquidated, as a result of market events entirely outside Mr. Koerber's control.

During the second Koerber trial, the defense offered several witnesses to discuss the Private Placement Memo ("PPM") that was distributed to investors in 2007.  The private placement memo contained clear disclosures of the assets and liabilities of Founders Capital and the fact that the investor money was being used for projects outside of the equity mill.  With the exception of the value of the Heber cabin, which was hotly disputed at trial, the government did not rebut any of the additional information contained in the PPM. The effect of this evidence is that from the date of the PPM's distribution, the government can establish no fraudulent misrepresentations.  In fact, the government carefully curtailed its evidence at trial so that it would not extend past the date of the PPM distribution.  Therefore, it can be logically argued that those investors who were not suffering pecuniary loss at the time of the PPM cannot be transformed into victims at a point after the claimed fraudulent misrepresentations have ceased.

Additionally, the defense called witnesses (expert and lay witnesses) who described in detail the unforeseeable market conditions that affected investments across the United States in the time following the PPM.  For the Second Amended PSR to continue to count those later investment losses caused by unforeseeable, catastrophic market conditions as connected to the misrepresentations in this case runs contrary to established case law.  *See United States v. Stein*, 846 F.3d 1135, 1155–56 (11th Cir.), cert. denied, 138 S. Ct. 556, 199 L. Ed. 2d 436 (2017) ("Once Mr. Stein pointed to intervening events that may have affected the stock price, the district court was obliged to make findings regarding the effects of these intervening events, if any, and whether these events were reasonably foreseeable to Mr. Stein. Because the court failed to do so, we vacate the sentencing order. On remand, the district court should determine whether these

intervening events affected Signalife's stock price during the fraudulent period and, if so, whether they nonetheless were reasonably foreseeable to Mr. Stein. If the district court finds that these or any other intervening event reduced the value of Signalife stock during the fraudulent period and that the events were not reasonably foreseeable, the district court, to the extent possible, should approximate the effect of such intervening events and subtract this amount from its actual loss calculation[.]")

### **OBJECTION #12**

Following Mr. Koerber's original objections, the government submitted a "Response" to the USPO and to the defense on March 28, 2019.  In their "Response", the government explained their theory of how loss should be calculated and explained that no matter the losses of the downline investors, the overall loss amount would not change because of the method of loss calculation the government used.  Specifically, the government is relying entirely on money in/money out to/from first-line investors only based solely on Mr. Koerber's bank records.  The bank records of the first-line investors or their flow-through entities were not examined to determine where the money came from and what it was used for.  No consideration was given for salaries paid to first-line investors from company profits, or available collateral, or the timing of the payments, etc. etc. etc.  The Second Amended PSR incorporates this method of loss calculation, laid out on March 28th and makes no independent investigation or valuation of loss.

In light of the government's explanation of their loss amount calculation in their "Response" filed after Mr. Koerber's original objections, Mr. Koerber renews his objection to the loss amount contained in the Second Amended PSR, which impacts paragraphs 8, 15-19, 24, 47, 57 and 97 and respectfully submits the following supplemental points and authorities in support of his objection.

**The Method of Calculating Loss is Unreasonable**

*1. Fails to Credit for Collateral and Other Material Facts related to Fair Market Value*

Founders Capital, LLC promissory notes were standardized in 2005. One feature of the standardized Founders Capital, LLC promissory notes was a "Security/Collateral" paragraph, detailing a provision promising investors that the promissory note principal balance was secured by a relative portion of real estate equity. *See United States v. Austin*, 479 F.3d 363, 369 (5th Cir. 2007) ("A defendant who has pledged or otherwise provided collateral in order to obtain funds "has never deprived [the victim] of more than the total amount of the [funds] less the value of the pledge....") "Applying this rationale, assets pledged up until the time the offense is discovered or the time the defendant reasonably should have known that the offense was detected or about to be detected, are referable to the context of the transaction because the pledge of assets is not an attempt to buy a sentence reduction or continue the fraud, but instead to effectuate a reduction of the actual or intended loss." *Id.*

*2. The inconsistent conclusions of the accounting experts create a material factual dispute*

At trial, the government accounting expert and the defense accounting expert reached different loss amounts based on the methodologies they applied.  The jury was never asked for any sort of special verdict identifying which loss amount they found to be most persuasive.  The defense is prepared to put forth witness testimony and evidentiary support for a loss amount that is far less than the loss amount recommended by the government.

*3. Necessity of determining joint and several liability and crediting previous restitution payments or civil judgments against Mr. Koerber.*

Several of the first line investors in Founders Capital have already been convicted of defrauding the exact same "victims" identified in Mr. Koerber's case.  (Magelby, Isom, Bouchard, Joseph)  The judges in those cases awarded significant restitution payments based on the same loss amounts the government is now trying to require Mr. Koerber to reimburse.  There have also been numerous civil suits based on the same facts presented in Mr. Koerber's criminal case.  The PSR reflects pages and pages of civil liabilities Mr. Koerber already bears. The government is using many of the exact same witness statements that were submitted in these other criminal and civil matters to this Honorable Court.  No victim is entitled to a windfall of multiple awards simply because joint actors were tried separately or because the civil matters proceeded first.  The defense respectfully requests a joint and several liability finding and credit for all restitution payments and/or civil judgments awarded to date.  The defense needs sufficient time to investigate how many such awards/payments have been made to the 96 newly confirmed victims disclosed on April 28th.

### OBECTION # 13

On April 30, 2019, the Court forwarded to defense counsel the revised sentencing recommendation of the USPO.   Mr. Koerber objects to the recommendation on the ground that it utterly fails to consider any factors, which would justify a variance from the sentencing guidelines. Furthermore, the recommendation fails to consider the purposes of sentencing or the suggested sentencing factors under 18 USC Section 3553 and makes no mention whatsoever of Mr. Koerber's lawful conduct or contributions to the community in the intervening decade since the time frame of the indictment.  Collateral consequences of Mr. Koerber's prosecution and resulting sentence are not discussed or considered in any way.  Mr. Koerber's health and the

impact that imprisonment will have on his health are not addressed or considered.  Mr. Koerber's lack of a criminal record is also not mentioned at all.  There is no discussion about the fact that the sentence being recommended is significantly higher than the national average in these types of cases, by approximately 15 years.  The recommendation states that the government has not provided any proof of restitution payments made by Mr. Koerber prior to his conviction.  However, the government is aware that Mr. Koerber liquidated assets such as cars, gold coins, life insurance policies, and construction equipment to continue to pay individuals as long as he could.  During trial, there was testimony about the efforts that were made during late 2007 and early 2008 to liquidate properties.  The recommendation never mentioned the catastrophic real estate market crash and the impact that had on the amounts of the losses in this case.  The USPO recommendation is unreasonable and unsupported by the facts and circumstances surrounding this case and this particular offender.

## **CONCLUSION**

The government's victim count and loss amount calculations contained in the Second Amended PSR and the Second Addendum filed on April 30, 2019, are unreasonable and unsupported by the facts in this case.  Mr. Koerber's guideline range will vary by a significant number of years, depending on the facts found by this Honorable Court in the context of the sentencing guideline analysis.   Mr. Koerber has already requested an evidentiary hearing and respectfully requests that the objections contained herein be considered as well during the evidentiary hearing.  Mr. Koerber also requests enough time to investigate fully the claims of loss by the victims identified in the Government's April 28th disclosure.

Respectfully submitted on this the 9th day of May, 2019.


_____/s/ Kathryn N. Nester_