JOHN W. HUBER, United States Attorney (#7226)
AARON B. CLARK, Assistant United States Attorney (#15404)
RUTH J. HACKFORD-PEER, Assistant United States Attorney (#15049)
TYLER MURRAY, Assistant United States Attorney (#10308)
Attorneys for the United States of America
111 South Main, Suite 1800
Salt Lake City, Utah  84111
Telephone:  (801) 524-5682

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No.  2:17-CR-00037 |
| Plaintiff, | : | **EVIDENTIARY SUBMISSION REGARDING LOSS AMOUNT FOR SENTENCING** |
| v. | : | |
| CLAUD R. KOERBER, | : | Judge Frederic Block |
| | : | Magistrate Judge Paul M. Warner |
| Defendant. | : | |

---

Pursuant to the Court's May 13, 2019 instructions (ECF No. 567), the United States respectfully submits this written evidentiary submission in support of the loss calculation in this case.  The United States makes this submission in lieu of live testimony at the evidentiary hearing scheduled for July 25 and 26, 2019.[1]  As set forth below, the evidence shows defendant Koerber caused a loss of $45,258,892.09.

### SUMMARY

The United States calculated the loss amount in this case by identifying the total amount of investment money Koerber took in, and subtracting the amount of principal and interest

---

[1] The United States reserves the right to present rebuttal witnesses at the hearing, should the need arise.

payments he made back out to his frontline investors.  Excluding net winners, the resulting loss

figure is $45,258,892.09.  This calculation is straightforward, and is consistent with the loss

calculation suggested in the case law and Sentencing Guidelines for Ponzi scheme cases like this

one.  The figures used in the calculation are reliable because they came directly from Koerber's

own accounting records and independently prepared bank statements.

Koerber nevertheless disputes this amount and has insisted on an evidentiary hearing to

posit his own version of the loss.  Despite having months to come up with an alternative loss

amount, as of the time of this filing (a little over a week before the hearing), Koerber has failed

to provide a loss figure to the Court, the Probation Office, or the United States.  The likely

reason for the difficulty he is having is that he is trying to reduce the loss amount with non-

existent collateral, payments that have no relation to his investment fraud, and a meaningless

transaction in which he offered investors worthless equity in exchange for worthless debt.  Such

attempts to reduce the loss amount have no basis in logic, fact, or law.  The Court should reject

Koerber's loss arguments and reject whatever loss figure he comes up with based on these

arguments.

## KOERBER'S CRIMES

The evidence at trial showed Koerber raised investor money through the operation of a

Ponzi scheme and through misrepresentations and omissions about the profitability of his

businesses and how he would spend investor money.  Based on this evidence, the jury convicted

Koerber of four counts of Fraud in the Offer and Sale of Securities, in violation of 15 U.S.C.

§ 77a(a) and 77x (Counts 1-4); nine counts of Wire Fraud, in violation of 18 U.S.C. § 1343

(Counts 5-13); and two counts of Money Laundering, in violation of 18 U.S.C. § 1957 (Counts

15 and 16).

## METHOD FOR CALCULATING LOSS

Under the Sentencing Guidelines, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n. 3(A)(i)-(ii).  The United States and the Presentence Report calculated actual loss, which is "the reasonably foreseeably pecuniary harm that resulted from the offense." *Id*. "'Pecuniary harm' means harm that is monetary or that otherwise is readily measurable in money." *Id.* cmt. n. 3(A)(iii).  "'[R]easonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. cmt. n. 3(iv). "The court need only make a reasonable estimate of the loss."  *Id.* at cmt. n. 3(C);  s*ee also United States v. McAlpine*, 32 F.3d 484, 488 (10th Cir. 1994) ("The amount of loss need not be precise.  The court need only make a reasonable estimate of the loss, given the available information.").

The method for calculating loss in a Ponzi scheme/investment fraud case, like this one, is established in both case law and the sentencing guidelines.  To calculate the loss from such crimes, the Court must (i) identify the amount invested in the scheme, then subtract (ii) the amount the defendant returned to investors during the course of the scheme and (iii) any offsets for collateral. The resulting amount is the loss.  *Id.* at cmt. No. no.3(E)(i) - (ii).  *See also, e.g., United States v. Lewis*, 594 F.3d 1270, 1289-90 (10th Cir. 2010) (loss in a Ponzi scheme case was calculated as the "sum of investor deposits to the accounts of scheme companies less the sum of payments to investors from those companies."); *United States v. Aptt*, 354 F.3d 1269, 1278) (10th Cir. 2004) (loss amount from Ponzi scheme calculated as total amount invested less amounts returned, plus promised, but unpaid, interest); *United States v. Hsu*, 669 F.3d 112, 120-22 (2d Cir. 2012) (loss

from Ponzi scheme calculated as amounts invested (including returns that were re-invested in the scheme) less amounts paid out); *United States v. Orton*, 73 F.3d 331, 333-34 (11th Cir. 1996) (loss from Ponzi scheme calculated by determining total net loss (amount invested – amount returned) of all victims who lost all or part of the money they invested).

Because of the nature of a Ponzi scheme, some investors may receive more in return than they initially invested.  Under the Sentencing Guidelines, such gains to individual investors are *not* used to offset the losses to other investors in the scheme.  U.S.S.G § 2B1.1 cmt. n. F(iv).  Losses in a Ponzi scheme exclude net winners because "Ponzi scheme operators do not provide investors with gains out of the goodness of their hearts or to lessen damage to investors, but to keep their fraudulent scheme running."  *United States v. Hsu*, 669 F.3d at 572.  Otherwise, a defendant like Koerber would be rewarded for "conduct that perpetuates, and constitutes a component of, the Ponzi scheme."  *Id.  See also United States v. Orton*, 73 F3d. 331, 334 (11th Cir. 1996) (excluding investors who gained from the Ponzi scheme "takes into consideration the nature of a Ponzi scheme by holding a defendant fully accountable for all losses suffered by those victims who lose money, but does not allow the defendant to fully benefit from payments made to others.").

## EVIDENCE SUPPORTING LOSS CALCULATION

As set forth below, the loss calculation in this case is based on Koerber's own bank and accounting records.  Those records show (i) the amount Koerber obtained from investors; and (ii) the amount he returned to investors as either principal or interest payments.  Excluding net winners, the difference between these two gives a loss amount $45,258,892.09.  And because there is no evidence of collateral or other items that should offset this amount, this is the amount the Court

should use to calculate Koerber's guideline range.

FBI Forensic Accountant Angela Mennitt calculated this loss amount on behalf of the United States.  Ms. Mennitt is both a Certified Public Accountant and a Certified Fraud Examiner.[2]  As part of her work on this matter, she reviewed, among other things, over 60 bank accounts associated with Koerber and Koerber's own internal accounting records, which were maintained with accounting software called Quickbooks.[3]  She also reviewed promissory notes, Koerber's purported Private Placement Memorandum (Defense Trial Ex. 516), Koerber's Promissory Note Summary (Government Trial Ex. 21), and the drafted—but never finalized—compiled balance sheet from CPA Clark Wilkinson (Government Trial Ex. 105).  She also listened to the testimony throughout the trials.[4]  She is therefore very familiar with this financial aspect of this case.[5]

### Identifying the Amount Obtained from Investors

Ms. Mennitt identified the amount Koerber obtained from investors using Koerber's own accounting and bank records.  Specifically, she reviewed the period from April 2004 to October 2007 (the latest date available for Koerber's Quickbooks accounting records.)[6]  Ms. Mennitt used Koerber's Quickbooks records to identify the bank accounts into which Koerber deposited investor funds.[7]  She could do this because Koerber's Quickbooks records categorized deposits from investors as "long term notes" or "promissory notes."[8]  She then examined the bank records and

---

[2] *Angela Mennitt Testimony*, 2018 Trial Tr. 1138-1140 (Excerpts from 2018 Trial Testimony of Angela Mennitt are attached as Exhibit 1).
[3] *Id.* at 1140-1142;  *See also Declaration of Angela Mennitt ("Mennitt Dec."),* ¶ 2  (attached as Ex. 2).  The specific bank and accounting records Ms. Mennitt used to calculate loss are listed in paragraphs 6 and 7 of her declaration.
[4] *Angela Mennitt Testimony*, 2018 Trial. Tr. 1145-1146; Mennitt Dec. ¶ 2.
[5] Mennitt Dec. ¶ 2.
[6] Mennitt Dec. ¶ 4.
[7] *Mennitt Dec.* ¶ 5, 8.
[8] *Id.* At ¶ 8.

identified which deposits came from investors (as opposed to deposits from other sources) by matching deposits found in the bank records to deposits in the "promissory notes" or long term notes section in Koerber's Quickbooks files.[9]  By doing so, she was able confirm that a specific deposit came from a specific investor.  The deposits used in this calculation came from Koerber's frontline investors—i.e. those who gave money directly to him and received promissory notes from him in return.[10]  Through this process, she was able to sum the total of each deposit from each investor and arrive at the total amount invested with Koerber.[11]

***Identifying the Amount Koerber Returned to Investors***

To identify how much Koerber returned to his investors, Ms. Mennitt again looked at Koerber's bank records and Quickbooks files.  Koerber's payments to investors were listed in Quickbooks as either draws (i.e. repayments of principal) or as interest payments.[12]  She found payment transactions in Koerber's bank records and matched them to the payment entries in the Koerber Quickbooks files associated with the draws (reductions) to the promissory notes and interest expense.[13]  Through this process, she was able to sum the total of all payments to each investor and arrive at the total amount Koerber returned to investors.[14]

Throughout the process of identifying deposits, draws, and interest payments, Ms. Mennitt excluded any internal transfers between bank accounts to avoid any duplication.[15]

***The Loss Calculation***

---

[9] *Id*
[10] *Id.*
[11] *Id.*
[12] *Mennitt Dec.* at ¶  9.
[13] *Id.*
[14] *Id.*
[15] *Id.* At  at ¶ 10.

Once Ms. Mennitt identified the total amount of investor funds deposited into Koerber's accounts, and the total amount he paid back to each such investor (either as draws or interest payments) she simply subtracted the total amount each investor received from the total amount invested.  The resulting amount is that investor's loss [16], and also represents the amount Koerber owes to that investor in restitution

To illustrate the process of identifying investor deposits and payments to investors, Ms. Mennitt provided the supporting calculations for Temuco, LLC, an entity managed by Jerem Eyre.  This work is shown as Exhibit 2 to Ms. Mennitt's declaration.   It shows Temuco invested $1,070,645 and had a principal draw of $8,500, which leaves a principal balance of $1,062,145.  This number corresponds to the outstanding principal balance shown for this investor on Koerber's Promissory Notes summary in Government Trial Ex. 21.[17]  The records showed interest payments to Temuco of $439,994.49, leaving a loss for this investor of $622,150.51.  This same process was repeated for the other investors to come up with the total loss amount.

As part of this process, Ms. Mennitt reviewed the documents and excluded any investors who received more in return than they invested with Koerber from the loss calculation, as required by U.S.S.G § 2B1.1 cmt. n. F(iv).[18]  Ms. Mennitt's loss calculation is reflected in the spreadsheet attached as Exhibit 1 to her declaration.  As shown in the spreadsheet, the total amount Koerber obtained from losing investors was $91,417,871.37[19]; and the total amount he returned to them (either as interest payments or returns of principal) was $46,158,979.28, leaving a total loss amount

---

[16] *Id.* at  ¶ 11.
[17] *Id.* at ¶ 12; Govt. Tr. Ex. 21 (attached as Ex. 3).
[18] *Mennitt Dec. at ¶* 13.  .
[19] *Id.* at ¶  13. This amount is lower than the $98.6 million identified a trial, in large part because this excludes the investment made by "net winners."

of $45,258,892.09.[20]

This is a conservative calculation because it only represents cash in and cash out.  It excludes the interest Koerber promised, but failed to pay in the summer of 2007.  At that time, Koerber's stream of investment money ran dry, and he was therefore unable to make interest payments.  Instead of making interest payments, Koerber increased the promissory note principal balance by the amount of unpaid interest (denoted in his books as "compounding interest") — effectively re-investing the returns he promised to investors.[21]  In some cases, the loss amount in a Ponzi scheme can include such promised returns that the victims re-invest—even if the defendant did not actually have the ability to pay the return.  *See United States v. Hsu*, 669 F.3d at 122 (intended loss for guidelines could include earnings that victims in a Ponzi scheme re-invested, even though defendant had no money to actually pay the earnings).  If these amounts had been included in the loss calculation, the loss would have been even higher.

### There Are No Offsets For Collateral

Koerber argues that, in addition to the offsets for the interest and principal payments he made to investors, the loss amount should be further reduced by the amount of collateral that Koerber pledged to secure the amounts he received from investors.  Under Koerber's theory, at the time investors gave him money, he promised them a "relative portion" of the equity he supposedly held in residential real estate as collateral, and the losses should be reduced by the value of this collateral.  Koerber Supplemental Objections, ECF No. 566, p. 29.

---

[20] Ms. Mennitt did not include any offsets for collateral in her calculation, and she did not consider offsets for payments unrelated to promissory notes (e.g. labor costs, property lease payments, or other reimbursements). Mennitt Dec. at ¶ _3_.

[21] Trial Ex. 22a at pages 19-23 (Koerber recorded the increase in the note balance as "compounding interest") (attached as Ex. 4).

But under the Sentencing Guidelines, loss is not reduced by the purported value of the collateral that Koerber promised in order to induce investment—loss is only reduced by "the amount the victim has **recovered** at the time of sentencing from disposition of the collateral," or "if the collateral has not been disposed of by [the time of sentencing], the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n. 3(E)(i)-(ii) (emphasis added).

*There Was No Prior Recovery from the Disposition of Collateral*

Here, despite Koerber's insistence otherwise, the available evidence shows that victims have not recovered anything from any purported disposition of collateral. For example, during the 2017 trial, Koerber's lawyer questioned Frank Breitenstein and Garth Allred, two individuals who invested with Koerber through an entity called Vonco. In his questions, Koerber's lawyer suggested that Vonco had received approximately 50 properties from Koerber's companies. The witnesses were not aware of this.[22] And even if such a transfer happened, the bankruptcy trustee overseeing the bankruptcy of William Hoopes (Vonco's owner, who listed his Vonco investors as creditors in his bankruptcy), must have found that any such properties had no value, because he reported "that I have made a diligent inquiry into the financial affairs of the debtors and the location of the property belonging to the estate; and that there is no property available for distribution from the estate over and above that exempted by law."[23] In any event, it appears that neither Vonco nor its investors actually recovered anything through a transfer of properties from Koerber to Vonco.

Also during the first trial, an attorney named Justin Elswick testified about a discussion he had with Koerber about a large cabin in Heber City that Koerber proposed could be used as security

---

[22] 2017 Frank Breitenstein Testimony, 2017 Trial Tr., 443-446; 449-52 (attached as Ex.5); 2017 Garth Allred Testimony, 2017 Trial Tr. 1355-1357 (attached as Ex. 6).
[23] Chapter 7 Trustee's Report of No Distribution, *In re William K and Vonnie J Hoopes*, 2:09-bk-20396, (D. Utah May 8, 2009).

9

for the millions owed to investor Paul Bouchard (of Hunters Capital).  But upon doing research, Mr. Elswick's firm discovered that this property was not even titled in Koerber's name and so Mr. Koerber's offer of this cabin as security was a "hollow promise or a false promise.".[24]  Again, there was nothing recovered as a result of this purported Heber Cabin collateral.

Similarly, investor Garth Allred testified he that asked a friend who had a title company to research properties associated with Koerber's companies to see if any of them could be used to repay Allred.  The friend initially thought some properties might be available, but after Allred and other Vonco investors filed a lawsuit in an attempt to recover from Koerber, they ultimately found no properties that were free and clear, and Allred never recovered anything from his $200,000 investment.[25]

Likewise, witness Craig Carroll, who invested directly with Koerber, met with Koerber after Koerber stopped making interest payments and asked Koerber about taking properties in lieu of the promissory notes Koerber had issued.  There were some discussions about this, and Carroll even looked at a couple of properties, but no properties were ever transferred.  In fact, Carroll sued Koerber and obtained a judgment for the outstanding balance he was owed, but Koerber has never paid it.[26]  Carroll recovered nothing from the disposition of collateral.

Koerber also tries to give the impression he used property to repay investor Jerel Clark, alleging that Jerel Clark testified at trial that after he "received a transfer of real estate [from Koerber] in January 2008, [Clark] suffered no pecuniary loss."  Koerber Supplemental Objections, ECF No. 566 at p. 7. This statement is false, and misrepresents Clark's testimony.  Clark testified

---

[24] 2017 Justin Elswick Testimony, 2017 Trial Tr. 4975-4977; 4986; (attached as Ex. 7).
[25] 2018 Garth Allred Testimony, 2018 Trial Tr. 815-816 (attached as Ex. 6A).
[26] 2018 Craig Carroll Testimony, 2018 Trial Tr. 504-505; 512-21; (attached as Ex.8).

that his father sold an office building, in Logan, Utah to Koerber under a seller financing arrangement in which Koerber would take control of the building and make the elder Clark's mortgage payments, but Clark's father would still hold the mortgage and be responsible to pay the mortgage if Koerber failed to make any payments.  Koerber stopped making the payments, but the transaction prevented Mr. Clark's father from selling the building to someone else.  So Clark arranged for Koerber to transfer control of the building back to Clark's father, and Clark agreed to take a $100,000 reduction in the note Koerber owed him in return.  Contrary to what Koerber asserts in his objection, Clark testified that he still lost about half his investment and this loss of money was a "hardship" for him.[27]

Similarly, Paul Bouchard of Hunters Capital, one of the largest investors in Koerber's scheme, was asked at the 2017 trial about any recoveries from Koerber.  He was asked "[a]fter the payments [from Founders Capital] stopped, how much money did you get back?"  He responded: "Zero."[28]

It is no surprise that the supposed collateral Koerber owned provided no recovery to his investors.  The evidence at trial showed that the supposed "security" Koerber offered his investors was illusory because he lacked sufficient equity to cover the amounts he owed.  As Ms. Mennitt explained at trial, despite Koerber's promise to have sufficient real estate equity to cover the amounts he took from investors, he did not do so.  Using historical costs for the real estate, Koerber's "own books and records at the time showed the equity was negative, meaning they didn't have any value."[29]  And even using Koerber's own "market" valuation for the properties,

---

[27] 2018 Jerel Clark Testimony, 2018 Trial Tr. 571-574 (attached as Ex. 9).
[28] 2017 Paul Bouchard Testimony, 2017 Trial Tr. 2518-2519 (attached as Ex. 10).
[29] 2018 Angela Mennitt Testimony, 2018 Trial Tr. 1201-1207; Trial Ex. 142 at slides 23-24 (Attached as Ex. 11).

which included a monthly mark-up above purchase price and was not based on fair market value, he at best had $31.9 million of equity—an amount far less than he owed to investors.[30]  This led Ms. Mennitt to conclude that Koerber's "statement that the notes were backed by real estate" was, in fact, "false." [31]

The numbers are even worse when one considers the fact that Koerber did not even own many of the properties he supposedly used as collateral.  Koerber at best had a lease option on many of these properties, meaning that he would have had to come up with additional funds to obtain fee title to the properties. Only then would he be able to sell them.[32]  When Ms. Mennitt accounted for the properties that Koerber did not own or on which he only held a lease option, the equity amount fell to just $14.7 million—which is again far less than what he owed.[33]

Finally, in connection with the Presentence Report, Koerber told the Probation Officer that from 2009 on, he liquidated and preserved assets from his companies for the benefit of owners and creditors.[34]  Despite this assertion, Koerber admits he does not have "a complete accounting of the surviving assets or the financial transactions from 2009 forward."[35]  As a result, there is no way to tell which assets he supposedly liquidated, when he did it, how much he received, or how much he provided to his victims.  Koerber is in the best position to provide information about the alleged payments made to his victims from his purported disposition of collateral, and he has admitted he cannot provide it.  Thus, despite Koerber's assertions that he transferred properties and/or liquidated assets to pay his victims, there is no evidence that investors have previously "recovered"

---

[30] 2018 Angela Mennitt Testimony, 2018 Trial Tr. at 1201-1206; Trial Ex. 142, slide 24.
[31] Id. at 1206.
[32] 2018 Lori Chapman Testimony, 2018 Trial Tr. 79-82 (attached as Ex. 12);
[33] 2018 Angela Mennitt Testimony, 2018 Trial Tr. 1206-1211; Trial Ex. 142 at slide 25.
[34] Amended Presentence Report, ECF 562 at p. 21.
[35] Id.

anything from the disposition of any collateral. *Cf. United States v. Bin Wen*, 2018 WL 6715828 at \*36-39 (W.D.N.Y December 21, 2018) (finding that while the Government has the initial burden of establishing the loss amount, and always retains the burden of persuasion, the defendant has the burden of production with respect to providing evidence to show credits to the loss amount); *United States v. Jimenez*, 513 F.3d 62, 85-86 (3d Cir. 2008) ("Although the burden of persuasion remains with the Government, once the Government makes out a prima facie case of the loss amount, the burden of production shifts to the defendant to provide evidence that the Government's evidence is incomplete or inaccurate."). For these reasons, the Court should refuse to provide any offset to the loss amount for any alleged prior disposition of collateral.

*There is No Existing Collateral from which Victims can Recover*

Koerber is likewise not entitled to an offset for the fair market value of existing collateral. Under the guidelines, if there exists collateral that has not been disposed of by the time of sentencing, then there can be an offset to loss for "the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n. 3(E)(i)-(ii). There is no such collateral here. When explaining his financial condition to the Probation Officer, Koerber said his assets consist largely of a few thousand dollars in various checking and savings accounts, some used vehicles, and a trailer, yielding him a net worth of just under $19,000.[36] He did not identify currently existing collateral available to repay the investors. And as set forth above, the evidence in the record shows Koerber's prior promise of collateral to secure what he owed investors was illusory.

Moreover, any potential future recoveries from Koerber based on other purported assets—

---

[36] *Id*. at p. 18-19

such as the horror movie Koerber funded with investor money (and which has never been repaid)[37] and Koerber's unspecified interest in "Iceberg related property"[38]—cannot be used as an offset because property returned after detection of the fraud should not be credited against the loss amount. *United States v. Swanson*, 360 F.3d 1155, 1168-69 (10th Cir. 2004) ("the fact that a victim has recovered part of its loss after discovery of a fraud does not diminish a defendant's culpability for sentencing purposes.").

In addition, such items cannot be used to offset loss because their fair market value is too speculative. Koerber's statements to the probation officer confirm this. Koerber says he cannot give a fair market value for the movie or the Iceberg related property, because both can fluctuate in value, depending on how well the Iceberg restaurant does, the outcome of a copyright lawsuit for an unrelated movie involving Richard Dutcher (the director of the investor-funded horror movie)[39], and the marketability of actor Ving Rhames.[40] The Court should refuse to reduce the loss amount for such speculative future recoveries. *See, e.g., United States v. Jimenz*, 513 F.3d 62, 85–86 (3d Cir. 2008) (affirming district court's refusal to credit loss amount for amount of collateral pledged because of the "speculative nature of any recovery" where there was conflicting evidence as to the collateral's value, the victim's subordinate position, and the uncertainty of collection from a bankruptcy proceeding). For these reasons, Koerber is not entitled to an offset to the loss amount for the fair market value of existing collateral, and the total loss amount should

---

[37] 2018 Richard Dutcher Testimony, Trial Tr. 1801 (attached as Ex. 13).
[38] Amended Presentence Report, ECF No. 562 at 21.
[39] The lawsuit does not appear to be going well for Mr. Dutcher. Judge Benson granted summary judgment against Dutcher on March 22, 2019. *Dutcher v. Bold Films et al.*, 2:15-cv-110, ECF No. 347. Judge Benson further denied Dutcher's motion to reconsider on April 11, 2019, but gave him another opportunity to submit supplemental briefing on the protectable elements of his movie and substantial similarity. *Id.* at ECF No. 353
[40] Amended Presentence Report, ECF No. 562 at 21.

be $45,258,892.09.

***Frontline Investors v. Downline Investors***

This $45,258.892.09 loss was suffered by those who gave money directly to Koerber's companies, either through checks or wire transfers. The individuals and entities who gave money directly to Koerber's companies are referred to as frontline investors. Koerber kept track of his frontline investors in his own business records, including on a spreadsheet entitled "Founders Capital Promissory Notes."[41] Ms. Mennitt traced monetary payments directly to and from Koerber for these individuals and entities, and they are listed in the left hand column of the spreadsheet attached as Ex. 1 to her declaration.[42] The 36 frontline investors listed in the spreadsheet are the direct victims of Koerber's fraud, and represent the victims the Court should use to calculate the sentencing guidelines enhancement for the number of victims.

Defendant's frontline investors, however, collected money from numerous other individuals and entities (referred to as "downline investors") with the promise that they would invest the money in Founders Capital and the downline investors would receive a portion (typically 3%) of the 5% return Koerber promised to frontline investors. These frontline investors were popular because they had "access" to invest with Koerber. Despite his various attempts to distance himself from the downline investors, Koerber arranged this structure, and taught his followers to create their own LLC's and then raise money from others to invest in Founders Capital. Koerber was aware that his frontline investors were accepting money from downline investors to funnel to Founders Capital.[43] He gave some of his frontline investors office space and provided them with

---

[41] Trial Ex. 21 .
[42] Mennitt Decl. at ¶ ¶ 4-11.
[43] *See, e.g., Matson Magleby Testimony*, 2018 Trial Tr. 597-598; 600- 604; 615; 632-633; (attached as Ex. 14);

documents to use in raising money from investors.[44]

Indeed, setting up this structure of frontline and downline investors was part of Koerber's scheme—he designed it in an attempt to avoid having to comply with securities laws and to insulate himself from liability to those from whom he took money.  But the only reason any of these frontline and downline entities existed was to invest with Koerber.  This was made clear when one frontline investor, Paul Bouchard, who had a frontline investment company called Hunters Capital (and who testified in the 2017 trial), was asked "Would Hunters Capital [his frontline investor company] have existed but for Founders Capital?" his answer was a resounding "No." [45]

The existence of these downline investors is relevant for at least two reasons.  First, it illustrates the fallacy of Koerber's argument that the United States failed to exclude certain "net winners" from the loss calculation.  For example, Koerber complains that Peter Hansen and Matson Magleby should not be considered victims, because they *personally* may have received more back in payments than they *personally* provided to Koerber.  Koerber Supplemental Objections, ECF No.566, p.6.  While it may be true that some frontline investors personally received more than they personally invested, that does not mean that their downline investors came out ahead.  In fact, the bank records, as confirmed by Koerber's own accounting records, show otherwise.  For example, Peter Hansen's Hansen House Investments invested a total of $1,234,100

*Clavell Anderson Testimony,* 2018 Trial Tr. 1647-1649 (attached as Ex. 15); *Michael Isom Testimony* 98-103; 119-126; (attached as Ex. 16); *Peter Hansen Testimony*, 2018 Trial Tr. 1059-1061; 1065-66 (attached as Ex. 17); *Sonny Jensen Testimony*¸ 2018 Trial Tr. 1502-1503; 1516-18;  1520-1524; 1527 (attached as Ex. 18); 2017 *Trial Testimony of Paul Bouchard*, 2505-2509; 2515-2517; 2578-2579; Trial Ex. 55 (email reflecting approval from Koerber regarding request from frontline investor, Clyne Long, to allow additional investment from downline investor, Clyne Long's son-in-law); (attached as Ex. 19).

[44] 2017 *Trial Testimony of Paul Bouchard*, 2017 Trial Tr. at 2504-2507; 2526; *2018 Matson Magleby Testimony*, 2018 Trial Tr. 598.

[45] *2017 Trial Testimony from Paul Bouchard*, *2017 Trial Tr. at 2586.*

16

in Founders Capital.[46]  This money consisted not only of his own personal money but also money he collected from others to invest with Koerber.[47]  Those same records further show that Hansen House received back a total of $928,838.66, resulting in a loss of $305,261.34.  The same is true of Matson Magleby. He used his own money to invest, but also obtained money from others.[48]  The records show that he, along with his downline investors, placed $3,547,272.18 with Founders Capital.  They received back $2,872,481.34, resulting in a loss of $674,790.84.[49].

Second, even though the United States is not asking the court to include all the downline investors as victims for purposes of the sentencing guidelines calculation, the United States reserves its right to seek to have downline investors included in any restitution order.  The downline investors suffered loss as a direct and proximate result of Koerber's conduct, and they should be listed on the restitution order.  This will not change the total restitution amount, however, because any loss suffered by a downline investor will simply be subtracted from the total loss suffered by the frontline investor.  For example, if a frontline investor showed a $100,000 loss, but the evidence shows that one of that investor's downline investors suffered a loss of $10,000, then the frontline investor's loss would be reduced to $90,000 and the downline investor would show a loss of $10,000.  But the total loss for restitution purposes would for both the frontline and downline investors would still be $100,000.  In other words, the loss and restitution amount would be the same, but for restitution purposes, the loss amount will be allocated among the frontline investors and the downline investors who have provided information about their investments.

***Evidence Regarding Foreseeability of the Loss***

---

[46] Loss Spreadsheet (attached as Ex. 20). (Also attached as Ex. 1 to the Angela Mennitt Declaration.)
[47] *Peter Hansen Testimony*, 2018 Trial Tr. 1059-1061; 1065-66.
[48] *Matson Magleby Testimony*, 2018 Trial Tr. 597-598; 600- 604; 615; 632-633.
[49] Loss Spreadsheet.

Under the Sentencing Guidelines, "reasonably foreseeable pecuniary harm means pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense."  U.S.S.G. § 2B1.1 cmt n.3(A)(iv).  The question is whether it was reasonably foreseeable that Koerber's offenses would expose his investors to the types of losses they suffered.  *United States v. McKanry* 628 F.3d 1010, 1020 (8th Cir. 2011).  The evidence presented a trial demonstrates that the investors' losses were exactly the type of losses that were reasonably foreseeable to Koerber.

The evidence showed Koerber ran a Ponzi scheme, in which the promised investment returns were supposedly coming from his successful real estate business. In reality, Koerber's businesses were not profitable, but he sustained the illusion of success by using nearly half the money he received to make payments back to investors.  Koerber's bank and accounting records confirm he did this.[50]  Moreover, in a February 2008 meeting with investors, Koerber estimated that of the approximately $100 million he took in, he used $40 million to pay investors.[51]  In that same meeting, he acknowledged that using investment money to pay interest was a problem. Koerber said:  "[w]ell, we used money invested to pay interest, and that eats up fast.  You know, you're paying out $5 million in interest a month.  In three or four months you've paid out $20 million.  That money is not represented in equity anymore."[52]  A scheme like this, where one is dependent on new investor money rather than the success of the underlying business to pay returns, is destined to fail.  Loss is always the foreseeable result.  *S.E.C. v. Traffic Monsoon, LLC,* 245 F.Supp.3d 1275, 1299 (D. Utah March 28, 2017) (artificial returns from a Ponzi scheme "mislead

---

[50] *See, e.g.,* Govt. Tr. Ex. 142, slides 11, 12, 20, and 35.
[51] Govt. Tr. Ex. 25c (attached as Ex. 21); Govt. Tr. Ex. 25, clip 9, transcribed at 2018 Tr. Trans. 2149-2151 (attached as Ex. 22); *2018 Michael Isom Testimony*, 2018 Trial Tr. 172-178.
[52] Govt. Tr. Ex. 25c ; Govt. Trial Ex.  25, clip 9, played at Trial Tr. 2151 (attached as Ex. 23).

new investors and conceal the fact that the Ponzi will inevitably collapse and investors will lose

money.") (internal citations omitted); *Merrill v. Abbott (In re Indep. Clearing House Co.)*, 77 B.R.

843, 860 (Bankr. D. Utah 1987) (The perpetrator of a Ponzi scheme "must know all along, from

the very nature of his activities, that investors at the end of the line will lose their money.").

The same holds true for Koerber's misrepresentations about his profitability.  The evidence

at trial showed that Koerber represented that he was generating hundreds of millions in revenue

and that he was profitable, when in truth, he was generating a relatively small amount of revenue,

and was losing large amounts of money.[53]  When someone lies about the profitability of his

business to induce investment, it is easily foreseeable that investors will likely lose their money.

Koerber himself acknowledged the foreseeability of this loss when he explained that taking and

spending investor money on houses and cars without making a profit (exactly what he was doing)

is "doomed to failure."  Koerber said:

> This is what happened in the dot-bomb generation.  These internet companies
> weren't making a profit.  All the investors were pouring their money into the internet
> companies, and the internet companies were spending all of their investors' money
> buying big houses, buying big cars, buying big technology, yadda, yadda, yadda. I
> don't know if you remember that. But everybody is like, how can these companies
> be pulling all of this investment money when they haven't even generated a profit
> yet? Because they were spending the investor's money. That's consumption,
> because that investor's money is capital, and capital exists as an asset in your
> balance sheet. Consuming capital is the result of an expense. **It was doomed to
> failure because they didn't know how to generate a profit.**[54]

---

[53] *See, e.g.,* Govt. Tr. Ex. 42, transcribed at  2018 Tr. Trans 2124-2125 (attached as Ex. 24); Govt.Tr.  Ex. 175c
transcribed at 2018 Tr. Trans  2125-2126 (attached as Ex. 25); Govt. Tr. Ex. 32, p. 53 (attached as Ex. 26); Govt
Trial Ex. 142, slides 17, 18, and 19; Govt. Trial Ex. 146, Clips 1 and 2 (transcribed at 2018 Tr. Trans 2129-2130)
(attached Ex. 27) (Koerber admitting to FBI he was not profitable); 2018 Forrest Allen Testimony, 2018 Trial Tr.
382-383 (attached as Ex. 28) (Koerber's bookkeeper telling Koerber "if [Koerber] ever expected to go into politics,
he needed to get all of these companies profitable.").
[54] Govt. Tr. Ex. 41, transcribed at 2018 Trial Tr. 2126-2127 (attached as Ex. 29).

Likewise, loss is foreseeable when a defendant takes investor money with the promise to spend it one way, but then spends it on something else. Koerber represented that he would use investor money in real estate transactions and that is where the investors thought their money was going.[55] In truth, Koerber spent only a small portion of the money on real estate transactions. He spent most of it paying returns to investors (i.e. making Ponzi payments), funding other entities (like his horror movie and Iceberg restaurants), buying fancy cars, and minting his own coins.[56] Again, under such circumstances, where someone is spending large portions of investor money on non-income generating activities, loss of the investors' money is reasonably foreseeable.

**Evidence About the Market Crash is Not Relevant to the Loss Calculation**

Koerber nevertheless insists that "unforeseeable" and "catastrophic" market conditions are responsible for the loss, not his fraudulent conduct. Koerber Supplemental Objections, ECF No. 566, p. 27. The problem with this argument is that the jury convicted Koerber for his conduct *before* the market crash. Before any crash, Koerber ran his Ponzi scheme, fraudulently induced investors into giving him money, and spent the investor money.[57] By June 2007, before the market crash, Founders Capital was in financial ruin; Koerber's investment money ran dry, and he therefore had no money to pay interest. Moreover, even if the market crash had some effect on the ultimate loss suffered by investors (through some decrease in the value of collateral), Koerber is still criminally responsible for that loss because "investors would not have been exposed to such risks had defendant[] not fraudulently induced them to invest in the first instance." *United States v. Stitsky*, 536 F. App'x 98, 112 (11th Cir. 2013)(unpublished); *see also United States v.*

---

[55] *See generally*, 2018 trial testimony of Peter Hansen, Dale Clarke, Craig Carroll, Matson Magleby, Jerel Clark, Jeff Goodsell, Garth Allred, and Clavell Anderson; Govt Trial Exs. 1, 35, 36 (attached as Exs 30, 31, and 32).
[56] Govt Tr. Ex. 142, slides 11-14 16.
[57] Timeline of Investor Deposits, (attached as Ex. 33).

*Cusumano*, No. 1:14-cr-1-mw-grj, 2015 WL 10324107, at *7 (N.D. Fla. Dec. 31, 2015) ("[e]ven

assuming SHCU losses in some measure were due to market factors, Defendant is accountable for

the losses because the losses were incurred directly and foreseeably as a consequence of his actions

by investing the member's monies in risky foreign currency trades during a global financial

downturn, while representing to investors that their investments would continue to generate a

monthly return of 5.6%") report and recommendation adopted, No. 1:14-cr1-mw/crj, 2016 WL

707433 (N.D. Fla. Feb. 22, 2016).

 Similarly, Koerber may argue that he never intended for investors to lose money, because

he was counting on the supposed "real estate equity" to pay them back, and that it was the market

crash, which diminished the value of the collateral, that caused investors to lose money.   In

rejecting a similar argument, one court explained this fallacy:

> Defendant's argument that he should not be held accountable for losses caused by
> market factors because he never intended to lose the investors' monies makes no
> sense. If that was the case a defendant would not be accountable for loses in a
> situation where the defendant steals money from a bank intending to invest the
> money in a business and then return the money to the bank once he has earned
> enough profit to replace the stolen money. Defendant's intent is not the measuring
> stick but rather the reasonable foreseeability of the losses.

*Id.*

 The evidence thus shows that the losses suffered by Koerber's investors were reasonably

foreseeable.

***Koerber is Not Entitled to Reduce the Loss Amount by Payments Unrelated to His Fraud***

 In a further attempt to lower the loss amount, Defendant also seeks to subtract other types

of payments made to victim investors.   Specifically, the spreadsheet Koerber submitted in his

"roadmap" purporting to outline his loss methodology includes a Real Estate section that reflects

deductions from the loss amount for  "Lease Option Consideration," "Rents," "Net Cash Proceeds

from Property Sale," and "Acquisition Representative Finders Fees."  These were payments made in connection with real estate programs that were separate from Koerber's investment scheme. These other programs had their own separate promises and obligations.  Koerber would have been obligated to make payments relating to these programs regardless of whether the person was an investor in Founders Capital.

Similarly, Koerber also hopes to reduce the loss amount for "Salaries and Wages," "Benefits – Insurance," and "Company Automobile" he paid to employees who were also investors.  Again, the employment arrangement Koerber had with these people was separate from any investment arrangement they had. Koerber would have had to pay the wages regardless of whether the employee was an investor.  (Indeed, it would likely come as a big surprise to the Koerber employees who were also investors that their wages—for which they worked—were instead intended to somehow constitute a return on their investment, meaning that they were working for free.  Such a result would be nonsense).

The law, however, prevents Koerber from reducing the loss amount by payments that are not related to his investment scheme.  The Tenth Circuit made this clear in *United States v. Masek*, 588 F.3d. 1283 (10th Cir. 2009).  In that case, the defendant pled guilty to fraudulently creating new subscriber accounts for satellite TV service in order to obtain commissions he did not earn. *Id.* at 1286.  At sentencing, the defendant argued that the loss amount should be reduced by a number of offsets, debits, and chargebacks relating to legitimate business dealings between him and the victim of his crime.  *Id.* at 1288.  The trial court refused to reduce the loss by these amounts, and the Tenth Circuit affirmed, explaining that "[the defendant] advances these claims as if the purpose of the sentencing hearing were to conduct a final accounting between [the defendant] and

[the victim].  This assumption is incorrect; the purpose of the hearing was to determine the amount of loss resulting from the charged offense." *Id.*   The Tenth Circuit further said that regardless of whether the victim owed the defendant money on other legitimate transactions, "such a debt would not affect the loss calculation." *Id.  See also United States v. Lange*, 592 F.3d 902, 906-07 (8th Cir. 2010) (rejecting claim that offsets to the loss amount should be made for profits made on other transactions because the guidelines commentary "provides that the court should apply a credit where the defendant returns the very money or property taken as part of the fraud," not when the victim receives "other benefits ... that do not correlate directly with the amounts [obtained] as part of the fraud.") quoting *United States v. Radtke*, 415 F.3d 826, 842 (8th Cir.2005); U.S.S.G. § 2B1.1 cmt. n. 3(A)(i)-(ii) (loss is the "reasonably foreseeably pecuniary harm that *resulted from the offense*.") emphasis added.

The same is true here. Koerber seeks to use this sentencing hearing as a way to conduct a final accounting of all payments between him and his victims.  Under *Masek*, this is prohibited. Koerber cannot reduce the loss for payments—like real estate program payments, wages, and benefits—that are not related to his investment scheme.  Such dealings "do not affect the loss calculation." *Id.*

Moreover, even if they were somehow related to his crimes, Koerber's proposed reductions for real estate and wage payments should not be used in the loss calculation because Koerber fails to include the full economic picture for those who participated in these activities.

With respect to the real estate transactions, Koerber entered into agreements in which he induced people to take out mortgages to purchase homes from one of his companies (Koerber called them "preferred buyers") by promising that another of his companies would enter into a

lease option on the home and pay the mortgage for the preferred buyers.  Koerber failed to make

the mortgage payments, as promised.  The evidence at trial from Frank Breitenstein, Dale Clarke,

and Michael Isom, showed that when Koerber stopped paying the mortgages, the preferred buyers

could not make the payments and the mortgage lenders foreclosed on the homes.[58]  Koerber's

methodology fails to include losses suffered as a result of such foreclosures.  Koerber' also does

not include loss given default.  These are amounts that financial institutions lose when a borrower

defaults on a loan.  When Koerber stopped paying preferred buyers as required in the contracts,

not only was it foreseeable that the owners would lose money, but upon foreclosure, the financial

institutions would too.  Koerber is thus trying to include the real estate payments to reduce the loss

amount, but he ignores the significant losses associated with the real estate transactions—and such

losses would increase the loss amount.  Because Koerber is trying to obtain the reduction in loss

from his real estate program payments, but fails to include the additional losses resulting from his

victims' participation in these programs, his methodology is deficient and should be rejected.

Similarly, Koerber wants to subtract from the loss amount payments he made for wages

and benefits, but his loss methodology fails to account the benefit that Koerber and his companies

received from these individuals' labor, which would offset the payments Koerber made in

exchange for this work.  The Court should reject the wages and benefits deduction for this

additional reason.

### Koerber Cannot Double Count Payments Made to Frontline Investors

Koerber's   spreadsheet   also   includes   a   purported   deduction   for   "Feeder   Fund

---

[58] *2018 Michael Isom Testimony*, 2018 Trial Tr  166-67; 2018 *Frank Breitenstein Testimony*, 2018 Trial Tr. 851-52
(attached as Ex. 34); 2018 Dale Clarke Testimony, 2018 Trial Tr. 892-93 (attached as Ex. 35).

Representative (2% per month)" calculation.  Presumably, Mr. Koerber wants to account for each frontline investor's yield they received from Koerber but did not pass along to their downlines. This only makes sense if Koerber plans to do a victim spreadsheet for all 600+ individuals who invested in his scheme.  If he plans to only do a victim spreadsheet for each of the frontline investors then the figure would not show the whole story.  For example, as described above, even if such a calculation shows that a frontline investor received more money back from Koerber than he personally put in, the United States' calculation accounts for that:  it has the total payments the frontline investor made to Koerber (including the money they received from others and passed along to Koerber) and the total payments that Koerber made back to the frontline investor (and it is from this amount that the frontline investor would then pay his or her downline investors).  Thus, the loss figure calculated by the United States already includes the 2% the frontline investor representative received.  Koerber is not entitled to deduct this amount twice.

### The Rescission Offering Is Not Relevant to the Loss Amount

Koerber's spreadsheet also includes a notation about a rescission offering.  Mr. Koerber sent out a rescission offering in the fall of 2007, in which he gave first line investors the option to convert debt to equity.  This occurred months after Koerber stopped making interest payments and months to years after Koerber fraudulently induced his victims to invest their money with him. Investors' decisions to swap debt to equity should be considered part and parcel of Mr. Koerber's fraud.  The rescission includes properties that evidence at trial shows Koerber does not even own, yet the rescission identifies equity amounts associated with these properties.[59]  This rescission constitutes nothing more than continued deception and lulling statements to investors to convince

---

[59] Govt Trial Ex. 142 at slide 25.

them that Koerber had a plan and they still might—someday—get their money.  But there is no evidence that any investor ever recovered money as a result from this purported equity interest. Exchanging worthless debt for worthless equity does not lower Koerber's culpability and it does not lower the amount of losses victims suffered from Koerber's scheme.


## CONCLUSION

Koerber ran a Ponzi scheme and fraudulently induced investments by misrepresenting his profitability and how he would spend investor money.  The evidence shows that through his crimes Koerber induced investment of nearly $100 million, and (excluding net winners), caused an investment loss of $45,258,892.09.  The available evidence shows there are no offsets to this amount for collateral or other amounts.  Accordingly, the Court should add 22 levels to Koerber's base offense level when computing his sentencing guidelines.  U.S.S.G § 2B1.1(b)(1)(L)


Dated this 17th of July, 2019



JOHN W. HUBER


*/s/ Tyler L. Murray*_____
Tyler L. Murray
Aaron Clark
Ruth Hackford-Peer
Assistant United States Attorneys