Kathryn N. Nester
(Utah Bar No. 13967)
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467

Robert Hunt (Utah Bar No. 5722)
Daphne Oberg (Utah Bar No. 11161)
Jessica Stengel (Utah Bar No. 8915)
Office of the Federal Public Defender
46 W. Broadway, Ste. 110
Salt Lake City, Utah 8106
Telephone: (801) 524-4010

*Attorneys for Claud R. Koerber*

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> CLAUD R. KOERBER, <br><br> *Defendant.* | **DEFENDANT'S RESPONSE TO GOVERNMENT'S EVIDENTIARY SUBMISSION REGARDING LOSS AMOUNT FOR SENTENCING** <br><br> Case No. 2:17-CR-37 <br><br> District Judge Frederic Block <br> Chief Magistrate Judge Paul M. Warner |

Pursuant to the Court's order recorded at ECF No. 615, Mr. Koerber respectfully

submits to United States District Judge Block the following response to the government's

Evidentiary Submission relating to loss amount.  Mr. Koerber, per agreement of the parties

and the Court, makes this submission in lieu of live testimony at the previously scheduled

evidentiary hearing.  Mr. Koerber reserves his right to present additional evidence or

1

argument during his sentencing hearing and does not waive or withdraw any of his existing objections to his Presentence Investigation Report, with the exception of the number of victims objection, which has already been withdrawn.  Mr. Koerber hereby incorporates all his previously filed objections to the PSR relating to the calculation of loss amount. As a reminder to the Court, the parties have agreed that for purposes of the guideline calculation only, the parties are considering only the investors listed on Gov. Exhibit 21.  (attached as Exhibit 1)

## THE DEFENSE OBJECTS TO THE GOVERNMENT'S METHOD FOR CALCULATING ACTUAL LOSS

The government bears the burden of proving by a preponderance of the evidence actual loss attributable to the defendant's conduct.  *United States v. Stein,* 846 F.3d 1135, 1152 (11th Cir. 2017).  Actual loss is the "reasonably forseeable pecuniary harm that resulted from the offense."  U.S.S.G. §2B1.1 cmt. n. 3(A)(i). "Reasonably forseeable pecuniary harm," means pecuniary harm the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.  U.S.S.G. §2B1.1 cmt. n. 3(A)(iv). To establish actual loss under §2B1.1, the government must establish both factual or "but for" causation and legal or "foreseeable" causation.  §2B1.1 at App. C Vol. 11 Amend. 617, at 178 (Nov. 1, 2001); see *United States v. Evans,* 744 F.3d 1192, 1196 (10th Cir. 2014).

### Factual/But For Causation

The government wholly fails to address factual/but for causation in their loss calculation.  The government agrees that the criminal conduct in this case relates to false promises of profitability of investments in Founders Capital and misrepresentations or omissions about how Founder's Capital would spend investor's money.  Doc. 611, p. 2.

2

However, the government makes no effort to connect investors' contributions with the alleged criminal conduct.   In other words, the government fails to meet its burden to show that but for the criminal conduct, there would have been no loss.  The government must show that the investors relied on Mr. Koerber's fraudulent representations about Founders Capital to satisfy the "but for" causation requirement.  *See United States v. Stein,* at 1153. (Government failed to show direct evidence of reliance on fraudulent conduct by individual investors or specific circumstantial evidence that ALL the investors relied upon the fraudulent conduct, therefore no factual causation established.)

At trial, the government introduced evidence of a magazine article wherein Mr. Koerber made false claims about the profits of Founders Capital  (Gov. Tr. Ex. 32, attached as Exhibit 2).  The interview was published in the Spring of 2007, and the government did not and has not produced a single witness who claims they invested with Founders Capital based on the representations published as a result of that interview.  Even under the government's theory that the magazine was mailed to investors and may have played a role in their subsequent investments, all investments preceding publication of the article cannot be considered actual loss due to an absence of "but for" causation.  The government's own loss calculation stops as of October of 2007.  The magazine article was the only physical evidence submitted by the government showing Mr. Koerber making a misrepresentation of the profitability of Founders Capital.

The government did submit testimony of some frontline investors who testified they felt misled by Mr. Koerber about the financial soundness of Founders Capital.  However, several other frontline investors testified at trial that their investments were not based on

3

representations about what their money would be used for and that even if they had known that some of Founders Capital income would be used to pay back interest owed to investors, they would have invested anyway.  Certainly any losses suffered by these particular investors cannot be considered actual loss as they were not factually caused by the criminal conduct.

The government was unable to establish at trial that Mr. Koerber made any representations whatsoever about Founders Capital investments to downline investors, other than the magazine article discussed above.  Even if the government is suggesting that representations made by frontline investors to downline investors would not have occurred but for the representations made by Mr. Koerber to his frontline investors, the government cannot establish by a preponderance of the evidence which investors relied upon which representations and whether particular investments were caused by those misrepresentations.  There is no evidence at all that Mr. Koerber participated in the representations made by the frontline investors.

The government's Evidentiary Submission claims that the only reason any of the frontline entities existed was to invest with Mr. Koerber. Doc. 611 at 16.  That is simply not true.  Clavell Anderson testified that his company Mountain Peaks existed before he began investing with Founders Capital.  (Exhibit 3)  The government's main witness, Mike Isom, testified that MiWe existed before he began doing business with Mr. Koerber.  (Exhibit 4, p. 18-19) All of the frontline investors agreed that the large majority of the funds they invested with Mr. Koerber were not their personal funds, but were funds of downline

investors.  Again, because those downline investments have no "but for" causation to the
criminal conduct, they cannot be considered in an actual loss amount.

Based on the government's inability to establish "but for" causation of any of the
downline investors, the actual loss should be limited to the personal losses suffered by the
frontline investors who based their investments on fraudulent representations or omissions.

### Legal or "Foreseeable" Causation

It is not enough to prove factual causation, the government also bears the burden of
proving legal causation (i.e. the foreseeability of harm). The government briefly addresses
legal causation or "foreseeability" on pages 17-20 of their Evidentiary Submission.  Doc.
611.  Their argument contends that Mr. Koerber knew he was running a Ponzi scheme;
therefore, it was foreseeable he would lose investors' money.  This Court has already heard
the argument of the parties at trial about whether or not Mr. Koerber was running a Ponzi
scheme.  The defense strenuously objected to suggesting that a Ponzi scheme existed in this
case and cited the Court to the government's previous admission in the first trial that this
was NOT a Ponzi scheme.  The Court considered the following in the defense motion *in
limine* to strike the word "Ponzi" from the trial:

> "A Ponzi scheme is '[a] fraudulent investment scheme in which money contributed by later
> investors generates artificially high dividends for the original investors, whose example
> attracts even larger investments. Money from the new investors is used directly to repay or
> pay interest to earlier investors, usually without any operation or revenue-producing activity
> other than the continual raising of new funds." BLACK'S LAW DICTIONARY 1198 (8th
> ed. 2004). *Mosier v. Callister, Nebeker & McCullough, P.C.,* 546 F.3d 1271, 1273 n.2 (10th Cir.
> 2008). In the first Koerber trial, the government agreed that Franklin Squires Companies was
> not a Ponzi scheme, rather it was an operating and functioning business investing in real
> property and other legitimate companies.

The Court ruled that the government could not use the word Ponzi in front of the jury.  To allow the government to now switch its theory of the offense from what they proved at trial, solely to manipulate the sentencing range under the guidelines, would defeat the purpose of establishing causation.

The foreseeability analysis is far more complex than the government's simplistic default to a non-existent Ponzi scheme.  When the FranklinSquires companies began, the original partners contributed investments for legitimate purposes such as establishing educational training, and investing in real estate purchases. These original investments preceded Founders Capital investment opportunities and any fraudulent conduct connected to Founders Capital by more than a year.  Yet, the government includes these early investments in their actual loss analysis.  Pursuant to the November rescission offer admitted at trial, over 100 million dollars of property interests were obtained with investor funds at a time when the real estate market was extremely profitable.  These property interests were legitimate and their purchase was consistent with the understanding of investors who relied on non-fraudulent representations.  The government cannot show that it was foreseeable that the credit market would constrict to the point where no lenders would authorize sales; thereby rendering the main assets of the company basically worthless.

In a Tenth Circuit case very similar to Mr. Koerber's case, an organizer of real estate investment funds solicited investors for limited partnerships that would acquire, renovate and operate low-income apartment complexes.  *United States v. Evans,* 744 F.3d 1192 (10th Cir. 2014). These were legitimate, albeit risky, investment ventures at their outset.  As Mr.

Evans began to experience cash flow problems, he was unable to make high interest payments to his investors and he commingled funds from the ventures and falsified records making him appear more successful than he was.  In April of 2007, a receiver took over the properties and Mr. Evans' fraud effectively ended.  By September of 2007, the value of the properties had dropped significantly and the properties fell into foreclosure.  In Mr. Evans' case, the government convinced the District Court to determine loss by subtracting the amount returned to his investors from the amount initially invested.  The Tenth Circuit reversed and ordered the District Court to make a new inquiry to determine the reasonably foreseeable amount of loss to the investors caused by the fraud and to disregard loss that occurred before the fraud and to account for the forces that acted on the values of the properties after the fraud ended.  *Id.*   After remand, the District Court still failed to take into consideration whether some of the losses resulted from activities outside the scope of Mr. Evans' fraud.  When Mr. Evans again appealed his resentence, the Tenth Circuit reversed again, reiterating the importance of causation and held the government to their burden to prove exactly what losses the fraudulent conduct caused.  *U.S. v. Evans (II),*  677 Fed. Appx. 469 (10th Cir. 2017).

In Mr. Koerber's case, the government bears the burden of establishing WHEN the fraud began and what the value of the investments were at that time.  When Mr. Koerber first disclosed the draft of his rescission offer to his frontline investors in June of 2007, the fraudulent conduct clearly came to an end.  The rescission offer introduced as a Defense Exhibit at trial, contained a true and accurate picture of the financial state of the company and revealed that investor money had been used for things other than real estate.

Therefore, any reduction in the value of the company's assets after the fraud should not be considered in a legal causation analysis.  Instead, the Court should look at the value of the company's assets at the time the fraud began and at the time it ended to determine legal causation.  The government's evidentiary submission lists the actual value of the equity provided in the rescission offer as of November 2007, to be 31.9 million dollars.  (See p. 1204 of Ex. 1 to Gov. Evidentiary Submission Doc. 611) Therefore, it was not foreseeable to Mr. Koerber that 31.9 million dollars of legitimately purchased equity could not be applied toward the outstanding debt to the investors at the time the fraud ended.  Therefore, the Court should subtract 31.9 million dollars from the government's proposed actual loss due to the inability to prove legal causation as to that amount.  The destruction of the value after the fraud falls solely at the feet of an unforeseeable market crash, making the property interests worthless.

**Method for Calculating Loss**

**Payments In/Payments Out**

The government used the following formula to calculate loss:  Amount invested – amount returned to investors – offsets for collateral = actual loss.  Of course, the government gave no credit at all for collateral (see p. 13-15 of Evidentiary Submission), so their amount is purely based on payments in and payments out for promissory notes only.

Mr. Koerber's forensic accounting expert, Mr. David Hardman, conducted his own analysis of the loss amount based on the QuickBooks of the companies.  Mr. Hardman's Declaration and attached loss summary spreadsheets are attached hereto as Exhibit 5.   As illustrated in Mr. Hardman's Investor Loss Summary, the government's determination of

the amounts returned to investors left out three major categories of funds.  First, they failed to subtract the funds paid to investors who profited from fees from acting as preferred buyers or as acquisition reps.  These fees and payments arose directly from their participation in the venture and represented pure profit to these investors.  Second, the government failed to include funds paid to these investors by Founders Capital for contract services.  The amounts the investors pocketed also increased the profits they made from engaging with the Franklin Squires companies, further mitigating their loss amounts.  The government also missed a $100,000 distribution made to Clavell Anderson to help him pay off his prior debts.  (Exhibit 5).  Finally, Mr. Hardman was able to run a report that accounted for minor misspellings of names and entities that picked up even more payments than the government was able to locate.  Based on all of this analysis, Mr. Hardman's figure for amounts repaid to investors was $31,665,668.96.

If the Court then subtracts the value of the outstanding collateral at the time the fraud ended (31.9 million according to the government), then there is effectively no actual loss.

**Offsetting Losses with Gains**

The government makes the argument that because Mr. Koerber was running a "Ponzi" scheme; he should not get to offset losses to some investors with gains of other investors. (Doc. 611 at p. 4).   Again, the government has previously conceded and this Court has previously ruled that the fraud charged in this case was not simply the running of a Ponzi scheme.  Over 60 million dollars of investment funds were applied to legitimate business interests and assets, which also created additional income for Mr. Koerber's

companies.  It was shown in trial that Hill Erickson and Iceberg operated at a profit for a significant period of time.  The companies held property interests in and profited from the sale or rent of hundreds of properties, none of which were obtained via fraud.  The companies had office staff and company cars and computer equipment and educational programs and a recording studio.  The carrying on of legitimate business ventures does not fit the accepted definition of a true Ponzi scheme.

The government cites the commentary to §2B1.1 prohibiting reducing loss amounts in Ponzi scheme cases by offsetting losses to some investors with gains of others. (Doc. 611 at 4, citing §2B1.1 cmt. n. 3(F)(iv)). Such a restriction makes sense in the context of a Ponzi scheme, because there are no legitimate investments and the loss is simply being passed down the line of investors.  In Mr. Koerber's case, many investors made profits not because they dipped into the investments of those behind them, but because the investments were directed into the purchase and sales of properties and assets that provided sufficient funds to generate returns on investments.  Similarly, many of the educational seminars generated significant income without any connection to the fraudulent conduct and those profits were used to make interest/principal payments to investors. Some investors were repaid in full before Mr. Koerber ever authorized paying interest payments with new investment funds. It would make no sense to fail to credit the legitimate returns on millions of dollars of investments simply because some investments may have been fraudulently redirected once cash flow became tight.  The government cites the case of *United States v. Hsu,* 669 F.3d 112 (2d Cir. 2012) in support of their method of loss calculation.  However, the Second Circuit Court of Appeals acknowledged in Hsu:

"We do not say that the method chosen by the district court was the only way to measure loss in a **Ponzi** scheme case.  Since, under the guidelines, the district court is required only to make "a reasonable estimate of loss," (citation omitted), other methodologies might have been appropriate in this case, and might even be preferable in other cases depending on the particular facts of the case."  *Hsu* at 122.

Perhaps one of the most troubling aspects of the government's methodology of calculating loss is the analysis of the investments coming from McGuire Group. Gov't Exhibit 21 shows that as of May 18, 2007, Les McGuire's company McGuire Group, LLC was a direct investor and promissory note holder of Founders Capital, LLC. A quick look at Gov't Exhibit 21 shows that not all McGuire Group, LLC note holders were singled out – and these nine individuals who held McGuire Group notes as of May 2007(rather than Founders Capital notes) are inaccurately listed in the PSR as "first line" investors. Whatever the motivation behind this approach, it results in fundamentally unsupportable conclusions for calculation of loss under the Guidelines. Such an approach also results in the following problems listed below.

First, contemporaneous Founders Capital financial records show that McGuire Group, LLC suffered no pecuniary loss, and is therefore no "victim" for Guidelines purposes. As shown on Mr. Hardman's spreadsheet attached, Founders Capital paid $12,982,157.32 on the then outstanding McGuire Group, LLC promissory notes, which was above the total principal invested by McGuire Group, meaning McGuire Group, LLC did not suffer a loss.

Second, the analysis relied upon by the government does not include a complete set of bank records or business financials from McGuire Group, LLC or its principals, such as Les McGuire, McGuire Financial, LLC, or McGuire Investing, LLC, and none has been provided to the defense. So, in singling out these individual McGuire Group note holders (and doing so without describing the total amount invested, with what entity, when, etc., and the total amount paid back to the investor, when, and by which entity), it is unclear how much of any particular McGuire Group, LLC's note

holder/investor money was subsequently loaned to Founders Capital versus put to some other use. It is also unclear how the United States reached any conclusion as to the total net gain/loss of any individual McGuire Group, LLC note holder/investor. This approach is unsupportable. See e.g. *United States v. Orr*, 567 F.3d 610, 617 (10th Cir. 2009) (Loss for purposes of counting victims, requires proof by a preponderance, set forth before the trial court.); *United States v. Leach*, 417 F.3d 1099, 1107 (10th Cir.2005)(Requiring loss calculation for each purported victim individually, rejecting a victim count of 200 and finding only "eight discernable victims" in a mail fraud conviction where no evidentiary showing was made for the 200 purported victims loss as part of the actual loss "determined under subsection (b)(1)[.]").

Third, a review of Founders Capital records shows that the following individual McGuire Group, LLC note holders/investors had received a net positive return (no pecuniary loss) even before looking at repayments from other McGuire Group related accounts: Brad Colovich; Carroll Investments, LLC/Ron and Craig Carroll; Silas Bennett; Strategic Innovations/Dan Raether; Valerio Investments.  If these individuals were truly frontline investors and made money, they could have returned that money to make their investors whole.  If they chose not to do so, that was an intervening cause and rendered their investors losses unforeseeable to Mr. Koerber.  The same analysis applies to Les McGuire.

The government's decision to treat the McGuire group investors as separate frontline investors and only take into consideration the "losers" while ignoring the "winners" is wholly inconsistent with their decision to do the opposite with Mike Isom's investors in MiWe.  The hallmark of reliable accounting practices is to apply consistent principles throughout your financial analysis. The government's discretion in picking and choosing what gains should be ignored and which investors should be considered net "losers" flies in the face of reliable accounting practices and should not be the basis for maximizing an individual's exposure to incarceration.

12

Taken together, these examples of plain flaws in the government's method of identifying who "lost" and who "gained", without considering the financial realities of each investor's conduct (and the frontline investors' use of each investor's proceeds) render the conclusions reached through this method of loss calculation unreasonable and unsupported.

## Credits Against Loss

Alternatively, there are more credits against loss available to Mr. Koerber that the government chose not to recognize.  The Sentencing Guidelines assume there will be Credits against Loss in investment cases and it is entirely irrational that the government ignores each and every potential credit against loss in this case.  U.S.S.G.  §2B1.1 cmt. n. 3(E).

### Wages/Salaries

The frontline investors not only received the benefit of interest payments on their investments, they also received salaries/wages for their participation in the FranklinSquires companies.  Mr. Hardman's attached spreadsheet shows over 1.6 million dollars paid in salary and wages directly to the victim frontline investors and Mr. Hardman explains how that amount was calculated.  Due to sensitive personal identifiers, should the Court desire to review these company tax records, Mr. Koerber seeks permission of the Court to supplement and file under seal with the Court.  These payments for services rendered should be credited against loss pursuant to U.S.S.G. §2B1.1 cmt. note 3(E)(i) as they were legitimate business expenses that directly benefitted individual investors.

It is unclear what services many of these frontline investors actually provided to receive the wages. There is no evidence of how many hours, if any, these individuals actually

performed duties in return for these wages. What is clear is that the extra payments they received into their pockets counterbalanced the total amount of actual loss they experienced.

**Vehicles/Insurance**

The discovery materials produced by the government in this case also established that over $650,000 of assets in the form of company vehicles were purchased with investor funds. (See Hardman Declaration attached)  The government has failed to establish the length of time the frontline investors recouped a benefit from these vehicles in the form of car and insurance payments.  In fact, the government is unable to show whether the investors kept the vehicles to be applied toward their outstanding debt with the company.  If so, all of these distributed assets should credited against loss.

**Oustanding Collateral**

The Operating Agreement of Founders Capital contained in the Rescission Offer admitted at trial provided that any outstanding equity in the company would be divided among the equity holders upon the dissolution of the company.  The Court heard testimony from Clavell Anderson at trial that the last remaining employees of Mr. Koerber's companies worked for approximately nine months trying to liquidate assets in the possession of the companies. Mr. Anderson testified they were able to liquidate some assets including precious metals and equipment connected to some of their companies. However, the market crash had rendered options to purchase impossible to liquidate because most homes lost so much value that their worth was far below the amount contracted in the options to purchase.  Such a devastating turn in the market making Mr. Koerber's companies completely incapable of selling their ownership interests in options to purchase was completely unforeseeable.

14

The Court heard the testimony at trial of movie producer Richard Dutcher confirming that the movie "Evil Angel" remains a viable commercial property even to this day.  Mr. Dutcher's unrebutted testimony valued the movie rights at 15 – 20 million dollars.   The Court also heard testimony about the value of the Iceberg hamburger franchise in the range of 2.5 million dollars.  The Court also heard about the liquidation of $900,000 of precious metals. These values existed after the fraud had completely ceased.  Yet the government completely rejects the idea that these properties had any commercial value whatsoever.  Mr. Hardman's attached Overall Loss Summary takes these credits against loss into account and, when they are subtracted, all actual losses are eliminated.

The Court heard testimony from both Dave Hardman and Angela Mennitt about the value of the real property at the time the fraud ceased in June of 2007.  Mr. Hardman valued the property at $128 million and Agent Mennitt valued it at approximately 31.9 million dollars. Either way, the application of this credit against loss also eliminates actual loss in this case. The complete subsequent devaluation of those properties through intervening, unforeseeable acts in the housing market cannot be lumped into the actual loss for purposes of determining the culpability of Mr. Koerber.

In the *Evans* case discussed above, the Tenth Circuit distinguished between real property offered as "collateral" to a loan and real property that formed the underlying assets of the limited partnerships when holding that unforeseeable market conditions CAN be properly considered if they affected the underlying assets tied to the financial viability of the ventures. *Evans* at 1198.  Conversely, a court can choose not to consider market fluctuations of pledged collateral, as it is foreseeable that specific collateral to a particular loan may

decrease in value. *See Turk in United States v, Crow,* 735 F.3d 1229 (10th Cir. 2013).  The investors' notes in Mr. Koerber's case were not secured with collateral.  The values of the real property and options to purchase property instead constituted the large majority of assets held by the company that enabled the company to grow and profit.  The complete devastation of all held assets of the company are certainly not linked to Mr. Koerber's misrepresentations of the value of his company and the plans he had for the use of investor funds.

### Deeds in lieu of foreclosure

The Court heard testimony at trial from several witnesses that they were offered opportunities to accept deeds of trust in lieu of payment on their investments.  The government has failed to provide records that would reflect how many of these transactions occurred and how they affected actual loss.  The government's loss calculation overstates the loss amount to the extent of the unknown value of these deeds in lieu.

The government's evidentiary submission denies that Vonco received any properties in lieu of payment on their debt and refused to credit any amount against loss for said transactions.  (Doc. 611, p. 9 – "there was no prior recovery from the disposition of collateral").  Attached as Exhibit 6 is direct proof that Vonco did, in fact, receive deeds in lieu and then had the complete authority to sell the properties to recoup at least some of their actual loss.

There is no way to tell how many more of the investors were able to recoup at least some of the collateral in the past ten years.

16

**Restitution from frontline investors**

Paul Bouchard, one of the frontline "victims" in this case has been convicted of committing fraud with his downline investors.  (See Docket attached as Exhibit 7)  He was ordered by the Court to pay restitution to his downline investors in the amount of $8,836,026.00 at a rate of $500.00 per month and he has been doing so ever since 2008, which pre-dated Mr. Koerber's indictment in this case by ten years. Any amounts received by investors who funneled their money through Bouchard can be credited against actual loss pursuant to  U.S.S.G. §2B1.1 cmt. n. 3(E)(i).

Several others of the individuals involved with Mr. Koerber in his companies have also been convicted of fraud connected to their downline investors.  For the same reason as Paul Bouchard, these amounts should also be credited against actual loss.  The government should have knowledge as to whether or not additional restitution amounts have been ordered against other frontline investors in state or federal courts and the defense seeks full disclosure of all known restitution amounts ordered and paid to date.


The government argues that Mr. Koerber should not be allowed to reduce his actual loss by "payments not related to his investment scheme." (Doc. 611 at p. 22)  However, the government considers EVERY dollar taken into the Franklin Squires companies to be related to his investment scheme/fraudulent conduct and applies ALL of it toward actual loss.  The government cannot have its cake and eat it too.  If there is no causation, there is no loss.  If there is causation, then Mr. Koerber is entitled to credit against his loss.

17

<u>Conclusion</u>

The government has elected to calculate a loss amount that wrongfully relies on methodology and case law applied solely to Ponzi schemes.  The government ignores each and every possible permutation of credit against loss provided for under the Guidelines. They count every single dollar that went into multiple businesses collected by multiple different individuals under different terms over a 4-year period as loss caused entirely by Mr. Koerber's fraudulent conduct.  The government completely failed to investigate the market value of hundreds of pieces of residential and commercial property in the possession of the company after the fraud had ceased and instead treated millions of dollars of property as if it did not even exist. The government applied inconsistent standards to determine which investors should be credited and which should not.  The government failed to follow the generally accepted accounting practices in place at the time of the offense, and relied on incomplete records, which also did not follow GAAP standards.  The government has imputed a fraudulent motive to each decision Mr. Koerber made at every moment of every day for four years in order to categorize all of Mr. Koerber's businesses as illegitimate and fraudulent and nothing more than a Ponzi scheme.  The government failed to submit evidence to the jury or to this court showing funds received by downline investors from frontline investors, leaving no way that this Court can say with any degree of certainty the true gains the frontline investors experienced.

Everything about the government's approach to loss in this case is designed to maximize Mr. Koerber's exposure to imprisonment and fails to take into consideration any of the legitimate business conducted by Mr. Koerber's companies.  The treatment of each

investor as identical for purposes of loss calculation is wholly inconsistent with the testimony at trial confirming that many of the investors believed that their investments were not connected to fraudulent misrepresentations at all.  There are entirely different circumstances surrounding the investments of different categories of investors.

Mr. Hardman's attached spreadsheet provides the Court with a breakdown of all of the categories of payments and loss that are reasonable to consider when determining an actual loss amount in this case.  The Court has the authority to consider some or all of them.  Alternatively, Mr. Koerber respectfully submits that the loss amount recommended by the government vastly overstates the culpability of Mr. Koerber and the actual harm in this case.  For all the reasons stated above, Mr. Koerber reserves his right to seek a variance from the guideline range at the sentencing hearing of this matter and respectfully seeks leave to do so.

Respectfully submitted on this the 16th day of August, 2019.


_/s/ Kathryn N. Nester_
Attorney for Claud R. Koerber

19