JOHN W. HUBER, United States Attorney (#7226)
AARON B. CLARK, Assistant United States Attorney (#15404)
RUTH J. HACKFORD-PEER, Assistant United States Attorney (#15049)
TYLER MURRAY, Assistant United States Attorney (#10308)
Attorneys for the United States of America
111 South Main, Suite 1800
Salt Lake City, Utah  84111
Telephone:  (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

---

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No.  2:17-CR-00037 |
| Plaintiff, | : | |
| | : | **REPLY IN SUPPORT OF EVIDENTIARY** |
| v. | : | **SUBMISSION ON LOSS AMOUNT** |
| CLAUD R. KOERBER, | : | |
| | | Judge Frederic Block |
| Defendant. | : | Magistrate Judge Paul M. Warner |

---

The United States respectfully submits this reply in support of its Evidentiary Submission on Loss Amount.  Defendant Rick Koerber ran an enormous Ponzi scheme and lied to his investors about how he would spend their money.  As set forth in the United States' loss submission, the evidence shows that by taking the total investment money Koerber took in, subtracting the principal and interest he paid to his investors, and excluding net winners, his crimes resulted in a loss of $45,258,892.09.  This means that the Court should add 22 levels to Koerber's base offense level when computing his sentencing guidelines under both the 2007 and the 2019 manual. U.S.S.G § 2B1.1(b)(1)(L).

After months of delay, Koerber finally submitted his theory on loss.  Consistent with his penchant for attempting to elevate perception over reality, Koerber asserts his crimes actually

caused no loss.  Koerber's theory is that if the Court ignores the fact that he ran a Ponzi scheme, excludes a number of victims who invested directly with him, reduces the loss for payments that were unrelated to the investments, and gives him credit for speculative future recoveries from assets that do not exist, then the investors actually came out ahead.  This will be news to those investors who gave money to Koerber and were never paid back.[1]  Koerber's theory of the loss calculation has no support in either fact or law.  The Court should reject it.

The specific problems with Koerber's loss calculation are explained below:

- **Koerber Ran a Ponzi Scheme**

Koerber curiously complains that his "strenuous objection" in the second trial to use of the terms "Ponzi" and "Ponzi scheme" before the jury now precludes the United States from labeling his fraudulent scheme as such before the Court.  He even goes further to claim, without any citations to the record, that (1) the United States supposedly conceded in the first trial that he was not running a Ponzi scheme, and (2) the Court's ruling on his motion *in limine* before the second trial was, in fact, a determination that Koerber's fraud was not a Ponzi scheme. Neither is true.

The United States has consistently argued throughout this case that, notwithstanding some apparently legitimate business, Koerber orchestrated a Ponzi scheme by using money from new investors to pay returns to old investors.[2] Meanwhile, Koerber has consistently argued that if his

---

[1] *See Plaintiff's Sentencing Memorandum*, ECF No. 559, p. 10.

[2] For example, from the United States' opening in the first trial: "Over the course of this trial, you will see that the defendant ran a Ponzi scheme meaning that he used money from new investors to pay returns to old investors." 2017 Trial Tr.  4 (attached as Ex. 1).

From the United States' closing in the first trial:

> "Let's consider the Ponzi scheme. Now, Mr. Mumford in opening statement made quite a bit of the term Ponzi. It is defined in the indictment and it is defined in paragraph 15 of the indictment. That says he operated the business as a Ponzi scheme, that is, Defendant Koerber used money placed with Founders Capital to make interest payments to earlier investors. In this way he created the false impression, also deceptive, that the businesses were profitable and that the investments were safe and secure and interest was being paid.

companies had *any* legitimate business or assets, he could not have been running a Ponzi scheme. This notion is contrary to established case law.  "Ponzi schemes sometimes use legitimate operations to attract investors, but the existence of that legitimate business does not preclude a finding that a company operated a Ponzi scheme." *Miller v. Wulf*, 84 F.Supp.3d 1266, 1272 (D. Utah 2015) (citing *Wing v. Layton*, 957 F.Supp.2d 1307, 1315 D. Utah 2013); *Jobin v. McKay (In re M & L Business Machine Co.)*, 84 F.3d 1330, 1332 (10th Cir.1996); and *Sender v. Simon*, 84 F.3d 1299, 1302 (10th Cir.1996).  Moreover, during the second trial, even the Court took issue with the notion that the existence of legitimate business precluded a finding that Koerber ran a Ponzi.[3] And while the Court, after lengthy argument during the second trial, ultimately ruled that

---

> "It does not matter if we call it a Ponzi or we just call it deceptive or we call it what it is in the instructions, a scheme and artifice to defraud. A scheme is simply a plan. An artifice to defraud is simply a plan to cheat. The plan to cheat was that Mr. Koerber wanted the other people's money. He wanted that money so that he could spend it, as it turns out, the way that he wanted to, which included some property, some part of the equity mill, but it included a whole lot more. It does not matter what we call it. Shakespeare said that the best in Romeo and Juliet. That which we call a rose by any other name would smell as sweet. That which we call a Ponzi by any other name would be just as deceptive."

2017 Trial Tr. 5062 – 5063 (attached as Ex. 2).

[3] During the argument over Koerber's motion for acquittal under Rule 29:

> [MS NESTER:] We would submit to Your Honor that the definition of a Ponzi scheme is a company that does not have legitimate assets or businesses that is simply hiding the fact that they're pushing money through.
>
> THE COURT: Let me interrupt you here. The jury is not here, but let's assume you have a company that has all of the assets in the world. But people invested in the company with the understanding or the promise, I'm not saying this is what the facts establish but conceptually, that all that money that they are investing is going to go into that business to purchase those assets.
>
> And, in fact, it turns out that a good chunk of that money is not being used for that purpose. It is being misrepresented and it is being used to pay interest for other people. That is I think what a Ponzi scheme is. Now, I'm not saying that the facts support that or not, but would you agree that if that was the evidence and if the jury were to believe that that would constitute a crime.
>
> MS. NESTER: No, sir. I actually wouldn't agree with that. We have a really –

the United States could not reference the words "Ponzi" or "Ponzi scheme," it acknowledged that "heart" of the United States' case was that Koerber's use of new investor money to pay old investors was a "material misrepresentation" that amounted to fraud.[4]  This fits squarely within the Tenth Circuit's definition of a Ponzi scheme: "A Ponzi scheme is a fraudulent investment scheme in which 'profits' to investors are not created by the success of the underlying business venture but instead are derived from the capital contributions of subsequently attracted investors."[5] As such, Koeber's continued claim that the United States has improperly labeled his fraud as a "Ponzi scheme" is without merit.

- **Koerber's Other Business Ventures Did not Generate Sufficient Funds to Pay Investors**

Koerber also contends he can offset the losses he caused with gains.  He argues, without citation to evidence, that he did not run a Ponzi scheme because he was able to pay investors with the returns generated by his seminars or other business ventures, and it was only "when cash flow became tight" that he used new investor money to pay returns.  Defendant's Response to Evidentiary Submission, ECF No. 623 at p. 9-10.  The jury's verdict belies this argument.  The jury convicted Koerber of securities fraud charges starting in 2005, when he first solicited

---

THE COURT: You don't think that would be a material misrepresentation that that would induce these people to invest their money?

2018 Trial Tr. 1704 – 1705 (attached as Ex. 3).

[4] 2018 Trial Tr. 2058 – 2059 . The entirety of the discussion during the jury instruction conference transpired from 2052 – 2059. (attached as Ex. 4).

[5] *Sender v. Simon*, 84 F.3d 1299, 1301 n.1 (10th Cir. 1996). *See also*, *Jobin v. McKay (In re M & L Bus. Mach. Co.)*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (defining Ponzi scheme as "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments. Typically, investors are promised large returns for their investments. Initial investors are actually paid the promised returns, which attract additional investors."); *Mosier v. Callister, Nebeker, & McCullough*, 546 F.3d 1271, 1273 n.2 (10th Cir. 2008) ("A Ponzi scheme is a 'fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments. Money from the new investors is used directly to repay or pay interest to earlier investors, usually without any operation or revenue-producing activity other than the continual raising of new funds.') (quoting BLACK'S LAW DICTIONARY (8th ed. 2004)).

investments, and continuing to 2007, when his scheme collapsed. This demonstrates that the jury believed he committed fraud when he first started soliciting investments for FranklinSquires/Founders Capital in 2005, and not just toward the end of his scheme in 2007.[6]

This evidence is also contrary to the evidence at trial, which demonstrated that Koerber ran a Ponzi scheme starting in 2005, and that despite the operation of his seminars and other ventures, Koerber could not have made payments to investors without a constant stream of new investor money. For example, Forrest Allen, Koerber's own bookkeeper, testified that the money Koerber used to make interest payments to investors came from whatever money was in Founders Capital's bank account, and the money in that account "came mostly from investors."[7] He further confirmed that this happened regularly throughout his time as bookkeeper (from January 2005 to fall 2007), and he was concerned that the businesses were not generating profits sufficient to pay interest payments to investors.[8] He also made clear that, as Koerber's bookkeeper, he never invested with Koerber in part because he recognized Koerber was suffering losses:

> Q. Mr. Allen, were you ever an investor in Founders Capital?
>
> A. No, I was not.
>
> Q. Why not?
>
> A. I didn't have any money.
>
> Q. Was there another reason?
>
> A. I was skeptical. I wasn't so sure that it was going to work.
>
> Q. And why was that?
>
> A. I was doing the accounting and seeing losses.[9]

---

[6] Verdict Form, ECF No. 530.(attached as Ex. 5)
[7] 2018 Forrest Allen Testimony, 2018 Trial Tr. 317, 385-387, 434 (attached as Ex. 6)
[8] *Id.*
[9] *Id.* at 435.

FBI Forensic Accountant Angela Mennitt likewise found that Koerber constantly relied on new investor money to make interest payments, and not the success of the underlying business. She testified that from 2005 to 2007 (the duration of Koerber's scheme), almost half the investment money that Koerber took in went back to investors.[10]   She also showed that Koerber's business activities did not generate returns for investors because these activities suffered huge net losses:

> The other companies did produce some revenue; for example, Franklin Squires. They had training. They had seminars. They had those types of income sources. However, those incomes were immediately swallowed up by the commensurate expenses for that time period which can be revealed to be huge, huge net losses incurred by these companies. [11]

Ms. Mennitt also prepared a summary chart showing that all the other deposits into Founders Capital from Koerber's other ventures only amounted to $20.3 million, and that this amount was far less than the $53.3 million Koerber paid to investors.[12]   Based on this, Ms. Mennitt concluded that Koerber's other ventures "couldn't possibly support the investor payments going out of that account."[13]   And she confirmed that, in classic Ponzi Scheme fashion, Koerber relied on money from new investments to pay returns to existing investors from the very beginning of his scheme in 2005:

> Q. This is over time? Did this just happen at the end where they needed new investor money to make these payments, or –
>
> A. This happened consistently through 2005, 2006 and 2007.
>
> Q. Was there ever a time you saw in the books and records that they didn't have to use new investor money to make the interest payments?
>
> A. No.[14]

---

[10] 2018 Angela Mennitt Testimony, 2018 Trial Tr. 1171-73 (attached as Ex. 7); Trial Ex. 142, Slide 11 (attached as Ex. 8).
[11] 2018 Angela Mennitt Testimony, 2018 Trial Tr. 1198.
[12] Trial Ex. 142, slide 20 (attached as Ex. 9)
[13] 2018 Angela Mennitt Testimony, 2018 Trial Tr. 1197.
[14] 2018 Angela Mennitt Testimony, 2018 Trial Tr. 1197.

Even Koerber's own accounting witness, David Hardman, had to agree on cross examination that Koerber's Founders Capital was "receiving back" from its investments "a lot less than they gave" and that as a result, to make the 60% a year interest payments, Koerber had to get new money in to be able to make payments to investors. [15]

And finally, Koerber himself admitted that he used investor money to make payments back to investors. He did so in February 2008, when he drew a pie chart in an attempt to explain where the investor money went. In that meeting, Koerber estimated that of the approximately $100 million he took in, he estimated he used $40 million to pay investors. [16]

Accordingly, Koerber's assertion that he did not run a Ponzi scheme is untrue. He did so from the very beginning. As a result, Koerber's argument that he can offset losses with gains is without merit.

- **Koerber Caused Losses of over $45 million**

U.S. Sentencing Guidelines Manual §2B1.1(b)(1) provides sentencing enhancements for fraud based on the amount of loss caused by the criminal conduct. Actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. §2B1.1 cmt. n. 3(A)(i). Reasonably foreseeable pecuniary harm is monetary harm "that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* at cmt. n. 3(A)(iv). "Thus, §2B1.1 incorporates and requires both factual or 'but for' causation and legal or foreseeable causation." *U.S. v. Evans*, 744 F.3d 1192, 1196 (10th Cir. 2014).

Koerber objects to the United States' method of calculating loss, arguing that the United States fails to address factual/but-for causation and foreseeability in its loss calculation. Koerber argues that the United States must show that each investor relied on at least one of Koerber's

---

[15] 2018 David Hardman Testimony, 2018 Trial Tr. 1947-49 (attached as Ex. 10).
[16] Trial Ex. 25c (attached as Ex. 11); *2018 Michael Isom Testimony*, 2018 Trial Tr. 172-178 (attached as Ex. 12).

fraudulent representations about Founders Capital to satisfy the "but for" causation requirement. He also claims the United States must show direct evidence of reliance on a fraudulent representation as to each individual investor or else factual causation is not established. He argues that the "only physical evidence" submitted at trial about Founder's Capital's profitability was a magazine article where Koerber made false claims about profitability, published in Spring 2007 and is thus insufficient to show any investors relied on it in deciding to invest.

To begin, the United States need not show which specific misrepresentation each investor relied on in deciding to invest. In cases "involving numerous investors, the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information." *U.S. v. Stein*, 846 F.3d 1135, 1153 (11th Cir. 2017). The United States relies not only on Koerber's misrepresentations but also his omissions and the fact that he was running a Ponzi scheme. USSG § 1B1.3(a)(1)(A).

The United States' theory of this case was always twofold. Mr. Koerber committed fraud because he ran a Ponzi scheme—he attracted investors with the promise of high returns and, instead of operating a successful business, used new investor money to pay old investors—a scheme that is inherently deceptive and ultimately unsustainable. Mr. Koerber also committed fraud because he deceived his investors about the safety and profitability of his real estate program, and because of how he spent their money. Koerber claimed his Equity Mill program was safe and successful when it wasn't. He claimed his businesses (including Founders Capital) were profitable when they weren't. He claimed he would use the money in real estate transactions, and he didn't. More to the point, his investors relied on these representations. They believed the equity mill was profitable. They thought Koerber was a "producer."

8

These misrepresentations were material and establish *both* but-for causation and foreseeability.  Consider the following testimony and evidence introduced at trial:

Dale Clarke testified at trial, that he saw an equity mill flyer that offered a lucrative investment opportunity that was "little to no risk" and he believed his investment was low risk because of the brochure and the workshop he attended where Mr. Koerber spoke.[17]   When asked if he was aware that money that was being invested in Founders Capital was paid back to other investors as a return, he said he did not know that.

Q. Would that have concerned you to know that?

A. It would have.

Q. Why?

A. Because I thought that I was investing in real estate directly through this fund.[18]

More to the point, Dale Clarke testified that had he known where his money was actually going, there was "no way" he would have invested.[19]   Further, had Koerber admitted that his businesses weren't profitable, he would not have invested.

Q. Were you made aware before you made any of your investments in Founders Capital that the entities in Mr. Koerber's businesses weren't making a profit?

A. No.

Q. Would that have made a difference to you?

A. Absolutely.[20]

Mr. Clarke's testimony matches that of many other investors.  Consider the following testimony of investor Peter Hansen:

---

[17] 2018 Trial Tr., Dale Clarke Testimony, 878 (attached as Ex. 13)
[18] *Id.* at 880.
[19] *Id.* at 881.
[20] *Id.* at p. 882.

9

Q. Did Mr. Koerber often talk about being profitable?

A. Yes.

Q. Did you think Mr. Koerber was profitable?

A. Yes, I did.

Q. Did you think that Mr. Koerber's companies were profitable?

A. I did. [21]

\*\*\*

Q. As an investor, and we'll talk about you having invested here in a minute, but as an investor, did these kinds of statements about profitability have an effect on you?

A. Yes.[22]

Mr. Michael Isom's testimony is remarkably similar to Mr. Clarke's and Mr. Hansen's.

Isom was convinced that Koerber was successful because of the cars Koerber and his associates

drove, and Founders Capital's ability to make monthly interest payments to investors.

Q. These interest payments, where did you think the money was coming from for these interest payments?

A. From the Equity Mill process of buying a home and selling it and the profits they made from doing so on a piece of property.

Q. So you thought these were profits?

A. Correct.

Q. Did you have any sense as to whether the Equity Mill Founders Capital was profitable?

A. Did I have any sense that it was profitable?

Q. Yes.

A. Oh, yes.

---

[21] 2018 Trial Tr., Peter Hansen Testimony, 1046 (attached as Ex. 14).
[22] *Id.* at 1050

Q. Where did that come from? Why did you think it was profitable?

A. Being able to wire over $400,000 a month, to pay the 5-percent interest was the first thing, but then just everything else that was going on with the company and my interactions with them.

Q. Explain that a little. What do you mean with everything else that was going on with your interactions?

A. The cars they drove, the building that they were in, how many people were involved with it, conversations with Mr. Koerber, other people that worked for him.

Q. Did you ever have conversations with Mr. Koerber where you asked him if you should send more money to him?

A. Numerous conversations with him about that.

Q. When you asked him if you should send more money what was his response?

A. Yes. We have more deals being presented to the Equity Mill than we can fund.[23]

Mr. Matson Magleby similarly testified that Koerber never disclosed that the Equity Mill was running at a loss, that he did not know Koerber was paying monthly returns to older investors by using new investor money, and had he known this, he would have been concerned.[24]  When asked why he would have been concerned, he replied, "if I knew that the principal was being used to make interest payments then that's obviously not sustainable, so that would have been very concerning."[25].

Investor Craig Carroll testified that he was required to attend a Koerber seminar before being allowed to invest and that the investment was supposed to go to purchasing real estate.[26] He further testified that he received a monthly return on his investment and believed it was from

---

[23] 2018 Trial Tr., Michael Isom Testimony, 135-136 (attached as Ex.15)
[24] 2018 Trial Tr. Matson Magleby Testimony,  615–18 (attached as Ex. 16).
[25] *Id*. at 617.
[26] 2018 Trial Tr.,  Craig Carroll Testimony, 488–91 (attached as Ex. 17).

"buying and selling real estate . . .".[27]   Investor Garth Allred testified that Koerber told him that

he made "$5 million" the previous year "through the real estate business."[28]

Koerber also does not mention the numerous audio and video clips admitted at trial where

Koerber touted his profitability and his success.   Trial exhibit 41 is a video clip of Mr. Koerber

that was taken from a seminar Koerber conducted in 2006.   Koerber states:

> This is what happened in the dot-bomb generation.  These internet companies weren't making a profit.  All the investors were pouring their money into the internet companies, and the internet companies were spending all of their investors' money buying big houses, buying big cars, buying big technology, yadda, yadda, yadda. I don't know if you remember that. But everybody is like, how can these companies be pulling all of this investment money when they haven't even generated a profit yet? Because they were spending the investor's money. That's consumption, because that investor's money is capital, and capital exists as an asset in your balance sheet. Consuming capital is the result of an expense. **It was doomed to failure because they didn't know how to generate a profit.[29]**

Omitted, and unspoken is the fact that Founders Capital had not even generated a profit

yet.  Omitted, and unspoken is the fact that Koerber was spending investors' money and that

monthly interest payments to investors were taken from other investors money.  Koerber purported

to understand how a successful company generates a profit, yet Founders Capital was similarly

doomed to failure because of how Koerber was spending investors' money.

On numerous occasions, Koerber touted his profitability.   In Exhibit 42, Koerber tells

seminar-goers (and potential investors) in 2006 that he was profitable.

> Oh, I'm profitable.  I make more profit every day than I ever made in a year prior to this year.  That is not an exaggeration.  Because I never knew how to profit.  I generate more revenue in a month than any year that I ever had in my life before now.[30]

---

[27] *Id*. at 495.
[28] 2018 Trial Tr. Garth Allred Testimony, 792 (attached as Ex. 18).
[29] Govt. Tr. Ex. 41, transcribed at 2018 Trial Tr. 2126-2127 (attached as Ex. 19).
[30] Govt. Tr. Ex. 42, transcribed at 2018 Trial Tr. 2125 (attached as Ex. 20).

But Koerber admitted to the FBI in 2009 that none of his companies were ever profitable.[31] Pretending to be profitable was a key component of Koerber's investment pitch, even though he never turned a profit.  Koerber devised a scheme to defraud where he purportedly developed a real estate program that was profitable and safe, and he attracted numerous investors with the promise of a 5% monthly (60% annually) return.  In reality, his companies were bleeding millions of dollars and relied on new investor money to make promised monthly returns.  It is no wonder he deflected when investor Craig Carroll asked for financial information.[32]  Accurate financial statements would reveal Koerber spent investor money however he chose, including making Ponzi payments and investing in a movie and a restaurant franchise.  All the while Koerber touted his success, drove fancy cars and lived in a mansion.

But-for causation is derived from Koerber's own statements (in seminars, in flyers and advertisements, and in personal conversations) to investors and from what he failed to say to investors (that his companies were unprofitable, that he was paying monthly returns not from the success of the underlying business but from new investor money).  These are the material misrepresentations upon which investors relied.  Meanwhile, the only person who knew that Founders Capital was a Ponzi Scheme was Koerber himself, yet he continued to accept new investor money until his scheme collapsed.  Because Koerber knew he was both lying to investors and omitting important information they needed to make informed decisions about their investment, these losses are foreseeable.  Koerber's arguments on these points therefore lack merit.

- **Koerber Wrongfully Tries to Exclude McGuire Group Investors from the Loss Calculation**

Koerber tries to exclude millions of loss by arguing that certain investors, which he

---

[31] Trial Ex. 146, Clip 1, transcribed at 2018 Trial Tr.  2129-2130 (attached as Ex. 21).
[32] Trial Exhibit 90 (attached as Ex. 22).

classifies as "McGuire Group" investors, should be excluded from the loss calculation because they did not invest directly with Koerber. This is false. As set forth in the supplemental declaration of Angela Mennitt, each of the investors that Koerber seeks to exclude invested directly with Koerber. The evidence shows they wrote checks directly to Koerber's Founders Capital and Koerber made interest payments directly back to these victims from Founders Capital.[33] Koerber even issued and personally signed notes from Founders Capital to these investors.[34]

It was not until June 2007— after Koerber's scheme started to collapse and he stopped making interest payments—that Koerber tried to gaslight these investors into thinking they had actually invested with the McGuire Group and not Founders Capital. On June 18, 2007, he sent an email to each of these investors, saying "As you also know, we have had to categorize your initial investments through Les as investments in McGuire Group, LLC rather than in Founders Capital."[35] Koerber went on to try to convince these investors that, even though his Founders Capital took and spent their money, "for a number of very important reasons you should consider your entire investment to have been made in McGuire Group LLC—rather than in Founders Capital LLC directly" and that the notes issued to them by Founders Capital "had been done so in error."[36]

This was contrary to what the investors had understood all along. For example, investor Dale Clarke testified that when he received this email, he "wasn't aware of McGuire Group, LLC at the time;" he understood he made his investment in Founders Capital; he received his interest payments from Founders Capital; and that it was news to him that Koerber was categorizing him

---

[33] Supplemental Declaration of Angela Mennitt, ¶¶ 4- 6 (attached as Ex. 23)
[34] Defense Trial Ex. 983 (attached as Ex. 24)
[35] Trial Ex. 93 (attached as Ex. 25)
[36] *Id.*

in the McGuire Group.[37]

Investor Craig Carroll had a similar reaction to the email.  Mr. Carroll invested directly with Koerber by writing a check to Founders Capital and hand-delivering the check to Koerber's bookkeeper, Forrest Allen.[38]  Mr. Carroll thought he was investing in Founders Capital and even received a promissory note from Founders Capital, signed by Koerber himself.  It wasn't until June 2007—years after he invested—that Koerber sent the email telling Mr. Carroll that Koerber was going to redo the notes to reflect his investment was in McGuire Group.  Mr. Carroll "thought was a little odd because I didn't know that Les McGuire was even involved in real estate with Mr. Koerber."[39]  Mr. Carroll made clear that "I thought the investments that I gave to the company or to Founders Capital were, you know, Rick Koerber and his investment strategies and so forth."[40]

In short, the money trail, as reflected by checks and other bank records, flows directly from these so-called "McGuire Group" investors to Koerber and Founders Capital.  And Koerber treated these investors like his direct, frontline investors by issuing them notes from Founders Capital and paying interest to them directly from Founders Capital.  These were not "downline" investors and they should not be treated like they were.  With his June 18, 2007, email, Koerber tried to fool these investors into thinking they had really invested in the so-called McGuire Group, and he is trying to fool the Court into thinking the same thing.  This was part of the scheme Koerber set up as he attempted to insulate himself from liability using these middle men.  The Court should reject Koerber's after-the-fact attempt to reduce the loss he caused by re-categorizing these investors.  They were frontline investors and their losses are properly included in the loss calculation.

- **Koerber Wrongfully Tries to Reduce the Loss with Wage, Vehicle and Other**

---

[37] 2018 Trial Tr., Dale Clarke Testimony, 887-888 (attached as Ex. 26)
[38] Defense Trial Ex. 983; Trial Ex. 177a (attached as Ex. 27); 2018 Trial Tr., Craig Carroll Testimony, 493, 509-510 (attached as Ex. 28);
[39] *Id.* at 496
[40] *Id.* at 501.

**Payments Unrelated to the Investment Scheme**

Koerber also tries to reduce his loss by subtracting other payments he made to investors (including preferred buyer and acquisition representative payments, wage payments, vehicle payments, and other unspecified distributions), which were unrelated to their investment in Founders Capital. Koerber is advancing "these claims as if the purpose of the sentencing hearing were to conduct a final accounting between [the defendant] and [the victims]." *United States v. Masek*, 588 F.3d. 1283 (10th Cir. 2009). The Tenth Circuit law, however, is that "[t]his assumption is incorrect; the purpose of the hearing [is] to determine the amount of loss resulting from the charged offense." *Id.* As a result, the loss calculation should be based on the transactions relating to the fraud—which in this case are the fraudulently induced investments and the repayments of principal and interest on those investments. The other dealings between Koerber and the victims, such as real estate program payments, wages, cars, and benefits— are not related to his investment scheme. Such dealings "do not affect the loss calculation." *Id. See also United States v. Lange*, 592 F.3d 902, 906-07 (8th Cir. 2010) (rejecting claim that offsets to the loss amount should be made for profits made on other transactions because the guidelines commentary "provides that the court should apply a credit where the defendant returns the very money or property taken as part of the fraud," not when the victim receives "other benefits ... that do not correlate directly with the amounts [obtained] as part of the fraud.") quoting *United States v. Radtke*, 415 F.3d 826, 842 (8th Cir.2005); U.S.S.G. § 2B1.1 cmt. n. 3(A)(i)-(ii) (loss is the "reasonably foreseeably pecuniary harm that ***resulted from the offense***.") (emphasis added). That these other payments are not related to the investment scheme is best evidenced by the timing of the payments. For example, Koerber tries to reduce Clavell Anderson's investment loss by amounts he received for preferred buyer payments, contract labor, and for a $100,000 "owner" distribution. Koerber made the preferred

buyer payment in August 2005, the contract labor payments between March 2005 and January 2006, and the $100,000 owner distribution in November 2005.  Clavell Anderson did not invest with Koerber until October 2006, meaning that all the other payments Koerber is trying to deduct for Anderson happened **before** Anderson even invested.[41]   Koerber cannot legitimately claim that payments he made to Anderson before Anderson even invested constitute a "return" on Anderson's investment, or relate in any way to Anderson's investment.

Likewise, Koerber understates the investments made by Stephen Anderson's Nexus Capital, and then tries to deduct $781,766.13 from the loss suffered by Nexus Capital.  But this $781,766 figure primarily represents money paid to a company called Nexus Group, which, according to Koerber's business records, belongs to individuals other than Stephen Anderson.  It is thus an unrelated company.  Since the Nexus Group is not related to Stephen Anderson or Nexus Capital, Koerber's payments to Nexus Group cannot offset Nexus Capital's loss.[42]

Similarly, Koerber understates the investment made by Todd Huff—JTH Publishing by $150,000 and then tries to reduce Mr. Huff's investment loss with an offset $327,794.75 for funding that Koerber provided to JTH Publishing for publishing Koerber's Creative Real Estate Lifestyles Magazine.  Many of these disbursements were made before Mr. Huff even invested in Founders Capital.  These disbursements for the magazine do not constitute an investment return and are not logically related to Mr. Huff's investment and should not be used to offset Mr. Huff's investment loss.[43]   Moreover, the money Koerber spent on the magazine was part of the fraud— he used money that was supposed to go to real estate to publish the magazine and he used the magazine to tout himself and his fraudulent investment scheme.  Koerber cannot reduce his loss

---

[41] Supplemental Declaration of Angela Mennitt, ¶ 9a
[42] Supplemental Declaration of Angela Mennitt, ¶ 9b
[43] Supplemental Declaration of Angela Mennitt, ¶ 9c

through fraudulent spending.

Similarly, Koerber understates the investment made by David Bartholomew and HIJ investments by $3,100,000 and the monthly interest that Koerber's own records show he paid. And finally, Koerber's proposed offset for preferred buyer payments for Mr. Bartholomew again were made **before** he invested with Koerber and thus cannot constitute an investment return.[44]

Such problems infect most of Mr. Koerber and Mr. Hardman's loss calculations.[45]

Moreover, even if it were proper to try to account for these type of payments in the loss calculation, Koerber fails to properly account for their full impact. For example, Koerber fails to account for the significant losses suffered by preferred buyers when banks foreclosed on the homes they bought. He also fails to account for any benefits that Founders Capital received from the labor performed in exchange for the wages he paid, or from the work performed by his acquisition representatives.[46] By seeking credit against his loss amount for the "estimated" wages he paid to his victims, he is essentially saying these individuals worked for him for free. For these reasons, the Court should refuse to reduce the loss for payments unrelated to his fraud scheme.

- **Koerber Wrongfully Tries to Reduce the Loss with Speculative Asset Values**

Koerber also contends the Court should reduce the loss for the value of assets that Koerber supposedly owns (but which have not been liquidated or distributed to investors), including the *Evil Angel* movie, an interest in Iceberg, real estate, and unspecified precious metals. There are a number of problems with this theory:

- ***The Movie, the Iceberg, the Cars, and the Coins were part of the Fraud***. Koerber

---

[44] Supplemental Declaration of Angela Mennitt, ¶ 9d
[45] Supplemental Declaration of Angela Mennitt, ¶ 10.
[46] Koerber says that "it is unclear what services many of these frontline investors actually provided to receive the wages." ECF No. 623 at 13. Koerber, however, is the person in the best position to provide this information; he ostensibly hired and supervised them. He cannot hire them and then simultaneously disavow that they did any work.

led his investors to believe that he was using their money for real estate transactions but he instead, among other things, ran a Ponzi scheme, spent on a lavish lifestyle (including luxury cars), invested in a horror movie and a hamburger restaurant, and minted his own coins.  These items further helped perpetuate the fraud, and helped Koerber project his illusion of success.  The amounts Koerber invested in these ventures were thus part of the fraud and make up part of the loss—they cannot be used to reduce it.  *United States v. Benson*, 79 Fed. Appx. 813, 826 (6th Cir. 2003) (unpublished) (refusing to reduce loss for investments defendant made in ventures that were contrary to what defendant represented he would invest in because "they should be included in the fraud.")

- ***Koerber Cannot Reduce the Loss for $31.9 Million Real Estate Value Because No Investor Recovered Anything from this Equity, and the Supposed Value Does Not Exist.***  Koerber wants to reduce his loss by $31.9 million for the value of real estate he supposedly held as of July 2007, when he says he came clean to investors about his financial status in a rescission offering.  Under Koerber's theory, he actually owned this real estate, and it was the market crash that diminished this value and prevented him from paying investors.  But under the sentencing guidelines, loss is only reduced by "the amount the victim has **recovered** at the time of sentencing from disposition of the collateral," or "if the collateral has not been disposed of by [the time of sentencing], the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n. 3(E)(i)-(ii) (emphasis added). Here, the investors have never actually **recovered** anything from any of this supposed real estate equity. And there is no way to give any value for this supposed

real estate now for sentencing.  Koerber failed to give any value for real estate when reporting his financial condition to probation.[47]  And, as shown in detail at trial and in the United States' Evidentiary Submission on Loss, Koerber never really had the real estate equity that he told investors he had (and that he now wants the Court to believe he had).[48]  Most of the real estate value Koerber claims involved real estate that was actually owned by other people; Koerber at best held a lease option on these properties and because he failed to make the payments, he lost even this speculative interest.[49]  The most glaring example of this was the "Heber Cabin," which made up $11,850,372 of the supposed $31.9 million (about one-third) of Koerber's purported real estate equity as of July 31, 2007 (the date of the rescission offering).  This property was actually owned by another person on that date, and though Koerber later obtained a lease option on the property, he was never able to exercise it.[50]  This property was thus never available to repay investors.  Moreover, contrary to Koerber's assertion that he gave accurate financial information to investors in the summer of 2007, he didn't.  The CPA Koerber hired to compile the financial information refused to provide any assurance that Koerber's financial information was accurate because he could never assure himself that the notes receivable( for money that Koerber had supposedly loaned to companies under his control)—which formed the vast majority of Koerber's assets—were valid.[51]  In short, this supposed real estate equity was part of the fraud; it never existed.

---

[47] Amended Presentence Report, ECF No. 562 at18- 21
[48] The evidence supporting Koerber's lack of real estate equity was set forth at trial and as part of its Evidentiary Submission on Loss, ECF No. 611, pp. 11-13.
[49] Id.
[50] Trial Ex. 142, slide 25; 2018 Trial Tr. Dean Hamilton Testimony 769-773 (attached as Ex. 29).
[51] 2018 Trial Transcript, Clark Wilkinson Testimony, 1002-1006 (attached as Ex. 30).

Koerber cannot try to reduce his loss with real estate equity that he never owned and that never has provided any recovery to investors.

- ***Koerber cannot try to reduce the loss by promising to make payments after the fraud has been detected.***  Tenth Circuit law is clear that "the fact that a victim has recovered part of its loss after discovery of a fraud does not diminish a defendant's culpability for sentencing purposes."  *United States v. Swanson*, 360 F.3d 1155, 1168-69 (10th Cir. 2004).  If somehow Koerber ever does recover anything from the movie, the Iceberg, or this non-existent real estate, it will go toward reducing his restitution obligation, but it does not diminish his culpability for the crime and cannot now be used to reduce the loss amount.  *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir. 1998) ("the purpose of the loss calculation under the Sentencing Guidelines is to measure the magnitude of the crime at the time it was committed. The fact that the victims have been able to recover part of their loss after the discovery of the fraud does not diminish [defendant's] culpability and responsibility for purposes of sentencing.").

- ***Koerber admits that the real estate equity, movie, coins, and Iceberg were not collateral, and investors have no lien on them***.  In his memo, Koerber admits "the investor's notes in this case were not secured with collateral." Defendant's Response to Evidentiary Submission, ECF No. 623 at p. 16.  Because Koerber never pledged the movie, the Iceberg, coins, or the purported real estate as collateral to investors, they cannot be used to reduce the loss.  *United States v. Benson*, 79 Fed. Appx. at 826 (refusing to reduce loss by $800,000 in real estate purchases "because these assets were not pledged as collateral, and investors had no lien on them, the

loss should not have been reduced.") (unpublished).

- ***The values that Koerber places on the movie, the Iceberg, and the supposed real estate equity are pure speculation***.  Even if these assets were collateral, there is no way to reduce loss for these assets because there is no reliable way to value them.  Koerber himself admitted that assigning any value to these assets is speculative.  When he was talking to probation about his financial condition, he said he could not give a value to these assets, because both can fluctuate in value, depending on how well the Iceberg restaurant does, the outcome of a copyright lawsuit for an unrelated movie involving Richard Dutcher (the director of the investor-funded horror movie), and the marketability of actor Ving Rhames.[52]  Koerber now tries to have his accountant value the movie at $30,000,000, half of which should go to reduce Koerber's loss.  But the movie's creator testified at trial that he could make "10 to $12 million on it."[53]  Given these vastly different amounts, and the fact that this movie has been pirated and never released in the United States,[54] the Court can have no confidence in any of the information offered by Koerber as to the movie's value.  And though Koerber continually touts this Iceberg property, no victim has ever benefitted from this purported value, and other than the unsubstantiated number in Hardman's declaration, there is no way to tell what, if anything, it is worth.  The purported value of the real estate is likewise speculative.  The Court should refuse to reduce the loss amount for assets that have no verifiable value and based on speculative future recoveries.

---

[52] Amended Presentence Report, ECF No. 562 at 21.
[53] 2018 Richard Dutcher Testimony, 2018 Trial Tr. 1800 (attached as Ex. 31)
[54] *Id.* at 1798.

*See, e.g., United States v. Jimenz*, 513 F.3d 62, 85–86 (3d Cir. 2008) (affirming district court's refusal to credit loss amount for amount of collateral pledged because of the "speculative nature of any recovery" where there was conflicting evidence as to the collateral's value, the victim's subordinate position, and the uncertainty of collection from a bankruptcy proceeding); *Cf. United States v. Wolfe*, 71 F.3d 611, 617 (1995) (future amounts potentially recovered by bankruptcy trustee in part "because the amounts that might be recovered by the bankruptcy trustee are wholly speculative."); *United States v. Hooker*, 456 Fed. Appx. 549 (6th Cir. 2012) (refusing to credit loss amount for amounts purportedly repaid by defendant, but there was no evidence of the amount and "only speculation could support the contention that the few payments Hooker did make reduced the loss.).  Indeed, despite the fact that Vonco appears to have had the opportunity to recover on some of the real estate, it is also clear that there was no value available in such real estate, because Vonco's bankruptcy trustee found that "there is no property available for distribution from the estate over and above that exempted by law."[55]  In short, any supposed value in any of these assets in pure speculation.

### G.     Koerber is Not Entitled to a Loss Reduction for Restitution Paid by Paul Bouchard

Koerber finally contends that he is entitled to a reduction in his loss for amounts that Paul Bouchard paid to people who invested in Koerber through Paul Bouchard.  This makes no sense.  Bouchard attempt's to pay money to his downline that does not reduce the fact that Bouchard lost

---

[55] Chapter 7 Trustee's Report of No Distribution, *In re William K and Vonnie J Hoopes*, 2:09-bk-20396, (D. Utah May 8, 2009).

money from Koerber's scheme.  The amounts Mr. Bouchard paid to those individuals therefore does not reduce the loss amount that Koerber inflicted on Bouchard.

## CONCLUSION

For these reasons, Koerber's loss calculations have no merit.  The evidence shows Koerber caused a loss of $45,258,892.09 and the Court should compute his guidelines accordingly.

Dated this 30th of August, 2019

JOHN W. HUBER

*/s/ Tyler L. Murray*_____
Tyler L. Murray
Aaron Clark
Ruth Hackford-Peer
Assistant United States Attorneys