Kathryn N. Nester  (#13967)
Federal Defenders of San Diego, Inc.
225 Broadway, Ste. 900
San Diego, CA  92101
(619) 234-8467
(619) 687-2666 fax

Scott Keith Wilson, Federal Public Defender (#7347)
Robert K. Hunt, Assistant Federal Public Defender (#5722)
Daphne A. Oberg, Assistant Federal Public Defender (#11161)
Office of the Federal Public Defender
46 W. Broadway, Ste. 110
Salt Lake City, UT  84101
(801) 524-4010

Attorneys for Claud R. Koerber

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>CLAUD R. KOERBER,<br><br>    Defendant. | **AMENDED MOTION TO REVOKE MAGISTRATE JUDGE'S DETENTION ORDER AND FOR EXPEDITED STAY OF ORDER AND IMMEDIATE RELEASE**<br><br>2:17-cr-00037-FB-PMW<br><br>District Court Judge Frederic Block<br>Magistrate Judge Paul M. Warner |

Pursuant to 18 U.S.C. § 3145(b), and both the Fifth and Eighth Amendments

to the United States Constitution, Defendant Claud R. Koerber submits this amended

motion and moves the Court to revoke Magistrate Judge Warner's May 31, 2019 detention order.  Mr. Koerber also moves for an expedited order immediately staying the Magistrate Judge's detention order and releasing Mr. Koerber from custody immediately, pending resolution of this motion.

OVERVIEW

After 10 years of Mr. Koerber being on release under the provisions of the Bail Reform Act under exceptionally minimal conditions, on personal recognizance and without incident; on May 31, 2019 the government alleged for the first time that Mr. Koerber had violated his release conditions. The alleged violation occurred, according to prosecutors, when Mr. Koerber issued a run of the mill business receipt, to an attorney, on March 2, 2019 for $209.35. The receipt was for document delivery services in an unrelated Oregon civil matter, and the attorney is licensed and in good standing, in both Oregon and Utah. The attorney, Mr. J. Morgan Philpot, testified that the $209 receipt was true and accurate. No other witness testified to having firsthand knowledge of the transaction.

But, relying on "documents, as described by the government"[1] rather than Mr. Philpot's testimony, Magistrate Judge Paul M. Warner found that Mr. Koerber had violated his release conditions.  Then, Magistrate Judge Warner found that Mr. Koerber presented a danger to the community based on government proffers related to a few civil disputes Mr. Koerber had with landlords more than seven years ago,

---

[1] May 31, 2019 Hearing Transcript, at p. 138 (Attached to the memorandum of law and authority filed herewith, as "Exhibit 1.")

ii

and two unrelated civil legal proceedings from back in 2014 and 2016, Magistrate Judge Warner effectively overruled seven prior Bail Reform Act decisions made by three different Magistrate Judges and two different District Court Judges in this case (the most recent three decisions post-date *all* of the proffered incidents raised by the government for the first time on May 31).  Magistrate Judge Warner, therefore, ordered Mr. Koerber incarcerated.

Almost four months later, it is now beyond reasonable question that the evidence and core allegations relied upon by the government and by Magistrate Judge Warner - are meritless.  It is now also apparent that Magistrate Judge Warner relied upon falsehoods advanced by the Peterkin law firm (the Oregon source of hearsay allegations presented by the government) and a reckless disregard for the truth by prosecutors in this case who based their central explanation for how Mr. Koerber allegedly violated his release conditions upon information prosecutors knew, or reasonably should have known, was false and misleading.

Mr. Koerber did not violate his release conditions, and this Court should correct the injustice that occurred on May 31.

REQUEST FOR RELIEF

**First**, pursuant to 18 U.S.C. § 3145(b), and both the Fifth and Eighth Amendments to the United States Constitution, Mr. Koerber moves for revocation of

Magistrate Judge Warner's May 31, 2019 detention order.[2] As a matter of law, Mr. Koerber is entitled to this review.  The Court's consideration of this detention issue must be "*de novo*" including consideration of new evidence provided since the May 31 hearing, and "showing no deference to any" of Magistrate Warner's prior "findings or conclusions." *United States v. Cisneros*, 328 F.3d 610, 616 n.1 (10th Cir. 2003); *United States v. Taylor*, 2012 U.S. Dist. LEXIS 144199. *See also* DUCrimR57-16(a)(1).

**Second**, Mr. Koerber also moves to immediately stay Magistrate Judge Warner's detention order and for an expedited order granting Mr. Koerber's release today, pending the full resolution of this motion.

GROUNDS FOR RELIEF

Mr. Koerber's present incarceration under Magistrate Judge Warner's detention order is unjust, and as explained in the supporting memorandum filed herewith, it is both factually and legally unsupportable.  In this context, immediate release is particularly appropriate when a judicial officer has made probable cause findings based upon the government's "knowingly" submitted false statements, or statements submitted "with reckless disregard for the truth" or when prosecutors have "knowingly or recklessly omit[ted] … information which, if included, would have

---

[2]  Magistrate Judge Warner previously made an express invitation that this detention matter be revisited within three or four weeks; yet despite the government's recent inability to rebut arguments which undermine the core facts relied upon by both the government and Magistrate Judge Warner on May 31, and Mr. Koerber's proposal of five new conditions of release, he declined to revisit any of his prior findings or conclusions.

vitiated probable cause[.]" *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996); *Jones v. City and County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988). *See also DeLoach v. Bevers*, 922 F.2d. 618, 622 (10th Cir. 1990) ("Recklessness may be inferred from omissions of facts which are 'clearly critical' to a finding of probable cause.")

Based upon the timing and circumstances, Mr. Koerber is scheduled to be sentenced on October 15, 2019. Mr. Koerber's release prior to sentencing is essential to avoid additional irreparable harm to his preparations and work with his attorneys in advance of the sentencing memorandum and the sentencing hearing itself.

If Mr. Koerber is not released prior to sentencing, under the relevant rules he will be required to file a new separate motion for release pending appeal, pursuant to 18 U.S.C. § 3143. Given the significant overlap of the facts, law and circumstances that will have to be considered by the Court in this motion and in any future motion under § 3143 for release pending appeal – it will promote judicial economy and vindicate Mr. Koerber's rights, to release him immediately while the Court fully resolves the other issues raised herein. Releasing Mr. Koerber immediately avoids additional irreparable prejudice to Mr. Koerber and his ability to defend himself at sentencing and in advance of his appeal – which is of heightened significance given that the Tenth Circuit has already upheld the district court's prior findings of significant prejudice to Mr. Koerber caused by a pattern of prosecutorial misconduct

and government violation of federal statutes. *See United States v. Koerber*, 813 F.3d 1262, 1285 (10th Cir. 2016).

Magistrate Judge Warner's finding that Mr. Koerber presents a danger to the community sufficient to justify incarceration is invalid under both Tenth Circuit precedent requiring that a finding of "dangerousness" relate to the possibility of future illegal conduct not merely conduct deemed suspicious by the government (*United States v. Cook,* 880 F.2d 1158, 1161 (10th Cir. 1989)) and Supreme Court precedent instructing that under the Eighth Amendment, the denial of release on dangerousness grounds must be for only the most serious of risks (*Sellers v. United States*, 89 S. Ct. 36, 38 (1968) ("The idea that it would be "dangerous" in general to allow the applicant to be at large must...relate to some kind of danger that so jeopardizes the public that the only way to protect against it would be to keep the applicant in jail.")).

## CONCLUSION

Given that Mr. Koerber had a lawful expectation of liberty provided by the Bail Reform Act and protected by the due process clause of the Fifth Amendment at the time of the May 31 hearing (*see United States v. Abuhamra*, 389 F.3d 309, 319 (2nd Cir. 2004)) and that his current incarceration is untenable under related Eighth Amendment guarantees, it would be patently unjust to require Mr. Koerber to remain incarcerated while this Court fully decides this § 3145(b) motion.

Mr. Koerber has no other meaningful or more timely remedy.  Therefore, Mr. Koerber requests both an immediate stay of Magistrate Judge Warner's detention order (so that he can be released today), and that the detention order be revoked pursuant to 18 U.S.C. § 3145(b).

ARGUMENTS AND AUTHORITY

INTRODUCTION

During the first substantive hearing presided over by this Honorable Court, the Court recognized the unique circumstances of this "unusual" case after, *inter alia*, every available federal judge in the District of Utah had recused or declined to preside, stating on the record:

> Let me cut to the chase. It may well be that the 10th Circuit is going to bounce this case if there is a conviction…I think there's a real chance that the Circuit Court can toss this case…[a]nd it may well be that the 10th Circuit will agree that it should be reversed for any number of reasons[.]

Hearing Transcript, May 7, 2018, Doc. 380 at pp. 38,40, 42.[3]  When the defense expressed concern that proceeding with a second trial would expose Mr. Koerber to the possibility of incarceration upon conviction, even though the conviction realistically might be viewed as

---

[3] Hearing Transcript, May 7, 2018, Doc. 380 at p. 46.  The unusual circumstances of this case include that the case has spanned a decade; Mr. Koerber's longtime defense attorney was removed from the case, without explanation and against Mr. Koerber's wishes after a first jury trial ended with a hung jury; and where federal District Court Judge Clark Waddoups has found "significant problems with the substantive prosecution" of this case including "a pattern of widespread and continuous misconduct" by prosecutors that "began even before the original indictment" and ultimately "undermine[d] Defendant's possibility of receiving a fair trial." *See* Case No. 2:09-CR-302, Doc 472 at pp. 11, 15. After the Court of Appeals affirmed the district court's findings of widespread prosecutorial misconduct and prejudice to Mr. Koerber, *see United States v. Koerber*, 813 F.3d 1262, 1278, 1281, 1283 (10th Cir. 2016), Judge Waddoups recused and the newly assigned judges (Judge Parrish and Judge Shelby who also both later recused) and the newly assigned Magistrate Judge (Warner), all declined to acknowledge or address that prosecutorial misconduct had played any part in this case.

invalid and unlawful by the Court of Appeals, Your Honor responded, "Not necessarily."

*Id.*, at p. 45.  A long colloquy then followed, where Your Honor ultimately concluded,

> Look, he's been out a long time…I'll tell you right now…I'm not going to put him in jail pending appeal…There's no situation that I can conjure up where he should be in jail pending a legitimate appeal when there is a legitimate chance you have that you have a meritorious appeal…I do think your client [deserves] some kind of comfort level in light of this kind of unusual case...[and] [y]ou need to have something definite from me…We're not going to put him in jail, so I'm giving you very definite information about it right now.

*Id.*, at pp. 46, 49.

Mr. Koerber was convicted on September 20, 2018. Consistent with the Court's prior ruling and the multiple prior instances when Mr. Koerber was evaluated for and granted release, Your Honor allowed him to remain on release post-conviction pursuant to 18 U.S.C. § 3143.

The government did not object to Mr. Koerber's post-conviction release, nor did it object to any of the prior release decisions made over the last decade.[4] Yet, after 9 years, 11 months and 12 days of release without incident, on May 31, 2019 the government went to great lengths to see Mr. Koerber incarcerated despite this Court's prior assurances. As explained in detail below, prosecutors misled Magistrate Judge Warner to accomplish this goal.

---

[4] *See* attached Appendix J

TABLE OF CONTENTS

OVERVIEW ................................................................................................ ii

REQUEST FOR RELIEF ......................................................................... iii

GROUNDS FOR RELIEF ....................................................................... iv

INTRODUCTION ................................................................................. viii

ARGUMENT ............................................................................................ 6

  **I.   Mr. Koerber Did Not Violate His Release Conditions ....................................... 6**

    A.   The Gov't Theory of a Release Violation Was False and Misleading ................. 8

    B.   No Remaining Basis to Question the $209, March 2 Receipt ........................... 15

    C.   No Probable Cause for any of the Misdemeanor Statutes .................................. 17

  **II.   Magistrate Judge Warner's Dangerousness Finding is Legally Invalid ......... 19**

    A.   Dangerousness is Factually Unsupported in Each Instance. ........................... 20

    B.   Magistrate Judge Warner Misapplied the Dangerousness Factor ..................... 25

      *1. "Pattern of Deception" Does Not Support a Financial Dangerousness Risk.* .. 26

      *2. "Pattern of Deception"  is Incompatible with Tenth Circuit Precedent.* ........... 27

      *3. "Pattern of Deception" Finding is Invalid Under the Eighth Amendment.* ....... 28

      *4. Finding of Dangerousness is Not Based Upon Any Significant Risk* ................ 29

    C.   Wrong Burden of Proof and Error Applying a Presumption of Detention ......... 31

    D.   The 3142(g) Factors Support Mr. Koerber's Immediate Release ...................... 33

CONCLUSION ........................................................................................ 35

APPENDIX A thru L   ……………………………………………….………   37

# PROCEDURAL HISTORY

Sentencing was last scheduled in this matter for May 13, 2019. Mr. Koerber had been on release for eight months following trial, without incident. Then the Court granted Mr. Koerber's request for an evidentiary hearing, prior to sentencing, because Mr. Koerber was challenging the method used by the government to calculate and exaggerate loss amount. The defense was also challenging the number of alleged victims prior to sentencing.  In the PSR and in subsequent communications, prosecutors claimed to have evidence of 100, then 250 and most recently 600 alleged victims that it wanted the Court to consider for sentencing.  Prosecutors had also included in the government's loss calculation multiple alleged victims who have testified that they suffered no pecuniary loss. As a result, the Court granted an evidentiary hearing.

Because of Mr. Koerber's subsequent detention, Mr. Koerber was unable to participate effectively in the highly detailed and extensive preparations necessary for the evidentiary hearing.  However, defense counsel worked diligently with their expert witness and engaged in critical negotiations with the government relating to loss amount and number of victims. The government and defense counsel reached agreements that vitiated the need for a contested hearing and advised the Court on May 13, during a status conference.   The government stipulated that it would attempt to prove approximately 34 victims for sentencing purposes.

A week later on May 22, U.S. Pretrial Services officer Annie Carr filed a petition alleging that Mr. Koerber had violated his release conditions.  Ms. Carr's petition did not explain the alleged release violation.  The Magistrate Judge then issued a warrant for Mr. Koerber's arrest.

On May 28, Ms. Carr filed an amended petition that still did not explain the alleged release violation but did summarily list four misdemeanor statutes.

On May 29, prosecutors filed a supporting legal brief that explained for the first time that the alleged release violation occurred when Mr. Koerber issued a $209.35 receipt, on March 2, 2019, to attorney J. Morgan Philpot. *See* Doc. 584.[5]  The receipt related to the dispatch of appeal documents for an unrelated civil case in Oregon (*Fryberger v. Edwards*). Alternatively, the government argued that Mr. Koerber, on March 6, improperly answered a question while completing an on-line registration form for Corvus Administration and Management, LLC ("Corvus"). As directed by Magistrate Judge Warner, the Marshals did not arrest Mr. Koerber until – as arranged – Mr. Koerber self-surrendered.

On Friday, May 31, 2019, Magistrate Judge Warner conducted a hearing on the alleged release violation with Mr. Koerber in leg irons, a belly chain and handcuffs during the entire proceeding.

The government's presentation focused on two documents: (1) the $209, March 2 receipt provided by Mr. Koerber, on behalf of Corvus, to attorney Morgan Philpot; and (2)

---

[5] Since approximately 2012 Mr. Koerber has built a career offering contact services to lawyers and law firms. Mr. Koerber works for a company owned by his family members, Corvus Administration and Management, LLC as the business manager and contract paralegal (providing legal research, legal writing, and trial support for attorneys).

the March 6, 2019 business re-registration application forms submitted to the Utah Department of Commerce.   The government's single argument was that Mr. Koerber violated his release conditions because "Mr. Koerber lied." *Id*. at p. 133 lines 5-11.

> Koerber prepared a receipt…showing Corvus accepted money…on March 2, 2019, but declared to the Utah Department of Commerce that Corvus would start doing business on March 6, 2019. Both cannot be true.  Either Koerber violated Utah Code § 76-6-504…when he created the Corvus [d]ispatch [r]eciept of March 2, 2019, or he violated U.C.A. § 78-8-504…when he completed the One Stop Business Registration and indicated Corvus would begin doing business on March 6, 2019.

Doc. 584 at p. 4. Mr. Koerber denied having violated his conditions of release and presented witnesses and exhibits to establish that the March 2 receipt was accurate, and that he had accurately and appropriately completed the Department of Commerce on-line form.

Nevertheless, preferring the government's explanation of the documents[6] over Mr. Koerber's witnesses, the Magistrate Judge ruled that "a violation has occurred." May 31, 2019 Hearing Transcript attached as Exhibit 1 ("Ex. 1") at p. 139 lines 18-20. But, in explaining his conclusion, Magistrate Judge Warner declined to find probable cause that Mr. Koerber had actually violated any of the four alleged misdemeanor statutes. Instead, he found "not an attempt to violate the law per se" but a "potential violation" related to the March 2, 2019 receipt.  Specifically, Judge Warner explained:

> That's why I found that there's probable cause to believe there was deception, that there was an attempt - - not an attempt per se to violate the law, but, in essence, an attempt to deceive, which was in-fact a potential violation. I don't know.

---

[6] May 31, 2019 Hearing Transcript attached as Exhibit 1 at p. 138 (Giving "great weight to the documents themselves" and finding "the documents, as described by the government, to be sufficient to meet the burden.").

*Id.* at p. 164, lines 9-14. *See also* p. 163, lines 7-8. ("I think the document may or may not have been backdated.")[7]

When Mr. Koerber inquired how this finding constituted probable cause to conclude that one of the alleged misdemeanor crimes had been committed (required by 18 U.S.C. § 3148(b)), Magistrate Judge Warner again declined to tether his probable cause finding to a statutory violation claiming:

> [I]n over thirteen years on the bench, this court has made probable cause determinations on hundreds of warrants and other related matters…this court may not be able to precisely define probable cause, but this court knows it when it sees it[.][8]

Doc. 624 at p. 5. As argued below, this approach by Magistrate Judge Warner was legally and factually untenable. The law does not support an unexplainable, subjective basis for a judge's probable cause finding. "Probable Cause is measured against an objective standard." *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir. 2004). "[T]he relevant question is whether a 'substantial probability' exist[s] that the **suspect committed the crime**[.]" *Felders v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) (Emphasis added).

---

[7] The relevant provision of the Bail Reform Act requires that any probable cause finding be directly tethered to "probable cause to believe that the person has committed a Federal, State, or local crime while on release", 18 U.S.C. § 3148(b)(1)(A), not merely conduct that a judicial officer finds objectionable or suspicious.

[8] Prior to his current position, Magistrate Judge Warner was the United States Attorney for the District of Utah when the joint state/federal investigation of Mr. Koerber and his businesses was first authorized. *See United States v. Koerber*, 966 F. Supp. 2d 1207, 1214 (D. Utah 2013) ("The allegations against Defendant were the focus of a joint investigation and prosecution among the DOJ, the Utah Division of Securities, the FBI, and the IRS that had been in motion in one form or another since 2005" which overlaps Magistrate Judge Warner's service as the United States Attorney).

Following Magistrate Judge Warner's finding that a release violation had occurred, he proceeded to conduct a revocation hearing.  Prosecutors then argued that Mr. Koerber's continued release would endanger the safety of the community based on accusations relating to two civil court disputes Mr. Koerber had with landlords more than seven years ago, and two additional unrelated legal proceedings back in 2014 and 2016.  The government had not included any of these allegations in their written submission, and did not provide any evidence to support these allegations at the hearing. *See* Doc. 584. Mr. Koerber objected and denied these allegations of dangerousness.

Nevertheless, relying on these bare proffers by prosecutors, Magistrate Judge Warner effectively overruled seven prior Bail Reform Act decisions made by three different Magistrate Judges and two different District Court Judges in this case (the most recent three decisions post-date *all* of the incidents of alleged dangerousness raised by the government for the first time on May 31) and concluded that Mr. Koerber's continued release would present a "danger to the community" based on a "pattern of deception", a "financial danger" making him an unmanageable candidate for release. Ex. 1 at p. 164.

On August 20, 2019, Magistrate Judge Warner issued an order (Doc. No. 624) denying Mr. Koerber's request for reconsideration, although Mr. Koerber had informed the court of substantial new exculpatory evidence demonstrating a reckless disregard for the truth by prosecutors, who were unable to rebut that the government's central explanation for how Mr. Koerber allegedly violated his release conditions was based upon information the government knew, or reasonably should have known, was false and misleading.

Magistrate Judge Warner declined to review or comment on the evidence and these new developments.

Mr. Koerber has been incarcerated since May 31, 2019.

ARGUMENT

Magistrate Judge Warner's detention ruling is factually and legally untenable. As outlined below, Magistrate Judge Warner's factual conclusions are clearly in error, and his detention order is the result of multiple legal errors.

## I.      Mr. Koerber Did Not Violate His Release Conditions

The question presented at the May 31 hearing was whether Mr. Koerber violated any condition of release and if so, whether his release should be revoked as a sanction for the violation.  *See* 18 U.S.C. § 3148; *see also* Ex. 1 at p. 10.

No firsthand witnesses were presented by the government at the May 31 hearing. The government's only witness, Ms. Carr, testified that she based her petition on third-party provided documents and "nothing else."[9]  *See* Ex. 1 at p. 34.  Magistrate Judge Warner also adopted the government argument and position by giving "great weight to the documents themselves" and finding "the documents, as described by the government, to

---

[9] It appears that Magistrate Judge Warner did not have statutory authority to conduct the May 31 hearing. Under 18 U.S.C. § 3148(b), it is the "attorney for the Government [that] may initiate a proceeding for revocation" by filing a motion with the district court. § 3148(b). See also *United States v. Gotti*, 794 F.2d 773, 776 (2d Cir. 1986). No other authority is granted by statute to initiate this proceeding. As such the statutory grant of authority to the "attorney for the Government" also functions as a limit on any other method of invoking a proceeding for revocation under § 3148. Because an attorney for the government did not initiate the proceeding on May 31 the court has legal grounds to revoke Magistrate Judge Warner's detention order.

be sufficient to meet the [government's] burden." *Id*. at p. 138.

The government's reasoning, adopted by Magistrate Judge Warner, was that on March 6, 2019, Mr. Koerber completed an online form to re-register Corvus with the State of Utah. In doing so, he was required to answer a question that asks, "What is the date that you will start or did start doing business?" Mr. Koerber answered "March 6, 2019." The government argued if Mr. Koerber was telling the truth on this form, then Corvus was not doing business on March 2. This is significant, according to the government, because Mr. Koerber had issued a $209 business receipt to attorney Morgan Philpot dated March 2. The receipt was for dispatch of appeal documents in an unrelated Oregon civil matter (*Fryberger v. Edwards*). According to the government, Mr. Koerber's use of the date March 6 when registering Corvus creates a reasonable inference that the receipt he gave Mr. Philpot was not actually issued on March 2. This is also the inference directly relied upon by Magistrate Judge Warner. *See* Ex. 1 at p. 10 p. 163, lines 7-8. ("I think the document may or may not have been backdated.")

Alternatively, the government speculated that if the Corvus receipt was accurate, and in-fact issued on March 2, then on March 6 when Mr. Koerber answered the online registration form question indicating that Corvus "will start or did start doing business" on March 6, 2019 – this statement was false since Corvus was doing business on March 2. Either way according to the government, Mr. Koerber "lied" and the lie somehow constitutes a misdemeanor offense. *See* Doc. 584 at p. 4 ("Both of these things cannot be true, and either way, one of those lies has violated Utah statutes.")

The government's description of the documents appears simple enough, but it is

false, and prosecutors misled Magistrate Judge Warner by omitting and failing to disclose materially exculpatory information. This is significant because "'the totality of the evidence' must be considered and the court 'must not ignore…exculpatory evidence in order to find probable cause." *Felders*, 755 F.3d at 879-83.

Because Mr. Koerber is moving for revocation of Magistrate Judge Warner's order pursuant to 18 U.S.C. § 3145, the Court is required to make its own factual findings and determination on whether probable cause exists that Mr. Koerber committed a crime while on release, with no deference to Magistrate Judge Warner's findings or conclusions. "[I]n so doing the Court may elect to start from scratch and take evidence…and also may incorporate the record of the proceedings conducted by the Magistrate Judge, including any exhibits." *United States v. Tayler*, 2012 U.S. Dist. LEXIS 144199 (Utah District Court, 2012).

### A.    The Government's Theory of a Release Violation Was False and Misleading.

Prosecutors based their argument that Mr. Koerber committed a criminal offense during release, on the false and misleading theory that Mr. Koerber's answer to the Department of Commerce's online question was an affirmative representation that Corvus was not conducting business or had not conducted business prior to March 6, 2019.  On May 31, AUSA Clark went even further and argued that Mr. Koerber's answer of "March 6" on the registration form was the equivalent of promising the State of Utah that "he would not start doing business until March 6, 2019." Ex. 1 at p. 137.

But despite Mr. Clark's description and the government's characterization of Mr.

Koerber's answer to the online form, the government knew, or reasonably should have known, that:

1. The Department of Commerce ("UDOC") requires businesses that are re-registering on-line to answer the question – "What is the date that you will start or did start doing business?" – with the current date, meaning the date the form is being filled out.

2. The UDOC on-line form does not allow a business that was previously registered, to use the historical date it started doing business, in answer to the question.

3. The UDOC question regarding what date the business "will start or did start" does not apply to pre-registration activity. Department of Commerce employees are trained to explain that this question is applicable only to the newly re-registered business going forward.

Based on these three facts, the government knew or reasonably should have known that Mr. Koerber's answer on the online form was accurate and in compliance with Department of Commerce requirements, policy, and instruction.  The government's argument at the hearing was not made in good faith.[10]  Prosecutors misled Magistrate Judge Warner regarding 1) how the online form works, 2) what the Department of Commerce requires in answer to the online question at issue, and 3) what the answer to this particular question – actually means.  Significantly, Ms. Francine Giani, the Executive Director of

---

[10] Prosecutors have a duty to investigate prior to making a criminal allegation. *See* Utah Rules of Professional Conduct, Rule 3.1 and Rule 3.3; Fed. R. Civ. Pro, Rule 11.

the Utah Department of Commerce, and members of her staff working with the prosecution - were present in the courtroom on May 31 (and interacting with prosecutors during the hearing)[11] and yet, did nothing to correct the misleading presentation and arguments made by prosecutors.

Investigating the government's omission and misleading argument, following the May 31 hearing Mr. Koerber's wife (Jewel Franklin) contacted the Department of Commerce directly. Below is a selection of her July 2, 2019 communications regarding the meaning and requirement of the question put at issue by prosecutors:

| | |
|---|---|
| **Question**: | "[I]f I have a business previously registered but has been expired for more than 2 years, what should I do?" |
| **Dept. of Commerce** | "You would start completely over." […] |
| **Question:** | "I'm trying to re-register the business now but the form asks me to select the date I started doing business, and it doesn't let me cho[o]se the date it started. It won't let me choose a date before January 1, 2018. What do I do for that question?" |
| **Dept. of Commerce** | "[I]t is brand new...today is the first day you can start. […] If you answer any of those questions online referencing your old business, it will not work. Start new. Blank." |
| **Question:** | "Even though I have continued using that business for the past several years? That wouldn't matter? Just register it new?" |
| **Dept. of Commerce** | "Yes. It is expired. You will get a new entity number. Brand new." |

---

[11] Ms. Giani and the Utah Department of Commerce were identified by the government (by then-US Attorney Tolman in May 2009) as members and participating partners of the prosecution team in this case, and in prior hearings it has been established that Ms. Giani had at least one staff member cross-deputized as a Special Assistant United States Attorney to participate in this case as far back as 2008 and 2009.

Declaration of Jewel K. Franklin, attached as Exhibit 2 ("Ex. 2") at p. 6-7 (includes screenshots of the actual online session). Significantly, when asked how to answer the relevant question, even if a business has been conducting business "for the past several years," the Department of Commerce instructs those completing the form to still use the current date.  This exchange, directly with the Department of Commerce, shows the actual meaning of the question regarding when a newly re-registered business "did start" or "will start" doing business; and that the government's arguments were plainly false and misleading.

Because Mr. Koerber's use of the date March 6 – on the on-line form – was not a promise or representation that Corvus was not doing business before March 6, there is no reason to suspect the date on the March 2 receipt. In fact, it has always been beyond reasonable dispute that Corvus operated from 2012-to the present.   Not only did prosecutors omit the facts related to the Department of Commerce form, but Mr. Koerber disclosed his employment with Corvus throughout the last decade to the Pre-trial Services Office, including to Ms. Carr in October 2018 and to Ms. Mary Schuman in February 2019 – which is why Ms. Schuman raised the registration status of Corvus in the PSR on March 4, 2019.

Because the evidence flatly contradicts the government's arguments and the basis for Magistrate Judge Warner's finding of probable cause, Mr. Koerber previously submitted this information. *See* Doc. 612-1. Prosecutors subsequently effectively conceded the points made here by omitting any reference to this evidence in the government's

responsive filing. However, without explanation, Magistrate Judge Warner declined to address this evidence or the fact that prosecutors had misled him on this central argument.

When a judicial officer has made probable cause findings based upon the government "knowingly" submitting false statements, or statements submitted "with reckless disregard for the truth" and when prosecutors have "knowingly or recklessly omit[ted]…information which, if included, would have vitiated probable cause", the probable cause finding itself is legally invalid, and the Court must act to correct the error. *Wolford v. Lasater*, 78 F.3d 484, 489 (10th Cir. 1996). See also *Jones v. City and County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988); *Stewart v. Donges*, 915 F.2d 572, 583-84 ("[It is a] clearly established violation…to knowingly or recklessly omit…information which, if included would have vitiated probable cause.")

Probable cause is vitiated "if the magistrate or judge…was misled by information …that the affiant knew was false or would have known was false except for his reckless disregard for the truth." *DeLoach v. Bevers*, 922 F.2d. 618, 622 (10th Cir. 1990) ("Recklessness may be inferred from omissions of facts which are 'clearly critical' to a finding of probable cause.") "A reckless disregard for the truth exists…[and] a factfinder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations." *Id*.

Significantly, Mrs. Franklin's July 2 communication with the Department of Commerce is entirely consistent with the witness testimony presented by Mr. Koerber at the May 31 hearing. Mr. Koerber presented live witness testimony from an owner of

Corvus (John Belcher) and from attorney Russell C. Skousen.[12] Both of these witnesses testified on the meaning and accuracy of Mr. Koerber's answer to the Department of Commerce on-line form and regarding Corvus operating continuously from 2012 thru March 6, 2019.  Or in more simple terms, Mr. Koerber's witnesses testified that the Department of Commerce question put at issue by prosecutors, does not mean what the government claimed, and Mr. Koerber's answer to that question of March 6 was true and accurate – in context – and in line with Department of Commerce policy, instructions, and requirements.

Mr. Belcher testified that he was an active participant with Mr. Koerber in the re-registration effort on both March 5 and March 6, 2019.  He testified that he was with Mr. Koerber when Mr. Koerber had tried to re-register Corvus on March 5 immediately after Mr. Koerber saw the March 4 presentence investigation report (PSR) criticizing the fact that Corvus' business registration was expired. Mr. Belcher testified that the Department of Commerce on-line form prohibited them from answering this specific question with the date that Corvus had started doing business back in 2012.  Mr. Belcher also explained that before proceeding to answer the question they contacted the Utah Department of Commerce and asked how to answer.  He testified:

> Well, the main concern was when we tried to register the company, it wouldn't let us put the date that we actually formed the company…[b]ecause it's a Web form and it just puts a big red error and says you filled this out wrong, and try again. It only allows you to put that day's date or a future date.  And we asked them [the Utah Department of Commerce] how to

_____

[12] Mr. Skousen is a former attorney for Mr. Koerber and his prior businesses, and a current employer of Corvus' services. He is also the former Executive Director of the Utah Department of Commerce.

> proceed…[t]hey said put today's date. It happens all the time.  It's fairly
> normal.  You know, the old company, we've got it in our system, and that's
> how it's always done."

*Id.*, at p. 68 lines 4-15.  This explanation by Mr. Belcher has now been directly

corroborated by the Department of Commerce conversation with Mrs. Franklin on July 2.

*See* Ex 2. Prosecutors and Utah Department of Commerce leaders and staff heard Mr.

Belcher's testimony and nevertheless continued to omit what they knew and to persist in

misleading Magistrate Judge Warner.

Mr. Skousen testified that based upon his experience as the former Executive

Director of the Utah Department of Commerce and as a private practicing attorney, this

kind of circumstance happens "[v]ery often", *id.*, at p. 78, that a business can re-register

and before it does, the unregistered status doesn't effect a company's "ability to do

business", *id.*, at p. 79, all that is required is that the business re-register and re-form a "new

entity that has a new entity number" and the business activities taking place prior to the

date of re-registration are legitimate; but they "do not enjoy the protection" of limited

liability, *id.*, at p. 79 (meaning that the business principals are personally exposed if a

lawsuit should arise).  Mr. Skousen also testified that his law firm had used Corvus from

2015 forward despite the expired registration, and that Mr. Koerber's services were "[q]uite

reliable." *Id.*, at p. 85.

Despite the testimony of Mr. Belcher and Mr. Skousen (which as now been

confirmed as accurate and correct with regard to Department of Commerce policy and

requirements), Magistrate Judge Warner chose to rely on "the documents, as described by

the government[.]" *Id.*, at p. 138. But, a court "may not engage in a 'divide and conquer'

analysis of the facts to determine whether probable cause exist[s]", *Valenzuela*, 365 F.3d at 896 (citing *U.S. v. Arvizu*, 534 U.S. 266, (2002)). This is especially important here, when the government's description of the documents was false and presented with reckless disregard for the truth. *See DeLoach*, 922 F.2d. at 22.

Based upon this clear understanding of what the online re-registration form allows, what Department of Commerce policy requires, and how a Department of Commerce employee has instructed applicants to answer the very question involved in Mr. Koerber's situation with Corvus on March 6 – it is beyond dispute that Mr. Koerber did not commit any act of deception and did not make a false statement when he used the date of March 6 in the process of re-registering. As such, the government's basis for arguing that the March 2 receipt was suspect is also meritless.

The evidence presented undermines the validity of Magistrate Judge Warner's refusal to reconsider his prior findings and his May 31 conclusions because "'the totality of the evidence' must be considered" and the Court "must not ignore…exculpatory evidence in order to find probable cause." *Felders*, 755 F.3d at 879.

### B. There Is No Remaining Evidentiary Basis to Question the Accuracy of the $209, March 2 Receipt to Mr. Philpot.

Based on the evidence now accurately and fully before the Court, there is nothing that calls into question the March 2 date on the $209 receipt to Mr. Philpot.  It is true that Magistrate Judge Warner has also speculated that "timing is just not in Mr. Koerber's favor … [because] Mr. Skousen testified that Mr. Koerber has a pattern of doing things at the last minute." Ex.  1 at p. 138.  But, even if Mr. Koerber has such a pattern, this suspicion

is not sufficient to find that the March 2 date on the $209 receipt is inaccurate.   *See*

*Valenzuela*, 365 F.3d at 896 (A court may not "arrive at probable cause simply by piling

hunch upon hunch.") Further, Magistrate Judge Warner's suspicion stretches Mr. Skousen's

statement beyond its meaning.  Mr. Skousen actually testified: "Rick does a lot of work for

a lot of different people, and sometimes we don't get a pleading drafted and filed until the

deadline.  It's just the nature of the practice at times."  *Id*. at p. 91.  Mr. Koerber's attorney

followed up asking: "In all the time that Mr. Koerber has worked for you, has he ever

missed a deadline?"  *Id.* at p. 92.  Mr. Skousen answered, "There **may have** been once.  I

don't remember a specific instance. . .I don't remember a specific time."  *Id*. (Emphasis

added).  This testimony taken directly, actually supports the statement of Mr. Philpot that

the March 2 receipt was issued two days before the required deadline. *See* Ex. 1 at pp. 106-

107. Further, Mr. Koerber has since provided declarations from almost a dozen additional

attorneys, practicing in several different states and different federal districts, and all of them

attest to the quality of Mr. Koerber's work, his integrity, and his respect for the law and

court rules.  *See* attorney declarations attached Exhibit 5 ("Ex. 5").  Thus, Magistrate Judge

Warner's reliance on speculation regarding the possibility of a missed deadline, is not an

adequate substitute for the evidence provided. Contrary to Magistrate Judge Warner's

suspicion and speculation, the evidence presented has been broadly exculpatory. Mr.

Philpot testified that the date on the receipt is accurate, *see* Ex. 1 at pp. 108,115,116, and

almost a dozen other respectable attorneys have told the Court that Mr. Koerber's paralegal

work is professional, high quality, and that he demonstrates respect for the law and court

rules. *See* Ex. 3. Evidence must be "sufficient to lead a prudent person to believe" that the

crime has been committed. *Jones* 854 F.2d at 1210.

### C. No Evidence Establishes Probable Cause that Mr. Koerber Violated any of the Four Misdemeanor Statutes.

Pursuant to 18 U.S.C. § 3148(b), in order to conclude that Mr. Koerber violated the terms of his release, the Court must find probable cause that a crime was committed. However, Magistrate Judge Warner has twice declined to find "probable cause" that Mr. Koerber committed one of the four specified misdemeanor crimes. Instead, he explained: "I found that there's probable cause to believe there was deception, that there was an attempt - - not an attempt per se to violate the law, but, in essence, an attempt to deceive, which was in-fact a potential violation. I don't know." *Id.* at p. 164, lines 9-14. But, the law does not allow Magistrate Judge Warner's unexplainable, subjective basis for a probable cause finding. "Probable Cause is measured against an objective standard." *Valenzuela*, 365 F.3d at 896. "[T]he relevant question is whether a 'substantial probability' exist[s] that the **suspect committed the crime**[.]" *Felders,* 755 F.3d at 879. (Emphasis added).

The amended petition invokes four statutes: 1) Utah Code § 76-8-504 "Written False Statement"; 2)  Utah Code § 76-6-504 "Tampering With Records"; 3) Oregon Revised Statutes § 165.080 "Falsifying Business Records"; and 4) Oregon Revised Statutes § 33.015 "Criminal Contempt".

Of course, the government must do more than cite a statute and make allegations. Instead, it has the burden of proving that "a 'substantial probability' exist[s] that [Mr. Koerber] committed [a] crime, requiring something more than suspicion" looking at "the

totality of the evidence" presented. *Felders*, 755 F.3d at 879. This did not happen at the May 31 hearing, and Magistrate Judge Warner made no findings related to any of these statutes.[13]

In conducting this Court's § 3145 *de novo* review of Magistrate Judge Warner's detention order, this issue of probable cause has to be revisited – independently – where this Court must give "no deference to the Magistrate Judge's findings and conclusions" and "in so doing the Court may elect to start from scratch and take evidence…and also may incorporate the record of the proceedings conducted by the Magistrate Judge, including any exhibits." *United States v. Tayler*, 2012 U.S. Dist. LEXIS 144199 (Utah District Court, 2012).

For the reasons already explained above, there is no factual basis whatsoever for the crime of Written False Statement since it is now reasonably undisputable that Mr. Koerber's March 6 submission the Utah Department of Commerce was true, accurate and in line with instructions and guidance provided. Additionally, as also discussed thoroughly above, there is not factual basis for the crime of Tampering with Records because there is no reason to questions the date on the $209.00 March 2 receipt. Finally, neither the government nor the Court ever explained how either of the Oregon statutes could be at issue given the plain lack of Oregon jurisdiction. Therefore, Magistrate Judge Warner's

---

[13] *See United States v. Fisher*, 702 F.2d 372, 378 (2d Cir. 1983) ("The experience of a police officer is a factor to be considered in the determination of probable cause, *see United States v. Cortez*, s*upra*,449 U.S. at 418, 101 S.Ct. at 695, but the relevance of the suspect's conduct should be sufficiently articulable that its import can be understood by the average reasonably prudent person, *see*, e.g., *id*.").

detention order should be revoked pursuant to § 3145. If the Court has any unresolved questions regarding the lack of probable cause for any of these four statutes, Mr. Koerber has provided a detailed analysis of each statute and the lack of factual support included below, as Appendix A, Appendix B, Appendix C and Appendix D.

II. **Magistrate Judge Warner's Decision to Incarcerate Mr. Koerber Based on Dangerousness is Legally and Factually Invalid.**

Under 18 U.S.C. § 3148(b) even if a court finds probable cause that a defendant has committed a misdemeanor offense in violation of his release conditions, the court may revoke detention only if it also finds "that no conditions or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." § 3148(b)(2). Flight risk has never been a concern of the Court related to Mr. Koerber. *See* e.g. Ex. 1 at p. 140; *also* Appendix J.

To make a finding under § 3148(b)(2) that Mr. Koerber is so dangerous "that no conditions or combination of conditions will reasonably assure …the safety of any other person and the community" the Court is required to evaluate the factors specified in § 3142(g). In Mr. Koerber's circumstance, these factors have been evaluated multiple times, were never attacked by the government, and in every instance the Court found that these factors weighed in favor of Mr. Koerber's release with minimal conditions and personal recognizance. *See* Appendix J. Post-conviction this Court again released Mr. Koerber, this time under § 3143, finding by "clear and convincing evidence" that none of these factors indicated that Mr. Koerber was a flight risk or a danger.

All of the instances proffered by the government, to prove Mr. Koerber's alleged

dangerousness – except for the March 2, $209 receipt – were known to the government and subject to the Court's prior considerations.  It, therefore, makes a mockery of these past decisions to argue that this one new incident in March 2019, involving a $209 receipt (with no government witnesses having first-hand knowledge and the only other party to the receipt testifying under oath that it is true and accurate) should tip the scales and effectively reverse seven prior court orders. It is also unreasonable, based on these circumstances, to argue – let alone conclude – that Mr. Koerber, who has been on release for a decade (essentially without conditions), now presents such a serious danger that no set of conditions could reasonably assure the Court. On top of this, both the government and Magistrate Judge Warner declined to substantially address five new proposed release conditions volunteered by Mr. Koerber that would directly address the basis of these alleged claims of dangerousness should the Court have any concerns. *See* Appendix L.

A. **Magistrate Judge Warner's Finding of Dangerousness is Factually Unsupported in Each Instance.**

The government's filings prior to the May 31 hearing did not include any allegation of dangerousness. Instead, at the hearing, the government proffered four alleged circumstances that prosecutors argued were sufficient to justify Mr. Koerber's incarceration (two civil disputes Mr. Koerber had with landlords more than seven years ago, and to two unrelated legal proceedings in 2014 and 2016.)

Mr. Koerber objected to both the last-minute nature of these proffers and the fact that there was no evidence presented to support any of the government's allegations. Findings of dangerousness must be based on evidence that is actually "before the court."

*United States v. Tortora*, 922 F.2d 880, 888 (1st Cir. 1990).

Prosecutors have since provided a few FBI 302 interview reports and selected pages from court proceedings. Significantly, however, the government has produced no signed witness statements. Further, as detailed below, Mr. Koerber has provided evidence demonstrating that prosecutors here again have omitted material facts and exaggerated allegations related to these alleged instances of dangerousness. In this context, it was impermissible for Magistrate Judge Warner to use these instances to find a "pattern of deception" and dangerousness. *See* Rule 32.1 of the Federal Rules of Criminal Procedure; Note to Subdivision (b) (The revocation hearing "is less a summary one because the decision under consideration is the ultimate decision to revoke rather than a mere determination of probable cause" and "disclosure of all the evidence against the [accused] is required [.]").  Evidence must show "a strong possibility that a person will commit additional crimes if released…[evidence must] support such a conclusion with a high degree of certainty." *Chimurenga*, 760 F.2d at 405.

The "pattern of deception" described by Magistrate Judge Warner, consists of the following:

     1)  The *United States v. Bundy* criminal trial in 2016.

Mr. Koerber has been widely praised for his professional involvement as a member of the legal defense team in the *United States v. Bundy* trial. *See e.g.* the declarations of attorney's Ludwig, Schindler, and Arnold included in Exhibit 5. Nevertheless, the government has repeated stale and long ago disproven allegations that Mr. Koerber was somehow involved in an attempt to deceive District Court Judge Anna Brown. According

to prosecutors, this Court should find that Mr. Koerber's continued release presents a danger to the community because Judge Brown did not know that Mr. Koerber was the same person designated as "Claud R. Koerber" and sometimes as "Rick Koerber" when his name was previewed as a potential witness; and that Judge Brown did not know Mr. Koerber was in the courtroom during the *Bundy* trial. These allegations are inaccurate.

It is beyond reasonable dispute, *see* Ex. ** at pp. 17-24, that Judge Brown herself approved Mr. Koerber as a CJA paralegal in the early stages of the case. In that process, Mr. Koerber candidly disclosed to Judge Brown his legal name "Claud R. Koerber", his nickname "Rick Koerber", as well as the criminal history of this case. *Id*. It is also beyond reasonable dispute (based on *inter alia*, emails from Judge Brown and her clerk) that Judge Brown knew Mr. Koerber and his involvement and had personally approved Mr. Koerber's presence in the well of the court during trial and in the defense work area at the back of the courtroom. *See* Exhibit 7 at pp. 19-20.

Prosecutors have known about and had access to this information but have neglected to correct the record regarding these meritless allegations. Mr. Koerber's involvement in the *Bundy* trial demonstrates the professional value he has created in the community and the government's continued attempt to disparage Mr. Koerber with these false allegations shows the illegitimate length prosecutors have gone to in order to see him incarcerated.

For the Court's benefit Mr. Koerber includes a more detailed analysis of his involvement in the Bundy Trial and the lack of evidence supporting these allegations, in Appendix E.

2)  The *Koerber v. Mismash* landlord/tenant dispute in 2011.

The government argues that eight years ago, Mr. Koerber deceived his landlord (Nancy Mismash) regarding electric bills, repairs, and the existence of a private contractor business. The government has provided no witness statement but relies instead on an FBI 302 report describing an interview with Ms. Mismash's attorney. Prosecutors have neglected to mention that this was a civil proceeding in state court, and there were no allegations in Ms. Mismash's pleadings that Mr. Koerber had engaged in any deception. *See* Exhibit 8. Further, prosecutors argued at the May 31 hearing that Mr. Koerber claimed to use a private contractor company that did not exist. Mr. Koerber has provided undisputed evidence showing that the business most certainly did exist and that prosecutors simply failed to do even a basic investigation of the matter. *See id*. There is no allegation of illegal conduct and frankly nothing in the *Koerber v. Mismash* proceeding that demonstrates dangerousness. In fact, prosecutors omit that Mr. Koerber ultimately prevailed in this matter before the Utah Court of Appeals. *See id*.

For the Court's benefit Mr. Koerber includes a more detailed analysis of his involvement in the *Koerber v. Mismash* matter and the lack of evidence supporting these allegations, in Appendix F.

3)  *Real Property Management v. Koerber* (Elwood) 2012 landlord dispute for $228.

Prosecutors alleged that another dispute between Mr. Koerber and his landlord seven years ago also demonstrates dangerousness. Here, prosecutors falsely allege that Mr. Koerber was responsible for $21,000 in damage to property. No allegation of deception or

illegal conduct has been made by the government.   No witness statements have been provided. Once again, prosecutors have omitted references to the actual pleadings in this matter. These pleadings show that there was no allegation of deception by the landlord. *See* Exhibit 8. Worse, prosecutors have extremely exaggerated the facts. The public court records show that **the parties reached a stipulation and resolved the dispute for a total of $228.66**. *See id*. This is a far cry from the alleged $21,000 proffered by prosecutors. The Court should resist attributing any significance to this supposed incident of dangerousness, except to note again the illegitimate lengths prosecutors have gone to in order to disparage Mr. Koerber with unsupported rumor and allegations in order to see Mr. Koerber unfairly incarcerated.

For the Court's benefit Mr. Koerber includes a more detailed analysis of his involvement in the Real Property Management (Elwood) matter, and the lack of evidence supporting these allegations, in Appendix G.

4) The *Fish v. Fish* divorce proceeding in November 2014.

Prosecutors misidentify this incident as taking place in 2015. It took place during a hearing in November of 2014. Mr. Koerber was not a party to the matter but testified as a witness. Mr. Koerber was never accused of deception or any wrongdoing. There is clearly nothing unlawful that took place in this November 2014 hearing. Mr. Koerber did not have a financial obligation, and there is no evidence – or even an allegation – that there was any pecuniary loss caused by any action of Mr. Koerber.

For the Court's benefit Mr. Koerber includes a more detailed analysis of his involvement in the *Fish v. Fish* matter, and the lack of evidence supporting these

allegations, in Appendix H.

    5)  The *Fryberger v. Edwards* matter in Oregon.

Besides the allegations already discussed, related to *Fryberger v. Edwards*, Magistrate Judge Warner relied on claims by the Peterkin law firm (which represents Fryberger) that they did not know who Mr. Koerber was, did not know that he was a convicted felon, and that they would not have agreed to him having access to certain sensitive discovery. *See* Ex. 1 at p. 162. But again, Magistrate Judge Warner was misled by prosecutors who were reckless with regard to the truth. It has now been conceded by the Peterkin attorneys that Mr. Koerber had ceased all interactions with plaintiff's law firm long before he was convicted. *See* attached Exhibit 11. It has also been conceded by the Peterkin attorneys that their associate Ms. Lordi knew who Mr. Koerber was, had researched Mr. Koerber at the beginning of the *Fryberger v. Edwards* case, and had discussed his personal history with Mr. Koerber over the phone. Finally, it has also been conceded in the Oregon proceeding that neither the Peterkin lawyers nor their client had produced a single page of discovery material. *See id*. In other words, all of the Peterkin claims relied upon by Magistrate Judge Warner were false and the government's proffers without support.

For the Court's benefit Mr. Koerber includes a more detailed analysis of his involvement in the *Fryberger v. Edwards* matter, and the lack of evidence supporting these allegations, in Appendix I.

    **B.**    **Magistrate Judge Warner Misapplied the Dangerousness Factor**

In the present circumstances the most relevant § 3142(g) factor is the "nature and

seriousness of danger to any person or the community that would be posed by the person's release." § 3142(g). On May 31, Magistrate Judge Warner explained "I don't see Mr. Koerber as a violent man", Ex. 1 at p. 140, but identified the possibility of "a financial danger, fraud, for want of a better word, that kind of danger." *Id.* Magistrate Judge Warner was relying on the legal principle that "financial danger" can sometimes constitute the basis for a dangerousness finding under § 3142(g). *See United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992) ("[w]e hold that danger may, at least in some cases, encompass pecuniary or economic harm.")  However, Magistrate Judge Warner's findings of dangerousness did not derive from any circumstance where Mr. Koerber was engaged in any illegal or wrongful conduct that caused pecuniary or economic harm.

> 1. *Magistrate Judge Warner's "Pattern of Deception" Finding Does Not Support a Financial Dangerousness Risk.*

Under § 3142(g) the first step in considering this factor is determining "the nature of the alleged dangerousness." Here, Magistrate Judge Warner misapplied this factor. Using the term "financial danger" and "fraud," Magistrate Judge Warner found that Mr. Koerber presented a danger to the community based on government proffers related to two civil disputes Mr. Koerber had with landlords more than seven years ago, and to two unrelated legal proceedings from 2014 and 2016. Based on these circumstances, Magistrate Judge Warner found that Mr. Koerber has engaged in a "pattern of deception" and that this pattern constituted dangerousness sufficient to revoke Mr. Koerber's release. *See* Ex. 1 at p. 164.

But, in making this finding Magistrate Judge Warner substituted this "pattern of deception" for the holding referenced in *Reynolds*, explaining that "pecuniary or economic

harm" is a kind of danger that is encompassed within the dangerousness factor of § 3142(g). *Reynolds* at 192. This is significant for several reasons. First, *Reynolds* concedes that this type of harm is likely limited to special circumstances and relates directly to "pecuniary or economic harm." Second, the instances relied upon by Magistrate Judge Warner do not involve any pecuniary or economic harm suffered by anyone who claimed harm from being deceived.

As discussed in more detail below, each of these alleged instances involved court proceedings. None of the pleadings in any of the cases includes any allegation of deception. None of the orders from the courts overseeing these proceedings include any findings or any discussion of deception by Mr. Koerber. Finally, the two landlord disputes were resolved by the courts in Mr. Koerber's favor, where the alleged financial damages were related to typical landlord tenant property damage issues. The two other cases lack any claim whatsoever of pecuniary or financial harm. Thus, Magistrate Judge Warner's finding of a "pattern of deception" does not constitute "the nature of dangerousness" contemplated by *Reynolds* nor does it constitute a risk of financial harm based on deception, because it does not derive from a credible claim of fraud or pecuniary harm that might result from deception if Mr. Koerber remains on release.

> 2. *Magistrate Judge Warner's "Pattern of Deception" Finding is Incompatible with Tenth Circuit Precedent.*

A second significant problem in Magistrate Judge Warner's finding of dangerousness is that none of the proffered instances of dangerousness include allegations of illegal conduct by Mr. Koerber. This is invalid. Leaving aside the fact that all of these

alleged instances of dangerousness occurred between three and eight years ago Congress intended, **and Tenth Circuit precedent requires**, **that allegations of dangerousness must relate to illegal conduct** not merely any random conduct that the government claims – in hindsight – to be problematic. *See* Comprehensive Crime Control Act of 1984, Senate Report No. 98-225, reprinted in 1984 U.S.Code Cong. & Ad. News, pp. 3182, *et seq.*; *See also Cook*, 880 F.2d at 1161 ("Safety of the community 'refers to the danger that the defendant might engage in criminal activity to the detriment of the community.'") In the Tenth Circuit, a finding of financial dangerousness has generally been found only in circumstances where defendants have continued illegal financial activities related to charged crimes, or where there is a history of a defendant failing to make full financial disclosures of significant financial transactions or assets, and thereby violating conditions of release related to financial restrictions. *See e.g. United States v. Wittig*, 2006 Dist. LEXIS 1950 (District of Kansas, 2006).

> 3. *Magistrate Judge Warner's "Pattern of Deception" Finding is Invalid Under the Eighth Amendment.*

A third significant problem with Magistrate Judge Warner's dangerousness finding and his failure to consider Mr. Koerber's proposed release conditions, is that the Eighth Amendment guarantees that in circumstances like Mr. Koerber's, denial of release is only appropriate in the most serious circumstances, and "only for the strongest of reasons." *Sellers v. United States*, 89 S. Ct. 36, 38 (1968)("The idea that it would be "dangerous" in general to allow the applicant to be at large must...relate to **some kind of danger that so jeopardizes the public that the only way to protect against it would be to keep the**

**applicant in jail**.") *See also United States v. Affleck*, 765 F.2d 944, 957 (10th Cir. 1985) ("Even if Congress is free to define nonbailable offenses, certainly the allowable justifications are limited…at a minimum, the eighth amendment must prohibit unreasonable denial of bail.")

It is difficult to understand how the most recent incident involving a $209 receipt to an attorney for dispatch of appeal documents; two landlord disputes from more than seven years ago; and two other court cases involving no financial losses caused by Mr. Koerber, could somehow satisfy this constitutional standard. *See Chambers v. Mississippi*, 405 U.S. 1205 (1972) (Releasing a defendant despite the allegation that it would "create a tense and explosive situation in the community which might result in bloodshed.").

Almost 20 years after *Sellers* the Supreme Court reaffirmed that release in circumstances like Mr. Koerber's should only be denied if the evidence shows "a strong possibility that a person will commit additional crimes if released...[evidence must] support such a conclusion with a high degree of certainty." *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). *See also United States v. Orta*, 760 F.2d 887 (8th Cir. 1985) ("The structure of the statute mandates every form of release be considered before detention be imposed.")

> 4. *Magistrate Judge Warner's Finding of Dangerousness is Not Based Upon Any Significant Risk of Harm to Any Person or the Community.*

All findings of dangerousness under § 3142(g) must be specific and articulable. *See United States v. Salerno*, 481 U.S. 739, 751 (1987). Assuming for the sake of argument that the allegations considered by Magistrate Judge Warner do show some concern for

dangerousness, the specific dangers highlighted are limited to Mr. Koerber's relationships with landlords and those attorneys and clients he works with in the legal community. This is significant because Mr. Koerber has attached Exhibit 9, a declaration from Duane and Cathy Runyan, Mr. Koerber's landlords for the last 5 years. The Runyans make very clear that Mr. Koerber and his family are, and have been, good tenants and productive members of their local community. This is direct evidence that Mr. Koerber's continued release does not present any reasonable risk or danger to landlords. Mr. Koerber has also attached Exhibit 5, a collection of declarations from eight experienced attorneys from Utah, Oregon, California, and Nevada who have hired or worked with Mr. Koerber on cases where he has worked as a paralegal. Each attest to Mr. Koerber's integrity and respect for the law and court rules. These declarations show that Mr. Koerber's professional work is a very valuable service to the community. Mr. Koerber has also included Exhibit 12, a collection of declarations from several clients also showing that Mr. Koerber's professional legal work is valuable to the community. Taken together, the evidence presented regarding Mr. Koerber's current conditions – weighs against the bare proffers by the government – and prohibits a finding of  "a strong possibility" that Mr. Koerber "will commit additional crimes if released" and there is certainly no evidence to support allegations of any such risk "with a high degree of certainty." *Chimurenga*, 760 F.2d at 405.

### C.   Magistrate Judge Warner Misapplied the Burden of Proof and Erred in Applying a Presumption of Detention.

At the May 31 hearing Magistrate Judge Warner applied the burden of proof to Mr. Koerber requiring that he prove by "clear and convincing evidence" that he was not a danger. *See* Ex. 1 at p. 163.[14] In doing so, Magistrate Judge Warner committed plain legal error. Magistrate Warner was not making a determination of whether Mr. Koerber should be released post-conviction (governed by § 3143 and Rule 46(c)), that decision had already been made by this Court in September 2018. Instead, he was required to follow § 3148(b) and Rule 32.1(a)(6) which govern the possibility of sanctions and revoking release for a violation of release conditions. *See United States v. Thomas*, 2018 U.S.Dist. LEXIS 81605 ("While 18 U.S.C. § 3143 specifically addresses release or detention pending sentencing it does not appear to include any express provisions as to revocation of a previously entered Order of Release.")

Under these provisions, it is the government – not Mr. Koerber – who had the burden to prove that Mr. Koerber's continued release would constitute a danger to the community to the degree that no set of conditions could reasonably ameliorate the risk. *See* 18 U.S.C. § 3148(b)(2)(A); *see also United States v. Gotti*, 794 F.2d 773, 776-77 (2d Cir. 1986) ("This [§ 3148(b)] scheme indicates that where there is probable cause to believe the released defendant has committed a crime **he may hereafter be detained upon a finding, by … a preponderance of the evidence, that no conditions of release will guard against flight or dangerousness**[.]") (Emphasis added). Thus, unlike the pretrial release

---

[14] The evidence Mr. Koerber has provided does nevertheless meet this standard.

provisions of § 3142 there is no provision within the Bail Reform Act other than § 3148 that governs the decision of whether or not to impose the sanction of revoking Mr. Koerber's release post-trial.

Magistrate Judge Warner also erred in applying a presumption of detention at the May 31 hearing. *See* Ex. 1 at p. 163. In fact, § 3148(b) makes clear that there is no presumption of detention even when a release condition has been violated, so long as the offense at issue is not a felony. *See* 18 U.S.C. § 3148(b).

By making these two legal errors, Magistrate Judge Warner's dangerousness conclusion and his decision to incarcerate Mr. Koerber are invalid. Further, because of these errors, the May 31 hearing violated Mr. Koerber's guarantees of due process pursuant to the Fifth Amendment. Once Mr. Koerber was released post-conviction, he had a right to mandatory release going forward and a protected liberty interest under both the Bail Reform Act and the Eighth Amendment.

> The statute [§ 3143] establishes a right to liberty that is not simply discretionary but mandatory: the Judge "shall order the release of the person in accordance with Section 3142 (b) or (c). In sum, even though a guilty verdict greatly reduces a defendant's expectation in continued liberty, it does not extinguish that interest. The language of Section 3143(a) confers a sufficient liberty interest in continued release…to warrant some measure of due process protection.

*United States v. Abuhamra*, 389 F.3d 309, 319 (2nd Cir. 2004). Eighth Amendment guarantees also apply, even post-conviction, to assure that a defendant is not denied release except "for the strongest of reasons." *Sellers*, 89 S. Ct. at 38. *See also Affleck*, 765 F.2d at 957.

Finally, in misapplying the burden of proof and at the same time by mistakenly

applying a presumption of detention, Magistrate Judge Warner misapprehended Mr.

Koerber's circumstance. Magistrate Judge Warner stated at the May 31 hearing,

> Mr. Koerber, he's not a big deal.  He's another white-collar defendant who
> has committed, according to a jury, serious fraud, and has been convicted.
> He doesn't merit or warrant special attention, even though he's been going
> through this for years.

Ex. 1 at p. 165. But, respectfully, this misses the larger point. Once this Court made its May

2018 order regarding Mr. Koerber's release, and then subsequently released Mr. Koerber

post-conviction, the interest of justice supports continued release. *See e.g. Abuhamara*, 389

F.3d at 319. As Justice Jackson famously instructed, under these kinds of circumstances

"there is a very practical aspect… which must not be overlooked or underestimated- that is

the disastrous effect on the reputation of American justice if [the court] should now send…

men to jail and [a reviewing] Court later decide that their conviction is invalid. ***All***

***experience with litigation teaches that the existence of a substantial question about a***

***conviction implies a more than negligible risk of reversal***. Indeed this experience lies back

of our rule permitting and practice of allowing bail where such questions exist, to avoid the

hazard of unjustifiably imprisoning persons with consequent reproach to our system of

justice." *Williamson v. United States*, 184 F.2d 280, 284 (2d Cir. 1950).

### D.   The 3142(g) Factors Support Mr. Koerber's Immediate Release and His Release Pending Appeal.

The Court has previously considered and granted Mr. Koerber's release pursuant to

the terms of the Bail Reform Act on at least seven prior occasions. For the Court's benefit

Mr. Koerber includes a more detailed analysis of each of these prior seven court orders

granting his release in Appendix J.

The only information provided by the government *that was not previously available* relates to the *Fryberger v. Edwards* matter. As detailed above, the plaintiff's allegations in that matter relied on by Magistrate Judge Warner were false. The complaining attorneys in that matter have now conceded the point. For this reason alone the Court's review of § 3142(g) factors should clearly support Mr. Koerber's release.

Further, it is clear, as detailed throughout this motion that Mr. Koerber is not a "risk" or a "danger" which this Court has previously supported. There is no substantiated complaint against Mr. Koerber, no verified evidence provided, and no witnesses brought before the Court by the prosecution that verifies any of the government's allegations against Mr. Koerber. On the other hand, Mr. Koerber has provided ample evidence, witnesses, and details summarizing and concluding the opposite. This evidence includes Exhibit 5 and Exhibit 9 and Exhibit 12. On top of all this, the fact that Mr. Koerber was on release  - without incident, for a decade – provides strong evidence against any proffered risk of dangerousness.

A declaration from attorney Bret Whipple, offers a poignant endorsement of Mr. Koerber and a warning about how prosecutors have unfairly attacked Mr. Koerber.

> I was well aware before working with Mr. Koerber of the personal legal issues he faced in Utah and how a party opposed to my client might try and gain an unfair advantage by disparaging me and my client for our association with him. But, increasingly, I came to make an independent assessment of Mr. Koerber's abilities and character. I regard him as one of the most intelligent and honest persons with whom I have been associated.

Ex. 5 at pp. 4-5. In any event, the government has not proven by any standard that Mr. Koerber's continued release is dangerous to the point that no conditions of release can satisfy the Court.

Finally, the Bail Reform Act does not require guarantees, only reasonable assurances. *See Tortora*, 922 F.2d at 884 ("Undoubtedly, the safety of the community can be reasonably assured without being absolutely guaranteed . . . requiring that release conditions guarantee the community's safety would fly in the teeth of Congress's clear intent[.]"): *See United States v. Gonzalez*, No. CR12-0128JB (D. New Mexico. Jan. 17, 2013) (unpublished) (overruling a requirement of a guarantee). In this context, if the Court has any concerns, the conditions previously proposed by Mr. Koerber directly address the alleged risks. As previously pointed out, the specific dangers highlighted are limited to Mr. Koerber's relationships with landlords and those attorneys and clients he works with in the legal community. Mr. Koerber has attached Exhibit 9, a declaration from his current landlords, and Exhibit 5, a collection of declarations from eight experienced attorneys from Utah, Oregon, California, and Nevada. These declarations show that Mr. Koerber presents no specific risk of dangerousness upon release.

For the Court's benefit Mr. Koerber includes a more detailed analysis of the § 3142(G) factors in Appendix K.

CONCLUSION

As pointed out in the beginning of this memorandum, in May 2018, this Court poignantly considered the history of this case and the position of Mr. Koerber and made certain findings, including that should a conviction occur - this Court would allow Mr.

Koerber to stay on release pending appeal. This Court specifically stated that it *could not conceive* of a reason to require Mr. Koerber be detained pending appeal. The Court should not allow the false allegations and reckless disregard for the truth demonstrated by prosecutors to change this decision. Instead, the Court should revoke Magistrate Judge Warner's detention order.

Respectfully, Mr. Koerber moves for his immediate release with an order today, based on the abundance of information herein, and the substantial evidence which he has provided. Mr. Koerber's release is essential to his defense prior to sentencing, to work with his attorneys on his forthcoming appeal and to otherwise enjoy his liberty.

In addition, this motion is the most direct and appropriate method to vindicate Mr. Koerber's Fifth and Eighth Amendment constitutional rights as well as his statutorily defensible right to liberty discussed above.  This Court has a unique obligation to defend the rights at issue here, especially in light of the prosecutors' conduct.

Keeping all this in mind, Mr. Koerber respectfully submits this motion for expedited consideration.

DATED: September 24, 2019

*/s/ Kathryn N. Nester*
Attorney for Defendant

APPENDIX A

*The Evidence Does Not Support a Probable Cause Finding for the Crime of Written False Statement (U.C.A. §76-8-504)*

The second crime alleged in the petition as a violation of Mr. Koerber's release conditions is the Utah misdemeanor crime of Written False Statement.

> A person is guilty of a class B misdemeanor if: (1) He makes a written false statement which he does not believe to be true on or pursuant to a form bearing a notification authorized by law to the effect that the false statement made therein are punishable; or (2) with the intent to deceive a public servant in the performance of his official function, he: (a) Makes any written false statement which he does not believe to be true; or (b) Knowingly creates a false impression in a written application for any pecuniary or other benefit by omitting information necessary to prevent statements therein from being misleading; or (c) Submits or invites reliance on any sample, specimen, map, boundary mark, or other object which he knows to be false.

U.C.A. § 76-8-504. The government argues that the factual predicate for the crime of Written False Statement is Mr. Koerber's submission of the Department of Commerce online form during the processes of re-registering Corvus on March 6, 2019.

The first obvious problem with this allegation is that it is plainly false. As was revealed at the hearing, Mr. Koerber's submission on this online form does not qualify for this statute because the form did not include the required statutory notification since Mr. Koerber signed as a manager, not a member, of the company. *See* Ex. 1 at p. 48-49. This is sufficient for the Court to disregard all claims related to this statute. The government has never rebutted this issue.

The second and most significant problem with this allegation has already been detailed thoroughly above. Mr. Koerber did not submit any false information on this

form, and instead complied with Department of Commerce direction and policy. *See generally*, Exhibit 2. As also pointed out above, the government has now conceded the falsity of this allegation by implication, when it previously omitted any response to Exhibit 2.

Third, no evidence was presented that Mr. Koerber's answer on the online form regarding March 6 – was meant to deceive, even before the new evidence in Exhibit 2 came to light. Also, Mr. Koerber's answer to the online question is not disclosed publically and is not used in any material way or required to register a business. This is significant because in November 2018 and on February 28, 2019, Mr. Koerber had already openly volunteered that Corvus was doing business (including providing current bank records) prior to re-registration. Put simply, the statute at issue here requires proof that a person makes a written false statement that "he does not believe to be true" and for the purpose of deception. There is no evidence that Mr. Koerber did not believe that by using the date required by the Department of Commerce "March 6", he was doing anything different than simply telling the truth.  The evidence from multiple sources (Belcher, Skousen, Franklin, Department of Commerce) supports the answer as being accurate and reasonable. And, unquestionably there is no evidence that Mr. Koerber did not believe the statement to be true after he and Mr. Belcher received direct guidance from the Department of Commerce, who explained that the answer clearly applied to the newly re-registered version of the company.

Magistrate Judge Warner made no specific findings on this point, except to trust the conjecture by prosecutors that something seemed questionable about the timing of the

re-registration of Corvus, and the proximity of that re-registration to the date of the March 2 receipt for the *Frybeger v. Edwards* matter.  However, the Court now has additional details before it, showing the reasonableness of the timing – including the fact that Mr. Koerber began the re-registration process on March 5, the day after he received the PSR from Ms. Schuman (Pre-Trial Services Officer) that criticized him for Corvus being unregistered, and after he had received a copy of the March 5 email between prosecutors and the Office of Pre-trial Services indicating that Pre-trial Services had asked the prosecutors to conduct additional research into Corvus.  *See* Exhibit 3. Thus, the available evidence shows – without any contravention – that the two events (the March 2 receipt, and the March 6 re-registration of Corvus) were simply un-related.

Mr. Koerber's re-registration of Corvus was, in fact, an effort to comply with his conditions of release—not a release violation.  Mr. Koerber accepted dispatch for Corvus from attorney J. Morgan Philpot on Saturday, March 2.  Two days later, at the beginning of a new work week, on March 4, Mr. Koerber received the initial draft of the PSR that had been delivered to his attorneys from U.S. Pretrial Services officer Mary Schuman.  The PSR criticized him for working through Corvus – given that Corvus' registration had remained expired.  Mr. Koerber and his attorneys had discussed this issue.  Mr. Koerber freely disclosed this information to Ms. Schuman in November and just a few days earlier on February 28.  Mr. Koerber's attorneys had objected to the criticism, and Mr. Koerber hoped that the issue would have been removed from the PSR.  But it wasn't. So, Mr. Koerber took immediate action, as described in Mr. Belcher's testimony.

Magistrate Judge Warner stated at the May 31 hearing:  "It would seem to me, in

my modest judgment, that if I had been convicted of serious crimes of fraud, as Mr. Koerber, and then been allowed by the judge, in this case Judge Block, to be released pending sentencing, that I would be, as they say, on my very best behavior. I would do all in my power to ensure that I did not run afoul of the law in any way, simply because I would suspect that I would be on, to use a phrase, relatively thin ice." Ex. 1 at p. 160. But, respectfully, this is what the evidence shows. Immediately after his conviction Mr. Koerber candidly disclosed all material information related to Corvus. There is no evidence that re-registering Corvus on March 6 gave Mr. Koerber any benefit in the Oregon case or any other significant benefit. This is pure speculation.

Finally, in light of the evidence now presented it should be clear that Mr. Koerber was acting diligently--just as Magistrate Judge Warner said he should have been--to make sure he was in compliance with the Department of Commerce after the PSR gave him notice that this was a concern.

APPENDIX B

*The Evidence Does Not Support a Probable Cause Finding for the Crime of Tampering with Records (U.C.A. §76-6-504)*

The first crime alleged is the Utah misdemeanor crime of Tampering with Records.

> Any person who, having no privilege to do so, knowingly falsifies, destroys, removes, or conceals any writing, other than writings enumerated in Section 76-6-503.5 for which the law provides public recording or any record, public or private, with the intent to deceive or injure any person or to conceal any wrongdoing is guilty of tampering with records.

U.C.A. § 76-6-504.

The first legal problem prohibiting any finding of probable cause that Mr. Koerber committed this misdemeanor crime is that the statute deals with circumstances where a valid or legitimate "record" or "writing" exists, but is later *tampered with* by a person who does not have authority to make changes to the record or writing. The government's brief and oral arguments make clear that the supposed predicate act for this offense is Mr. Koerber having created the March 2 receipt for Attorney J. Morgan Philpot. Given that neither the government nor Magistrate Judge Warner substantially addressed the statutory language or the elements – revocation of Magistrate Judge Warner's detention order is appropriate.

The second legal problem for the government is that the language of the statute begins by presuming – that a writing or record exists and is later *tampered with* by a person who does not have authority to make changes to the record or writing. The language of the statute does not address the *creation* of the writing or record in the first

instance – which is the case with Mr. Koerber's March 2 receipt.

The third legal problem is that there is no allegation or finding that Mr. Koerber carried out any of the prohibited acts of "falsify[ing]"; "destroy[ing]", "remov[ing]" or "conceal[ing]" the $209, March 2 receipt. It is undisputed that that March 2 transaction – actually took place.  Mr. Koerber created the March 2 receipt, and there is no allegation that it was ever modified.  Thus, any suspicion or hunch that Mr. Koerber did something other than create a business document, that he had the privilege to create as the manager of Corvus, and in so doing acted in violation of this statute; is unfounded. The closest argument – implicitly – is that if Mr. Koerber backdated the receipt –  somehow this constitutes "falsify[ing]" the March 2 receipt. But, there is no explanation for how this would be so.

If two parties transact business, and both parties agree that the receipt evidencing the transaction is accurate, *see* Ex. 1 at 107-108,[15] there has to be some reliable evidence that the receipt has been falsified before any probable cause could exist that a crime occurred. *See United States v. Fisher*, 702 F.2d 372, 375 (2nd Cir. 1983) ("The quantum of evidence required to establish probable cause…must constitute more than rumor, suspicion, or even strong reason to suspect[.]") (Internal quotation marks omitted.); *see also Felders*, 755 F.3d at 879 (Same).

Given the falsity of the government's argument regarding the March 6 answer

---

[15] Magistrate Judge Warner does not give greater weight to Mr. Philpot's direct testimony on this issue over mere suspicion or speculation. *See* Ex. 1 at p. 10 p. 163, lines 7-8. ("I think the document may or may not have been backdated.")

during re-registration (discussed thoroughly above) the closest evidence discussed by the

government and Magistrate Judge Warner that could weigh on this issue is Mr. Koerber's

practice of working up until the last minute. But, this plainly does not constitute evidence

that the March 2 receipt was falsified.  If this were true, and if this hunch were sufficient

to establish probable cause – this same flawed logic would implicate more than just

Corvus' March 2 receipt to Mr. Philpot, but would be equivalent grounds to justify an

unlimited inquisition-style sweeping, where the government could point to **any other**

**receipt** by Mr. Koerber, at any point in the past to argue that each such document may not

have the correct date – and then, that this too constituted a criminal violation.  Tenth

Circuit precedent clearly prohibits reliance on such speculation. "This court has

unambiguously held that probable cause cannot be established, as noted, simply by piling

hunch upon hunch." *Poolaw v. Marcanted*, 565 F.3d 721, 729 (10th Cir. 2009). Actual

evidence presented "must constitute more than rumor, suspicion, or even strong reason to

suspect[.]" *See Fisher*, 702 F.2d. at 375. The evidence must derive from "reasonably

trustworthy information" and it must be "sufficient to lead a prudent person to believe"

that the crime has been committed. *Jones v. City and County of Denver*, 854 F.2d 1206,

1210 (10th Cir. 1988).

From America's founding, one of the fundamental principles of criminal law has

been to reject the very abusive history of incarcerating citizens based on rumor and

suspicion. *See e.g. Felders*, 755 F.3d at 879 ("The requirement of probable cause has

roots that are deep in our history … [requiring more than] "common rumor or report,

suspicion or even 'strong reason to suspect'"). In light of the new evidence (Mr. Philpot's

bank statement) showing payment of an advanced retainer to Corvus for the *Edwards* matter on Feb. 28, 2019, (attached here as Exhibit 4) from which the cash funds for the March 2 dispatch were paid – coupled with the testimony of Mr. Philpot that the date on the March 2 receipt is accurate – the evidence in existence contravenes the hunches and suspicions about the March 2 date.

The fourth problem is that Mr. Koerber must be found by probable cause to have committed one of the prohibited acts, "with the intent to deceive or injure" someone or "to conceal any wrongdoing[.]" U.C.A. § 76-6-504.  However, no allegation is made on this point.  Ms. Carr testified that she had found no evidence that Mr. Koerber gave the March 2 receipt to anyone besides Mr. Philpot and no evidence that he "ever made any representations to a court in Oregon." *See* Ex. 1. at p. 51.  This distinction is important, because while the government implies, and Magistrate Judge Warner suspected, that Mr. Koerber was part of some effort to deceive the Oregon Court of Appeals – he is not alleged to have violated an aiding or abetting statute, or a conspiracy statute, or the like. He is alleged to have violated this tampering statute, which requires that he himself did one of these prohibited acts, without authority, and that he did it "knowingly" and "with intent" to harm some person. Mr. Koerber is not a party to the Oregon action.  Mr. Koerber made no representations to the Oregon Court of Appeals.  There is no evidence that Mr. Koerber has any financial interest in the outcome of that appeal.  To find probable cause on this point would require the impermissible piling of hunch upon hunch.

Finally, any one of the above problems is enough to vitiate probable cause related to this statute. The Court's *de novo* review should pay close attention to other false and

misleading statements by prosecutors on this point.  For example, prosecutors falsely stated that, "Koerber prepared a receipt for an Oregon court [.]" see Doc. 584 at p. 4, when it is clear that Mr. Koerber prepared the receipt for Mr. Philpot, and it was Mr. Philpot who subsequently certified the notice of appeal for the Oregon Court of Appeals. Also, prosecutors stated that "Koerber submitted a dispatch receipt to an Oregon Court of Appeals." Id., at p. 3, but the evidence is that he did not.  As cited above, Ms. Carr admitted that she found no evidence that Mr. Koerber submitted anything to the Oregon Court of Appeals.

The problems listed here explain the most likely reason Magistrate Judge Warner could not tether his probable cause finding to this statute, or any other when he stated: "I think [the March 2 receipt] may or may not have been back dated", Ex. 1 at p. 163, and this was "not an attempt per se to violate the law, but, in essence, an attempt to deceive, which was, in fact, a potential violation. I don't know." *Id*. at 161.

The Supreme Court instructed long ago that probable cause finding must "be grounded in facts within the knowledge" of the court so as to "make his faith reasonable." *Kastenbaum*, 263 U.S. 25, 28 (1923). Even looking at all the evidence, "the facts and circumstances" considered must "warrant a man of prudence and caution in believing that the offense has been committed." Stacey v. Emery, 97 U.S. 642, 645 (1878).

APPENDIX C

*The Evidence Does Not Support a Probable Cause Finding for the Crime of Falsifying Business Records.  (O.R.S. § 165.080)*

This argument was not addressed at the May 31 hearing by the government and was only casually included by reference in its written submission.  No discussion of the elements or the government's theory was provided. The only statement that directly addresses this alleged crime at all was that: "Mr. Koerber's conduct also appears to violate Oregon Revised Statute § 165.080 (Falsifying Business Records) and O.R.S. 33.015 (Contempt)." Doc. 584 at p. 5. There are several problems with any probable cause finding for this purported crime.

First, the business records statute at issue (O.R.S. § 165.080) does not apply to Mr. Koerber's circumstance, because the business records possibly at issue – 1) the March 2 receipt provided to Mr. Philpot; and, 2) the March 6 registration forms provided to the Utah Department of Commerce – were activities done in Utah, by Mr. Koerber while he was in Utah, and delivered to recipients in Utah. Thus, there is no basis for Oregon jurisdiction.  *See State ex rel Circus Circus Reno, Inc., v. Pope*, 317 Or. 151, 154-56, 854 P.2d 461 (1993).  *See also Kotera v. Daioh Intern, U.S.A. Corp.,* 179 Or. App 253, 40 P.3d 506 (2002).

Second, even if Oregon had jurisdiction over these acts, Oregon law makes clear that the documents (either the receipt or the business registration form with the Utah Department of Commerce) are not the kinds of records covered by the Oregon statute. *See e.g. Tayler v. Hender*, 116 Or. App. 142, 840 P.2d 1331 (1992). The related Oregon

statute defines business records as "any writing […] kept or maintained by an enterprise[.]" O.R.S. Section 165.075(2). The March 2 receipt is not a record kept by Corvus but was delivered to a customer, as part of a commercial transaction. Similarly, the online form related to the Corvus business registration is not kept by Corvus, it is kept by the Department of Commerce. As such, neither document, even if Oregon had jurisdiction, falls within the statute. *See Tayler*, 116 Or. App. 142.

Third, there is no allegation that anyone suffered actual harm by Mr. Koerber's receipt or business registration documents, this alone forecloses the applicability of the statute according to established Oregon law.  *See Logan v. Tiegs*, 2004 WL 2851949, No. CV 03-435-BR, CV 03-470-BR.

Fourth, for the factual reasons stated above, there is no evidence that the receipt on March 2, 2019 is false, only speculation, and the Utah Department of Commerce policy and instructions were followed by Mr. Koerber in good faith, showing that his answer of March 6, 2019 as the date the new entity would start doing business was correct to the best of his knowledge and belief.

APPENDIX D

*The Evidence Does Not Support a Probable Cause Finding for the Crime of Contempt.*
*(O.R.S. § 33.015)*

This argument was not addressed at the May 31 hearing by the government.  No discussion of the elements was provided in their written submission.  The only statements related to this purported crime have to do with allegations that the March 2, 2019 receipt was false, and that the transaction between Corvus and Philpot, where Philpot contracted for commercial delivery service was not an arm's length transaction.  There are several problems with this argument, each prohibits a probable cause finding.

First, the contempt statute defines the jurisdiction of the criminal offense of contempt as limited to those activities that take place "in the presence of the court[.]" O.R.S. § 33.015(2).  Mr. Koerber was never in the presence of the Oregon circuit court nor the Oregon Court of Appeals.  Although the government argues that Mr. Koerber provided the March 2 receipt to the Oregon Court of Appeals, the only evidence in the record shows that he actually provided it to Mr. Philpot.  Mr. Philpot then made a certification in his notice of appeal and himself attached the receipt to the notice, which he caused to be filed with the Court.  Indeed, it was Mr. Philpot and he alone as an officer of the court in Oregon, who decided that Corvus constituted delivery by a commercial delivery service under the laws of Oregon.  Thus, as an initial matter, even if there were some deception involved – which no evidence establishes - Mr. Koerber cannot legally fall within the jurisdictional parameters of the statute.  Again, Ms. Carr testified at the May 31 hearing that she possessed no evidence that Mr. Koerber "ever made any

representations to a court in Oregon." *See* Ex. 1. at p. 51.

Second, there was no representation made by anyone to the Oregon Court of Appeals regarding the registration status of Corvus, or the relationship between Corvus and Attorney J. Morgan Philpot.  There was no representation made about the length or history of Corvus's operations, and Mr. Koerber himself was not the one who delivered the documents for Corvus.  The only evidence provided shows that Mr. Koerber accepted Mr. Philpot's payment, and gave him a March 2, 2019 receipt for the dispatch – which promised a 3-day delivery to the three parties whose addresses appear on the receipt.  Mr. Philpot testified that the receipt was accurate.

However, the government and Magistrate Judge Warner take the position that the March 2 looks like an arms-length transaction. Left unspoken is an argument regarding what is improper. There is no requirement in the Oregon statutes or in the Oregon rules that require an arms-length transaction. But, on that point, the receipt accurately states that it is from Corvus Administration and Management, LLC.  When Mr. Philpot provided this receipt to the Oregon Court of Appeals, he certified its accuracy.  The suspicion about an arms-length transaction being suggested by the receipt is speculation. In substance, even the suspicion is not justified.  Mr. Philpot is not an owner of Corvus. Mr. Koerber is not an owner of JM Philpot Law.  The fact that Mr. Philpot contracted with Corvus for paralegal services and document delivery services is a fact – but to find that his contract for both of these services from the same entity is somehow problematic; or that these facts were not adequately reflected in a dispatch receipt sufficient to avoid the crime of contempt, is an exaggeration unsupported by any reference to the law.

The only legitimate arguments being advanced by the Peterkin law firm in Oregon suggest that perhaps the Court of Appeals will find that Mr. Philpot's choice to use Corvus does not comply with the relevant statutes, or that Corvus was not a commercial delivery service within the meaning of the relevant Oregon statute. But both of these issues are far from legitimate grounds to allege criminal contempt.

APPENDIX E

The *United States v. Bundy* criminal trial.

Mr. Koerber has been recognized, by multiple highly experienced federal trial attorneys, for his instrumental role in the *United States v. Bundy* trial in Oregon in 2016. *See* Attorney Declarations attached here as Exhibit 5 ("Ex. 5"). Mr. Koerber formerly began working on that case as a CJA paralegal for Attorney Lisa J. Ludwig, and also worked for attorney's Mike Arnold, Lissa Casey, J. Morgan Philpot, and Marcus R. Mumford.

Ms. Ludwig has provided a declaration, *see* Ex. 5, pp. 17-24, where she confirms that District Court Judge Anna J. Brown personally approved Mr. Koerber's involvement. Ms. Ludwig also included three letters of reference that were submitted by Mr. Koerber to Judge Brown. *Id.* Mr. Koerber's resume that was also submitted to Judge Brown (by Ms. Ludwig) is also attached hereto at Exhibit 6 ("Ex. 6").

It is beyond reasonable dispute that these documents show that Mr. Koerber clearly identified himself to Judge Brown by his legal name Claud R. Koerber and also referenced his well-known nickname, "Rick Koerber." *Id*. This disclosure was made upfront by Mr. Koerber, and these documents also demonstrate that Mr. Koerber forthrightly disclosed to Judge Brown the status of this District of Utah criminal case and its history. *Id*. Ms. Ludwig describes Mr. Koerber's work on the *Bundy* case as "voluminous and thorough" and has declared that Mr. Koerber was "committed to the process of court proceedings" rendering "valuable assistance to the Bundy defense." *Id*.

Mr. Arnold has also provided a declaration, *see* Ex. 5, pp. 6-9, where he explains

that he personally "worked very closely with Mr. Koerber on pre-trial, detention, and strategic matters to prepare for trial." *Id*. at p. 7. He characterizes Mr. Koerber's paralegal work as "associate attorney level research and drafting[.]" *Id*. Mr. Arnold also declares that Mr. Koerber successfully worked with other defense attorneys and "was glue who helped hold the various defense teams together" *id*., at p. 8, demonstrating "integrity" and a strong "work ethic[.]" *Id*. According to Mr. Arnold, Mr. Koerber was open and forthcoming in disclosing his own legal issues and the status of those charges against him. *Id*. Significantly, Mr. Arnold also notes that he personally observed how Mr. Koerber would perform his assignments to a higher standard because he knew that he would be more strictly scrutinized due to the circumstances. *Id*. at pp. 8-9.

Attorney Matt Schindler has also provided a declaration, *see* Ex. 5 at pp. 11-14. Mr. Schindler has defended more than 225 criminal cases and was also a defense attorney on the Bundy case. *See id*. Mr. Koerber did not work directly for Mr. Schindler but they had multiple interactions and Mr. Schindler personally observed Mr. Koerber's conduct as part of the defense team. Mr. Schindler has declared that he knew of Mr. Koerber's background and the federal criminal case against him. *See id*. Mr. Schindler states that Mr. Koerber's "contributions to the successful defense of that case were significant and real" and that he was "extremely impressed" by Mr. Koerber. *Id*. at p.13. Finally, Mr. Schindler has stated that despite "his criminal history" if Mr. Koerber ever decides to become an attorney Mr. Schindler would "fly out to Utah to recommend him to the State Bar" because "it was that clear to me that he could be an excellent criminal defense attorney." *Id*., at pp. 13-14.

Given these facts it is difficult to see how Mr. Koerber's involvement in the Bundy matter could support a dangerousness finding. The opposite is true. The fact that Mr. Koerber has acquired this kind of reputation from competent and experienced attorneys (as part of pursuing a new career path while defending this case) shows that Mr. Koerber is a value to his community and has ample reason to obey the Court's orders upon release.

Nevertheless, the government has continued to argue that an Order to Show Cause that was filed post-trail in the *Bundy* matter (against attorney Marcus R. Mumford), should convince the court that Mr. Koerber committed deception and is a danger.

According to the government, the Order to Show Cause charges that Mumford (not Mr. Koerber) added Mr. Koerber's name to a joint defense witness list submission but used the name Rick Koerber instead of Claud R. Koerber while doing so. According to the government this is evidence of Mr. Koerber attempting to deceive Judge Brown in that case. The Order to Show Cause also alleges, and the government argues here that since Mr. Koerber had been in the courtroom during the entire trial he should not have been added to the witness list. Both of these arguments are meritless.

No witness statements have been presented to establish these allegations and prosecutors have mischaracterized the circumstances. Specifically, prosecutors claim that it was Judge Brown who filed the Order to Show Cause as soon as she learned of these facts. However, it was not Judge Brown who filed the Order to Show Cause, and it was filed well after the trial concluded. This is significant because Judge Brown knew first hand who Mr. Koerber was at all times, and was quite aware of his presence in the

courtroom since she had approved it. *See* Exhibit 7. Evidence of this is included in the same docket quoted by prosecutors who had selectively pulled out allegations but omitted exculpatory evidence that shows the meritlessness of the argument.

To help the Court quickly see the absence of merit to the prosecutor's argument, Mr. Koerber has attached several additional documents from the Oregon proceeding as Exhibit 7 ("Ex. 7). The first document is a selection of Mr. Mumford's response to the Order to Show Cause explaining his answer to these allegations which lead to the resolution of the matter without action by the Oregon Court. *See* Ex. 7 at pp. 2-18. In Mr. Mumford's response he also cites transcripts from the actual proceedings where Judge Brown repeatedly acknowledges that she was aware of who Mr. Koerber was, and his presence in the courtroom.

The second document attached is a September 1, 2016 email exchange between J. Morgan Philpot and Judge Brown herself. *See* Ex. 7 at pp. 19-20. From this email the Court can see quite clearly that Mr. Philpot asked Judge Brown directly for permission to have Mr. Koerber in the courtroom during trial. In the email he identifies Mr. Koerber as "Claud R. 'Rick' Koerber." Ex. 7 at p. 19.  This shows the lack of merit in the government's argument.

Also attached is Judge Brown's personal email response on September 1, where she states "I don't have any objection to Mr. Koerber sitting [in the well of the courtroom]" and "Mr. Koerber is certainly welcome to use that common defense team space in the back of the well behind the rows of defense tables if that can be coordinated with the rest of the Defendants." Ex. 7 at p. 20.

When it is clear that Judge Brown knew Mr. Koerber as "Claud R. Koerber" and "Rick Koerber" when he first associated with the case, *see* Ex. 5 and Ex. 6, and several months later she granted Mr. Philpot's request for "Claud R. 'Rick' Koerber" there is no reasonable argument that Judge Brown was deceived. The opposite it true. All available evidence shows that Mr. Koerber and those working with him – including Judge Brown – knew exactly who he was and what role he played as part of the defense team.

Finally, to alleviate any possible doubt, the final document attached is an exchange between lawyers, Judge Brown's chambers, and the local county detention facility. *See* Ex. 7 at pp. 21-23. In this exchange, Judge Brown's clerk confirms that Mr. Koerber (who is referenced both as Claud R. Koerber and by his birthname Claud R. Franklin)[16] is a member of the defense team. *Id.*

---

[16] Mr. Koerber provided copies of his Wyoming Birth Certificate at the May 31 hearing. The long form original certificate shows Mr. Koerber's birthname as Claud R. Franklin. The short form birth certificate reflects Mr. Koerber's name change to Claud R. Koerber (after his adoption as a young child.) At the May 31 hearing, both the government and Magistrate Judge Warner criticized Mr. Koerber's use of both last names as somehow abnormal or improper. Magistrate Judge Warner stated "most law-abiding people don't use a lot of different names. They just don't." Ex.1 at p. 162. Both the government and Judge Warner appear tone deaf to the common difficulty facing children who are adopted after birth and have multiple last names. Consider *e.g.* the well-known circumstance of former President Barack H. Obama (who is also known by the last name "Soetoro" and the nickname "Barry".) At trial, the government's only witness was forced to admit that Mr. Koerber very publicly publishes the use of both the name Koerber and the name Franklin to avoid any chance of the public being misled. See Ex. 1 at 41 (Also discussing that Mr. Koerber uses his photograph on social media as well as his emails to help avoid any confusion. As a matter of law, both the government and Magistrate Judge Warner were in error to hold the position that a person's use of family names, assumed names, or nicknames is by itself suspicious conduct as far as the law is concerned. It is not. And any impact this error had on Magistrate Judge Warner's probable cause finding must be corrected. *See State v. Tinnin*, 64 Utah 587, 232 P. 543, 544–45 (1925); *Platt v. Locke*, 11 Utah 2d 273, 278, 358 P.2d 95, 98 (1961).

That prosecutors continue to advance this allegation of deception against Mr.

Koerber without any witnesses, and in light of these facts, shows the exaggeration and

meritlessness at issue. Further, prosecutors have had access to the same docket entries

and references to the same records, yet they have failed to investigate or failed to disclose

them in their effort to make these allegations against Mr. Koerber.

No allegations were ever made by prosecutors or the court against Mr. Koerber in

the Oregon proceeding. There is no evidence from 2016 or since, that Mr. Koerber was

involved in any wrongdoing let alone illegal conduct in the *Bundy* matter. Finally, the

defense attorneys who worked with Mr. Koerber and participated in the filing of the

witness list have now provided declarations to this Court affirming Mr. Koerber's

conduct and integrity.

In making his finding of dangerousness Magistrate Judge Warner related the idea

that "where there is smoke, there is fire", Ex. 1 at p. 160, but **the smoke here is being**

**created by prosecutors.** Clearly there is nothing close to fraud or financial danger at

issue with Mr. Koerber's involvement in the Bundy matter. There is clearly no pecuniary

loss at issue in the scenario.

One final declaration provided by another experienced trial attorney, in another

federal district, attorney Bret Whipple, offers a poignant endorsement of Mr. Koerber and

a warning about how others might unfairly attack his involvement.

> I was well aware before working with Mr. Koerber of the personal legal
> issues he faced in Utah and how a party opposed to my client might try and
> gain an unfair advantage by disparaging me and my client for our
> association with him. But, increasingly, I came to make an independent
> assessment of Mr. Koerber's abilities and character. I regard him as one of

the most intelligent and honest persons with whom I have been associated.

Ex. 5 at pp. 4-5.  *See also* the Declaration of Maysoun Fletcher, Ex. 5 at p. 10 (declaring

that Ms. Fletcher observed that Mr. Koerber has "tremendous respect for the United

States Court.")

APPENDIX F

The *Koerber v. Mismash* landlord/tenant dispute in 2011.

Eight years ago, a state court in Utah was asked to decide competing claims between a landlord (Ms. Nancy Mismash) and her tenants (Mr. Koerber and his wife). In this civil case there were no allegations of fraud or deception in the pleading by Ms. Mismash. A copy of her pleading is attached hereto as part of Exhibit 8 ("Ex. 8").

The trial court originally granted Ms. Mismash summary judgment by default. In that order, there is no allegation or finding of fraud or deception. *Id*. One of Mr. Koerber's arguments on appeal was that Ms. Mismash had unfairly obtained summary judgement through the expedited proceedings of an unlawful detainer action without serving a proper summons. Mr. Koerber ultimately prevailed with this argument in the Utah Court of Appeals. *Id*.

The government nevertheless includes this instance as a supposed example of Mr. Koerber's dangerousness. The evidence provided by the government is a double hearsay account by an FBI agent of an interview with Ms. Mismash's attorney. No witness statements have been provided and the government has omitted any response to the fact that there were no allegations of deception before the Utah court. Worse, the allegations advanced by prosecutors at the May 31 hearing were that Mr. Koerber reportedly back dated utility checks to avoid eviction and submitted property improvement receipts from a contractor business that does not exist. *See* Ex. 1 at p. 157 (AUSA Clark: "Mr. Koerber submitted a false invoice for contractor work on the home. The contractor did not exist and the work had never been performed.")

These allegations were plainly false and if prosecutors had done even simple research, they would have discovered that the Utah Department of Commerce has a business registration for the contractor. This shows that the government's proffer in May 31 was false. Mr. Koerber pointed this out in a prior filing, *see* Doc. 612 at page 38 (listing Utah Business Entity numbers 5334662-0142 and 8831548-0142). Mr. Koerber also clarified what was argued before the Utah court. The receipts mentioned by prosecutors were for deposits made, not work performed. Prosecutors have nevertheless failed to correct their previously asserted false allegations. There is still no witness statement, no evidence of pecuniary harm to Ms. Mismash based on any deception by Mr. Koerber and nothing close to criminal activity. *See Sellers*, 89 S. Ct. at 36 ("The idea that it would be "dangerous" in general to allow the applicant to be at large must … relate to some kind of danger that so jeopardizes the public that the only way to protect against it would be to keep the applicant in jail.")

To alleviate any concern that the Court might have about how Mr. Koerber interacts with landlords, his current landlords Duane and Cathy Runyan (from 2014 – present) have provided a declaration attached hereto as Exhibit 9 ("Ex. 9.").

The Court should not give any weight to these plainly exaggerated and false allegations as part of a so-called pattern of deception. There is no conduct here, even if the allegations were true, that is illegal. There is no evidence before the Court except exculpatory evidence. Further, the fact that Mr. Koerber prevailed on appeal; without any subsequent action from Ms. Mismash or the court, and that the government has failed to correct the record regarding its prior false allegations, is sufficient to rebut any question

of dangerousness. Finally, the declaration from Duane and Cathy Runyan is the most reliable evidence showing that for the last six years, Mr. Koerber and his wife have been excellent tenants, and that Mr. Koerber is an active and valuable participant in his community.

APPENDIX G

The 2012 *Real Property Mgmt. v. Koerber* (Elwood) landlord/tenant dispute.

Prosecutors also include another alleged dispute between Mr. Koerber and a landlord from seven years ago. As support for these allegations prosecutors rely on a double hearsay interview report from an FBI agent who interviewed Ms. Elwood. Prosecutors claim that according to Ms. Elwood, when Mr. Koerber and his family moved out of the home, there was allegedly $21,000 of damage to the property by pets and holes in the walls. *See* Doc. 620 at p. 14. These allegations fall far short of criminal conduct, or the kind of dangerousness required by the legal standard described above. These allegations also fail to allege any deception whatsoever. Clearly, these allegations cannot support the so-called "pattern of deception" found by Magistrate Judge Warner, but do show the prosecutor's pattern of exaggeration.

Tellingly, prosecutors have once again shown a reckless disregard for the truth in making these allegations. The public records available show that there was no claim for $21,000 in damages, or anything close, in the plaintiffs pleading for this case. *See* Attached Exhibit 10. Besides the last month's rent, **a total of $228.66 in non-contract fees was allegedly owed by Mr. Koerber.** *See id*. Further, contrary to the allegation that Mr. Koerber damaged the property when asked to leave, the docket for the case shows that the parties stipulated to a move out date and no extra charges. *See id*. The matter was subsequently dismissed without any allegations remotely close to the government's argument. Here, there are no allegations of fraud, deception or dangerousness. Instead prosecutors have converted a seven-year-old $228.66 landlord dispute into something the

government hopes will be more salacious. The Court should resist attributing any significance to this supposed incident of wrongdoing by Mr. Koerber.

Finally, as addressed above, Mr. Koerber's current landlords clearly show that there is no cause for concern by the Court related to Mr. Koerber's current living situation.

APPENDIX H

The *Fish v. Fish* divorce proceeding in November 2014.

This court proceeding involved a multiyear civil dispute between Mr. Koerber's wife (n/k/a Jewel Franklin) and her ex-husband Wesley Fish. The government misidentifies the relevant proceeding as having taken place in 2015. However, the proceeding at issue was a November 2014 hearing on competing Orders to Show Cause. The court had approximately twenty pending instances of alleged contempt against Mr. Fish and one alleged instance against Mrs. Franklin. The court held Mrs. Franklin in civil contempt for failing to pay approximately $800.00 in reimbursement expenses.

During the proceeding to which Mr. Koerber was not a party and had been excluded from the courtroom as a witness, Mrs. Franklin's attorney argued against a finding of civil contempt because Mrs. Franklin believed that Mr. Koerber had sent the required payment via electronic bill payment to Mr. Fish's attorney, through a local credit union. Mr. Koerber was called as a witness and testified that he had in fact sent the electronic bill payment. Mr. Koerber produced screen shots from the credit union website showing the payment, the payment date, and the payment ID number provided by the credit union. In rebuttal, Mr. Fish's attorney called her law firm's bookkeeper who testified that while a payment could have been sent the firm had not cashed any check. The court found the bookkeeper's testimony more relevant and Mr. Koerber's testimony less credible, establishing that the payment had not been completed.

Mr. Koerber was never alleged to have testified falsely. The court did not rule that Mr. Koerber testified falsely.  No contempt proceeding, or anything of the sort, were

sought by the court or any other party against Mr. Koerber.

There is clearly nothing unlawful that took place in this hearing. The government points to no evidence that any misconduct took place. In fact, Mr. Koerber had no financial obligation to Mr. Fish or to the court. Further, Mr. Fish suffered no pecuniary harm because of any alleged deception and the proceeding amounts to nothing unusual in the context of a long and contentious family law matter.

The fact that this incident took place approximately five years ago, without any subsequent complaint or action, by any party or by the court, undermines any significance that prosecutors have tried to attach to this proceeding.

Clearly, there is no evidence of financial fraud related to Mr. Koerber based on this proceeding. Even if the allegations and all inferences were accepted as true there is no support for a dangerousness finding. *See Cook*, 880 F.2d at 1161 ("Safety of the community 'refers to the danger that the defendant might engage in criminal activity to the detriment of the community.'")

APPENDIX I

The *Fryberger v. Edwards* matter in Oregon.

Besides the issues related to *Fryberger v. Edwards* already discussed in detail above, Magistrate Judge Warner made additional findings related to claims alleged by the Peterkin attorneys. However, it is now beyond reasonable dispute that several of the claims made by the Peterkin attorneys (and relied on by Magistrate Judge Warner) were patently false.

For example, Magistrate Judge Warner found as part of his "dangerousness" ruling that the Peterkin law firm "was not aware" that they were dealing with a "convicted felon" when they interacted with Mr. Koerber. *See* Ex. 1 p. 162. But in the Oregon proceeding it has now been conceded that Mr. Koerber ceased interactions with the Peterkin law firm long before he was convicted. *See* attached Exhibit 11.

It has also been conceded in the Oregon Court of Appeals proceeding that a lawyer from the Peterkin Law firm, Ms. Danelle Lordi, knew who Mr. Koerber was, knew about his involvement in the prior *United States v. Bundy* case and had researched Mr. Koerber and Mr. Philpot on-line at the very beginning of the *Fryberger v. Edwards* case. *Id*.

Ms. Lordi, it has also now been conceded, talked directly with one of Mr. Koerber's former employers and with Mr. Koerber himself, long before Mr. Koerber's trial and conviction and learned about Mr. Koerber's background and history. *Id*.

Magistrate Judge Warner also referenced, in making his findings, that the Peterkin law firm "would not have shared certain discovery with him had they known his status. But he didn't disclose that to them." Ex. 1 at p. 162. But, the Peterkin law firm never

produced even one page of discovery in the *Fryberger v. Edwards* matter. See Ex. 11. In other words, probation officer Annie Carr, prosecutors, and Magistrate Judge Warner all relied on the documents provided by Peterkin - without conducting any investigation – and it is now undisputed that these allegations were false. *Id*.

APPENDIX J

Mr. Koerber's Release History.

On June 19, 2009, after consideration of the statutory flight risk and dangerousness factors, Mr. Koerber was originally released by Magistrate Judge Alba under § 3142(c), with no objection from the government, and minimal conditions (no financial restrictions).

On December 12, 2009, following a superseding indictment, Mr. Koerber was again arraigned and released by then-Magistrate Judge Nuffer under § 3142(c), without objection from the government, and with the same minimal conditions.

In September of 2011, following a second superseding indictment, Mr. Koerber was again arraigned and released pursuant to § 3142(c) by Magistrate Judge Alba.

When Mr. Koerber's case was initially dismissed with prejudice in August 2014, District Judge Clark Waddoups ordered Mr. Koerber's release conditions under the Bail Reform Act terminated and pending the government's appeal between September 2014 and re-indictment in January 2018, Mr. Koerber was free without conditions or supervision – all without objection from the government.

On January 17, 2017, Mr. Koerber was re-indicted, and in February 2017 he was arraigned before Magistrate Judge Furse. After considering the circumstances and required factors, and Mr. Koerber's history of prior compliance with release conditions and no prior violations between June 2009 and February 2017, and with no objection from the government, Magistrate Judge Furse ordered Mr. Koerber released on personal

recognizance pursuant to §3142(b), and again with minimal conditions that he surrender any passport, and that he not violate any local, state or federal law.

This Court made a ruling that it would not incarcerate Mr. Koerber pending appeal in May 2018. *See* Doc. 380 at pp. 38, 40, 42.

In September 2018, this Court released Mr. Koerber post-conviction pursuant to 18 U.S.C. § 3143.

APPENDIX K

3142(g) Factors

The Court is wholly justified in assuring and granting Mr. Koerber's release prior to sentencing and during appeal by relying on 18 U.S.C. § 3142(g) factors. Regarding the "nature and circumstances of the offense" for which Mr. Koerber has been convicted, the conduct at issue is now more than a decade old. There is no allegation that Mr. Koerber has continued any activity remotely close to the charged conduct, and there is no allegation that Mr. Koerber has subsequently been involved with any kind of investment activity.

Regarding the "weight of the evidence", Mr. Koerber was convicted. However, multiple investor witnesses at trial testified that they were not deceived, and that they did not lose money. Also, until recently the government has alleged up to 600 victims, however it has recently conceded that it can only attempt to prove 35 or less for sentencing purposes. The loss amount in question is also in dispute. Ultimately, the facts and evidence in this case show that contrary to the government's repeated attempt to paint Mr. Koerber as the worst of the worst fraudsters, only a few witnesses claimed to have been misled, and it was unrebutted that Mr. Koerber's business did, *inter alia*, acquire millions of dollars in real estate. Many witnesses also agreed that financial losses were connected to the crash in the subsequent real estate and finance markets.

In any event, while very serious, neither of these first two factors weigh significantly for determining release under the present circumstances. Although there is a conviction, Mr. Koerber was granted release pre- and post-trial without objection from

the government and without financial restrictions. This brings the other factors more directly into light regarding the history and characteristics of Mr. Koerber, including what he has done and has been doing over the last decade.

      1. *Education and Work History*:

Mr. Koerber graduated from high school in 1991. Following high school, Mr. Koerber obtained an Associate's Degree from Casper College and later attended both the University of Denver and Western Governor's University. Mr. Koerber worked as a systems analyst for Xerox Corporation after college from 1994-1996, and from approximately 1996 through 2011 was an entrepreneur. As discussed above, since 2011 Mr. Koerber has offered contract paralegal and litigation services to attorneys and law firms. In doing so Mr. Koerber has built an excellent reputation for providing value to the community. *See* Exhibits 5 and 12.

      2. *Family & Community Life:*

Mr. Koerber is married. He has a strong and active relationship with his wife and his eight children and four grandchildren. He is also currently the primary provider for two of his children who are still minors, and also the primary caretaker for his terminally ill mother, who also lives across the street from him and his family, in a small rural Utah community. Mr. Koerber has also built strong relationships and is an asset in his local community, and in his local church congregation where he regularly serves as a volunteer. He is also a trusted friend and confidant.

      3. *Financial Responsibility*:

Despite the financial failure of his prior businesses that is the subject of this case, and during the 10-year history that this case has been pending, Mr. Koerber has not been a financial burden on any government agency or third party for his temporal support or the support of his family. Instead he has consistently been gainfully employed and the sole income provider for his household. During the last 7 years, Mr. Koerber has worked diligently to build a new career providing support services for attorneys. The attached declarations **from a broad selection of experienced attorneys and clients** show that Mr. Koerber has worked diligently, has built a good reputation, and in his work, he has performed as a valuable asset to those he serves and to the legal community. *See* Ex. 5 and Ex. 12.  This should weigh heavily in favor of granting Mr. Koerber's release.

    4.  *History of No Flight Risk and History of No Danger to the Community*:

Mr. Koerber has never been considered a flight risk or danger to the community. He was initially arraigned in the current prosecution, back on June 19, 2009. Since that time, he has consistently appeared at each hearing and has timely responded to all requests that he be present, including his self-surrender to the U.S. Marshal prior to the revocation hearing on May 31, 2019. Over the last 10 years, Mr. Koerber has been considered for release, and any potential flight risk and dangerousness has been evaluated under the Bail Reform Act (18 U.S.C. § 3141 *et seq.*) on several prior occasions. During the last 10 years, Mr. Koerber was never once violated while on release by his supervising probation officer. Ex. 1 at 51:21. Since indictment, Mr. Koerber has never attempted to abscond. Ex. 1 at 57:24. He has never been accused of using drugs or alcohol inappropriately and has not previously been alleged or found to pose a danger to

anyone in the community. Ex. 1 at 58:2-3, 5-6. Mr. Koerber has no criminal history

besides this case. There is no allegation that he has been involved in any financial activity

involving investors, or in any investment transactions of any kind since 2009. This is

consistent with the reason Mr. Koerber has been on release since 2017 on his own

personal recognizance and for the last ten years with exceptionally minimal Bail Reform

Act conditions.

APPENDIX L

Previously Proposed Conditions of Release

During his release, Mr. Koerber shall not have any management or executive level responsibilities in any business. Within 5 days of being released from custody, Mr. Koerber shall resign any and all managerial and/or executive level positions, including for Corvus Administration and Management, LLC.  Mr. Koerber shall present proof of this resignation in compliance with this condition, to the U.S. Pretrial Services Office.

During his release, Mr. Koerber shall not be a signer on any business bank or business credit union account. Within 5 days of being released from custody, Mr. Koerber shall remove his name from any such accounts, and shall present proof of compliance with this condition, to the U.S. Pretrial Services Office.

While on release, in financial transactions and in his employment, Mr. Koerber shall use his legal name, Claud R. Koerber.

While on release, Mr. Koerber shall maintain active employment and keep the U.S. Pretrial Services Office updated as to any changes in his employment.  To the extent that Mr. Koerber continues to be employed by attorneys, Mr. Koerber shall not file any documents with any court on the matters for which he is employed, and Mr. Koerber shall not provide verifications of dates, or provide any certifications or authentications of documents that will be filed with any court in any case for which he is employed. If there is a need for an exception to this restriction, Mr. Koerber may request an exception 72 hours in advance, by writing an email to the Pretrial Services Office. The email shall contain a description from his employer justifying the requested exception, and a

certification of good faith from his employer that the exception is reasonably required to accomplish a valid legal objective.  The U.S. Pretrial Services Office may, but is not required to grant the exception, and any exception shall be in writing.

While on release, Mr. Koerber shall provide a copy of the conditions of his release to any employing attorney, and before commencing any work for any attorney or any law firm, Mr. Koerber shall have the employing attorney sign an acknowledgment that he or she has received and reviewed the conditions of release, and that he or she expressly agrees to cooperate and ensure these conditions are followed.  Further, from this point forward while Mr. Koerber is on release, each employing attorney shall also sign an acknowledgment, before Mr. Koerber commences any work for that attorney, that he or she will independently and immediately report and detail to the Pretrial Services Office (via email) any claim or complaint made by any person, if and when made, regarding Mr. Koerber's personal conduct.