1         IN THE UNITED STATES DISTRICT COURT

2              DISTRICT OF UTAH

3             CENTRAL DIVISION

4

5  UNITED STATES OF AMERICA,   )

6          Plaintiff,      )

7    vs.               )  Case No. 2:17-CR-37-FB

8  CLAUD R. KOERBER,       )

9         Defendant.      )

10  _____)

11

12      BEFORE MAGISTRATE JUDGE PAUL. M. WARNER

13     ------------------------------------------

14             May 31, 2019

15       Pretrial Release Violation Hearing

16  Transcript Prepared from an Electronically Recorded Hearing

17

18

19

20

21

22

23

24  REPORTED BY: Patti Walker, CSR, RPR, CP   801-364-5440

25  351 South West Temple, #8.431, Salt Lake City, Utah  84101

1                        A P P E A R A N C E S

2

3

4   For Plaintiff:              Aaron B. Clark
                                Ruth J. Hackford-Peer
5                               U.S. ATTORNEY'S OFFICE
                                111 South Main Street, #1800
6                               Salt Lake City, Utah  84111

7

8   For Defendant:             Kathryn Neal Nester
                                Daphne A. Oberg
9                               UTAH FEDERAL DEFENDER OFFICE
                                46 West Broadway, #110
10                              Salt Lake City, Utah  84101

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2     Witness                    Examination By                    Page

3     Annie Carr                 Ms. Hackford-Peer (Direct)         15

4                                Ms. Nester  (Cross)                28

5     Greg Petersen              Ms. Nester  (Direct)               53

6     John Belcher               Ms. Nester  (Direct)               60

7     Russell Skousen            Ms. Nester  (Direct)               76

8                                Mr. Clark  (Cross)                 86

9                                Ms. Nester  (Redirect)             92

10                               Mr. Clark  (Recross)               92

11    Morgan Philpot             Ms. Nester  (Direct)               94

12                               Mr. Clark  (Cross)                 117

13                               Ms. Nester  (Redirect)             122

14                               Ms. Nester  (Further Redirect)     129

15                               Mr. Clark  (Recross)               130

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2     Exhibits                                        Page

3     Plaintiff's:

4     1                                                19

5     2                                                23

6     3                                                24

7     4                                                26

8     5                                                27

9

10    Defendant's:

11    1 and 2                                          45

12    3                                                46

13    4                                                55

14    5                                                57

15    6                                                63

16    7                                                85

17    8                                               111

18    9                                               132

19

20

21

22

23

24

25

 1          SALT LAKE CITY, UTAH; FRIDAY, MAY 31, 2019; 10:00 A.M.

 2                          PROCEEDINGS

 3          MS. HACKFORD-PEER:  Your Honor, were you

 4   pre-staffing with probation?

 5          Is Annie Carr back there?

 6          THE COURT:  She's coming around.  I wasn't

 7   pre-staffing.  She just wanted to know if I had any

 8   questions, but I didn't.  So I think we're good to go.

 9          MS. OBERG:  Your Honor, if I may, I believe our

10   client is still at the marshal's office.  If I can be

11   excused to go get him.

12          THE COURT:  Why don't you ask them to bring him up

13   as quickly as possible.

14          MS. HACKFORD-PEER:  And I have some documents for

15   the Court.

16          MS. NESTER:  Your Honor, can we remove the

17   shackles, please?

18          THE COURT:  No.  That's a marshal determination,

19   Ms. Nester.  I think you know that.

20          All right.  Are both sides ready?

21          MS. HACKFORD-PEER:  Yes, Your Honor.

22          THE COURT:  Court will come to order.

23          Good morning.  We're here today in the case of

24   United States vs. Claud R. Koerber.  The case number is

25   2:17-CR-37.  It's been assigned to Judge Frederic Block.

1   The United States is represented by Ms. Ruth Hackford-Peer

2   and Mr. Aaron Clark, assistant U.S. attorneys.  The

3   defendant is here and present in court and is represented by

4   Ms. Kathy Nester, former federal defender here in Utah, and

5   currently -- I forget your title, Ms. Nester.  I believe

6   it's executive director; is that correct?

7            MS. NESTER:  Yes, sir.

8            THE COURT:  For the Federal Defenders Office in

9   San Diego, Southern District of California, as well as

10  Ms. Daphne Oberg, who is an assistant federal defender here

11  in the District of Utah.

12           As noted, Mr. Koerber is here and present in

13  court.

14           The purpose of today's hearing is an initial

15  appearance on an alleged violation of Mr. Koerber's release

16  condition.  In anticipation of the hearing, I received the

17  petition, of course, itself, which has been amended once --

18  the language was amended once.

19           And, Ms. Nester, just to make sure, do you have

20  the current version that indicates violation of federal,

21  state, and local law, to wit, tampered with records, et

22  cetera?

23           MS. NESTER:  Yes, sir, I do.

24           THE COURT:  All right.  Thank you.

25           So I've seen that.  And I have also, of course,

1    reviewed the order setting conditions of release that was

2    initially issued, I believe, by Judge Furse in 1217.  And,

3    of course, I have seen the pleadings filed by the United

4    States.  I'm sure that copies were provided to you,

5    Ms. Nester, and to your colleagues.

6              Before we get to the substance of the matter,

7    because this is a violation proceeding, Mr. Koerber, I'm

8    obligated by law to inform you of your constitutional

9    rights, and I'd like you to listen carefully.  Under the

10   Fifth Amendment to our Constitution, you're entitled to the

11   right against self-incrimination.  It's commonly called the

12   right to remain silent.  It simply means you don't have to

13   make any statements about the alleged offense, or offenses,

14   but if you do make statements, they can and likely will be

15   used against you in a court of law.  Do you understand me,

16   sir?

17             THE DEFENDANT:  Yes.  I'm having a hard time

18   hearing you, Your Honor, but I understand you.

19             THE COURT:  All right.  I'll speak up a little

20   bit.  Is that better?

21             THE DEFENDANT:  Yes.  Thank you.

22             THE COURT:  Thank you.

23             The second right you have is obviously the right

24   to counsel under our Sixth Amendment, but I believe that you

25   are very competently and adequately represented at this

1   point by Ms. Nester and by Ms. Oberg, so I don't think I

2   need to review that unless you intend to retain counsel on

3   your own at this point.

4              THE DEFENDANT:  I do not.

5              THE COURT:  All right.  Thank you.

6              With that, here's how I anticipate proceeding on

7   this.  First of all, let me ask you, as is the common

8   practice on a violation, Ms. Nester, have you had time to

9   review the nature of the allegation with Mr. Koerber?

10             MS. NESTER:  I have, Your Honor.

11             THE COURT:  And has he determined whether or not

12  he chooses to admit or deny the allegation at this time?

13             MS. NESTER:  He has, and we deny.

14             THE COURT:  Mr. Koerber, could I have you stand,

15  please.  This is a formality, but I still want to go through

16  that process.

17             I now ask you, sir, how do you plead to the single

18  allegation in the petition, admit or deny?

19             THE DEFENDANT:  Deny.

20             THE COURT:  Thank you.

21             You may all be seated.

22             The record will reflect that the defendant,

23  Mr. Koerber, has entered a denial as to the allegation in

24  the petition.  That will be received by the Court and

25  entered into the record at this time.

1          I would like -- I'm assuming at this point,

2     Ms. Hackford-Peer, that you're ready to go forward on the

3     violation?

4          MS. HACKFORD-PEER:  Yes, Your Honor.

5          THE COURT:  And, Ms. Nester, I'm assuming that

6     you're prepared as well?

7          MS. NESTER:  Yes, sir.

8          THE COURT:  Okay.  Let me lay out a couple of

9     so-called ground rules.  The rules for these matters are

10    relaxed pursuant to the statute.  However, I know of -- at

11    least I say I know of.  I signed the subpoena yesterday for

12    two witnesses.  I saw one of them, Mr. Petersen -- is he

13    here -- and the other is Mr. Belcher, or Belcher.  Is it a

14    hard C or a soft C?

15         MR. BELCHER:  Belcher, Your Honor.

16         THE COURT:  Belcher.  Thank you, Mr. Belcher.

17         In a more formal setting, we would typically

18    invoke an exclusionary rule.  I'm happy to hear either side

19    on that as far as would you like the exclusionary rule, or

20    do you mind if they sit in?  What's your preference?

21         Ms. Nester?

22         MS. NESTER:  We're not asking for the rule to be

23    invoked, Your Honor.

24         THE COURT:  Okay.

25         MS. HACKFORD-PEER:  That's fine with us,

1    Your Honor.

2         THE COURT:  All right.  Then we'll allow

3    Mr. Belcher and Mr. Petersen to remain in the room during

4    the pendency of the matter.

5         MS. NESTER:  We do have some other witnesses.  It

6    wasn't necessary to subpoena them, Your Honor.

7         THE COURT:  Okay.  So here's how I see this going.

8    I have reviewed the statute.  And this is a little bit

9    unusual because his release has actually occurred twice, by

10   my review.  The first would be the release by Judge Furse

11   when he first, initially appeared.  And then following his

12   conviction, Judge Block made a determination to release him

13   again, for want of a better word.  The first would be under

14   3142.  The second would be under 3143.  I believe this

15   proceeding is controlled by 3148, which is sanctions on

16   release for violation of release condition.

17        As I read that statute -- and I want to hear from

18   both sides before we go forward with any evidence.  As I

19   read that statute, I believe that the standard for the

20   violation -- and there's only one condition here, which was

21   the defendant must not commit any offense in violation of

22   federal, state, or local, or tribal law while on release in

23   this case.  That was the original condition.  I didn't see

24   any new conditions that were imposed other than the passport

25   and travel restriction in that regard.

1              So as I read 3148, it appears to me that under

2     3148(b)(1)(A), the standard for review of this violation is

3     probable cause to believe that the person has committed a

4     federal, state, or local crime while on release.

5              What's the position of the United States?

6              MR. CLARK:  We agree with that, Your Honor.

7              THE COURT:  Ms. Nester?

8              MS. NESTER:  Your Honor, I believe the statute

9     uses that language.  I would like to -- I believe this

10    matter is up before the Supreme Court right now on issues of

11    whether or not the standard, when you're depriving someone

12    of their liberty, should, in fact, be higher.  So, just

13    simply, in case that case turns out in our favor, I would

14    like to go ahead and register an objection and say that I do

15    believe that because these require factual findings that

16    will involve the termination of his liberty, should the

17    Court so find, that we would ask for a jury and we would ask

18    for a beyond a reasonable doubt standard.  I do recognize

19    that's not the law right now, but it might be soon.  So

20    thank you, Your Honor.

21             THE COURT:  Thank you.  I will note your

22    objection, and we'll proceed on the standards as enunciated

23    by the statute.

24             Now before we begin the actual presentation of

25    evidence, I'd like to have just a brief proffer from both

1    sides as to what we can anticipate by way of evidence for

2    purposes of planning.

3            Ms. Hackford-Peer, I don't know if you or

4    Mr. Clark are going to be the lead counsel, but I'd like to

5    know which one is so I can kind of address one or the other.

6            MS. HACKFORD-PEER:  Your Honor, I'm going to be

7    taking testimony of Ms. Carr, and then Mr. Clark will be

8    arguing.

9            THE COURT:  Okay.  So I take it that -- well, why

10   don't you tell me, Ms. Hackford-Peer -- rather than me

11   trying to tell you, why don't you tell me, what is it you

12   anticipate by way of presentation of evidence this morning,

13   on the violation?

14           By the way, I really didn't mention this, but I

15   see this as a bifurcated proceeding, bifurcated in this

16   sense.  The first phase is on the violation.  If I don't

17   find a violation, that's the end of the proceeding.  If I

18   find a violation, then we go to the second phase of the

19   proceeding, which I think falls under 1343 and Rule 46(c),

20   which suggests that the burden of proof shifts to the

21   defendant to prove by clear and convincing evidence that he

22   doesn't represent an ongoing danger to the community.

23   That's how I read it.

24           Do you see it differently, Ms. Nester?

25           MS. NESTER:  No, sir.

1            THE COURT:  Okay.

2            Ms. Hackford-Peer?

3            MS. HACKFORD-PEER:  No.

4            THE COURT:  All right.  Thank you.

5            So with that, let me ask you, Ms. Hackford-Peer,

6    just tell me briefly what it is you anticipate presenting on

7    the violation proceeding.

8            MS. HACKFORD-PEER:  I intend to call Annie Carr.

9    We'll go through the six exhibits that I have here on the

10   exhibit list.  We expect to find that Mr. Koerber

11   violated --

12           THE COURT:  I don't need you to make any argument.

13   That's what she's going to do.  She's going to go through

14   the exhibits?

15           MS. HACKFORD-PEER:  Yes.

16           THE COURT:  Then what else?

17           MS. HACKFORD-PEER:  That's all I intend to do,

18   Your Honor.

19           THE COURT:  Okay.  That will be your violation

20   case?

21           MS. HACKFORD-PEER:  Correct.

22           THE COURT:  Then Mr. Clark will argue the case for

23   you, correct?

24           MS. HACKFORD-PEER:  Correct.

25           THE COURT:  All right.  Thank you.

1          Ms. Nester, what do you anticipate presenting on

2  the violation portion?

3          MS. NESTER:  Your Honor, we have five witnesses

4  today, and there's a possibility that Mr. Koerber, depending

5  on how the evidence goes, may ask to address the Court as

6  well.  And we do have exhibits that we'll be introducing

7  through the witnesses, but I don't think it will take more

8  than a couple of hours.

9          THE COURT:  Okay.  Fair enough.

10          Are both sides ready to go at this point?

11          MS. HACKFORD-PEER:  Yes, Your Honor.

12          MS. NESTER:  Yes, sir.

13          THE COURT:  Ms. Hackford-Peer, why don't you call

14  your first witness.

15          MS. HACKFORD-PEER:  The United States calls Annie

16  Carr.

17          THE COURT:  Ms. Carr, if you would step forward

18  and raise your right hand, and be sworn, please.

19                          ANNIE CARR,

20          Having been duly sworn, was examined

21                  and testified as follows:

22          THE COURT:  Now, Ms. Carr, if you would step

23  around into the witness box, have a seat there, and pull

24  yourself up close to the microphone.  Thank you.

25          Ms. Hackford-Peer, you may proceed.

```
 1                       DIRECT EXAMINATION

 2   BY MS. HACKFORD-PEER:

 3   Q    Go ahead and state your name for the record, please.

 4   A    Annie Carr.

 5   Q    And how are you employed?

 6   A    I'm a U.S. Probation officer.

 7   Q    And what is your relationship to Mr. Koerber?

 8   A    He is a defendant that I'm currently supervising.

 9   Q    I'm going to give you some documents.

10        MS. HACKFORD-PEER:  I have given the Court this

11   binder as well.  Defense counsel has the same documents.

12   BY MS. HACKFORD-PEER:

13   Q    I want to talk with you about these documents today.

14   Let's start by looking at Exhibits 1, 2, and 3.

15        THE COURT:  Why don't we take them one at a time,

16   Ms. Hackford-Peer.

17        MS. HACKFORD-PEER:  Okay.

18        THE COURT:  You say one, two, and three.  I think

19   it's easier if we just do them one at a time.

20   BY MS. HACKFORD-PEER:

21   Q    Let's look at Exhibit 1.  Are you familiar with that

22   document?

23   A    Yes.

24   Q    Where did you get that document?

25   A    I received these documents from --
```

1   Q    Let's just talk about Exhibit 1.

2   A    Okay.  Exhibit 1.

3            THE COURT:  For the record -- just to clarify.

4   For the record, you're referring to the declaration of

5   Kristi L. Turbin; is that correct?

6            MS. HACKFORD-PEER:  Tubbin, I believe, Your Honor.

7            THE COURT:  Tubbin.  Excuse me.  Okay.

8            Go ahead, Ms. Carr.

9            THE WITNESS:  I received these via e-mail from

10  Trisha Peterkin.

11  BY MS. HACKFORD-PEER:

12  Q    And who is Trisha Peterkin affiliated with?

13  A    The law firm of Peterkin Burgess.

14  Q    And you received this document directly from the law

15  firm Peterkin Burgess?

16  A    Yes.

17  Q    So what is Exhibit 1?

18  A    This is a declaration of Kristi Tubbin.

19  Q    And what's her position at that law firm?

20  A    She is a legal assistant.

21  Q    And in that document she talks about receiving a manila

22  envelope with a notice of appeal inside of it; is that

23  right?

24  A    Yes.

25  Q    And attached to that declaration is the notice of

1   appeal?

2   A    Yes.

3   Q    And that's an appeal for what case?

4   A    The Fryberger vs. Edwards.

5   Q    How is Mr. Koerber associated with that case?

6   A    He is the paralegal for Morgan Philpot.

7   Q    And Mr. Philpot represented the client that owes money

8   in that case; is that right?

9   A    Right.

10  Q    And then if you go to page five of that document --

11  actually let's go to page four of the notice of appeal.  Do

12  you see a certificate of service?

13  A    Yes.

14  Q    And what's the date of that certificate of service?

15  A    March 2nd, 2019.

16  Q    And if you turn the page, how was this delivered?  Will

17  you read the last --

18  A    By a commercial delivery service with proof of dispatch

19  attached.

20  Q    And we're going to go to page 13 now of that document.

21  What is that document?

22  A    This looks like the -- I guess the receipt.

23  Q    So the proof of dispatch?

24  A    Yeah, the proof of dispatch.

25  Q    Let's go over that dispatch notice a little bit.  What

1    is the date on that dispatch notice?

2    A    March 2nd, 2019.

3    Q    And who is the client identified as?

4    A    Morgan Philpot.

5    Q    And there are a couple of e-mails listed under Morgan

6    Philpot.  Do you see that second e-mail?

7    A    Yes.

8    Q    Are you familiar with who that e-mail belongs to?

9    A    That belongs to Mr. Koerber.

10   Q    And that e-mail is crf&jmphilpot.com?

11   A    Yes.

12   Q    And this dispatch notice shows that this was dispatched

13   to who to deliver?

14   A    To Sarah Fryberger, the Oregon Court of Appeals, and

15   the trial court.

16   Q    Okay.  Those are the three entities, it looks like,

17   where the document was going to be delivered to; is that

18   right?

19   A    Right.

20   Q    Who was going to do the delivering?

21   A    Oh, I'm sorry.  I'm sorry.  Corvus Administration and

22   Management.

23   Q    Are you familiar with that entity?

24   A    Yes.

25   Q    And what is that entity?

1    A    It is the business that Mr. Koerber had.

2    Q    And the receipt shows that $209.35 was paid to deliver

3    these documents; is that right?

4    A    Correct.

5    Q    And then there's a signature on the bottom.  Who do you

6    believe that to be?

7    A    The initials are CRK, which I believe would be Claud R.

8    Koerber.

9              MS. HACKFORD-PEER:  Your Honor, we move to admit

10   Exhibit 1.

11             THE COURT:  Any objection?

12             MS. NESTER:  No, sir.

13             THE COURT:  It will be received.

14             (Plaintiff's Exhibit 1 was received into

15   evidence.)

16   BY MS. HACKFORD-PEER:

17   Q    Okay.  Let's go to Exhibit 2, Ms. Carr.  Actually, can

18   we go back to Exhibit 1 for just a minute?

19        Do you know Kristi Tubbin?

20   A    No.

21   Q    Where were these documents filed -- or what do these

22   documents pertain to?

23   A    With the Oregon Court of Appeals.

24   Q    So will you read Ms. Tubbin's declaration on the second

25   page of her document.

```
 1   A     Where do you want me to read?

 2   Q     The bold part.

 3   A     Okay.  I hereby declare and affirm that the above

 4   statement is true to the best of my knowledge and belief,

 5   and that I understand it is made for use as evidence in

 6   court and is subject to penalty for perjury.

 7   Q     Now let's go to Exhibit 2.  What is this document?

 8   A     This is a declaration of Michael Peterkin.

 9   Q     And did you similarly get this document from Trisha

10   Peterkin?

11   A     Yes.

12   Q     And you got that directly from Trisha Peterkin?

13   A     Yes.

14   Q     Let's go over this declaration.

15         Mr. Peterkin attaches a number of documents to his

16   declaration.  I want to go over those quickly.  Let's go to

17   page four of 29.

18   A     Okay.

19   Q     What is this document?

20   A     LCC certificate of organization of Corvus

21   Administration and Management.

22   Q     If you look at the seal at the bottom, when was this

23   company incorporated?

24   A     March 6th of 2019.

25   Q     And if you look under Article III, there's a registered
```

1    agent name and address.  Will you state the name and address

2    identified there.

3    A    It says Derrick O. Roebuck, 5526 West 13400th South,

4    number 335, in Herriman, Utah, 84096.

5    Q    Who do you believe Derrick Roebuck -- do you believe

6    Derrick Roebuck is an actual person?

7    A    I believe it's an alias for Mr. Koerber.

8    Q    In that same declaration, Mr. Peterkin's declaration,

9    if you'll go to page 26 of 29.

10   A    Okay.

11   Q    Will you identify the e-mail there.

12   A    It's the same e-mail.  It's crf@jmphilpot.com.

13   Q    And the name associated there is C.R. Franklin,

14   correct?

15   A    Yes.

16              THE COURT:  What page were you on?

17              MS. HACKFORD-PEER:  Page 26 of 29.

18              THE COURT:  I'm sorry.  I thought you said six.

19              Go ahead.

20   BY MS. HACKFORD-PEER:

21   Q    There is a photograph on that e-mail of C.R. Franklin.

22   Do you recognize that person?

23   A    Yes.

24   Q    And who is that?

25   A    The defendant.

1    Q     So is C.R. Franklin a name that you know Mr. Koerber to

2    go by?

3    A     Yes.

4    Q     And if we could turn the page now to page 27 of 29.

5    What is this document?

6    A     This is a document regarding Corvus Administration and

7    Management.

8    Q     And when did this company expire?

9    A     June 27th of 2013.

10   Q     So if we then go back to page --

11         MS. NESTER:  I'm sorry, Your Honor.  I am a little

12   bit confused about the source of this document.  I don't

13   understand where that document came from.  If I could just

14   get some foundation, I probably don't have a problem with

15   it.

16   BY MS. HACKFORD-PEER:

17   Q     Can you read paragraph 13 of Mr. Peterkin's

18   declaration?

19   A     What page is it on?

20   Q     It's on page three.

21   A     Attached as Exhibit 8 is a true copy of the entity

22   information page from the State of Utah, Department of

23   Commerce, Division of Corporations & Commercial Code showing

24   the previous registration of Curvus Administration and

25   Management, LLC that expired as of 06/27/2013.

1    Q    So if you'll turn the page now back to the new articles

2    of incorporation.  Does it appear that this is a

3    reincorporation?

4    A    I'm sorry.  What page is that on?

5    Q    Page four.  I'm sorry.  I should direct you.  Page four

6    of 29.

7    A    Yes.

8    Q    This appears to be a reincorporation of a company that

9    had previously expired; is that right?

10   A    Yes.

11            MS. HACKFORD-PEER:  Your Honor, I move to admit

12   Exhibit 2.

13            THE COURT:  Any objection?

14            MS. NESTER:  No, sir.

15            THE COURT:  It will be received.

16            (Plaintiff's Exhibit 2 was received into

17   evidence.)

18   BY MS. HACKFORD-PEER:

19   Q    Okay, Ms. Carr.  Let's move on to Exhibit 3.  Where did

20   you receive this document?

21   A    Also from Trisha Peterkin.

22   Q    And who is this a declaration of?

23   A    Wendy Neff.

24   Q    And who is Wendy Neff.

25   A    She is an investigator.

1   Q   And what did she do?

2   A   She went to the address under the Corvus Administration

3   and Management and took a picture.

4   Q   Okay.  So to be clear, she went to 5526 West 13400

5   South in Herriman?

6   A   Yes.

7   Q   And what is at that location?

8   A   It's a UPS store.

9   Q   And did she note the hours of that UPS store?

10   A   Yes.

11   Q   And what would that store have been open on March 2nd,

12   2019?

13   A   March 2nd is a Saturday, and so they would have been

14   open from 10:00 a.m. to 4:00 p.m.

15         MS. HACKFORD-PEER:  Your Honor, I move to admit

16   Exhibit 3.

17         THE COURT:  Any objection, counsel?

18         MS. NESTER:  No, sir.

19         THE COURT:  It will be received.

20         (Plaintiff's Exhibit 3 was received into

21   evidence.)

22   BY MS. HACKFORD-PEER:

23   Q   Okay.  Exhibit 4.  Where did you receive -- first, are

24   you familiar with this document?

25   A   Yes.

```
1    Q    Where did you receive this document -- or from whom?

2    A    I received this from the Utah Division of Corporations.

3    I can't remember the entire name.

4    Q    The Utah Division of Corporations & Commercial Code?

5    A    Yes.

6    Q    And did you receive that via e-mail?

7    A    Yes.

8    Q    What is Exhibit 4?

9    A    This is a screen shot of what one would have to fill

10   out to register a business online.

11   Q    In the State of Utah, right?

12   A    Yes.

13   Q    So let's look at the second screen shot.

14   A    Okay.

15   Q    When a person fills out and signs a registration like

16   this, what do they -- what are they declaring?

17   A    I'm just going to read what it says.

18   Q    Okay.

19   A    I declare, under penalties of perjury and as an

20   authorized authority, that this filing has been examined by

21   me and is, to the best of my knowledge and belief, true,

22   correct, and complete.

23   Q    And then this document also makes reference to the

24   electronic signature rules in the State of Utah; is that

25   right.
```

1    A    Yes.

2            MS. HACKFORD-PEER:  Your Honor, I move to admit

3    Exhibit 4.

4            THE COURT:  Any objection?

5            MS. NESTER:  No, sir.

6            THE COURT:  It will be received.

7            (Plaintiff's Exhibit 4 was received into

8    evidence.)

9    BY MS. HACKFORD-PEER:

10   Q    Let's move on to Exhibit 5.  Are you familiar with this

11   document?

12   A    Yes.

13   Q    And where did you get this document?

14   A    From the same person at Utah Division of Corporations &

15   Commercial Code.

16   Q    And what is Exhibit 5?

17   A    This is a printout of what would be received.  Once an

18   individual registered a business, it would be received by

19   them and by the Utah division.

20   Q    So it's a recording of the answers when you do an

21   online registration for a business; is that correct?

22   A    Yeah.  Yes, the application.

23   Q    And what business is this the application materials

24   for?

25   A    Corvus Administration and Management.

1    Q    And it's that UPS address in Herriman; is that correct?

2    A    Yes.

3    Q    Let's go to page five of that document, the last page.

4    Whose electronic signature is identified there?

5    A    Claud R. Koerber.

6    Q    Let's go back to page two of that document.  The second

7    question there says what is the date you will start or did

8    start doing business.  What did Mr. Koerber identify as the

9    date Corvus would start doing business?

10   A    March 6, 2019.

11   Q    Then if you go to page four of that document, who is

12   the registered agent?

13   A    Derrick Roebuck.

14   Q    And who is the manager?

15   A    Claud Koerber.

16   Q    And do you believe them to be the same individual?

17   A    Yes.

18   Q    So was Corvus incorporated in Utah on March 2nd, 2019?

19   A    No.

20        MS. HACKFORD-PEER:  I move to admit Exhibit 5,

21   Your Honor.

22        THE COURT:  Any objection?

23        MS. NESTER:  No, sir.

24        THE COURT:  It will be received.

25        (Plaintiff's Exhibit 5 was received into

```
1   evidence.)

2           MS. HACKFORD-PEER:  Can I have just a moment?

3           THE COURT:  You may.

4           MS. HACKFORD-PEER:  Your Honor, Exhibit 6 was

5   already admitted as part of the Peterkin declaration, so I'm

6   not going to move to admit that.

7           THE COURT:  All right.

8           MS. HACKFORD-PEER:  And I have no further

9   questions for you, Ms. Carr.

10          THE COURT:  Thank you.

11          Ms. Nester, I assume you're going to do the

12  cross-examination?

13          MS. NESTER:  Yes, sir.

14          THE COURT:  You may proceed.

15          MS. NESTER:  Thank you, Your Honor.

16                      CROSS-EXAMINATION

17  BY MS. NESTER:

18  Q    Good morning, Ms. Carr.

19  A    Hello.

20  Q    It's been a while.  It's good to see you again.

21  A    It's good to see you.

22  Q    So I'd like to go back just a little bit.  And before

23  we even start, as Mr. Koerber's probation officer that he

24  was to report to, did you ever look at his birth

25  certificates?  Have you ever reviewed them?
```

1    A    No.

2    Q    Do you know what his legal name is or if it's ever been

3    changed?

4    A    I don't know if it's ever been changed.

5           MS. NESTER:  May I approach, Your Honor?

6           THE COURT:  You may.

7    BY MS. NESTER:

8    Q    I'm handing you two documents.  They're copies.  Can

9    you look at those for a second.

10           THE COURT:  I'm assuming counsel has a copy?

11           MS. NESTER:  Yes, sir, they do.  Thank you.

12           MS. HACKFORD-PEER:  Can you direct us to which one

13    you're looking at, though.  We just have a pile.

14           Thank you.

15    BY MS. NESTER:

16    Q    So in your experience as a probation officer, have you

17    seen birth certificates before of people that you supervise?

18    A    Yes.

19    Q    Do those appear to be facsimiles of birth certificates?

20    A    Yes.

21    Q    All right.  And the first one that's -- the one that's

22    the long form that has the signatures on the bottom, what

23    does that say Mr. Koerber's name at birth was?

24    A    Claud Roderick Franklin.

25    Q    And the short form that you have, what is the name on

1    that certificate?

2    A    Claud Roderick Koerber.

3    Q    Do you have any knowledge as to when that name was

4    changed, or by whom, or why?

5    A    The bottom -- the date issued is October 25th of 2010.

6    Q    That's the date that the certification is issued.  But

7    you don't know when the actual birth certificate was

8    changed?

9    A    No.  No.

10   Q    Have you ever called or asked anyone about

11   Mr. Koerber's legal name?

12   A    No.

13   Q    All right.  Okay.

14        So I want to look at the documents that

15   Ms. Hackford-Peer just went over with you.  The first

16   document that you talked about is a declaration signed by a

17   legal assistant, right?

18   A    Yes.

19   Q    For a law firm in Oregon?

20   A    Yes.

21   Q    It's by a woman named Kristi Tubbin?

22   A    Yes.

23   Q    Have you ever spoken to Kristi Tubbin?

24   A    No.

25   Q    So you've never interviewed her yourself or discussed

1    this with her in any way?

2    A    No.

3    Q    Did you prepare this declaration for her?

4    A    No.

5    Q    Do you know who did?

6    A    No.

7    Q    In this declaration she claims that at 5:40 p.m. on

8    March 8th of 2019, a slightly heavyset male with long, dark

9    brown hair and a dark brown beard handed her a manila

10   envelope, right?

11   A    Uh-huh.  (Affirmative)

12   Q    Did you read that?

13   A    Yes.

14   Q    Did you ever send her a picture of Rick Koerber to ask

15   her if that was him?

16   A    No.

17   Q    And did she ever tell you or anyone else that the

18   person she saw was Rick Koerber?

19   A    No.

20   Q    Do you have any reason to know that that person was or

21   was not Rick Koerber?

22   A    No.

23   Q    And basically that's the sum total of her information,

24   is that she was hand delivered these documents relating to a

25   civil case on March 8th, a little bit after five o'clock,

1   right?

2   A      Yes.

3   Q      From an unknown person?

4   A      Yes.

5   Q      Then you also have attached on there what she was

6   delivered; is that right?  She attaches that to her

7   declaration?

8   A      Yes.

9   Q      And page 13 of 15 is a receipt from Corvus

10  Administration and Management; is that right?

11  A      Yes.

12  Q      Do you know that to be the company that Rick Koerber is

13  affiliated with?

14  A      Yes.

15  Q      And how do you know that?

16  A      From the documents that I've received.

17  Q      Did you ever ask Rick where he worked?

18  A      No.

19  Q      Have you ever asked Rick who Corvus Administration and

20  Management is?

21  A      No.

22  Q      And when you look on that document, there's an initial

23  MP.  Do you know whose initials those are?

24  A      I assume it's Morgan Philpot.

25  Q      But you're assuming that?

1   A    Right.

2   Q    So if it turns out that's someone else's initials, you

3  would not have any personal knowledge of that?

4   A    Correct.

5   Q    And if you go down underneath that box of the people to

6  be delivered, there is a statement saying PDF to print plus.

7  Do you know what that means?

8   A    No.

9   Q    Have you asked anyone what that means?

10   A    No.

11   Q    And then there's initials at the bottom, CRK.  Do you

12  recognize those initials?

13   A    Yes.

14   Q    And whose are those initials?

15   A    Mr. Koerber's.

16   Q    So you today have no personal knowledge of anything

17  about this delivery other than what's in these two pages

18  from this legal assistant in Oregon; is that right?

19   A    That's correct.

20   Q    Okay.  Did you ever look up the docket of the civil

21  case?

22   A    No.

23   Q    Did you explore at all what the civil case is about?

24   A    No.

25   Q    Or what allegations are being made about this law firm?

1   A     No.

2   Q     Did you ever read the Oregon statutes on delivery of

3   process, or do any legal research, or ask for a legal

4   opinion on what is permitted in the State of Oregon to

5   deliver and serve process?

6   A     No.

7   Q     But you listed on the violation that he's committed a

8   crime through the service of process, right?

9   A     Right.

10  Q     So what exactly about the service of process is

11  criminal?

12  A     So the information that I based the allegation on are

13  these documents.

14  Q     And nothing else?

15  A     Correct.

16  Q     Okay.  So you don't know what allegations have been

17  made about this law firm in this litigation?

18  A     No.

19  Q     And you don't know -- do you know how much money is

20  involved?

21  A     I believe on here somewhere it said above $4 million.

22  Q     All right.  And do you know whether or not the Oregon

23  court has addressed any of this in the context of the civil

24  litigation?

25  A     No.

1  Q    Do you know -- on that document we were just looking
2  at, page 13 of 15 -- never mind.  I'll strike that.
3       All right.  Do you know what the term dispatch means in
4  Oregon law?
5  A    No.
6  Q    Okay.  Let's go to Exhibit 2 of the Peterkin
7  declaration.  Now this is, in fact, a lawyer at the law firm
8  involved in the $4 million lawsuit; is that right?
9  A    Yes.
10 Q    Have you ever talked to Mr. Peterkin?
11 A    No.
12 Q    Have you ever reviewed the pleadings that were filed
13 prior to all of this?
14 A    No.
15 Q    All right.  On Government Exhibit 2, Ms. Hackford-Peer
16 referred you to page four of 29 where there's a registered
17 agent on this -- excuse me, Your Honor.
18      There's a registered agent on this new registration of
19 Corvus, name of Derrick Roebuck, right?
20 A    Right.
21 Q    And you said you believe that's an alias of
22 Mr. Koerber?
23 A    Yes.
24 Q    And what do you base that belief on?
25 A    Information that we have in our system.  I believe it's

1    in the presentence report.

2    Q    It's in the presentence report.  And do you know how it

3    got in the presentence report?

4    A    No.

5    Q    Let me show you, now that you bring that up --

6         MS. NESTER:  Your Honor, may I approach?  I'm

7    going to just show her the presentence report.

8         THE COURT:  Yes, you may.

9         MS. NESTER:  Thank you, Your Honor.

10        May I just stay here for one minute because I'm

11   going to flip the page?

12        THE COURT:  Yes.

13   BY MS. NESTER:

14   Q    Do you recognize that document?

15   A    Yes.

16   Q    What is that?

17   A    The presentence investigation report.

18   Q    And the date that this report was prepared was what

19   day?

20   A    March 4th.

21   Q    March 4th.  All right.  And on March 4th -- the way

22   that it works, probation officers get information before

23   they do this final report to the Court; is that right?

24   A    Right.

25   Q    And this report -- this first report that was issued on

1    March 4th, I want to bring your attention to paragraph 75.

2              MS. NESTER:  Your Honor, since this is a sealed

3    document, I'm not going to admit it.  But there's one

4    section that's not confidential.

5              THE COURT:  At least as far as you're concerned.

6              MS. NESTER:  Exactly.

7    BY MS. NESTER:

8    Q    I'm going to ask you to read paragraph 71.

9    A    The defendant reported being self-employed as a

10   contract paralegal since 2013 under the business name of

11   Corvus Administration and Management, LLC, and American Land

12   Run, LLC.  He reported he is usually paid as a 1099 status.

13   He has not renewed his business registration with the Utah

14   Department of Commerce since 2013, and stated he has not

15   filed income taxes under the advice of counsel.  He

16   estimated grossing $4500 monthly.

17   Q    On March 4th, when your coworker -- when your coworker

18   issued this report, Mr. Koerber had self-reported to her

19   that he worked for Corvus Administration and Management,

20   right?

21   A    Yes.

22   Q    And that he was an independent contractor, right?

23   A    Yes.

24   Q    And are you aware that he provided financial

25   disclosures to Ms. Mary Schumann?

```
 1   A    I wasn't aware firsthand, but that is usually what

 2   happens.

 3            MS. NESTER:  May I approach, Your Honor?

 4            THE COURT:  You may.

 5            MS. NESTER:  Again, Your Honor, these are sealed,

 6   but if I could just review it with her.

 7   BY MS. NESTER:

 8   Q    I'm going to show you an e-mail on top of a set of

 9   documents.  Can you look at the middle e-mail and tell me

10   the date that those documents were transmitted to the United

11   States Probation Office?

12   A    February 28th, 2019.

13   Q    From whom?

14   A    Jessica Stengel.

15   Q    Do you know Jessica in the defender office?

16   A    No.

17   Q    It's all right.

18        And it mentions that it's enclosing what documents?

19   A    Financial disclosures.

20   Q    And if I can, have you reviewed all these financial

21   disclosures?

22   A    No.

23   Q    Did you ask Mary what all Mr. Koerber told her and

24   provided her?

25   A    No.
```

1    Q    Do you know that he provided her all the bank records

2    for Corvus Administration and Management --

3    A    No.

4    Q    -- on February 28th?

5    A    No.

6    Q    You didn't know that?

7    A    No.

8    Q    All right.  Can you tell me right here in the

9    disclosures that were given to Ms. Schumann what is stated

10   by Mr. Koerber?

11   A    Mr. Koerber is the manager of Corvus Administration and

12   Management, LLC.  As the manager, Mr. Corvus controls a

13   checking and savings account.  Mr. Koerber does not own any

14   stock or membership.

15   Q    So he revealed to probation that he had this company

16   and that's how you learned about it, right?

17   A    Right.

18   Q    But you never interviewed Mr. Koerber or even Mary

19   Schumann about this company?

20   A    No.

21   Q    So as you sit here today, you don't know what that

22   company does, do you?

23   A    I only know what these documents say it does.

24   Q    Those documents don't know who Corvus Administration

25   is.  Those people don't know who it is, do they?  They're

1   from Oregon.

2   A     No.  The documents from the Utah Division of --

3   Q     Okay.  We'll get to those.  That's fair.  Thank you for

4   clarifying that.  We'll get to that in just one minute.

5         All right.  Also in Mr. Peterkin's -- so Mr. Peterkin,

6   who's the lawyer, is asserting that -- and just to sum up,

7   kind of like we did with Ms. -- I forgot her name already --

8   Ms. Tubbin, just to summarize Mr. Peterkin's affidavit, he

9   is basically claiming that -- sorry, one second -- that he

10  believes the notice of appeal was improperly served; is that

11  right?

12  A     Correct.

13  Q     And do you understand the basis for why he says that

14  it's improperly served?

15  A     Yes.

16  Q     All right.  And did you ever -- did you ask a legal

17  opinion, or a lawyer to explain to you how the service of

18  process -- if Mr. Peterkin's opinion is correct about

19  service of process?

20  A     No.

21  Q     And there is an allegation here where he is claiming on

22  information and belief that Rick Koerber is also Rick

23  Franklin; is that right?

24  A     Correct.

25  Q     And he attaches e-mails, right?

1    A    Right.

2    Q    And the e-mail has Mr. Koerber's picture on it?

3    A    Right.

4    Q    So Mr. Koerber wasn't hiding who he was.  His picture

5    was on his e-mail, right?

6    A    Uh-huh.  (Affirmative)

7    Q    And Mr. Koerber has -- those are actually Mr. Koerber's

8    legal names, Koerber and Franklin; is that right?

9    A    Correct.

10   Q    And there's apparently also some Web page, I don't know

11   where he got it from, called About Me, and that is on

12   page -- that's attached to his affidavit -- Mr. Peterkin's

13   affidavit, and it is page number --

14   A    Twenty-five.

15   Q    Yes.  Thank you.  With a picture of Mr. Koerber, an

16   explanation of what he does, and both his names, Koerber and

17   Franklin; is that right?  Do you see that at the top, Rick

18   Koerber, Claud R. Koerber Franklin?

19   A    Yes.

20   Q    On a public document, right?

21   A    Yes.

22   Q    And Mr. Peterkin has no personal knowledge about Corvus

23   Administration in his affidavit, does he?  He doesn't know

24   anything about that company?

25   A    I'm sorry.  Say that again.

1    Q    Mr. Peterkin, in Government Exhibit 2, he has no

2    personal knowledge about the company Corvus Administration,

3    does he?

4    A    I don't think so.  I couldn't say.

5    Q    It's not in his declaration?

6    A    Right.

7    Q    Are you also aware in Mr. Peterkin's affidavit he talks

8    about whether or not -- let me find it.  Just a moment.

9         So Mr. Peterkin is complaining that the registration of

10   Corvus -- the reregistration of Corvus that happened on

11   March 6th happened after his dispatch date, is that right,

12   of March the 2nd?

13   A    Yes.

14   Q    So he thinks because they weren't registered with the

15   Department of Commerce, that they weren't a real company, or

16   that they didn't exist?

17   A    Right.

18   Q    Did you ever ask anyone or make any investigation about

19   whether Corvus Administration and Management existed and

20   operated under any capacity before the dispatch of these

21   documents that were filed in the civil suit?

22   A    Well, based on the documents that were received from

23   the Utah Division of -- whatever that long name is, it

24   looked like it was expired.

25   Q    Do you know what that means under the law when a

1  company's business registration expires?

2  A    No.

3  Q    Do you know what legal effect that has?

4  A    No.

5  Q    Do you know what's required to reregister a company?

6  A    No.

7  Q    Do you know why companies register with the Department

8  of Commerce?

9  A    I mean I can guess, but no, not necessarily.

10  Q    Let's look, then, at Government's Exhibit 5 while we're

11  talking about that.  This is the document that you received

12  that was filled out when they reregistered on March the 6th;

13  is that right?

14  A    Right.

15  Q    And when they reregistered the document on March 6th --

16  go to the second page.

17       First of all, let's look at the first page.

18            MS. NESTER:  This is Government's Exhibit 5,

19  Your Honor.

20  BY MS. NESTER:

21  Q    The very first question that they ask is do you have a

22  federal employer identification number.  Is that asked

23  there?

24  A    Yes.

25  Q    And what's the answer?

```
 1   A     Yes.

 2   Q     And do you know what a federal identification number

 3   is?

 4   A     Yes.

 5   Q     What is that?

 6   A     It's the way the government identifies employees --

 7   employers.  I'm sorry.

 8             MS. NESTER:  And may I approach, Your Honor?

 9             THE COURT:  You may.

10   BY MS. NESTER:

11   Q     I'm going to approach you right now and see if you

12   recognize this document.

13   A     I know what it is.

14             MS. NESTER:  Your Honor, while she's looking at

15   that, can we go ahead and move to admit the two facsimile

16   copies of the birth certificates as Defense Exhibits 1 and

17   2?

18             THE COURT:  Any objection, counsel?

19             MS. HACKFORD-PEER:  No objection, although you may

20   want to redact them.

21             MS. NESTER:  We'll do that.  We'll redact and then

22   resubmit it at a break, or something.  Thank you.

23             THE COURT:  What are you going to redact?

24             MS. HACKFORD-PEER:  Birth date, personal

25   information.
```

 1             THE COURT:  That kind of thing.  Okay.  I thought
 2   you meant the names.
 3             MS. NESTER:  I think that's the point.
 4             THE COURT:  Typically we would redact names.  All
 5   right.  They'll be received.
 6             MS. NESTER:  Thank you.
 7             (Defendant's Exhibits 1 and 2 were received into
 8   evidence.)
 9   BY MS. NESTER:
10   Q    Do you recognize that document?
11   A    Uh-huh.  (Affirmative)
12   Q    What is that document?
13   A    It's a document from the IRS assigning an employer
14   identification number.
15   Q    Can you speak up just a little bit.
16   A    It's a document from the IRS assigning an employer
17   identification number.
18   Q    To whom?
19   A    To Corvus Administration.
20   Q    Who's it addressed to, the letter?
21   A    The Corvus Administration -- I'm sorry.  Claud Koerber.
22   Q    What's the date on that letter from the IRS?
23   A    March 5th, 2012.
24   Q    2012.  So seven years before what we're talking about
25   right now?

1    A      Correct.

2    Q      Is that right.

3    A      Uh-huh.  (Affirmative).

4             MS. NESTER:  Your Honor, I move to admit this as

5    Defense Exhibit 3.

6             MS. HACKFORD-PEER:  No objection.

7             THE COURT:  It will be received.

8             (Defendant's Exhibit 3 was received into

9    evidence.)

10   BY MS. NESTER:

11   Q      Now let's go back to Government's Exhibit 5.

12          I want to go back to Government's Exhibit 5.  So the

13   first question basically says there is a federal employer

14   identification number, and that's true, based on what you

15   just saw, correct?

16   A      Correct.

17   Q      All right.  Then if we could go down to page two of the

18   document where it says what is the date you will start or

19   did start doing business, right?

20   A      Right.

21   Q      And there's a date of the day that he files, which is

22   March 6th, 2019?

23   A      Yes.

24   Q      When you got these documents, did you speak to anyone

25   at the Department of Commerce in person, or did they just

1   send you the documents?

2   A     No.  They just sent me the documents.

3   Q     Do you know what they advise people to fill out on

4   these forms in terms of that date?

5   A     No.

6   Q     Do you know what would have happened if Mr. Koerber had

7   put the actual date of 2012 of when the business was first

8   started and tried to put it in there?  Do you know what

9   would happen on the form?

10  A     No.

11  Q     If you could go to the middle of the page, what is the

12  title of that box?

13  A     Previous account information.

14  Q     When does it say it was originally applied for?

15  A     March 5th of 2012.

16  Q     And that indicates that on this form, at some place,

17  Mr. Koerber, or whoever filled out this document, advised

18  that this company had previously registered, correct?

19  A     Correct.

20  Q     All right.  Then if you go down a little bit further to

21  physical business locations, do you see the address on

22  there, which you've said is the address of the UPS store,

23  right?

24  A     Yes.

25  Q     Did you interview anyone in the UPS store?

1    A    No.

2    Q    Do you know how long Mr. Koerber has maintained a

3    business box there for Corvus?

4    A    No.

5    Q    If you could go to the -- flip two more pages to the

6    box that's titled ownership and management information.  Do

7    you see that?

8    A    Yes.

9    Q    What is Claud Koerber's position?

10   A    Manager.

11   Q    What are Jewel Franklin and John Belcher's positions?

12   A    Members.

13   Q    Members.  All right.  If you recall, in Government

14   Exhibit number -- I believe it's four, they showed you a

15   sample of what it looks like when you swear you're going to

16   tell the truth and not commit perjury, right?

17   A    I'm sorry.  Where are you looking?

18   Q    Government's Exhibit 4.

19   A    Okay.

20   Q    Thanks.

21   A    Yeah.

22   Q    That was the sample that you got?

23   A    Yes.

24   Q    On the second page of that there's a perjury statement,

25   correct?

1    A    Correct.

2    Q    And it's to be signed by whom?  A member?

3    A    Oh, yes.  Uh-huh.  (Affirmative)

4    Q    Is there any requirement that the manager sign under

5    penalty of perjury?

6    A    No.

7    Q    Do you have any evidence that Claud Koerber is a member

8    of Corvus Administration?

9         Do you know the difference?

10   A    I assume to be a manager you'd have to be a member, but

11   I don't know.

12   Q    At the very last page of this document, who is listed

13   as the electronic signature?

14        The very last page of Government's Exhibit 5.  Sorry.

15   A    Claud Koerber.

16   Q    And what is his title there?

17   A    Manager.

18   Q    How did this situation very first come to your

19   attention?

20   A    I was in training and I got an e-mail from -- I believe

21   it was from our assistant deputy chief.

22   Q    All right.  And how did your assistant deputy chief

23   become aware of this situation?

24   A    I don't know.

25   Q    Is it fair to say that you became aware of it after the

1    first PSR was returned, March the --

2    A    Yes.  Yes.

3    Q    So before Mr. Koerber self-reported that he was Corvus

4    Administration and Management, there was no investigation

5    into this at all, right?

6    A    Not that I'm aware of.

7    Q    And then --

8            MS. NESTER:  One moment, Your Honor.

9    BY MS. NESTER:

10   Q    Have you made any investigation into the credibility of

11   the law firm that's making these allegations?

12   A    No.

13   Q    And according to the receipt that was issued by

14   Mr. Philpot -- or by Corvus Administration, the total amount

15   paid to Mr. Koerber for this service of process was $240; is

16   that right?

17   A    I thought it was 209.

18   Q    You're right.  It's 209.  $209 total --

19   A    Right.

20   Q    -- is what was earned by Mr. Koerber, right?

21   A    Yeah.

22   Q    And have you found any evidence that Mr. Koerber made

23   any representations or submitted any documents at all to any

24   court in Oregon?

25   A    Say that again.

1    Q    Have you found any evidence that Mr. Koerber, not

2    Mr. Philpot, but Mr. Koerber ever made any representations

3    to a court in Oregon?

4    A    No.

5              MS. NESTER:  Just one moment, Your Honor.  If I

6    could just have a minute.

7    BY MS. NESTER:

8    Q    Before you filed a revocation claim against

9    Mr. Koerber, did you look into any evidence about how long

10   he's been monitored by your office?

11   A    I know that he's been supervised by our office this

12   last time since he first appeared, I believe, before

13   Judge Furse.

14   Q    All right.  And before that, are you aware of him being

15   supervised?

16   A    Yes.

17   Q    For how long?

18   A    Several years.

19   Q    And you looked through his whole file?

20   A    Yeah, I've looked through the file.

21   Q    And this is the first violation in over a decade that

22   he's been accused of; is that right?

23   A    I believe so.

24             MS. NESTER:  That's all I have.  Thank you,

25   Your Honor.

```
 1                THE COURT:  Thank you.

 2                Ms. Hackford-Peer, any redirect?

 3                MS. HACKFORD-PEER:  No, Your Honor.

 4                THE COURT:  Do you have any additional information

 5     or evidence you would either like to proffer or submit on

 6     the violation issue?

 7                MS. HACKFORD-PEER:  Mr. Clark would like to argue

 8     it when it's appropriate, but no additional evidence.

 9                THE COURT:  All right.  Thank you.

10                Ms. Nester, do you have information or evidence

11     you'd like to proffer at this time on the violation issue?

12                MS. NESTER:  I do, Your Honor.

13                THE COURT:  Okay.  Go ahead, please.

14                MS. NESTER:  We're not going to re-call her.

15                THE COURT:  Thank you.  I'm enjoying myself so

16     much here.

17                Ms. Carr, thank you.  I appreciate your testimony.

18     You may step down.

19                MS. NESTER:  Your Honor, at this point we would

20     like to call Probation Officer Greg Petersen.

21                THE COURT:  Mr. Petersen, if you'll step forward,

22     please.

23                Please raise your right hand.

24     //

25     //
```

```
1                         GREG PETERSEN,

2              Having been duly sworn, was examined

3                    and testified as follows:

4              THE COURT:  Thank you.

5              Mr. Petersen, if you'd step around and have a seat

6    in the witness box, please, and pull yourself close to the

7    microphone.

8              You may proceed, Ms. Nester.

9              MS. NESTER:  Thank you, Your Honor.

10                     DIRECT EXAMINATION

11   BY MS. NESTER:

12   Q    Good morning, Mr. Petersen.

13   A    Good morning.

14   Q    Thank you for being here on short notice.

15   A    You're welcome.

16   Q    This won't take long.

17        Can you --

18             MS. NESTER:  I believe the Court knows you well.

19   There's no need for an introduction, Your Honor.

20             THE COURT:  I do know Mr. Petersen.

21   BY MS. NESTER:

22   Q    Can you tell me at what period of time you were tasked

23   by the Court -- I mean, by the District of Utah to supervise

24   Mr. Koerber?

25   A    From approximately June of 2009 to October of 2013.
```

1    Q    So four years?

2    A    About.

3    Q    And during that period of time, how would you describe

4    the -- well, strike that.  It doesn't matter.

5        Were you aware that he was employed during that time?

6    A    Yes.

7    Q    And did you question him -- I mean, I know it's been a

8    long time and I'm sure you don't remember, but it is regular

9    in your course of supervision to question people about their

10   current employment?

11   A    Yes, it is.

12   Q    And to verify their current employment?

13   A    Yes.

14   Q    And I asked you to look back through your file and see

15   if you had done that back then, true?

16   A    Correct.

17   Q    And the earliest evidence you had of his employment was

18   from a law office; is that right?

19   A    Correct.

20   Q    And what is the name of that law office?

21   A    It says Corvus Law Group, LLC.

22   Q    And what was the date of that pay period when he was

23   employed there?

24   A    The pay stub that I had in our system was November

25   11 -- excuse me, November 1st, 2011 through November 15th of

1    2011.

2    Q    So at the end of 2011, he was employed by a law group

3    of Corvus Law Group, LLC; is that right?

4    A    Yeah, at least through November, from my records.

5    Q    And at the very bottom of the paycheck there's an

6    address for this law firm?

7    A    Yes.

8    Q    What is that address?

9    A    15 West South Temple, Suite 1000, Salt Lake City.

10            MS. NESTER:  Your Honor, can I move to admit a

11   copy of the pay stub as Defense Exhibit No. 4?

12            THE COURT:  Any objection, Ms. Hackford-Peer?

13            MR. CLARK:  No objection, Your Honor.

14            THE COURT:  All right.  Well, thank you,

15   Ms. Hackford-Peer.  That document will be received.

16            (Defendant's Exhibit 4 was received into

17   evidence.)

18   BY MS. NESTER:

19   Q    At some point later did you ever receive correspondence

20   from a gentlemen named Morgan Philpot?

21   A    Yes.

22   Q    And what was the date of that correspondence?

23   A    Well, the date says December 28th of 2012.  It was time

24   stamped in our office June 13th of 2013.  So I'm not exactly

25   sure if there was some type of clerical error, but that's

1    when we received it in our office was June 13th of 2013.

2    Q    And actually in the body of the letter it refers to

3    something that occurred in February of '13, right?

4    A    Correct.

5    Q    So it appears pretty clear that the date on the letter

6    is some type of an error, because it would be impossible,

7    right?

8    A    That would be what I'd surmise.

9    Q    But according to your date stamp, you received this on

10   or around June 13th of 2013?

11   A    Correct.

12   Q    And do you have that document in front of you?

13   A    Yes, ma'am.

14   Q    And does that document verify that Mr. Koerber was

15   working in a legal capacity as a law clerk and paralegal for

16   Mr. Morgan Philpot at least from February of '13 through

17   June of 2013?

18   A    The first line, if I could just read it, says I

19   employee -- it looks like a typo -- I employ Mr. Koerber as

20   my law office administrator and as my personal law

21   clerk/paralegal.

22   Q    And tell me, if you can, what he says his primary

23   duties of Mr. Koerber were?

24   A    Mr. Koerber's primary duties include drafting

25   engagement agreements, participating in client

1  consultations, legal strategy discussions, conducting

2  thorough legal research, and drafting preliminary documents

3  and legal filings.

4  Q    And did you follow up with Mr. Philpot and ask whether

5  or not Mr. Koerber was an independent contractor or a W-2

6  employee?

7  A    I don't recall.  I did go back through my notes, and I

8  remember I drove out to the address listed here, which I

9  believe might have been Mr. Philpot's personal residence,

10 and not feeling comfortable, I just kept driving.  And I

11 don't remember if I made a phone call after that or not.

12 Q    But at least this letter does verify there was some

13 type of employment relationship between Mr. Philpot and

14 Mr. Koerber as far back as June of 2013?

15 A    Yes.

16       MS. NESTER:  Your Honor, I move to admit this as

17 Defense Exhibit 5.

18       MR. CLARK:  No objection, Your Honor.

19       THE COURT:  Thank you.  It will be received.

20       MS. NESTER:  Thank you, Your Honor.

21       (Defendant's Exhibit 5 was received into

22 evidence.)

23 BY MS. NESTER:

24 Q    During the time that you supervised Rick Koerber, did

25 he ever attempt to abscond the district?

```
 1   A    Not that I'm aware of.
 2   Q    Was he ever accused of using drugs or alcohol
 3   inappropriately?
 4   A    Not that I'm aware of.
 5   Q    Did he ever pose a danger to anyone in the community?
 6   A    Not that I'm aware of.
 7   Q    Did he ever violate and cause you to revoke him, ever?
 8   A    He did violate a couple of times as far as missing
 9   checks-ins, and I think one time he moved without getting
10   permission.  But that was stuff that we just verbally
11   admonished him and moved forward.
12   Q    The situation where he moved without getting
13   permission, do you recall the circumstances around that?
14   A    I don't -- I remember he was living in Highland and
15   then relocated to Herriman.
16   Q    Would it refresh your memory to hear that he was
17   evicted without notice?
18   A    It wouldn't but that could have been the case.
19   Q    So if someone got evicted without notice, it would be
20   impossible for them to let you know ahead of time that they
21   were moving, right?
22   A    Fair.
23   Q    And over that four-year period, you never made any
24   reports to the Court or recommended that he should be
25   incarcerated or any sanctions taken against him; is that
```

```
 1   right?
 2   A    Correct.
 3          MS. NESTER:  That's all I have for this witness,
 4   Your Honor.
 5          THE COURT:  Thank you.
 6          Who's going to handle the cross-ex?
 7          MR. CLARK:  Me, Your Honor, but we don't have any
 8   cross-examination.
 9          THE COURT:  You don't have any.  Thank you.
10          Mr. Petersen, thank you for your testimony, sir.
11   You're excused and may step down.
12          MS. NESTER:  Your Honor, at this point I would
13   like to call Mr. John Belcher to the stand.
14          THE COURT:  All right.  Mr. Belcher, if you'll
15   please step forward.
16          MS. NESTER:  I've lost -- I'm not used to the
17   dryness anymore, Your Honor.  I need some water.
18          THE COURT:  Well, it's hard to -- please raise
19   your right hand and be sworn.
20                    JOHN BELCHER,
21            Having been duly sworn, was examined
22                 and testified as follows:
23          THE COURT:  Mr. Belcher, if you would please come
24   over here and have a seat.  Pull yourself up close to the
25   microphone, if you would, please.
```

1           I was just going to say, Ms. Nester, that if you

2    think it's dry here, we've had the second wettest spring on

3    record.  It rains constantly.

4           MS. NESTER:  Left just in time.

5           THE COURT:  So to say it's dry is gilding the lily

6    a little bit.  But go ahead.

7                        DIRECT EXAMINATION

8    BY MS. NESTER:

9    Q    Good morning.

10   A    Good morning.

11   Q    Would you please introduce yourself to Judge Warner?

12   A    My name is John Belcher.

13   Q    And, John, how are you related to Rick Koerber?

14   A    I am his brother-in-law.

15   Q    So you are married to his --

16   A    My wife is his wife's sister.

17   Q    Correct.  How long have you been his brother-in-law?

18   How long have you all been married?

19   A    Well, I've been married longer than he has.  So I

20   think -- I want to say at least probably nine years.

21          It's okay for me to forget the anniversary of their

22   wedding, isn't it?

23   Q    Yes, it is.

24   A    Okay.

25   Q    So I wanted to address with you the formation, or the

1  inception, if you will, of the company Corvus Administration

2  and Management, LLC.  Do you remember when that company was

3  created?

4  A    Yes, I do.

5  Q    What year was that?

6  A    2012, and I think we formally registered it in 2013.

7  Q    If the registration documents showed you registered it

8  in March of 2012, would you disagree with that?

9  A    No.  I'd say that's absolutely correct.

10  Q    So tell me, if you can, or tell Judge Warner, if you

11  can, why you all created Corvus Administration and

12  Management.

13  A    For me to hopefully one day make some money with it.

14  But we wanted to form a business to perform services that --

15  honestly, for Rick's family to make some money.  I wanted to

16  make some money.  Just like any business, we wanted to make

17  some money.

18  Q    What was the nature of the business that Corvus was

19  going to engage in?

20  A    Legal services.  We delivered process.  We -- I mean, I

21  didn't do the writing.  Rick did the writing.  I actually

22  was more hands off.  I was ownership and not involved in the

23  day-to-day per se.

24  Q    When you guys opened the company was there a bank

25  account affiliated with the company?

```
 1   A     Yes.

 2               MS. NESTER:  May I approach, Your Honor?

 3               THE COURT:  You may.

 4   BY MS. NESTER:

 5   Q     Do you recognize that document?

 6   A     Yes, I do.

 7   Q     What is that document?

 8   A     It's the inception of the bank account.  It's the form

 9   we had to fill out.

10   Q     And what is the name of the organization that the

11   account was opened up under?

12   A     Mountain America Credit Union.

13   Q     No.  I mean the name of the business.

14   A     I apologize.  Corvus Administration and Management,

15   LLC.

16   Q     And then if you look back on the back page, who is the

17   signing manager?

18   A     The manager is Claud R. Koerber.

19   Q     And that's his real name, right?

20   A     Correct.

21   Q     And you also heard -- you were in the courtroom --

22               MS. NESTER:  Your Honor, can I move this as

23   Exhibit 6 of the defense?

24               THE COURT:  Any objection?

25               MS. HACKFORD-PEER:  No, Your Honor.
```

1         THE COURT:  It will be received.

2         (Defendant's Exhibit 6 was received into

3    evidence.)

4    BY MS. NESTER:

5    Q    You were in the courtroom when you heard Ms. Carr, the

6    probation officer, testify about the registration listing a

7    registered agent under the name of Derrick Roebuck?

8    A    Yes, correct.

9    Q    Tell me who Derrick Roebuck is.

10   A    It's an alias.  It's an anagram.

11   Q    And why did you guys use an alias name for the

12   registered agent of Corvus Administration?

13   A    At that time when we formed the company, a lot of the

14   legal troubles that Rick was in -- in the legal world, we

15   didn't want people Googling Rick Koerber and finding his

16   name, and then harassing our attorneys' clients.  It would

17   be bad for business.  It would be horrible.

18   Q    So to your knowledge, have you ever been aware of Rick

19   Koerber using the name Derrick Roebuck at any point in the

20   business of Corvus Administration other than listing it as a

21   registered agent name?

22   A    No.  That was the only time we ever used it.

23   Q    And the registration is public, like you said?

24   A    That is correct.

25   Q    It can be Googled?

1   A    It can be accessed by anybody at any time.

2   Q    When people would pay Corvus Administration for their

3   services, who would they pay?

4   A    They would pay Corvus Administration.

5   Q    But who personally would they pay?

6   A    Rick Koerber.

7   Q    Was there ever any doubt about who ran Corvus

8   Administration the entire time that you worked in it?

9   A    Not at all.

10   Q    During the time that you worked in Corvus

11   Administration, how often, if ever, did you ever serve

12   process or deliver papers for law firms?

13   A    The company, fairly often.  Even personally, I served a

14   few back in 2013.

15   Q    When you guys would serve those documents, you'd get

16   paid for that, right?

17   A    Correct.

18   Q    When you guys opened the first -- when you first opened

19   Corvus, did you get any advice from anyone about the proper

20   way to do that?

21   A    We got lots of advice.  At that time we had to cross

22   all our t's and dot all our i's as best we could.

23   Q    And that's because Rick was in trouble, right?

24   A    That is correct.

25   Q    So you were being super careful?

1   A     That is correct.

2   Q     So who did you talk to?

3   A     We consulted some of the attorneys that we knew and

4   worked with.  We also -- the Department of Commerce in the

5   registration.

6   Q     So when you talked to the Department of Commerce, what

7   specific advice were you seeking?

8   A     What would be -- was there any additional paperwork,

9   anything we had to fill out in order to use the registered

10  agent that we used or the proper format to register the

11  company.

12  Q     What, if anything, did you tell them about wanting to

13  use an alias name as a registered agent?

14  A     It's a long time ago.  We -- as I recall, again, on a

15  phone conversation, we said is there any problem using an

16  alias, and they said no.  Is there any way to register an

17  alias?  They said no.

18  Q     All right.  And then when you got -- now I want to move

19  forward.  So from starting in 2012, about how many years was

20  Corvus active and working for law firms?

21  A     It's been continually active.

22  Q     And do you know about how many different clients Corvus

23  has had over the years, law firms and lawyers?

24  A     Maybe 500.

25  Q     And I want to move forward now to 2019.  Okay?

1   A     Okay.

2   Q     Was there an occasion in February or early March where

3   Rick Koerber and/or Jewel, his wife, had a conversation with

4   you about needing to register -- update the registration of

5   Corvus?

6   A     Yeah, there was.

7   Q     What do you remember about that?  Talk slow.

8   A     I apologize.

9   Q     Okay.

10  A     They came down to our new house in Spanish Fork and

11  stayed with us for a few days, and at that time it was after

12  sentencing, the case --

13  Q     You mean the conviction, not the sentencing?

14  A     I apologize.  I don't know all the -- what it's all

15  called.  But yes, after the conviction.

16        And they were -- there was some concern that the

17  company being expired -- I don't know if it was the

18  probation and parole or if it was the prosecutor's office,

19  but whatever report they were working on, we determined it

20  was probably best to cross our t's and dot our i's and

21  register the company and make sure everything was the way it

22  should be.

23  Q     So when you talked to Rick about it, what has his

24  concern about why it needed to be done right away?  Do you

25  remember?

1   A    To the best of my knowledge, when we talked about it,

2   the concern was that, hey, they're going to take the fact

3   that this company is not registered and say I'm not

4   employed, it's not a real company, something to that effect.

5   Q    And this was early March, because you guys registered

6   March the 6th, right?

7   A    Yeah.  It would have been the first week of March.

8   Q    So were you aware that he received his copy of his

9   probation report either March 1st or March 2nd, shortly

10  thereafter?

11  A    I don't know that I'm aware that he received it, but,

12  yeah, that would be that.  I know we were talking about that

13  information and that's probably where that information came

14  from.

15  Q    During the time that you all were talking about needing

16  to satisfy probation, did you ever talk about anything to do

17  with a case in Oregon?

18  A    No.  I don't -- again, we didn't talk about any of the

19  day-to-day or the -- I wasn't involved in a lot of the

20  day-to-day activities.

21  Q    When you guys went to reregister the company, did you

22  talk to anyone in the Department of Commerce then about how

23  to do that?

24  A    Yes.

25  Q    Who did you talk to?

1    A    I don't have a name.  We just called the number on the

2    website.

3    Q    And what did you ask them?

4    A    Well, the main concern was when we tried to register

5    the company, it wouldn't let us put the date that we

6    actually formed the company.

7    Q    Why is that?

8    A    Because it's a Web form and it just puts a big red

9    error and says you filled this out wrong, and try again.  It

10    only allows you to put that day's date or a future date.

11    And we asked them how to proceed.

12    Q    And what did they tell you?

13    A    They said put today's date.  It happens all the time.

14    It's fairly normal.  You know, the old company, we've got it

15    in our system, and that's how it's always done.

16           MS. NESTER:  One moment, Your Honor, with the

17    Court's indulgence.

18    BY MS. NESTER:

19    Q    So when you guys reregistered, what decision, if any,

20    did you make about who to list as the members and the

21    manager of the company?

22    A    Jewel and I are the owners, the members, if you will,

23    for the LLC.  So we listed us as the members, and we

24    determined to list Rick as a manager.  Even though they

25    don't require it, we wanted to be transparent.

1    Q     What about the registered agent?

2    A     The registered agent, we kept it the same it has been

3    because that was the company that they had on file.

4    Q     And this was after his probation report had discussed

5    this name and you guys left it on there?

6    A     That is correct.

7    Q     And why didn't you change it?

8    A     Because we didn't want to -- I mean, it was known.  It

9    was one that had already been out there, and we didn't want

10   to make it look like we were changing or trying to hide

11   something.

12             MS. NESTER:  That's all I have.

13             Thank you, Your Honor.

14             THE COURT:  Thank you.

15             Cross-examination.

16             MS. NESTER:  Your Honor, would you like the

17   exhibits I've already marked?

18             THE COURT:  Yes.

19             MS. NESTER:  We will need to redact.

20             MS. HACKFORD-PEER:  No questions, Your Honor.

21             THE COURT:  I have a couple.

22             Mr. Belcher, I've heard it referred to as Corvus

23   Law Group and also Corvus Management -- Administration and

24   Management services.  Are those two separate entities?

25             THE WITNESS:  The legal entity -- the law group

 1   formed into the management group.  It is separate.

 2              THE COURT:  What do you mean it formed into?

 3              THE WITNESS:  I apologize.  Morphed into.  The

 4   previous group was Corvus Law Group.  I wasn't involved with

 5   that at all.  The only thing I can testify to is Corvus

 6   Administration that we formed in 2012 and 2013.

 7              MS. NESTER:  I do think I can clear that up with

 8   another witness, Your Honor.

 9              THE COURT:  Okay.

10              So you were involved in the incorporation in 2013;

11   is that correct?

12              THE WITNESS:  Not incorporation, Your Honor,

13   organization.

14              THE COURT:  Organization.  Excuse me.

15              And what was the purpose of that organization?

16              THE WITNESS:  We just wanted to get aboveboard.

17   To open a bank account, you need to organize with the state.

18              THE COURT:  What was the purpose -- what was the

19   stated purpose of the business?

20              THE WITNESS:  Oh, the business purpose.  It was

21   always legal service.  It was always -- I've always, when

22   I've formed a business, put any legal business purpose.  But

23   it was to perform management services, specifically

24   targeting towards law groups and law firms.

25              THE COURT:  You said you had over 500 clients.

1           THE WITNESS:  I'm guesstimating on that,

2      Your Honor.  Several hundred at least.

3           THE COURT:  Give me five.

4           THE WITNESS:  Give you five clients?  Again, I'm

5      not involved in the day-to-day, but you've got Philpot Law.

6      You've got Skousen.  A gentleman over on 90th South.  He's a

7      bigger fellow.  I don't remember his name, the law firm

8      there as well.

9           Again, that wasn't my role.  I didn't manage or do

10     the day-to-day.

11          THE COURT:  What did you do?

12          THE WITNESS:  I was an owner, Your Honor.  I was a

13     member.

14          THE COURT:  You didn't do any actual work?

15          THE WITNESS:  Yes, Your Honor.

16          THE COURT:  Yes as in yes you did or yes you did

17     not?

18          THE WITNESS:  You are correct, Your Honor.  I did

19     not do much actual work after 2013.

20          THE COURT:  You appeared on the documents as an

21     owner, but not actively involved in the business, correct?

22          THE WITNESS:  Actively involved?  There is an

23     actual legal term on their incorporation, actively involved,

24     yes.  But I was not actively involved in the day-to-day.  I

25     have a full-time job and work elsewhere.

1          THE COURT:  On this reregistration that just

2    occurred recently, in March of this year, we talked about

3    we, we meaning you and I'm assuming Mr. Koerber?

4          THE WITNESS:  Yes, Your Honor.

5          THE COURT:  We registered it.  Did you do that

6    together, or did you do that or did he do that?

7          THE WITNESS:  It was myself, Rick Koerber, and

8    Jewel as well.

9          THE COURT:  All sitting at the computer at the

10    same time because it was done online?

11          THE WITNESS:  Sitting around the kitchen table

12    with a laptop.

13          THE COURT:  And what time of the day did you do

14    that?

15          THE WITNESS:  I'm going to say -- Your Honor, I

16    don't exactly remember what time of day it was.

17          THE COURT:  Was it in the evening?

18          THE WITNESS:  We sat down twice.  The first time

19    we tried to register, we couldn't use the date we wanted.

20    We called back, and the following day is when we completed

21    the registration.

22          THE COURT:  And they said to use today's date?

23          THE WITNESS:  Correct.

24          THE COURT:  That being March 6th.

25          THE WITNESS:  That is correct.

 1                THE COURT:  And the prior Corvus organization

 2   expired on June 27th of 2013?

 3                THE WITNESS:  That is correct.

 4                THE COURT:  Is it your understanding that that

 5   organization was a lawful entity after that point when the

 6   business registration expired?

 7                THE WITNESS:  To my understanding, yes.

 8                THE COURT:  Are you a lawyer?

 9                THE WITNESS:  I'm not a lawyer.

10                THE COURT:  Did you seek legal counsel on that?

11                THE WITNESS:  Not specifically on that.

12                THE COURT:  And what's the basis of your opinion?

13                THE WITNESS:  The company doesn't cease to exist.

14                THE COURT:  I didn't say it didn't cease to exist.

15   I said was it lawfully organized at that point?

16                THE WITNESS:  My basis for that is that the IRS

17   still had us -- had given us the tax ID number.  We still

18   were an entity.  We weren't -- just like a sole

19   proprietorship, it's still an entity.

20                THE COURT:  You continued to do business, although

21   you didn't do any yourself, correct?

22                THE WITNESS:  The company continued to do

23   business, that is correct.

24                THE COURT:  How much money were you making off

25   this?

1          THE WITNESS:  I didn't make any money.  The idea

2    was that once all the legal smoke cleared from this case,

3    that we could really take off and run a good business.

4          THE COURT:  So you've never made a dime off of

5    this; is that correct?

6          THE WITNESS:  I might have made a couple dollars

7    when I served process papers back in 2013.

8          THE COURT:  But, essentially, Mr. Koerber has just

9    asked you to use your name on the documents; is that

10   correct?

11         THE WITNESS:  No, that's not correct.

12         THE COURT:  Well, you haven't done any work.

13         THE WITNESS:  I've done some work, but not much.

14         THE COURT:  Okay.  So what is it you've done in

15   the last six years to demonstrate that you have more than an

16   ownership interest in this?

17         THE WITNESS:  I don't have more than an ownership

18   interest in this.

19         THE COURT:  All right.

20         Now the stated purpose of Corvus Administration is

21   business administration and management services.  That

22   doesn't sound like law work to me, yet you've described this

23   business as primarily involved in legal business and legal

24   service of process.  Why did you state the business -- the

25   purpose of the business is business administration and

```
 1   management services?
 2            THE WITNESS:  That's what we do.  We manage
 3   businesses.  I had come off owning my own business, and that
 4   was one of the services they provided for me was helping
 5   me --
 6            THE COURT:  In your testimony with Ms. Nester you
 7   talked about primarily legal services, did you not?
 8            THE WITNESS:  There was a need and there was
 9   opportunity, and that's what was available at the time.  But
10   we're not limited, by any means, to legal businesses.
11            THE COURT:  You say you served process a couple of
12   times, Mr. Belcher?
13            THE WITNESS:  Yes, Your Honor.
14            THE COURT:  Was that here locally or was that out
15   of state?
16            THE WITNESS:  That was here locally.
17            THE COURT:  All right.  Thank you.
18            Any redirect, Ms. Nester?
19            MS. NESTER:  No, Your Honor.
20            THE COURT:  Any cross-ex based on my few
21   questions?
22            MS. HACKFORD-PEER:  No, Your Honor.
23            THE COURT:  All right.  Thank you.
24            Mr. Belcher, thank you for your testimony, sir.
25   You are excused.  You may step down.
```

1              MS. NESTER:  Your Honor, at this time I would like

2    to call Russ Skousen to the stand.

3              THE COURT:  Mr. Skousen.

4              Please raise your right hand.

5                        RUSSELL SKOUSEN,

6              Having been duly sworn, was examined

7                    and testified as follows:

8              THE COURT:  Sir, if you'd come around and have a

9    seat in the witness box, and pull yourself up close to the

10   microphone, please.

11                     DIRECT EXAMINATION

12   BY MS. NESTER:

13   Q    Good morning.

14   A    Good morning.

15   Q    Mr. Skousen, would you please introduce yourself to

16   Judge Warner.

17   A    I'm Russell Skousen, an attorney in Utah.

18   Q    How long you have been an attorney?

19   A    Since 1991.

20   Q    And during the time that you've been barred in Utah,

21   have you also had jobs other than purely legal?

22   A    Yes.  I've been in-house counsel.  I've been the

23   executive director of the Department of Commerce.

24   Q    Which governor appointed you to that position?

25   A    Huntsman.

```
 1    Q     And when did you leave the Department of Commerce?
 2    A     August 2005.
 3    Q     And since then you've been in private practice?
 4    A     Yes.
 5    Q     And what type of business do you -- what type of law do
 6    you engage in generally?  What's the general nature of your
 7    practice?
 8    A     I'm really one of the few general practitioners out
 9    there, so I -- but real estate, estate planning, business,
10    outside and inside general counsel work.
11    Q     All right.  And during the time that you were at the
12    Department of Commerce and also during the time you've been
13    in private practice, have you ever had to deal with issues
14    relating to registering LLCs for clients?
15    A     Very often.
16    Q     Okay.  And tell me, if you can, what is the purpose for
17    a limited liability corporation -- that's LLC, right?  What
18    is the purpose for an LLC to register with the Department of
19    Commerce?
20    A     Well, one of the key benefits of either incorporating,
21    if you're a corporation, or organizing, if you're a limited
22    liability company, is so that the owners of the company do
23    not -- do not incur personal liability for the activities of
24    the company or corporation.
25    Q     And harkening back to law school, it's something akin
```

1    to a corporate veil around your personal liability; is that

2    right?

3    A    Right.

4    Q    And if your registration lapses, and I think

5    Judge Warner used this term just a few minutes ago, you no

6    longer have that legal entity designation, right?

7    A    So what happens if you fail to file your annual report,

8    you become administratively suspended.  And then that

9    suspension then becomes dissolution if you do not seek to

10   reinstate your company within two years.

11   Q    And if you're suspended and ultimately -- by the way,

12   how often does this happen to companies?

13   A    Very often.

14   Q    And when a company's registration lapses, what's the

15   legal effect of once their legal entity status is dissolved,

16   what does that mean?

17   A    Well, so if a company reinstates within two years, then

18   whatever activities were done between the time of suspension

19   and reinstatement, it relates back as though you were never

20   suspended.  And so you have -- you have that corporate shell

21   reinstated for all of your past activities.

22   Q    And what happens if your lapse extends past two years?

23   A    So if it extends past two years, you're no longer able

24   to do what's called reinstating, but you can form a new

25   entity that has a new entity number with the state, and your

 1   activities between the time of dissolution of the company

 2   and forming a new company of the same name do not enjoy the

 3   protection -- the members or owners of the company do not

 4   enjoy that corporate shield for the activities in that time.

 5   Q    What, if any, legal impact does this lapse that makes

 6   you vulnerable as a business owner to personal liability,

 7   what, if any -- what, if any, effect does that have on your

 8   ability to continue doing business as a business in the

 9   State of Utah?

10   A    As a practical sense, it doesn't affect your ability to

11   continue to do business, but you're exposed to personal

12   liability.  You don't have that protection of the corporate

13   shield.

14   Q    So the people that get hurt when you don't register is

15   yourself, right, because you're opening yourself up to

16   liability?

17   A    Right.  Individuals that interact with a company that's

18   been expired, if they sue the company, they can also go

19   after the assets.  If they win a judgment, they can go after

20   the assets of the owners of that company.

21   Q    In all of the time that you've been practicing and when

22   you were at the Department of Commerce, are you ever aware

23   of anyone being prosecuted or held criminally responsible

24   for not reregistering their company with the Department of

25   Commerce?

1    A    Not ever.

2    Q    Okay.  All right.

3         After a company's registration lapses, are their

4    records still available to be viewed by anyone in the

5    public?

6    A    Anyone in the public can get on the website of the

7    Division of Corporations & Commercial Code and do a search,

8    and the search will come up with names and entities of

9    expired and active companies.  There is certain information

10   that is available without paying a fee, but if you pay like

11   a dollar or two, you can get all of the documents that have

12   been filed with the state, all the annual reports.  You will

13   also get a breakdown of who the managers and owners are, and

14   so forth, that's been reported.

15   Q    Just to refresh our memory, what does it mean when you

16   use the phrase D as in dog, B as in boy, A, dba, what does

17   that mean?

18   A    It means doing business as.

19   Q    And when someone -- are there any restrictions through

20   the Department of Commerce of a person's ability to do

21   business as a company without being registered?

22   A    No.  You do not have to register a dba, but there are

23   certain rights and opportunities that are foreclosed to you

24   if you do not register.

25   Q    And is it common or have you seen in your experience

1    that people use names other than their own when they're
2    establishing businesses?
3    A    All the time.  You may have heard the term sole
4    proprietor.
5    Q    Right.
6    A    A sole proprietor is someone who either does a business
7    in their own name or does it under a name they've made up,
8    but they're not a recognized legal entity separate from the
9    owner of that business.
10   Q    Okay.  Are you aware -- are there examples, for
11   example, in our own community where people do business as a
12   name that is not actually their name?
13   A    Well, I'm familiar -- there's a law firm that does
14   business here and in a couple other states, at least
15   California.  They're called Lincoln Law, and part of their
16   logo is a silhouette of what looks like Abraham Lincoln.  I
17   don't think he owns that or has anything to do with that
18   company, but I think the idea is that they like that sense
19   of we're country lawyers, Honest Abe type attorneys.  But to
20   my knowledge, none of the attorneys have Lincoln in their
21   name at all -- their personal names.
22   Q    Also the registered agent that was used in these
23   registration documents was an individual or an anagram
24   Derrick Roebuck?
25   A    Right.

1    Q    What is the significance of listing a registered agent
2    with the Department of Commerce?
3    A    The purpose of having a registered agent is so that
4    either the Department of Commerce or anyone who is wanting
5    to make contact with a company has an address and someone
6    that will receive the correspondence that is intended to go
7    to the operators of that company.
8    Q    And you were here when we talked about -- or when
9    Ms. Hackford-Peer talked about the investigator that went to
10   the address listed for the registered agent and it's a
11   business box at a UPS store.  Did you hear that?
12   A    Yes.
13   Q    Does that pose any problems?  Can you list a P.O. Box
14   as the place where the company collects its correspondence?
15   A    Well, so the government can have various addresses for
16   a company.  There is a place where you do business.  There
17   can be an address for where the registered agent can be
18   contacted.  So companies very often will use like a UPS
19   store for doing that, and that's kind of a gray area because
20   they don't like to have P.O. boxes.  But a UPS store, that's
21   kind of --
22   Q    It doesn't look like a P.o. Box.  It's an actual
23   business box?
24   A    Right.
25   Q    Okay.  That's interesting.

1      All right.  Do you personally know Rick Koerber?

2   A    I do.

3   Q    How long have you known Rick Koerber?

4   A    Since September of 2005.

5   Q    And when you -- starting in 2012 --

6   A    Excuse me.  August of 2005.

7   Q    And fast-forward to 2012, which is when this company

8   that's at issue here, Corvus Administration, was

9   incorporated.  Did you ever become aware at some point that

10  Rick did business under that company name?

11  A    Yes.

12  Q    How did you become aware of that?

13  A    He told me.  I believe it was 2015 that I became aware

14  of that.

15  Q    And at that time were you hiring him to do work for

16  you?

17  A    Yes.

18  Q    What type of work did he do for your firm?

19  A    He did research and writing, screening new cases coming

20  in.  He helped with some office administration types of

21  things.  And there was also at least one occasion where I

22  had his company effect process in an eviction case.

23  Q    Did you hire him as a W-2 employee or was he an

24  independent contractor?

25  A    Independent contractor.

```
 1   Q     And when you paid him, how was the -- how were the

 2   checks addressed, or who was it addressed to when you paid

 3   him?

 4   A     Corvus Administration.

 5   Q     Did he ever at any time that he worked for you -- so

 6   what was the period of time where he actually worked for you

 7   and did jobs for you?

 8   A     Beginning at the end of -- the latter part of 2015.

 9   Q     Up until even now?

10   A     Yeah.

11   Q     During all this time, has he ever used the name Derrick

12   Roebuck to conduct any business with you or a client?

13   A     No.

14            MS. NESTER:  May I approach?

15            THE COURT:  You may.

16   BY MS. NESTER:

17   Q     Do you recognize that?  It's a redacted document.  Do

18   you recognize it?

19   A     I do.

20   Q     When did you provide that to me?

21   A     This morning.

22   Q     And what is that?

23   A     It is a redacted copy of a bank account for my law

24   firm, my operating account, and it is a bank statement

25   covering the month of December 2015.
```

1    Q    What's attached to the cover sheet?

2    A    So attached to the cover sheet is a photocopy of check

3    number 0891 made out to Corvus Administration for $2,000.

4    Q    Do you remember what it was for?  I mean, if it's

5    privileged, don't say.

6    A    I don't.

7    Q    And what does that represent, that payment?

8    A    It just represents legal support services that I paid

9    him for.

10          MS. NESTER:  Your Honor, may I introduce this as

11   Defense Exhibit 7?

12          THE COURT:  I don't know if you may or not, but we

13   can find out.

14          MR. CLARK:  No objection, Your Honor.

15          THE COURT:  It will be received.

16          (Defendant's Exhibit 7 was received into

17   evidence.)

18          MS. NESTER:  With the Court's indulgence for just

19   a moment.

20   BY MS. NESTER:

21   Q    So since you have been employing Corvus Administration

22   for a period of years, how would you rate the reliability of

23   those services?  If you asked something to be done, how

24   reliable is it that it's going to be done with this company?

25   A    Quite reliable.  It may be 11:59 p.m., but it gets

1  done, and it gets done very well.

2  Q    So you have confidence in this company and you continue

3  to employ them?

4  A    Yes.

5  Q    And did you ever become aware at any time that this

6  company was engaging in any type of dishonesty with you or

7  your clients?

8  A    No.

9         MS. NESTER:  That's all I have, Your Honor.

10        THE COURT:  Thank you.

11        Cross-examination.

12        MR. CLARK:  Yes, Your Honor.

13                    CROSS-EXAMINATION

14  BY MR. CLARK:

15  Q    Mr. Skousen, good morning still.

16        You mentioned you were at the Department of Commerce.

17  How long was that?

18  A    About nine months.

19  Q    And why did you leave?

20  A    I could not -- when I initially took the job from

21  Governor Huntsman, I told him up front that I couldn't

22  afford to do the job very long, but I would help get some

23  things done that the transition committee had identified

24  that needed to be done at the Department of Commerce, but

25  that if the salary could be increased to measure up with

1    other department heads, that I could stay.

2         His position was all cabinet level officers should

3    receive the same pay, and so he authorized legislation to be

4    proposed that would put all cabinet officers on equal

5    footing.  We tried that.  And over the summer, it didn't

6    happen.  It couldn't happen.  The legislature actually was

7    set to approve only my salary to be increased, and we didn't

8    think that was a good idea, so I left.

9    Q    So you weren't asked to leave by anybody in the

10   administration?

11   A    Well, what happened was, because the legislation didn't

12   pass, a staff member of mine was looking around for maybe an

13   option for me.  And then a friend of mine offered to give me

14   a loan.  I did not take the loan, but that went to the

15   governor and he just said, nah, I don't want that to -- if

16   that gets out, that wouldn't look good.

17        Also -- and I agreed.  I never even seriously

18   considered taking that loan.

19        Also there was some controversy over a division head

20   that I terminated with the governor's and chief of staff's

21   approval, also the approval of my successor in the office.

22   He was head of the Division of Consumer Services, a part of

23   it, but he was sort of the utility advocate for small

24   businesses.  And so I terminated him.  That was quite

25   controversial, including cartoons of the governor kicking

1    this poor man out of office.

2        So anyway, it was a mutual departure.  But, yeah, I was

3    asked to go.

4    Q    Okay.  Now you didn't mention this in your direct

5    testimony, but you're actually related to Mr. Koerber; is

6    that right?

7    A    By marriage.  His wife is my first cousin once removed.

8    Q    Okay.  And you mentioned that he has done some work for

9    you, but there was a time when you were actually working for

10   him, right?

11   A    That is correct.

12   Q    You actually have been a part of both of the trials

13   that we've had for Mr. Koerber's case, right?

14   A    I have been a witness at both trials.

15   Q    And why were you a witness?

16   A    I was general counsel at one of his companies after I

17   left.

18   Q    Which one was that?

19   A    FranklinSquires.

20   Q    What about Founders Capital?

21   A    No.

22   Q    And I didn't take your testimony or your

23   cross-examination at trial, but am I remembering right that

24   you testified at some point that you got a business opinion

25   from Mr. Koerber on the way that Founders Capital was being

1    run?

2    A    I arranged for Mr. Koerber's companies to get a number

3    of legal opinions on various aspects of how his companies

4    were being run.

5    Q    And you got those opinions, but you're aware that a

6    jury of his peers found that he was committing fraud with

7    those companies, right?

8    A    I'm aware of the verdict.

9    Q    Okay.  And you mentioned -- you mentioned that he's

10   been a great employee for you.  Have you ever asked

11   Mr. Koerber to backdate any filings?

12   A    Never.

13           MR. CLARK:  One moment, Your Honor.

14           Nothing further.

15           THE COURT:  A couple of questions from the Court,

16   Mr. Skousen.  I appreciate you being here this morning.

17           It sounds like you left -- what was the official

18   name of the office you worked at?

19           THE WITNESS:  Executive director of the Department

20   of Commerce.

21           THE COURT:  Thank you.  It sounds like you left by

22   mutual agreement.

23           THE WITNESS:  Yes.

24           THE COURT:  Is that a fair statement?

25           THE WITNESS:  Yes.

 1          THE COURT:  All right.  That was after nine
 2   months?
 3          THE WITNESS:  So actually eight and a half months.
 4   August 15th, 2005 was my last day.
 5          THE COURT:  Mr. Belcher testified earlier that --
 6   I'd asked him to name five attorneys or law offices he'd
 7   worked for.  He mentioned Skousen.  Would you be one of
 8   those?
 9          THE WITNESS:  It would be my law firm, Skousen Law
10   firm.  It was Skousen and Penny previously.
11          THE COURT:  Did Mr. Belcher do any work for you?
12          THE WITNESS:  He did that one service of process
13   on the eviction matter, but that's the only thing --
14          THE COURT:  Did Mr. Koerber do any work for you on
15   the eviction?
16          THE WITNESS:  Yeah.  He helped draft pleadings and
17   so forth, but the actual service of process of the summons
18   and complaint was done by Mr. Belcher.
19          THE COURT:  Now you alluded -- and I don't
20   remember, candidly, whether it was from Ms. Nester or
21   Mr. Clark -- that you found Mr. Koerber's work
22   satisfactory -- or maybe better than satisfactory.  I don't
23   remember the exact adjective.  But then you said, and I
24   wrote this down, and I'm paraphrasing, but he had the
25   tendency at the last minute -- to do things at the last

1    minute, or 11:59, so to speak.  Can you just expand on that

2    a little bit for the Court.

3            THE WITNESS:  Well, Rick does a lot of work for a

4    lot of different people, and sometimes we don't get a

5    pleading drafted and filed until the deadline.  It's just

6    the nature of the practice at times.  But --

7            THE COURT:  Did that happen on more than one

8    occasion?

9            THE WITNESS:  Yeah, a number.

10           THE COURT:  A number of times?

11           THE WITNESS:  Yes.

12           THE COURT:  Did it tend to be a pattern, for want

13   of a better word?

14           THE WITNESS:  Yeah, that -- not every pleading,

15   but often enough that it was --

16           THE COURT:  Pattern is a fair word?

17           THE WITNESS:  -- irritating to me.

18           THE COURT:  I can understand that.

19           Thank you, Mr. Skousen.  I have no further

20   questions.

21           MS. NESTER:  Can I follow up on what Your Honor

22   just asked?

23           THE COURT:  You may.

24   //

25   //

```
 1                    REDIRECT EXAMINATION

 2   BY MS. NESTER:

 3   Q    In all the time that Mr. Koerber has worked for you,

 4   has he ever missed a deadline?

 5   A    There may have been once.  I don't remember a specific

 6   instance.  But it's just one of those times you just beg for

 7   forgiveness.

 8   Q    But you can't remember any?

 9   A    I don't remember a specific time.

10   Q    Okay.  Thanks.

11             THE COURT:  Any recross, Mr. Clark?

12                   RECROSS-EXAMINATION

13   BY MR. CLARK:

14   Q    Mr. Skousen, are you aware of Mr. Koerber missing

15   filing deadlines in this case?

16   A    No.  I'm not involved in those matters.

17   Q    So if he had missed multiple deadlines, you wouldn't be

18   aware of it?

19   A    No, not directly.

20             THE COURT:  All right.  Anything else, Ms. Nester,

21   on this witness?

22             MS. NESTER:  No, Your Honor.

23             THE COURT:  Mr. Skousen, thank you for your

24   testimony.  You may step down.  You're excused.

25             Ms. Nester, who do intend to call next?
```

```
 1                MS. NESTER:  Morgan Philpot, Your Honor.

 2                THE COURT:  Mr. Philpot, hold on one moment,

 3     please.

 4                We've been going for almost two hours.  Let's take

 5     a ten-minute break, or until noon, to give our court

 6     reporter a little break.  And I would like you all to

 7     reconvene promptly at noon straight up, if you would,

 8     please, and then we'll hear from Mr. Philpot.

 9                MS. NESTER:  Thank you, Your Honor.

10                THE COURT:  Court's in recess.

11                (Recess)

12                THE COURT:  Be seated, please.

13                Just one moment, Mr. Philpot.

14                Mr. Simms, before we call the Court to order,

15     would you come to the bench, please.

16                (Discussion held off the record.)

17                THE COURT:  Court will come to order.

18                Good afternoon.  I believe it is now afternoon.

19     We're back in session in the case of U.S. vs. Koerber --

20     Koerber, excuse me.  And, Mr. Philpot, if you'll step

21     forward and raise your right hand and be sworn.

22                     MORGAN PHILPOT,

23              Having been duly sworn, was examined

24                   and testified as follows:

25                THE COURT:  Sir, if you'd step around here and
```

1    have a seat in the witness box, and pull yourself up close

2    to the microphone, please.

3              And, Ms. Nester, you're free to proceed.

4              MS. NESTER:  Thank you, Your Honor.

5                        DIRECT EXAMINATION

6    BY MS. NESTER:

7    Q    Good afternoon.

8    A    Good afternoon.

9    Q    Could you please introduce yourself to Judge Warner.

10   A    My name is Morgan Philpot.

11   Q    And what do you do for a living?

12   A    I am an attorney.

13   Q    How long have you been an attorney?

14   A    2008 -- since 2008.

15   Q    And which -- are you barred in more than one state?

16   A    I am barred in Utah and Oregon.

17   Q    And what type of law do you practice generally,

18   Mr. Philpot?

19   A    I'm a street lawyer.

20   Q    What does that mean?

21   A    I do a little bit of everything, and primarily, I would

22   say, you know, being an attorney in Utah, a bit of criminal

23   defense, divorce, civil matters.  I have drafted agreements,

24   contracts, reviewed them, given general legal advice.

25   Q    Do you appear in state or federal, or both courts?

1    A    Both.

2    Q    What is your standing with the Utah State Bar?

3    A    I'm in good standing.

4    Q    What about with the State of Oregon?

5    A    Same.

6    Q    Have you ever had your license revoked or suspended?

7    A    No.

8    Q    Have you had any discipline actions pending right now

9    against you?

10   A    No.

11   Q    I want to talk -- first, I want to go back in time just

12   a little bit, and then we're going to jump up to just try to

13   pinpoint the relevant time frames.

14        What was the -- how did you first meet Rick Koerber?

15   A    I was introduced to him in 2012.

16   Q    And at that time where was Rick working?

17   A    I think -- I don't remember the name of the firm, but

18   he was working downtown when I met him.

19   Q    There's been an exhibit introduced into evidence, a

20   paycheck from Corvus Law Group.  Does that refresh your

21   memory?

22   A    I vaguely remember Corvus Law Group.  I don't think --

23   I could be wrong.  I think of him more as Corvus

24   Administration.

25   Q    So let's talk about that, then.  So the first time you

1    met Rick, was he doing business under that name, or do you

2    know?

3    A    Honestly, I don't know at that time.  In 2012, I don't

4    know.

5    Q    At some point did he start helping you out with tasks,

6    and projects, and jobs that you would hire him on?

7    A    He did.

8    Q    When did that start?

9    A    I think at the beginning of 2013.

10   Q    And you were in the courtroom when you saw Mr. Greg

11   Petersen, the U.S. Probation officer, get on the stand and

12   say that he had a letter from you dated probably July of

13   2013 -- or June?

14   A    That's correct, yeah.

15   Q    And you wrote that letter?

16   A    Yes.

17   Q    And in that letter you confirmed that Mr. Koerber did

18   work for you; is that right?

19   A    That's correct.

20   Q    And at that time did you pay him as a W-2 employee or

21   was he an independent contractor for you?

22   A    Independent.

23   Q    And when you paid him, what was the name of the

24   business that you paid?

25   A    Corvus Administration and Management.

```
 1   Q    And can you just talk a little bit about the type of
 2   work that you believed he was available to give your firm.
 3   A    Legal services.  If I needed something done, I trusted
 4   Rick.  I would say I trusted him then and came to trust him
 5   even more to do all sorts of things.
 6   Q    Like what?  Give me some examples.
 7   A    You know, research, writing, advice.  We've done -- you
 8   know, I've gotten his advice on jury trials, jury selection,
 9   motion practice, delivery service of process, investigation.
10   It's pretty comprehensive.
11   Q    Okay.  And when you worked with him, did he ever use --
12   what name has he always used when he works for you?
13   A    Well, I know him as Rick.  He has used Rick -- I mean,
14   I know him as Rick Koerber, but he'll typically -- I know
15   his family goes by Franklin, and I think that's primarily
16   because of the stigma that's been put upon him by so much
17   bad press, and he wants his children to be somewhat
18   protected from that.  So I've known him as Rick Franklin and
19   Rick Koerber.
20   Q    Has he ever used the name Derrick Roebuck at any time
21   with you or any of your clients, to your knowledge?
22   A    When you say like use it with them, as in representing
23   himself as Derrick Roebuck?
24   Q    Correct.
25   A    No.
```

1   Q    So during the time that he worked for you, did he work

2   for you steadily since 2013 until now, or were there gaps?

3   A    Steadily.

4   Q    Were you aware whether he was working for other law

5   firms around town as well or even --

6   A    I was aware.

7   Q    -- out of town?

8   A    Sorry.  I was aware.

9   Q    How were you aware of that?

10  A    I knew some of the attorneys.  I recommend him to other

11  attorneys.  I have worked with him in state and out of state

12  with attorneys, and he has a very good reputation with

13  everybody he works with.

14  Q    Can you -- Judge Warner was interested in some of the

15  firms he's worked for.  Do you know any off the top of your

16  head?

17  A    Yes.

18  Q    Give us some names of firms that have hired him as

19  Corvus.

20  A    You've already met Russ.  I don't know how they hire

21  him.  I'm not privy to those agreements, but I know he has

22  worked with -- and, again, I can't speak to whether or not

23  he has employment agreements, but he has worked and advised

24  the Federal Defender's Office in Nevada.  He has worked with

25  and advised CJA attorneys in Oregon.  He has worked with

1  several law firms here in town.  I think -- again, I hate to

2  speak on his behalf, but I can name the attorneys.  I'm not

3  sure I know --

4  Q    What are some of the names of attorneys?  Judge Warner

5  probably knows them.

6  A    Pearson Butler I remember.  I think he's given some

7  advice to them.  I can't remember these guys' names.

8  Q    Any large firms in D.C., New York that you're aware of?

9  A    Yeah.  There's a firm he has -- there's a firm he's

10 worked with out of California that we're working with now,

11 Call & Jensen.  There is a firm in D.C. I know he's got a

12 good relationship with.  I can't remember their name.  It's

13 one of the really big, nationwide firms.  One of those elite

14 firms, you know.  Those ones.

15 Q    Yeah.  They don't talk to me.

16     So you are comfortable telling Judge Warner that he was

17 doing legal work for not just you, not just Mr. Skousen, but

18 various firms in Utah and outside of Utah providing these

19 legal services, right?

20 A    Yeah.  I would probably be better at representing the

21 who versus the names of the entities and the relationship,

22 and the respect I know they have for him, because I've seen

23 it firsthand.

24 Q    And have you ever referred him out and had someone come

25 back and say, man, why did you send me that guy?  Are they

```
 1   satisfied when they talk back to you?
 2   A    Always.
 3   Q    And how is your relationship in terms of reliability?
 4   If you ask Rick to get something done, does he get it done?
 5   A    He does.
 6   Q    What's the time of day where Rick works the most?
 7   A    He's a night owl.
 8   Q    Okay.  All right.  So now I want to move forward a
 9   little bit to --
10   A    Can I?
11   Q    Go ahead.
12   A    But that doesn't do it justice, because he doesn't
13   sleep much.  So he's also a morning guy.
14   Q    That end of the morning.  I'm aware.
15        So I want to move forward just a little bit to a case
16   that has occurred in the District of -- or the state court
17   of Oregon, right?
18   A    Right.
19   Q    It's a case called Edwards vs. Fryberger.  Of did I get
20   them backwards?
21   A    Fryberger v. Edwards.
22   Q    Sorry.  I knew I would do that.  Fryberger v. Edwards.
23        I'm just now asking -- I'm not going to get into
24   attorney-client privileged information, so could you just
25   reveal, based on what's in public pleadings, the nature of
```

1   the case.  What is the case about?

2   A    It's a contract land dispute basically.

3   Q    Which is the party that you represent?

4   A    Edwards.

5   Q    And has there been litigation in this case?

6   A    Sort of.  That's the problem.

7   Q    Without revealing anything your client has told you,

8   and I'm not asking for that, can you explain the history of

9   the litigation just very briefly -- not crazy, but just very

10  briefly.

11  A    The law firm in Oregon who represents the plaintiff,

12  and I'll just be very blunt, has been one of the most

13  unpleasant, unprofessional law firms I've ever worked with.

14  They have made a very serious false misrepresentation to the

15  circuit court in Oregon on the record, which they failed to

16  correct, which gave rise to the necessity of our appeal.

17  Q    So the grounds for your appeal is this

18  misrepresentation that's on the record?

19  A    That's part of it.

20  Q    And I need to get a little more detail than that to put

21  this in context.  So at some point was there a default

22  judgment awarded?

23  A    There was, yes.

24  Q    Can you explain to Judge Warner -- he's done civil

25  practice as well here in court, he'll know, but just explain

```
 1    very briefly how that default judgment came to be.
 2    A    Sure.  It's very clear from the record that there have
 3    been arguments over whether or not and when pleadings would
 4    be amended in Oregon.  The strangely absent attorney in the
 5    government's case today, who does not make an affidavit, who
 6    made the misrepresentation to the court also, I believe
 7    deceived my firm in order to prolong the filing of amended
 8    pleadings.
 9    Q    And what is her name?
10    A    Her name is Danielle Lordi, L-o-r-d-i.
11    Q    And without getting into your personal opinions, your
12    lawsuit -- or your appeal is claiming she misled the court
13    in order to get the default judgment; is that right?
14    A    It is obvious she misled the court.  It is on the
15    public record.
16    Q    And that's what going up?
17    A    That's correct.
18    Q    And your client at some point made a decision to --
19    don't reveal what they said, but made a decision to move
20    forward appealing that default judgment on the grounds of
21    misrepresentation; is that right?
22    A    In part.
23    Q    All right.  And that's when these pleadings are being
24    filed, this notice of appeal that's before Judge Warner
25    today, right?
```

1  A     The notice of appeal, if I understand you correctly,

2  yes.

3  Q     Prior to -- has the firm in Oregon filed anything with

4  the state court alleging that your service of process was

5  somehow improper?

6  A     Not with the circuit court.

7  Q     With the appellate court?

8  A     They tried.

9  Q     And what happened?  What did the appellate court do

10 with their motion?

11 A     They rejected it.

12 Q     Has that firm refiled that motion in any way?

13 A     They have not.

14 Q     Has there been any request from the firm that's active

15 right now to set aside that service of process?

16 A     No.

17 Q     If that firm chose to challenge your service of

18 process, could they do that if they learned how to do it

19 correctly?

20 A     Yes.

21 Q     And then would that court be able to give them a remedy

22 in the civil matter?

23 A     Yes.

24 Q     So now let's talk about the service of process because

25 this is really important.  So explain to me how Oregon law

1    is different from other states in terms of how to effect the

2    service of process.

3    A    So I imagine you want me to get at probably two

4    different aspects, which is service of process and delivery?

5    Q    Correct.

6    A    So can I touch on both of them at once?

7    Q    Yes.

8    A    They are very liberal when it comes to both service of

9    process and delivery, and have a very unique law when it

10   comes to delivery of, in particular, notice of appeal.

11   Q    What makes their law unique?

12        MS. NESTER:  May I approach, Your Honor?  I have

13   the statute here.

14        THE COURT:  You may.

15   BY MS. NESTER:

16   Q    I'm handing you the Oregon statute to help refresh your

17   memory.  So what makes the Oregon statute unique about how

18   process is served there?

19   A    So, again, process and delivery are different.  And

20   specifically delivery when it comes to a notice of appeal is

21   even more different than that.  So there's kind of really,

22   actually several distinctions, but all of them fitting in

23   with Oregon's very liberal -- and I don't mean in a

24   political sense, but I mean in a more legal sense -- very

25   liberal ability to effectuate service and delivery.  And I

1    couldn't tell you the language exactly, but there's case law

2    in Oregon that goes specifically to effectuating service of

3    process that almost says --

4    Q    Well, stay away from the case law right now.  Let's

5    focus on what the rule says.

6    A    So that's the rule on delivery.  And this is the rule

7    on delivering a notice of appeal.  And a notice of appeal

8    can be delivered by dispatch.  I don't know if that's the

9    right way to put it, but it can be dispatched and the date

10   of dispatch is the date of filing, if I'm getting that right

11   with the Court.  If you don't mind, let me look at it again.

12        It says regardless of the date of actual receipt by the

13   court to which the appeal is taken --

14   Q    Slow down.

15   A    Regardless of the date of actual receipt by the court

16   to which the appeal is taken, the date of filing the notice

17   is the date of mailing or dispatch for delivery, and that's

18   fairly unique.

19   Q    So, in other words, it's kind of that old-fashioned

20   mailbox rule, almost, that we used to have before we had

21   electronic filing.  It's when you placed it in the hands of

22   the courier, right, when you dispatch it?

23   A    Well, dispatch --

24   Q    Or could mean when you request it to be served.

25   A    So, interestingly, Oregon doesn't do a lot of defining.

1    So dispatch is the delivery to the agent.

2    Q    That's going to deliver it?

3    A    That's correct.

4    Q    And do they specify in the rule whether or not -- what

5    type of deliverer you have to contract with?

6    A    Do you mind if I look at it real quick?  I kind of

7    remember, but I want to get it right.

8         So the notice can be mailed or dispatched via the

9    United States Postal Service or a commercial delivery

10   service.

11   Q    What is a commercial delivery service, to your

12   understanding?

13   A    It's a delivery service that takes money for their

14   service.  I would -- I guess -- anyway, yeah.

15   Q    Is it defined anywhere by the State of Oregon what a

16   commercial delivery service is?

17   A    It is not.

18   Q    Did you -- and let's just get the dates clear because

19   this is important too.  When the default judgment was filed,

20   what was the date your notice of appeal would have been due

21   under Oregon law?

22   A    It would have been March 4th.

23   Q    Why March 4th?

24   A    Because the date of filing of the notice of appeal is

25   30 days from the entry of judgment.

1    Q    Okay.  And what was the 30th day?

2    A    The 30th physical day?

3    Q    Yes.

4    A    The 2nd of April.

5    Q    March you mean.

6    A    Sorry.  The 2nd of March, yeah.

7    Q    What day of the week was the 2nd day of March?

8    A    Saturday.

9    Q    So what happens when the filing deadline falls on a day

10   when the courthouse is closed?

11   A    It would be due the next business day.

12   Q    Which was what day?

13   A    March 4th.

14   Q    March 4th was your deadline to dispatch the documents

15   for service?

16   A    That's correct.

17   Q    Okay.  Now the Court has already introduced -- or

18   accepted the receipt made out by Corvus Administration dated

19   March the 2nd, and you're aware of that document, right?

20   A    Yes.

21   Q    Let me bring it to you now.

22            MS. NESTER:  May I approach, Your Honor?

23            THE COURT:  You may.

24   BY MS. NESTER:

25   Q    So you have in front of you what's already been

1    introduced by the government in this case.  Do you recognize

2    that receipt?

3    A    I do.

4    Q    Who issued the receipt?

5    A    Corvus Administration.

6    Q    And what is the date on the receipt?

7    A    March 2nd, 2019.

8    Q    So the dispatch date for purposes of Oregon law would

9    have been what date?

10   A    March 2nd, 2019.

11   Q    And that preceded even by two days your deadline?

12   A    That's correct.

13   Q    All right.  Then is there any requirement that it must

14   be delivered within a certain number of days?

15   A    No.

16   Q    Okay.  Is there a reference to three days in the rule?

17   A    There is.

18   Q    What is that reference?

19   A    In my opinion, you have to have a good faith basis that

20   it's going to be calculated to be delivered within three

21   days.

22   Q    That's what it says in the rule, right?

23   A    Yes.

24   Q    Okay.  So talk to me about how you dispatched this

25   notice of appeal filing to Corvus Administration for

1    delivery.

2    A    I told Rick to get it done.

3    Q    And did he charge you for that?

4    A    He did.

5    Q    And are the dollar amounts that are reflected on that

6    receipt the correct dollar amounts?

7    A    They are.

8    Q    And do you have a personal recollection that you asked

9    him to do it over the weekend, or that Friday, or that

10   Monday?  Do you remember when you asked him specifically to

11   do it?

12   A    As soon as humanly possible.

13   Q    No.  No.  Not deliver it.  When did you ask him, when

14   did you first ask him?

15   A    Well, I know we had discussed it prior to this.  But

16   this was -- I'm not sure I understand you.  This was the

17   date of dispatch, so this would be the day I asked him to do

18   it.

19   Q    March 2nd?

20   A    That's correct.

21   Q    Okay.  Did you give him any restriction as to

22   specifically how it was to be delivered or a request as to

23   how it was to be delivered?

24   A    By hand.

25   Q    And did you follow up with him to determine whether it

1    was being served?

2    A    I did.

3    Q    What did you learn about how it was served?

4    A    Well, it was served by Maureen Peltier.

5    Q    Who is Maureen Peltier?

6    A    A woman and acquaintance who lives in Oregon.

7    Q    And to your understanding, did Maureen Peltier give you

8    a declaration of her service of these documents?

9    A    She did.

10   Q    And was there anyone that accompanied her to service of

11   these documents?

12   A    Her husband.

13   Q    And what does her husband look like?

14   A    He is maybe five -- I'm not real good with heighth.

15   Five ten-ish, and kind of a portly dude with a grayish,

16   brownish beard and grayish, whitish long hair.

17   Q    How long is his hair?

18   A    I think probably roughly here.  (Indicating shoulders)

19              MS. NESTER:  May I approach, Your Honor?

20              THE COURT:  You may.

21   BY MS. NESTER:

22   Q    What is this document I'm handing you?

23   A    This is the declaration of Maureen Peltier.

24   Q    When did you obtain that from her?

25   A    I obtained this from her on May 30th, 2019.

1    Q    And is that a true and accurate description of the

2    declaration that she -- is that her signature at the bottom?

3    A    That is.

4    Q    And did you speak to her before that declaration?

5    A    I did.

6    Q    And how was the declaration prepared?

7    A    I prepared it.

8    Q    Based on what?

9    A    Based upon my conversation with her and my

10   understanding of the events.

11   Q    Did you give her the opportunity to correct it or amend

12   it?

13   A    I did.

14   Q    Did she make any corrections or amendments?

15   A    I don't think so.  She said it was absolutely correct.

16   Q    All right.

17             MS. NESTER:  Your Honor, at this point I would

18   like to move into evidence the declaration of Maureen

19   Peltier.

20             THE COURT:  Objection?

21             MR. CLARK:  No, Your Honor.

22             THE COURT:  It will be received.

23             MS. NESTER:  Defense Exhibit 8.

24             (Defendant's Exhibit 8 was received into

25   evidence.)

1        THE COURT:  Would you hand that up, please.

2        MS. NESTER:  Yes, sir.

3    BY MS. NESTER:

4    Q    So Ms. Peltier lives where?

5    A    In Oregon.

6    Q    With her husband, right?

7    A    Yes.

8    Q    And according to her statement, she was retained by

9    Corvus Administration to hand deliver the documents; is that

10   right?

11   A    That's right.

12   Q    The receipt that you have in front of you, there's the

13   initials MP.  Are those your initials?

14   A    They are not.

15   Q    Whose initials are those?

16   A    Those would be Maureen Peltier's.

17   Q    And what is your understanding, based on her

18   declaration, of when she affixed her initials to that

19   document?

20   A    I believe it was the 8th of March.

21   Q    When she did what?

22   A    Delivered.

23   Q    And that document is attached to an affidavit from a

24   legal assistant up in the law firm in Oregon, is that right,

25   and that's what she received?

```
 1           It may not be in the version I gave you.  Sorry.
 2    A      I see a declaration of Kristi L. Tubbin.  This is
 3    attached to Kristi L. Tubbin's.  Is that the one you want me
 4    to look at?
 5    Q      Yes.
 6    A      And what was the question?
 7    Q      And she's stating in her document that that was what
 8    she was handed?
 9    A      That's correct.
10    Q      Do you have personal knowledge -- were you in
11    communication with Maureen during the time that you are
12    anxiously awaiting for the documents to be delivered?
13    A      Yes.
14    Q      In what way did you communicate with her?
15    A      Phone calls by voice and text.
16    Q      And you personally talked about it with her, or her
17    husband, or both?
18    A      Both.
19    Q      And what was the nature of your communication with
20    them?
21    A      You're getting this done, right.
22    Q      And do you still have those texts?
23    A      I do.
24    Q      And did you review them before testifying today?
25    A      I did.
```

1    Q    And is it consistent with your testimony?

2    A    Yes.

3    Q    Right now has there been any move to set aside your

4    appeal as being improper in any court other than this one?

5    A    Well, the motion you mentioned earlier that the court

6    rejected.

7    Q    Right.  So right now your appeal still stands?

8    A    Yes.

9    Q    So if the opposing counsel has a good faith dispute

10   with you about whether Corvus Administration fits the

11   definition of a commercial delivery service, what would be

12   the avenue they could deal with that in Oregon?

13   A    They could file something with the court of appeals in

14   Oregon.

15   Q    Okay.  And they haven't --

16   A    Well, actually, sorry.  Can I correct that?  They have

17   a duty to meet and confer.  But as is typical of them, they

18   do not do that.

19   Q    And that's a pattern with them?

20   A    Yes, and that is why the court rejected their document.

21            MS. NESTER:  One moment, Your Honor.

22   BY MS. NESTER:

23   Q    Has anyone from U.S. Probation called you to interview

24   you about how this happened and what this was all about?

25   A    Not at all.

1  Q    Has anyone from the law firm, other than their motion,

2  which was your first notice, called you and said, hey,

3  what's up, who delivered this?

4  A    No.

5  Q    How much money do the lawyers that file these

6  affidavits stand to gain if your service of process is set

7  aside?

8  A    I don't know what their agreement is, but there are

9  millions of dollars at stake, and a family ranch, a very

10 valuable family ranch in eastern Oregon.

11 Q    And it would end the allegation that they made a

12 misrepresentation to a court --

13 A    That's correct.

14 Q    -- on the record?  That would go away too?

15 A    Yes.  Well, sorry.  That's not necessarily true.

16 Oregon allows for me to challenge in the circuit court as

17 well as the appellate court, which I intend to do.

18 Q    Did Rick Koerber ever make any representation to you

19 about the service of this process that ever turned out to be

20 untrue?

21 A    No.

22 Q    Did Rick Koerber make any representations at all to the

23 court in Oregon?

24 A    No.

25 Q    Who sent the receipt and the notice to the court?

1  A    That is -- I'm the one who attests to the court
2  relative to service of process.
3  Q    Is there anything on that receipt that's in front of
4  you that is not true, that was filed with the court?
5  A    No.
6  Q    If you had some nefarious intent, which date would it
7  have made more sense to you to lie about that you dispatched
8  it?  Which date would have given you the most possible time
9  to serve it?
10      Do you understand what I'm asking you?
11 A    I think so.  Can I look at the rule again and just
12 think about this for a sec?
13 Q    Yeah.
14      So let me ask it this way so it's not so opaque.
15 A    Sure.
16 Q    If you had stated on the receipt that you dispatched it
17 on the 4th, that still would have met your deadline under
18 the law, right?
19 A    That's correct.
20 Q    And that would have given you extra time to serve it,
21 right?
22 A    That's correct.
23 Q    So the best position you could have been in if you were
24 going to fake the date or backdate it, as Mr. Clark
25 suggested, would be to put it on the 4th?

```
1    A     That's correct.
2    Q     And instead you put the date you actually dispatched
3    it, which is the 2nd?
4    A     That's correct.
5          MS. NESTER:  Just a moment, with the Court's
6    indulgence, please.
7          That's all I have, Your Honor.
8          THE COURT:  Thank you.
9          Cross-examination, Mr. Clark.
10         MR. CLARK:  Yes, Your Honor.  Thank you.
11                    CROSS-EXAMINATION
12   BY MR. CLARK:
13   Q     Good afternoon, Mr. Philpot.
14   A     Good afternoon.
15   Q     You described the other law firm as unpleasant and
16   unprofessional.  I think that's what you used, right, as the
17   term?
18   A     Yes.
19   Q     Has anyone ever described your law practice that way?
20         MS. NESTER:  Objection, Your Honor.
21         THE COURT:  Overruled.  The rules of evidence are
22   relaxed in this.
23         THE WITNESS:  I would imagine somebody somewhere
24   has.
25   //
```

BY MR. CLARK:

Q    But never to your face I guess is what you're saying?

A    I'll think about that.  I think I've probably had my wife tell me that a time or two.

Q    Oh, okay.

You mentioned that millions of dollars were at stake here?

A    Yes.

Q    And a family ranch as well?

A    Yes.

Q    What would have happened if the notice of appeal was untimely?

A    That would be up to the -- we'd probably just ask for an extension of time.

Q    So you weren't at risk of losing $4 million -- or millions of dollars in a family ranch if the notice of appeal was untimely?

A    I imagine if it ultimately is found untimely, my client will probably seek redress with the court of appeals, the Supreme Court of Oregon, and the Circuit Court of Harney County.

Q    And that would have been probably against you and your firm, then?

A    I'm not sure what would be.

Q    If your client asked you to file a notice of appeal and

1    you were untimely and the court rejected your notice of

2    appeal, they'd come after you, right?

3    A    They probably could, yeah.

4    Q    You mentioned that you put together this declaration

5    for Maureen Peltier?

6    A    That's correct.

7    Q    Do you have that in front of you?

8    A    I do not.

9    Q    Okay.

10          THE COURT:  I have the Court's copy.  I'll let you

11   use that.

12          THE WITNESS:  Thank you, Your Honor.

13          THE COURT:  It's the exhibit actually.  It's not

14   the Court's copy.  It is the exhibit.

15   BY MR. CLARK:

16   Q    Mr. Philpot, who is Maureen Peltier?

17   A    Like objectively, subjectively?

18   Q    Why are you employing her or why is Corvus employing

19   her to deliver a notice of appeal in Oregon?

20   A    To get it done, I guess.

21   Q    Why are you choosing her?

22   A    She was available.

23   Q    How do you know her?

24   A    I met her when I was in Oregon for a trial.

25   Q    Okay.  Any more details than that, or you just met her

1    in Oregon?  How do you know her, Mr. Philpot?

2    A    I met her -- I don't know what -- tell me what you're

3    getting at and I'll tell you.  I met her in Oregon.

4    Q    In what capacity did you meet her?

5    A    I don't know.  It'd just help if we'd cut to the chase.

6    I mean, as a person I guess.  I don't know what you mean.

7    Like outside the courthouse, inside the courthouse, as a

8    nice person?

9            THE COURT:  Mr. Philpot, I think you know what

10   he's asking.  It's a relatively straightforward question.

11   What's the nature of the relationship?  How did you meet

12   her?  Is she employed in a business?  Is she working for

13   somebody?  Please just answer the question.

14           THE WITNESS:  Sorry.  I honestly didn't understand

15   that.  I met her at the Ammon Bundy trial in Oregon.  She

16   was a frequent attendee, a very nice person, came up said

17   hi, introduced herself, and just -- that's about it, I

18   guess.

19   BY MR. CLARK:

20   Q    What was she doing there?

21   A    I guess you'd say she was a supporter of Ammon Bundy.

22   Q    What does she do for a living?

23   A    I don't know.

24   Q    Really.  You mentioned you drafted this, and it's

25   not -- maybe you can help me understand.  What day did

1  Ms. Peltier receive this hand delivered notice of appeal?

2  A    I believe it was March 8th.

3  Q    You're looking there at paragraph six -- or sentence

4  six, whatever you'd call it?

5  A    Yes.

6  Q    So she received it March 8th?

7  A    I believe so, yeah.

8  Q    As you note here -- or she notes that she received and

9  completed the delivery, and that's March 8th, 2019?

10  A    Correct.

11  Q    So under your calculation, that would be four days

12  after -- four days after the notice of appeal deadline?

13  A    Yes.

14  Q    And six days after you had dispatched it with Corvus?

15  A    That's correct.

16  Q    Do you have the exhibits up there in front of you,

17  Mr. Philpot?

18  A    I do.

19  Q    Do you have the receipt that was page 13 of

20  Government's Exhibit 1?

21  A    I do.

22  Q    And, again, there's the initials MP here next to your

23  name, right?

24  A    That's correct.

25  Q    But you're saying that's not you?

1   A    That's correct.  I believe -- do you want me to

2   explain?

3   Q    Sure.

4   A    I believe that's Maureen's indication that she

5   delivered.

6   Q    Okay.  And you chose Maureen, or Corvus chose Maureen

7   just because you happened to know her and meet her during

8   the Bundy trial in Oregon?

9   A    Yeah, I guess, and we trusted her to do it, I think.

10           MR. CLARK:  One moment, Your Honor.

11           No further questions.

12           MS. NESTER:  Can I follow up, Your Honor, just

13   very briefly?

14           THE COURT:  Yeah.

15           MS. NESTER:  Thank you.  Just very briefly.

16                   REDIRECT EXAMINATION

17   BY MS. NESTER:

18   Q    Was there attempts to find other people locally in

19   between when Ms. Peltier got the documents and -- do you

20   know whether there was an attempt to find someone else and

21   it fell through?

22   A    I think Corvus -- you know, Rick tried to.

23   Q    So that explains why it was delayed a little bit?

24   A    Yeah -- well, yeah.

25   Q    Do you know who he tried to reach out to that ended up

 1  not doing it?

 2  A    I don't, but I bet if you refresh my memory, I would

 3  remember.  I mean the names are probably familiar to me.

 4          MS. NESTER:  That's all I need.  Thank you,

 5  Your Honor.

 6          THE COURT:  I've got a few questions of my own,

 7  Mr. Philpot.

 8          THE WITNESS:  Sure.

 9          THE COURT:  You indicated, sir, that you've been

10  practicing since 2008, and you've worked with Mr. Koerber a

11  number of times.  You've referred him to other attorneys.  I

12  can't recall.  Would you tell us who you referred him to.

13          THE WITNESS:  I think I can give you names.

14          THE COURT:  Please.

15          THE WITNESS:  And I would say more than referring,

16  vouching for him.

17          If I go back, I've had many conversations with

18  Russ Skousen.  We both, I think, have similar, mutual

19  feelings about him.  I have not only worked with him in

20  conjunction with other attorneys, but we've helped represent

21  attorneys like Dan Whiting from -- I always want to call

22  them Carson Butler, but that's the owner's name.  It's

23  Pearson Butler.

24          I have vouched for him and he has worked with Matt

25  Schindler, Bob Salisbury in Oregon.  He has worked with the

```
 1    Federal Defender's Office in Oregon.  I have vouched for him
 2    and worked with him with Call & Jensen, as I mentioned, in
 3    California.
 4              THE COURT:  Any local attorneys, Mr. Philpot?
 5              THE WITNESS:  I'm a little bit protective of him
 6    here because I don't want to lose his services for me.
 7              THE COURT:  You're under oath and I'm asking you a
 8    question.
 9              THE WITNESS:  No. I don't mean in that way,
10    Your Honor.  I don't mean protective in that way.  I mean,
11    anybody else he goes to work for is less time he gets to
12    work for me.
13              So locally, Pearson Butler.  I have recommended
14    him to an old law school buddy of mine, Austin Hepworth.  I
15    think pretty much everybody I ever have pleasant
16    associations with, I recommend him and vouch for him,
17    Your Honor.
18              THE COURT:  Okay.  Now Corvus was not primarily in
19    the business of commercial delivery services, were they?
20              THE WITNESS:  If I were to cite an objection, I'd
21    say that's irrelevant.  They do that service absolutely, and
22    they did it for me.
23              THE COURT:  You're saying my question is
24    irrelevant?
25              THE WITNESS:  Well, sort of, because the Oregon
```

1   law --

2              THE COURT:  I think, Mr. Philpot, you have the

3   roles reversed.

4              THE WITNESS:  I know, Your Honor.

5              THE COURT:  My questions are always relevant.

6              THE WITNESS:  I'm sorry, Your Honor.  It's just

7   I'm thinking of the Oregon law and it doesn't require that,

8   but yes, he's not --

9              THE COURT:  I'm not saying what the Oregon law

10  requires.  I'm asking you from your experience with Corvus.

11             THE WITNESS:  They're not primarily in the

12  business of commercial delivery.

13             THE COURT:  That's what I thought.

14             THE WITNESS:  I think.

15             THE COURT:  Okay.  And as an example, Mr. Philpot,

16  you're familiar with FedEx, and DHL, and UPS, and other

17  commercial delivery services, correct?

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  How much did you pay Corvus to

20  deliver?  Over $200, correct?

21             THE WITNESS:  Yes, Your Honor.

22             THE COURT:  How much would FedEx charge to send a

23  package to the court up in Oregon?  Do you have any idea?

24             THE WITNESS:  I could probably guess, Your Honor,

25  that it would end up being, if I wanted certified hand

```
 1    delivery, you know -- what do they call that, return receipt

 2    requested -- that I'm probably looking at 45 bucks,

 3    somewhere in there.

 4              THE COURT:  Maybe at the outside.

 5              So, Mr. Philpot, you had available to you any

 6    number of commercial delivery services, correct?

 7              THE WITNESS:  No.

 8              THE COURT:  You didn't?  You don't have DHL?  You

 9    don't have UPS?  You don't have FedEx available to you?

10              THE WITNESS:  To accomplish what I want,

11    Your Honor.  I did not want that.

12              THE COURT:  You didn't want FedEx, as an example?

13              THE WITNESS:  No.

14              THE COURT:  What was wrong with FedEx delivering

15    notice of appeal papers?

16              THE WITNESS:  Because I was on March 2nd with

17    potentially having to live with a deadline that was either

18    March 2nd, March 4th, March 7th, March 8th, depending on how

19    the Utah Court of Appeals would interpret the calculated to,

20    and I wanted it hand delivered by somebody I knew and

21    trusted.

22              THE COURT:  Okay.  So even though FedEx has a

23    worldwide organization and reputation, you didn't trust

24    FedEx, correct?

25              THE WITNESS:  I guess not.
```

```
 1                    THE COURT:  But you trusted Corvus, including a

 2      woman, to deliver this documents -- or these documents, that

 3      you had met in Oregon during the trial, really didn't know

 4      what her business was, didn't know what she does, but you

 5      trusted her, but not FedEx; is that correct?

 6                    THE WITNESS:  Yes.

 7                    THE COURT:  Okay.  That's what I wanted to know.

 8                    And you were willing to pay three, four, five

 9      times as much for the delivery by this woman, Ms. Peltier,

10      rather than go through a commercial operation such as FedEx?

11                    THE WITNESS:  Yes.

12                    THE COURT:  And do you know why Mr. Koerber sent

13      these appeal documents to Ms. Peltier as his agent in

14      Oregon?

15                    THE WITNESS:  To get them delivered.

16                    THE COURT:  No.  I mean why her as opposed to

17      anyone else.

18                    THE WITNESS:  Because I recommended he use her.

19                    THE COURT:  Okay.  You didn't just send them

20      yourself?

21                    THE WITNESS:  No.

22                    THE COURT:  You paid him 200 plus dollars to send

23      them?

24                    THE WITNESS:  Yes.

25                    THE COURT:  Okay.
```

1          THE WITNESS:  Can I elaborate, Your Honor?

2          THE COURT:  Sure.

3          THE WITNESS:  Some of my specific communications

4    that day to Ms. Peltier was that the documents would be

5    coming from Corvus Administration.

6          THE COURT:  How much was she paid to deliver, do

7    you know?

8          THE WITNESS:  $300, Your Honor.

9          THE COURT:  She was paid $300?

10         THE WITNESS:  Yes, Your Honor.

11         THE COURT:  Who paid that?

12         THE WITNESS:  I had to pay that, Your Honor.

13         THE COURT:  So you paid, if I'm understanding this

14   correctly, Mr. Koerber 209 -- was it $209?

15         THE WITNESS:  Yes, Your Honor.

16         THE COURT:  And then you paid an additional $300

17   to Ms. Peltier?

18         THE WITNESS:  Yes, Your Honor.

19         THE COURT:  So you paid over $500 for this service

20   that FedEx could have done for you for under 50 bucks,

21   correct?

22         THE WITNESS:  I disagree with that

23   characterization, but that is correct.

24         THE COURT:  Thank you.  I have no further

25   questions.

1              Follow-up, Ms. Nester?

2                 FURTHER REDIRECT EXAMINATION

3    BY MS. NESTER:

4    Q    If Judge Warner asked you if you -- why didn't you just

5    hire her yourself, would that have complied with the Oregon

6    rule?

7    A    If I had hired Maureen?

8    Q    Yeah.

9    A    As my dispatch?

10   Q    Yeah.

11   A    Yeah.

12   Q    Okay.  And also has FedEx ever messed up a delivery for

13   you in the past?

14   A    I don't use FedEx.  I think I have used it for -- I've

15   just -- I don't regularly use it, especially in the day of

16   electronic filing and a notice of -- well, anyway.  You

17   probably don't want me to elaborate.

18   Q    It doesn't matter.

19        If there was a contesting of whether something was

20   properly filed, would it be more prudent to have someone you

21   could call to testify about the physical delivery of the

22   documents rather than just a delivery person?

23   A    My opinion, yes.

24            MS. NESTER:  That's all I have.  Thanks,

25   Your Honor.

```
 1                    THE COURT:  Thank you.
 2                    Any redirect -- or, excuse me, recross, Mr. Clark?
 3                           RECROSS-EXAMINATION
 4    BY MR. CLARK:
 5    Q     Mr. Philpot, how did Ms. Peltier get the documents
 6    herself?
 7    A     She received them from Corvus.
 8    Q     How?
 9    A     I believe she went to a local print shop where Corvus
10    sent them to her and they were printed out so she could
11    deliver them.
12    Q     And Corvus gave them to her, then, on March 8th for her
13    to print out?
14    A     I believe so.
15    Q     So four days after the deadline?
16    A     That's correct.
17    Q     And six days after you say you dispatched it to Corvus?
18    A     That's correct.
19                    MR. CLARK:  Thank you, Your Honor.
20                    THE COURT:  Thank you.
21                    Anything else, Ms. Nester?
22                    MS. NESTER:  Not with this witness, Your Honor.
23                    THE COURT:  Thank you, Mr. Philpot.  If I could
24    have that exhibit back.
25                    Thank you for your testimony.  You're excused and
```

1   you may step down.

2           MS. NESTER:  May I grab my paperwork?

3           THE COURT:  Sure.

4           Ms. Nester, you may call your next witness.

5           MS. NESTER:  May I have just five minutes to talk

6   to my client?  I think we might be done, but I just want to

7   make sure.

8           THE COURT:  Sure.  Let's take a short five-minute

9   recess.  I do mean five minutes.  You're free to get up and

10  mill about, but we'll reconvene in five minutes.

11          Court's in recess.

12          (Recess)

13          THE COURT:  Court will come to order.

14          We're back in session in the case of U.S. vs.

15  Koerber.

16          And, Ms. Nester, are you prepared to call your

17  next witness?

18          MS. NESTER:  Your Honor, first I would like to --

19  I think it might be helpful to the Court if I could tender

20  as Defense Exhibit No. 9 the Oregon statute about delivery.

21  I think it might be helpful to you.  It's just an e-mail

22  that I cut and pasted it out of Oregon, but I represent to

23  you this is the statute.

24          MR. CLARK:  No objection, Your Honor.

25          THE COURT:  Then it will be received, and please

1    bring it up to the bench.

2           Thank you.

3           (Defendant's Exhibit 9 was received into

4    evidence.)

5           MS. NESTER:  Your Honor, at this time we do not

6    have any more documentary or witness testimony.  We

7    certainly do want an opportunity -- if the Court needs to

8    hear more from us, we're prepared to do that, but we are

9    done with the evidentiary part of our presentation.

10          THE COURT:  Okay.  Thank you.

11          Then let me ask the government, do you have any

12   rebuttal?

13          MR. CLARK:  No, Your Honor.

14          THE COURT:  Okay.  Are both sides ready to argue

15   the violation issue?

16          MR. CLARK:  Yes.

17          THE COURT:  Ms. Nester?

18          MS. NESTER:  Yes, sir.  I'm sorry.

19          THE COURT:  And will it be you or will it be

20   Ms. Oberg?

21          MS. NESTER:  It will be me.

22          THE COURT:  Okay.  Let's go ahead and hear

23   argument.  We'll hear -- I believe, Mr. Clark, you were

24   going to do the argument; is that correct?

25          MR. CLARK:  Yes.

1              Your Honor, we submitted a filing a few days ago

2    to try to preview for the Court what essentially our

3    position was, but it's essentially this.

4              THE COURT:  I did review that, by the way.

5              MR. CLARK:  So that will save us some time.  But

6    it's essentially this, Your Honor, that Mr. Koerber lied

7    either when he filled out the business registration for

8    Corvus on March 6th, 2019, or when he filled out -- when he

9    initialed the notice of appeal on March 2nd, 2019.  Both of

10   those things cannot be true, and either way, one of those

11   lies has violated Utah statutes.

12             We have heard a lot of testimony today that really

13   is peripheral.  It doesn't really matter whether they

14   qualify for commercial delivery services, at least in the

15   United States' mind.  It's that Mr. Koerber lied in one of

16   those two ways and he violated the statutes by doing that.

17             THE COURT:  Is that it?

18             MR. CLARK:  I think so, Your Honor.

19             THE COURT:  I like a man who gets to the point.

20   Thank you, Mr. Clark.

21             Ms. Nester, please.

22             MS. NESTER:  Thank you, Your Honor.

23             Your Honor, right now I'm just going to follow the

24   Court's instruction and only apply it to the violation and

25   preserve argument for later, if there needs to be a later.

1          THE COURT:  I appreciate that.  We're bifurcating,

2    so I just want to hear on the violation.

3          MS. NESTER:  I understand.

4          Your Honor, apparently -- first of all, the

5    affidavits that were submitted contain statements that are

6    just flat-out not true.  Mr. Koerber did not serve process

7    in Oregon, which is what they indicated in their affidavits.

8    The fact that Corvus --

9          THE COURT:  They didn't identify him.

10         MS. NESTER:  Correct.

11         THE COURT:  They described an individual, a

12   gentleman who served them.

13         MS. NESTER:  You know what, Your Honor, they put

14   that allegation in their motion that they filed with the

15   Court.  I don't believe that's in front of you right now,

16   and I apologize.  I'll strike that.  But they did make that

17   allegation.

18         THE COURT:  Okay.

19         MS. NESTER:  The question here is was there an

20   attempt to commit a fraud on the Court, is there a lie

21   somewhere, is there something that committed a crime.  And

22   in this particular case, Your Honor, there has been no

23   evidence that Mr. Koerber submitted anything untrue in his

24   receipt.  Morgan Philpot is the lawyer that signed the

25   affidavit that said that was a true and accurate receipt.

1    You have a declaration from the woman who confirmed that it

2    was served in the way that it was served.

3              As Your Honor knows, if you're going to establish

4    a fraud, you have to have an intent to misrepresent and know

5    that people are going to detrimentally rely on a falsity.

6    There has been no evidence of a falsity.

7              The only argument that they seem to be making now

8    is that the registration where they list the date of their

9    new registration is somehow a lie, and it's not.  It's the

10   day that the registration begins, and it's the only date

11   they're able to enter on the form.  They admitted on the

12   form they had been previously registered.  They used the

13   same EIN number.  The Department of Commerce has all their

14   records.  There is nothing that prohibits Corvus

15   Administration from doing business without having their

16   registration up to date.  It's just on them if they get

17   sued.  That's it.  There's nothing that prevents that.

18              THE COURT:  That's according to Mr. Skousen.

19              MS. NESTER:  That's according to the law,

20   Your Honor.  I mean, there's a lot of businesses that do

21   business that have expired corporate records.  It's a common

22   thing in the business world.  It's not a crime.  It's to his

23   own detriment, because if he did something while he was

24   acting as Corvus, they can sue him and they can pierce the

25   veil, as you remember, and go after his personal assets, of

1    which he has none.

2              But I think in order for them to take away this

3    man's liberty and say that he's committed a crime, they have

4    to have evidence of the crime.  You had a probation officer

5    tell you that her sole reason for filing the revocation are

6    these affidavits from the law firm in Oregon, that stand to

7    gain, losing allegations of a dishonesty on a record, and

8    about $4 million, and that's it.  They are not here.  They

9    cannot be cross-examined.  The government has -- I have not

10   seen any evidence that they've introduced other than the

11   corporate records, which have no falsities on it.

12             The use of the name is permissible.  You can use

13   other names.  You can make up names.  You can be whoever you

14   want to be on a corporate record as long as you are

15   registered.  He openly did business in this community and in

16   multiple other states as Corvus.  His picture is on his

17   e-mails.  He's using his legally defined name.  He does not

18   ever represent himself to be Derrick Roebuck, ever.

19             And, Your Honor, we're talking about a man that's

20   been on pretrial -- well, I'll get into that in the next

21   section.  But as far as proof of a falsity, there is not

22   proof of a falsity.  If that firm wants to argue that Corvus

23   doesn't meet the definition of a commercial delivery

24   service, great, file a motion and let a judge in Oregon

25   decide if it meets a commercial delivery service.

1          Interestingly, Mr. Koerber never represented on

2     any document that he's a commercial delivery service,

3     nowhere.  It doesn't say that on the receipt.  It just has

4     his business name, which is true.  His business address.

5     How much he was paid.  What he was hired to do, and that's

6     true.

7          So, Your Honor, I mean to try to take away this

8     man's liberty for doing a job he was hired to do, directed

9     to do by a lawyer who's barred in Oregon, there's simply not

10    a case to do that here.  And I'm happy to answer any

11    questions you have.

12              THE COURT:  I appreciate that, Ms. Nester.

13              MS. NESTER:  Thank you.

14              THE COURT:  Thank you.

15              Anything else from you?

16              MR. CLARK:  Briefly, Your Honor.

17         The documents that he filed when they reregistered

18    Corvus said that he would not start doing business until

19    March 6, 2019.  By the very notice of appeal that they

20    filed, he was doing business on March 2nd, 2019 as Corvus.

21    That document was signed under penalty of perjury,

22    Your Honor.  So there is evidence of a crime that violates

23    the statute here in Utah.

24         Mr. Koerber has been convicted of 15 counts of

25    fraud and money laundering.  He is someone who has to be on

 1    his best behavior, and he wasn't.  He signed something

 2    falsely under penalty of perjury.  So if nothing else, even

 3    if we were to accept Mr. Philpot's testimony and

 4    Mr. Belcher's testimony as completely true, which strained

 5    credibility in many aspects, he's still violated the

 6    statutes in Utah, Your Honor.

 7              THE COURT:  Thank you.

 8              It's the finding of the Court, Mr. Koerber, that I

 9    believe they have met their burden of probable cause.

10    That's not a high standard, as you all are aware.  And

11    that's the standard of the statute is probable cause.

12              There's conflicting evidence here, there's no

13    question about that, but I have to give great weight to the

14    documents themselves.  I listened carefully to the testimony

15    and, with all due respect, the testimony was, at best,

16    inconsistent at times.  And I won't comment further on that

17    credibility other than to say that I found the documents, as

18    described by the government, to be sufficient to meet the

19    burden.

20              The timing is just not in Mr. Koerber's favor.

21    Just a couple of observations here.  First of all,

22    Mr. Skousen testified that Mr. Koerber has a pattern of

23    doing things at the last minute.  We have a situation where

24    an appeal is due involving a $4 million judgment.  If the

25    appeal is not filed timely, there's a good chance that that

1   $4 million judgment is not going to be able to be contested

2   and so forth.

3          Quite frankly, I have to be honest, I found the

4   testimony peculiar by Mr. Philpot, that he chose to use

5   Corvus at a time where time was of the essence.  And

6   Mr. Koerber, acting on behalf of Corvus, receives these

7   documents on the 2nd of March, according to the dispatch.

8   Ms. Peltier gets them on the 8th.  But apparently, according

9   to the testimony, he merely e-mailed them, and they were

10  printed off on the 8th, with the filing deadline being the

11  4th.  It's peculiar in the timing and the methodology, to

12  say the least.  I find that explanation strained.  We're

13  paying over $200 for Mr. Koerber to e-mail documents to

14  Oregon that Mr. Philpot could have just as easily e-mailed

15  to Ms. Peltier, who, coincidentally, has the same initials

16  as Mr. Philpot.  Just coincidentally.

17         So I have to tell you that while it's certainly

18  not in my opinion a high standard to meet, I do believe that

19  the government has met the burden of proving, by probable

20  cause, that a violation has occurred.  And, accordingly,

21  we're going to move to the second portion of this hearing,

22  which is whether or not Mr. Koerber's release be revoked,

23  and that will be pursuant to the statute and rule that I've

24  referred to earlier, 3143, and Rule 46(c).  And in this case

25  the burden is now on Mr. Koerber, according to the rules.

1          So we'll call on Ms. Nester to go forward on that.

2     And, of course, Ms. Nester, you understand what it is the

3     Court's looking at here, or looking for, and that is by

4     clear and convincing evidence that Mr. Koerber is not

5     likely, I believe is the language of the statute, is not

6     likely to be a danger to the community.

7          Now in the government papers, and I'm sure you

8     received copies of them, danger to the community is not

9     necessarily just physical danger as in a violent crime,

10    because I don't think there's any suggestion that

11    Mr. Koerber is a physically violent person.  But they cite

12    cases to the effect that fraud, or other kinds of pecuniary,

13    financial dangers are also able to be considered as danger

14    to the community.  So that's what I want to hear about.

15         I don't think at this point I'm overly concerned

16    that Mr. Koerber is going to flee, or not appear.  So I

17    don't think we need to spend a lot of time on that issue,

18    unless the government has some reason to believe that we

19    need to discuss that.  I'm just trying to narrow our focus.

20         So I'd like to hear the evidence that goes

21    specifically to what I've addressed, and then anything else,

22    of course, I'm more than willing to hear, but I think that's

23    what's most relevant for the Court.

24              MS. NESTER:  Yes, sir.

25              Well, I think --

1          THE COURT:  I'm sorry.  I guess I should have

2    indicated by way of process, you're welcome to call

3    witnesses or just make argument, whatever you'd like to do.

4    Are you just going to make an argument here?

5          MS. NESTER:  Yes.

6          THE COURT:  Okay.  And then let me just find out

7    before you begin -- I'm sorry for interrupting -- does the

8    government intend to call any witnesses on the second issue

9    or is it just argument?

10          MR. CLARK:  Just argument, Your Honor.

11          THE COURT:  Okay.

12          I'm sorry.  Go ahead, Ms. Nester.

13          MS. NESTER:  So, Your Honor, from what I'm hearing

14    from the bench, the main issue that you're interested in is

15    whether or not his continued release would be a danger to

16    the community.

17          THE COURT:  In this case, very candidly, a

18    financial danger, fraud, for want of a better word, that

19    kind of danger.  I don't see Mr. Koerber as a violent man.

20          MS. NESTER:  And I thank you for that.

21          So I think -- I have to say I've been practicing

22    law now for about 28 years -- 27 and a half, and I don't

23    think I've ever had a revocation on facts like this.  So

24    it's plowing new ground a little bit.

25          I think that the Court is -- I mean, we have a

1    barred lawyer that has stood up and said this is what we did

2    and if we did it wrong, we'll take the consequences in the

3    court in Oregon, but has agreed that he hired Mr. Koerber to

4    do a job.  I think it's reasonable for a nonlawyer to have

5    trust in a lawyer and say that this is a job that I'm going

6    to do, this is a job I'm going to do.

7              I think that there are conditions this Court could

8    place on Mr. Koerber if you are concerned about his service

9    of process in the future, or dispatching documents.  I mean,

10   the Court is -- you know, taking away someone's liberty for

11   something of this nature is very, very serious.  And I know

12   Your Honor understands that.

13             This case is a super complex case that's been

14   going on for a decade.  If Mr. Koerber is placed behind bars

15   in the last few months before prepping for his sentencing

16   hearing, it's going to significantly impact his ability to

17   put together a good defense, to assist his lawyers.  He

18   alone has the knowledge of almost all of the documents we

19   need for sentencing.  It would probably significantly delay

20   our ability to put documents together for this Court.

21             I do think that, you know, we've tried our best to

22   put forth our understanding of what happened in this

23   situation.  You know, we brought our witnesses forward.

24   It's certainly Your Honor's decision to determine what you

25   find credible and what you don't, but we've really acted in

1   good faith here.

2         Mr. Koerber is the sole provider for a family.  He

3   was working to try to just put food on the table.  They live

4   in a trailer in Grouse Creek, Utah.

5         Your Honor, we have the testimony of the Tibbs

6   case where Mr. Koerber testified before you back in 2015,

7   and testified about his work in Corvus.  He's never hidden

8   it, even from you.  He testified about it in front of

9   Your Honor, and I have that testimony here today.  I think

10  you remember it, probably.  It's been a long time.  But he's

11  not out there taking money from clients.  He's not out there

12  doing anything of that nature.

13        And I think, Your Honor, at this point it would be

14  devastating to his defense, to his sentencing, to after ten

15  years of facing indictment and complying with every single

16  condition a court has ever placed on him.  He's shown up to

17  every court hearing.  He's called in.  He's dealt with his

18  supervision.  He has sat through two trials and come back

19  and back and back.  He has no hint of danger in terms of

20  fraud while he's been out.

21        This is just a very odd situation that we -- you

22  know, I have a feeling that Oregon is going to get to the

23  bottom of it.  And if it's possible, if we could delay the

24  Court's decision until Oregon rules on it, I would suggest

25  that.  I would suggest the Court consider conditions of

1    release that would reassure the Court that there won't be

2    service of process in a way that you think is improper.

3    There can be conditions about his work with Mr. Philpot.

4    There can be conditions, you know, keeping in mind that if

5    you prohibit him from doing what he's been doing for the

6    last ten years, he literally has no way to support his

7    family.  And, you know, he is working insane hours.  He's

8    scraping together a living.  He's trying to put money away

9    in case he ends up having to go to prison ultimately.

10           Judge Block has already indicated on the record to

11   all the parties that it's his intent to allow Mr. Koerber to

12   remain free pending his appeal, and that's based on the fact

13   that we have a very legitimate argument on statute of

14   limitations, and Judge Block has recognized that and stated

15   it on the record.

16           THE COURT:  For what it's worth, just so everybody

17   knows, I have spoken with Judge Block about this matter,

18   personally spoken to him about it, and he's asked me to

19   handle this.  He's well aware of the circumstances.  Just so

20   you know.

21           MS. NESTER:  Thank you.  I'm glad you've talked

22   with him.  I was not sure about that.

23           So I think to take something of this nature that

24   was clearly brought to this Court's attention by lawyers who

25   have something to gain, and not by any law enforcement, not

by any other normal route that we get complaints, it's just
beyond the pale, Your Honor.  This man, to have put up with
an ongoing prosecution for over a decade and still respect
the Court in every way, and still come, and still sit and be
respectful to all the parties, which he's always been, it
just seems to me like, Your Honor, if there's ever going to
be a chance where someone gets a pass and has increase of
conditions -- there's all kinds of conditions that are not
on him now that we could add to make Your Honor feel secure
and comfortable that he is not -- I can't have him violate
attorney-client privilege, but we could have him check in on
where he's working.  We could have him check in daily.  You
could put restrictions on him about what type of work he can
engage in.

        But to lock him up is going to make the sentencing
impossible for all of us who need to defend him.  I can't
express to you how critical it is to have him available and
present and assisting us as we prepare his case for court.
It's beyond my comprehension, especially when his lawyers
are so dependent on his personal knowledge.

        I mean, it goes back decades, this evidence,
decades, and it's dealing with victims that he has to
understand all the proceedings that they've gone through.
He has to go through all the promissory notes.  I mean, the
thought of doing that in a jail cell is devastating to

1     defense counsel.  I'm just going to tell you that on our

2     behalf.  I don't know if that's something you're going to

3     take into consideration, but it's absolutely true.

4          I don't know if it would -- I don't know.  That's

5     irrelevant right now.  But I honestly think, Your Honor,

6     there are conditions Your Honor could place on him that

7     would convey the seriousness of your concern about this

8     situation that would reassure the Court that -- and we're

9     only talking about a few more months.  We're only talking

10    about the summer and the beginning of the fall, in the scope

11    of the last ten years.  If there's a way we could restrict

12    him in some way where you feel like he's been punished or

13    warned sufficiently.

14         I don't even think this Court would suggest that

15    the evidence submitted in this court today would be

16    sufficient for a jury to find guilty beyond a reasonable

17    doubt.  And I know that's not the standard you're tasked

18    with, but it's something important to think about in terms

19    of, you know, is this a way to get someone in jail without

20    having to go through the problem of making a case and

21    prosecuting them when you know you can't do it.

22         THE COURT:  Well, that's true, Ms. -- I'm not

23    trying to argue with you here, Ms. Nester, but I just want

24    to respond to that.  But you realize that we're not on a

25    normal, level playing field here.  It's not that Mr. Koerber

1    is being brought in here to be prosecuted on this charge and

2    he has no other dealings with the system.  I mean, obviously

3    this comes in the context of everything that's gone before.

4    So obviously it's not the same, and we're not looking at it

5    as a stand-alone prosecution.  And all of us who were

6    involved in that understand that.  But I do appreciate the

7    point you're making, but it's kind of apples and oranges.

8              MS. NESTER:  Also, Your Honor, as far as, you

9    know, the pattern and practice, this is not connected in any

10   way to his allegations of FranklinSquires.  This is

11   something -- this is not connected at all to that conduct.

12   It's not like he's gone out and redone something again that

13   he's done before.  That's just not the case.

14             And, you know, you want to talk about a hard

15   lesson learned, you've got a lawyer trying to do what

16   they've been hired to do, and even told to do by a

17   practicing, licensed lawyer trying to make the right call.

18   And, you know, the thought of taking away his liberty over

19   that, when there's no notice to even him that what he's

20   doing is wrong, if that needs to be resolved, it can be

21   resolved civilly.

22             These lawyers have a remedy, Your Honor.  They

23   have no interest in whether or not Mr. Koerber goes to jail

24   or doesn't go to jail.  It won't impact those lawyers at

25   all.  It's not going to make their case any better or worse.

1    The facts are the facts.

2              Mr. Philpot has been honest with you about what

3    the facts are.  We've laid them out.  We've given you the

4    documents.  I mean, the Court has the facts.  It's not going

5    to help the lawyers in Oregon if Mr. Koerber goes to jail.

6              THE COURT:  Ms. Nester, just as a -- I know I talk

7    too much, but that's just me.

8              MS. NESTER:  So do I, Your Honor.

9              THE COURT:  You know, one of the things I learned

10   years ago when I was in the U.S. Attorney's Office is that

11   every good citizen has a motive, but sometimes,

12   notwithstanding their motive, they still might be providing

13   information that there's a problem.

14             I will tell you, I want you to be confident, I

15   want Mr. Koerber to be confident that irrespective of the

16   motives of the law firm in Oregon -- and I'm not taking

17   sides on that issue at all because it's not, quite frankly,

18   really in my wheelhouse.  I don't care about that lawsuit

19   per se.  It's not under my jurisdiction.  It's not something

20   that's involved in our court.  It's important to those

21   people who are involved in it, obviously, but not to me.

22             So what I am concerned about, though, obviously,

23   is what Mr. Koerber has done relative to his participation

24   in the filing of the appeal.  But beyond that, I'm not here

25   to assist those lawyers, or to assist that court, or any of

1    that.  I just want to be clear that they may have good

2    motives, they may have bad motives, I don't know.  I don't

3    care.  I'm more concerned about the conduct that's alleged

4    here, or that I have found by probable cause now at this

5    stage, and how that relates to the ongoing issue of whether

6    or not you have met your burden.

7             MS. NESTER:  Sure.  Also, Your Honor, I think it's

8    important, and I think the timing is super important, and

9    Your Honor mentioned this, and I think it goes to motive as

10   well, the timing is that is Mr. -- in one of the exhibits

11   we've -- well, we didn't introduce it because it's sealed.

12   But as Ms. Carr testified, his defense counsel sent

13   probation his financials on February 28th.  On

14   February 28th, he revealed everything about Corvus.  The

15   entity number.  Gave his position with Corvus.  Turned it

16   over to his probation officer that was writing his pretrial

17   report.  I'm sorry, his probation -- presentence report.  I

18   just blanked.  I'm sorry.  So she had that.

19             So then she issues a probation -- a presentence

20   report on March the 1st.  We end up forwarding that to our

21   client either the 1st or the 2nd -- I actually don't know

22   what day we sent it -- and he immediately contacts

23   Mr. Belcher -- and Mr. Belcher has testified here -- that

24   his probation officer has a problem with the fact that

25   Corvus's registration has expired.  So the first business

 1   day that happens, they go and reregister, because probation

 2   told him to.

 3              So the timing of the registration had nothing to

 4   do with when this service of process was done.  Corvus was

 5   operating when the receipt was given.  Mr. Koerber indicated

 6   that it was from Corvus, and he provided all of this

 7   information to the Court.  None of this was hidden.  He gave

 8   his bank records, his bank statements, and none of this has

 9   been followed up by probation at all.

10              THE COURT:  However, Ms. Nester, it's true that

11   the registration expired in 2013, did it not?

12              MS. NESTER:  Yes, absolutely.

13              THE COURT:  And so it goes on for now five and a

14   half, six years, whatever the time is, only to be renewed,

15   coincidentally, at the time that the service has taken place

16   in Oregon.

17              MS. NESTER:  It's renewed at the time the

18   probation officer put a paragraph in his presentence report

19   saying you've let this lapse, your registration has expired.

20   So he went and reregistered the next day.

21              THE COURT:  But your witnesses have made a big

22   point, Ms. Nester, that there's nothing illegal about that.

23   He's not required to do it.

24              MS. NESTER:  That's correct.  He did it to make

25   his probation officer happy, because she's the one who held

1   it against him in his probation report.  We were concerned.

2   We objected to it.  We submitted an objection to probation

3   and said take this out.  You're making it look like he's

4   doing something wrong because a registration has expired,

5   and there's nothing wrong with that.  And she wouldn't take

6   it out, so he went and fixed his registration the next day.

7            THE COURT:  How about in Oregon?

8            MS. NESTER:  What about in Oregon?

9            THE COURT:  Does it make a difference whether or

10   not it's registered -- the delivery service is registered to

11   do business in Oregon?

12            MS. NESTER:  I have no idea.  I don't know.

13            THE COURT:  Okay.

14            MS. NESTER:  I just don't know the answer to that.

15            THE COURT:  I don't know either.  That's why I'm

16   asking you.

17            MS. NESTER:  I don't know.  I would think not

18   because his place of business is Utah, and normally you

19   don't have to register everywhere you do business if you're

20   a company.  But I just don't know.  I would hesitate to tell

21   the Court that and not know.

22            THE COURT:  But, Ms. Nester, can you see what's

23   troubling to me a little bit here?  This seems, with all due

24   respect, to be kind of a tortured reasoning here, in my

25   opinion.  Mr. Philpot tells us that he gives Corvus, in this

1    case, Mr. Koerber, well over $200 to effect the service of

2    process on the notice of appeal.  Now, you know, he could

3    use FedEx or some other means, but he chooses to use Corvus.

4    And in reality, the evidence suggests that Mr. Philpot could

5    have just as easily e-mailed it himself to Ms. Peltier,

6    because that's all that Mr. Koerber apparently did.

7              MS. NESTER:  But he didn't know what

8    Ms. Peltier -- if she was a commercial delivery service.  It

9    has to go through Corvus to engage the Oregon statute.

10             THE COURT:  But Mr. Koerber got Ms. Peltier's name

11   from Mr. Philpot, right?

12             MS. NESTER:  As a subcontractor, someone that

13   lives in Oregon.

14             THE COURT:  It just seems to me to be a rather

15   tortured process, that Mr. Philpot spends well over $500

16   right at the cusp of losing the time limit to file this

17   appeal and goes through this process that's been described

18   here today as opposed to simply either, one, filing a motion

19   for an extension or, two, sending it FedEx.

20             MS. NESTER:  There's just no dishonesty on the

21   part of Mr. Koerber, though.  I mean, his receipt is

22   legitimate.  It reflects exactly what happened.

23             THE COURT:  Well, that's where you and I disagree,

24   obviously because of my finding earlier, in terms of the

25   date of the business being registered, the date of his doing

```
 1   business, and so on.  But that's --

 2            MS. NESTER:  I respect your ruling.  I'm not

 3   trying to reargue it.

 4            THE COURT:  I understand that.  I understand that.

 5   But anyway, I keep interrupting you.  It's because I want to

 6   hear --

 7            MS. NESTER:  That's okay.  I want you to interrupt

 8   me.  I want to tell you whatever you need to hear so this

 9   man doesn't get locked up.

10            THE COURT:  I understand.  Go ahead.

11            MS. NESTER:  I just feel like, Your Honor, this

12   has been a really long road.  And I think, you know, just

13   like you can take into consideration the facts of this

14   situation, you can also take into consideration the last

15   decade of this man's respect for the orders of the Court,

16   and respect for the probation office, and respect for the

17   prosecution.  He shows up.  He responds.  He replies.  You

18   know, I just don't know what more this man can do,

19   Your Honor.  And I just feel like at this point there are so

20   many options available to you.

21            If you look and see, I think he only has one

22   condition right now of release.

23            THE COURT:  That's correct -- well, two actually,

24   the standard condition, which was involved here, and then of

25   course the one condition concerning the passport.
```

1            MS. NESTER:  So you have so much power at your

2    disposal to craft something that's reasonable but not more

3    than necessary to make sure that this man can help us get

4    ready for his sentencing.  And on behalf of the defense

5    team, we're begging.  Whatever we can do to make the Court

6    satisfied and happy, we will do it.  So please consider your

7    options, and please consider how to ratchet this up.  I've

8    seen Your Honor revoke people, and I've seen you give people

9    chances.

10           And understand, it's not easy to walk into a

11   courtroom in shackles.  It's not easy to know that your

12   freedom lies with Your Honor.  And if you feel comfortable

13   that you've conveyed to Mr. Koerber what you need him to

14   hear and in any way you see fit, just so that he can assist

15   us with this sentencing, which is probably going to be the

16   most complicated sentencing I've ever done in my career, it

17   would just be such a help and so good for the due process of

18   this case to just resolve it.  And let's get it done, and

19   let's get it sentenced, and let's not have any more appeals.

20   Let's just do it right now.  Because, obviously, if

21   Your Honor -- you know, if his freedom is at stake, then it

22   triggers all these other steps we have to take.  And we just

23   need to focus on the sentencing.  We need to get this done.

24   We need to get it resolved.  This case has been here a long

25   time, Your Honor.

1          You want to talk about the Sword of Damocles, I

2     think is what it is, the Sword of Damocles is hanging over

3     this man's head.  It's been a decade.  He's exhausted.

4     Please let us just finish this and not make it even more

5     complicated.  And I think I'm done begging now.

6               THE COURT:  Thank you, Ms. Nester.

7               MS. NESTER:  You're welcome.

8               THE COURT:  I believe Mr. Clark is going to argue.

9               MR. CLARK:  Yes, Your Honor.

10              Your Honor, what's troubling to the United States

11    about his conduct is that it seems to fit a pattern.  The

12    Court is well aware Mr. Koerber was convicted of fraudulent

13    activity in connection with a $100 million Ponzi scheme.

14    And the Court may also be aware, as was a significant part

15    of the trial, that prior to this case, he had difficulties

16    in Wyoming in which he entered into a consent decree of

17    which he admitted that he was not being honest with the

18    people he solicited as investors there.  He was not giving

19    truthful information.

20              Our concern is that this is the same kind of

21    thing, Your Honor.  There is something just plain shady

22    about what's going on.  There's something shady about this

23    receipt, page 13 of Exhibit 1.  It looks like it's an

24    arm's-length transaction between Morgan Philpot and a

25    company named Corvus when in reality it's his paralegal who

1    is completing the delivery service for what apparently

2    amounts to $500, which is simply e-mailing it to somebody in

3    Oregon who they met and trusted because that person attended

4    the Bundy trial.  There's something shady about that.

5              I'll just say that upstanding members of society

6    do not operate this way, Your Honor.  They don't do this

7    sort of thing, and even more so when they have been given

8    the opportunity to remain out on bond after they've been

9    convicted of a $100 million fraudulent scheme.

10             In our estimation, Your Honor, Mr. Koerber is

11   still acting like he's above the law, and he is doing

12   whatever he can get away with.  It just so happened that

13   someone was doing some digging on him in this and brought

14   this to the Court's attention.  Because of that, I don't

15   think he can meet his burden, Your Honor.

16             There have been other instances that we have set

17   forth in the sentencing memorandum that we've already filed

18   in this case.  In 2011, his landlord accused him of

19   backdating utility checks.

20             MS. NESTER:  Your Honor, I'm going to object to

21   going back to conduct that's relevant at sentencing but not

22   relevant to this revocation.

23             THE COURT:  Well, I'm going to allow him to do it

24   because, Ms. Nester, this is relative -- I mean, he's trying

25   to, I think -- I'm not making his argument, but I think he's

1    trying to say, in essence, there's a pattern of fraud or

2    deceit here, and he's trying to demonstrate the pattern.

3              MS. NESTER:  But the problem is he's about to

4    bring up an incident that they're alleging for the first

5    time in their sentencing memo, which we've never had a

6    chance to rebut in this court, and we haven't had a chance

7    to investigate that.

8              THE COURT:  Well, then I'll give it whatever

9    weight is appropriate, based on what you say, Ms. Nester.

10   And I'll give you a chance to comment on it, if you'd like,

11   later too.

12             MS. NESTER:  Thank you.

13             THE COURT:  Go ahead, Mr. Clark.

14             MR. CLARK:  Thank you, Your Honor.

15             As part of that same incident with the landlord,

16   the landlord said that Mr. Koerber submitted a false invoice

17   for contractor work on the home.  The contractor did not

18   exist and the work had never been performed.

19             Then also, as we laid out in our sentencing

20   memorandum, in 2016, Mr. Koerber was involved in a trial in

21   Oregon assisting an attorney there.  Counsel for that trial

22   wanted Mr. Koerber at counsel table, but also wanted him as

23   a witness.  And the court executed -- or entered the

24   exclusionary rule.  And he was on the witness list as

25   Claud R. Koerber, and yet he still attended proceedings

1     under the name of Rick Koerber.  Once the court in Oregon

2     found out about that, that allegation became part of the

3     order to show cause against the lawyer there.

4            So what I'm trying to describe, Your Honor, there

5     is a pattern of Mr. Koerber seeming to do whatever he thinks

6     he can get away with.  And it seems almost laughable to me

7     that we are going to try to craft conditions now to try to

8     make him behave honorably and not do shady things.  He was

9     already supposed to be on his best behavior, and the

10    standard now reflects that.  And I don't think that he can

11    meet by clear and convincing evidence that he's going to

12    continue to be an upstanding member of society, because he

13    wasn't before.  So we think he should be detained at this

14    point, Your Honor.

15            THE COURT:  Thank you.

16            Ms. Nester, I'll give you the final word.

17            MS. NESTER:  Your Honor, as far as all those

18    matters that the government just stated, they did not object

19    to his release, knowing all that information, when we

20    finished the trial.  That would have been the time to bring

21    that up if they thought he shouldn't have been released.

22            Furthermore, we disagree with their

23    characterization of what happened.  That lawyer was not

24    found to have done anything wrong, as far as Mr. Koerber was

25    found, and it did not result in any type of contempt or any

1   kind of finding against Mr. Koerber.  And if the Court wants

2   to get into those two incidents, then maybe we could have

3   another hearing and I'll go investigate those and deal with

4   that.  But I think it's pretty disingenuous to stand up now

5   when they agreed to his release, knowing about whatever they

6   think he did before, and then all of a sudden now to be

7   morally offended by it.  It seems very disingenuous to me,

8   Your Honor.

9           THE COURT:  Okay.

10          I've listened carefully to the evidence today.  I

11  have carefully reviewed the documents that were submitted by

12  the government earlier.  I have listened to both sides'

13  arguments and the testimony, and so forth.  It seems to the

14  Court that we are in a position where we have to look at

15  Mr. Koerber in the totality of the circumstances relative to

16  whether or not he remains on release or whether or not he is

17  detained.  When I say the totality of the circumstances, I'm

18  talking about, as I referred to with Ms. Nester, the fact

19  that he comes here today having been convicted in a trial

20  last year of a number of felonies involving fraud, deception

21  and so forth, as opposed to just coming before the Court on

22  a case of first impression.  So we have to put all of this

23  in context, at least that's the Court view of it.

24          While I don't put a lot of weight on these other

25  instances that Mr. Clark alludes to, Ms. Nester, they are

 1  part of what I call a pattern of deception.  I don't know
 2  the details on all of those.  I know that individually each
 3  one can probably be explained to one extent or another, or
 4  mitigated, or litigated.  But the fact of the matter is --
 5  there's an old adage that where there's smoke, there's fire.
 6  Not always, but sometimes.  But the problem is, that I see,
 7  is that at the center of all of this, Mr. Koerber continues
 8  to be at the center.

 9          It would seem to me, in my modest judgment, that
10  if I had been convicted of serious crimes of fraud, as
11  Mr. Koerber, and then had been allowed by the judge, in this
12  case Judge Block, to be released pending sentence, that I
13  would be, as they say, on my very best behavior.  I would do
14  all in my power to ensure that I did not run afoul of the
15  law in any way, simply because I would suspect that I would
16  be on, to use a phrase, relatively thin ice.

17          Unfortunately for Mr. Koerber, apparently that
18  analogy of thin ice might be something he's used to.  I
19  don't know.  I'm not saying that in a flippant way, but
20  perhaps he's just used to being on thin ice and it's not as
21  frightening to him as it would be for many people.  I don't
22  know.  But for whatever reason, the circumstances of this
23  whole scenario -- and I have to agree, Ms. Nester, with what
24  Mr. Clark said -- it just has a ring to it.  It has an odor
25  to it, for want of a better word.  It just doesn't look

1    right to me, and I've been doing this for close to 45 years.

2    It just doesn't add up.

3         Yes, there's certain explanations, but the fact of

4    the matter is we hear from Mr. Skousen that there's a

5    deadline, he's used to working right up against the

6    deadline.  We hear from Mr. Philpot that he's willing to pay

7    large, relatively speaking, large sums of money to have

8    Corvus do this as opposed to simply e-mailing it himself,

9    and so on.  It doesn't add up, in my mind.  That's why I

10   found that there's probable cause to believe there was

11   deception, that there was an attempt -- not an attempt per

12   se to violate the law, but, in essence, an attempt to

13   deceive, which was, in fact, a potential violation.  I don't

14   know.

15        But the bottom line is, for me, that I'm finding

16   that the government brings this to the Court in an

17   appropriate manner.  And what I'm saying by that is that it

18   was appropriate for them to bring that to the Court's

19   attention.  I don't think it was brought in bad faith.  I

20   don't think it was brought gleefully, for want of a better

21   word.  I think that they were presented with information,

22   and they brought it.

23        At the same time, I've given a lot of thought to

24   this matter in the last ten days or so since I have been

25   informed about it.  It seems to me that some of the pattern

1    of deception, as I refer to it, that in this particular

2    instance it was somewhat nuanced and somewhat layered.

3              Now there may be reasons why Mr. Koerber wants to

4    use a variety of names, some legal, some aliases, and so

5    forth.  Not all of those reasons would necessarily be

6    negative or bad.  But the fact is that most law-abiding

7    people don't use a lot of different names.  They just don't.

8              According to the documents, the opposing law firm

9    was not aware that who they thought they were dealing

10   with -- I believe they thought it was Mr. Franklin -- was a

11   convicted felon, that he'd been convicted of serious fraud.

12   They allege in their documents that they would not have

13   shared certain discovery with him had they known his status.

14   But he didn't disclose that to them.

15             Then we have the problem with the dates.  And I

16   don't have to enumerate that, but I think it's clear that

17   Corvus was operating, by Mr. Koerber, as a so-called

18   delivery service, even though that's not what the business

19   purposes stated.  It's not stated as a business purpose.

20   It's stated that it's a business and management facility.

21             And so he enters into this agreement to file this

22   certificate on the 2nd, this dispatch, and yet he

23   reregisters on the 6th.  The timing is suspect.  It would

24   appear to me that it was not the arm's-length transaction

25   that you would have expected based on the testimony of all

1    the witnesses and the documents.  And I do believe that

2    there was some attempt to deceive the court in Oregon, not

3    the law firm per se, but the court, in terms of the filing.

4    That's what I believe.  Whether that's provable at a higher

5    level of standard than probable cause is neither here nor

6    there because I don't have to deal with that.  But I do

7    believe that.  And I think that that document may or may not

8    have been backdated.  It doesn't really matter because, as I

9    say, that's not before me per se, other than I've already

10   found the probable cause.

11          The problem that Mr. Koerber has is that he has a

12   presumption of detention with a burden of proof by clear and

13   convincing evidence.

14          Now Ms. Nester makes some very strong points,

15   particularly that it would be very difficult to prepare for

16   sentencing, review documents, and the like.  I'm very

17   sensitive to that.  I know that's real.  That's not just

18   puffery.  That's real.  However, there's a litany of cases

19   that suggest all kinds of things that don't qualify as

20   extraordinary circumstances to prevent detention, including

21   health issues -- post conviction detention including health

22   issues, and including, what you named Ms. Nester, family

23   support issues.  It goes on and on.

24          So in my mind, really -- and these are legal

25   concepts that you try and apply fairly, and intellectually,

1    honestly, at least I do, and I'm sure we all do -- does

2    Mr. Koerber meet his burden or is he such a danger to the

3    community, and it would be a financial danger, it would be a

4    fraud danger, that there's no basis upon which we can let

5    him remain out.

6           Based on what we've heard today, I find that the

7    defendant has not met his burden of proof by clear and

8    convincing evidence.  I do find that he's an ongoing danger

9    to the community relative to financial fraud or deception.

10   I find that the facts as laid out in the paperwork today

11   merited more weight than the testimony that was presented,

12   and that those facts suggest that Mr. Koerber has yet to

13   learn, or change his ways from a pattern of deception and

14   fraud that's gone on for a number of years.

15          Not only does this constitute a violation of the

16   order not to commit any other state, federal, local crime by

17   a probable cause standard, but it makes me wonder about his

18   commitment to obeying all of the orders of the Court, even

19   though in the past he has done so, at least ostensibly.

20          So I am ordering his release revoked and I'm

21   ordering him detained in the custody of the United States

22   Marshal Service for the time being.  Now I'm not foreclosing

23   a review of that detention, but let me explain ahead of time

24   what I'm interested in.

25          The pattern of deception, as I call it, has to

1  end.  It just has to end.  No more fraud.  No more

2  deception.  This has been going on too long, and today ends

3  that.  So I need to be assured, Ms. Nester, that there will

4  be no additional fraud or deception on the part of your

5  client between now and the time of sentencing, of any

6  kind -- of any kind.

7           I can tell you that he's done, from my

8  perspective, in terms of working in any legal related areas

9  where he has opportunities to file documents, or to date

10  documents, or to be involved in any of that.  If I were to

11  release him down the road, I'm telling you ahead of time,

12  that's not going to happen.

13          I'm not sure exactly what it would take to

14  convince me to release him, but I can tell you that I would

15  have to be persuaded that we're not going to have any

16  ongoing -- even anything close to resembling fraud or

17  deception.  We just can't have it.  We just will not

18  tolerate it.

19          With all due respect to Mr. Koerber, he's not a

20  big deal.  He's another white-collar defendant who has

21  committed, according to a jury, serious fraud, and has been

22  convicted.  He doesn't merit or warrant special attention,

23  even though he's been going through this process for years.

24  And I'm sympathetic to that fact, I truly am, but he is

25  still like any other criminal defendant who is under the

1    supervision of the Court, has responsibilities to walk that

2    line very carefully or lose their right, particularly post

3    conviction.  We're not even talking pretrial release.  We're

4    talking post conviction here.

5              That's what troubles me perhaps as much as

6    anything.  If this was a pretrial release matter,

7    Ms. Nester, your argument would be so much stronger, in my

8    mind.  There are additional restrictions, and so on.  But

9    right now I'm looking at this post conviction, and I'm

10   looking at that standard and that burden of proof that falls

11   on the defendant, not on the government.  There is a clear

12   shift of the burden, and a high standard.  I find it

13   ironic -- I'm losing my voice here.  I find it ironic that

14   you two struggle with very different standards today, the

15   government having a very low standard of probable cause and

16   the defendant having a very high standard of clear and

17   convincing, and the burden shifts, which is very unusual in

18   our business, but it does, according to the statute.  And I

19   have looked at those statutes carefully.  I'm trying to

20   intellectually and fairly apply those statutes.

21             So I'm saying I am, again, sympathetic to all the

22   consequences, but there are consequences, and Mr. Koerber is

23   now experiencing those consequences, and many of them are

24   very difficult.  And I do not make light of it, I do not

25   take pleasure in it, but I recognize it.  But, nevertheless,

1   I have to be honest with you.  As I've told so many

2   defendants over the many years I've been on this bench, we

3   make our choices, but we don't get to pick our consequences.

4   Mr. Koerber has made some choices, and now this is one of

5   the consequences.

6           So I invite you, Ms. Nester, I invite you at some

7   time down the road -- not Monday morning -- if you want to

8   file a review of detention and give me your best reasons why

9   he should be released, I'm more than happy to hear it, and I

10  will carefully consider it, because I want to be fair.  But

11  I also need to be fair to the government, and to the

12  taxpayers, and to the public, and to people both in this

13  state and in Oregon, and everywhere else, in Wyoming, where

14  people rely on representations, and where money and life

15  savings are involved.  So I'm interested in protecting

16  people and the community, and right now the best way to do

17  that is for Mr. Koerber to be detained, and that's the order

18  of the Court.

19          Now in terms of timetable, I would say no sooner

20  than a minimum of three or four weeks, I want some time to

21  think about this some more, but I think for the -- and I'm

22  not saying what I'm going to do, but I am willing to have

23  you apply for reevaluation.  I'm not saying what I'll do,

24  but I'll give you some time to put your facts together.  I'd

25  like to hear a little more detail on some of these other

1    things.

2              The other thing I want to say is unrelated to the

3    issue before us, but we have an evidentiary hearing set for

4    17, 18; is that correct?

5              MS. NESTER:  Yes, sir.

6              THE COURT:  And my understanding is that at some

7    point you people will be submitting briefs.

8              Has that happened?

9              THE CLERK:  No, not yet.

10             THE COURT:  What date did we set for that?

11             MS. NESTER:  June 4th.

12             THE COURT:  June 4th.  Okay.

13             Now to the extent, Ms. Nester, that you need help

14   with Mr. Koerber, I am willing to have him brought to the

15   courthouse -- not to San Diego, but to the courthouse, for

16   you to be able to go over documents, as necessary, to work

17   in preparation for that hearing.  I know you're in San Diego

18   most of the time, but Ms. Oberg, or Mr. Hunt, or somebody,

19   can notify the Court and we can set up a schedule to do

20   that.  I do not want his detention to interfere with your

21   ability to prepare for that hearing.  So please let your

22   colleagues work with me and we'll figure out a way to best

23   accomplish that.

24             MS. NESTER:  Thank you, Your Honor.

25             THE COURT:  Okay.

1      MS. NESTER:  May I just ask one request?  So I'm

2 going to have a really hard time getting that road map ready

3 by June 4th now.  Is there any way I could have an extra

4 week and just get it to you the week before?

5      THE COURT:  Well, you see, the fact that you're

6 asking for the continuance ahead of the deadline, I'm going

7 to give it to you.

8      MS. NESTER:  Thank you.

9      THE COURT:  Okay?

10      MS. NESTER:  Yes.

11      THE COURT:  So here's the deal.  I'll give the

12 government the same time.  Maybe you're ready by the 4th.

13      You're both looking a bit perplexed.

14      MS. HACKFORD-PEER:  Well, the filing Ms. Nester

15 needs to give to us on the 4th, we need that information to

16 prepare for the evidentiary hearing.  So that now gives us

17 four days with that information.  I can't add this, but if

18 she has another week now, that gives us a very limited

19 amount of time with that information.

20      THE COURT:  Well, if necessary, we'll set it back

21 just a little bit, the hearing.  But I don't want to do that

22 if we don't have to.  Look, I'm trying to be fair here.  I

23 know that she's been heavily involved in the last week in

24 preparing for this hearing.

25      MS. NESTER:  Yes, sir.

```
 1              MS. HACKFORD-PEER:  We can make it work,
 2    Your Honor.
 3              THE COURT:  That's what I love to hear.  That's
 4    what I love to hear.  So that's what I want, if you'll make
 5    that work.  And then we'll try, as best we can, to still
 6    hold that hearing on the 17, 18.  If not, we might move it
 7    just a little bit.
 8              Just as an aside, did we work out the victim side
 9    of the case?
10              MS. HACKFORD-PEER:  We were very close when this
11    happened, Your Honor.
12              MS. NESTER:  We were an hour away until the
13    warrant came down, Your Honor.
14              THE COURT:  Well, I'll give you an hour right now
15    to sort it out.  But the fact is, I would like you to
16    continue to work on that part of it.  But, you know -- and,
17    look, I don't need major briefing on this thing.  I just
18    want a road map, kind of a sense of where we're going, what
19    you're anticipating and so on, so that we can be
20    appropriately prepared for it.  And I realize you need a
21    little time to respond and so on, so we'll try to
22    accommodate you.
23              All right.  Ms. Hackford-Peer or Mr. Clark,
24    anything further today from the United States?
25              MS. HACKFORD-PEER:  No, Your Honor.
```

1           THE COURT:  Ms. Nester, anything further from you?

2           MS. NESTER:  No, Your Honor.

3           THE COURT:  All right.  Thank you all.

4           The Court's in recess.

5           (Whereupon, the proceeding was concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I hereby certify that the foregoing matter is

5    transcribed from the stenographic notes taken by me and is a

6    true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16   PATTI WALKER, CSR-RPR-CP       DATED: 6-7-19
     Official Court Reporter
17   351 South West Temple, #8.431
     Salt Lake City, Utah  84101
18   801-364-5440

19

20

21

22

23

24

25