Public

Michael D. Zimmerman (3604)
Troy L. Booher (9419)
Dick J. Baldwin (14587)
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84101
mzimmerman@zbappeals.com
tbooher@zbappeals.com
dbaldwin@zbappeals.com
(801) 924-0200

*Attorneys for Claud R. Koerber*

## UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>v.<br><br>CLAUD R. KOERBER,<br><br>　　　　Defendant. | **EMERGENCY MOTION FOR COMPASSIONATE RELEASE AND REDUCTION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)(i) (INDICATIVE RULING UNDER F.R.Crim.P. 37)**<br><br>**Separately Filed Under Seal**<br><br>Case No. 2:17-cr-00037-FB-1<br>District Judge Frederic Block |

**Table of Contents**

Background ........................................................................................................... 2

    1.    The COVID-19 Global Pandemic Has Overwhelmed Global Health
        Systems and the United States' Federal Prisons .................................. 2

    2.    Rick Is at Risk of Death While Serving a Sentence that this Court Has
        Acknowledged Has a "Real Chance" of Being Vacated ....................... 6

    3.    Rick Has Attempted to Exhaust His Administrative Remedies.......................... 13

Argument ........................................................................................................... 14

    1.    This Court Has Jurisdiction to Grant this Motion................................. 14

    2.    Rick's Vulnerability to the COVID-19 Pandemic Sweeping Federal
        Prisons Is an Extraordinary and Compelling Reason for His Home
        Confinement....................................................................................... 18

    3.    The § 3553(a) Factors Weigh Heavily in Favor of Home Confinement ............ 19

    4.    Rick's Home Confinement Is Consistent with the Applicable Policy
        Statements......................................................................................... 24

Conclusion ......................................................................................................... 25

Claud "Rick" Koerber, an inmate currently housed at Terminal Island, suffers from

███████████████████████████████████████████████████. These conditions place him at great

risk from COVID-19. Indeed, he has been hospitalized on two prior occasions after catching two

viruses less dangerous than COVID-19. Because of this great risk, he will be more safely

confined at his home in rural Utah. Rick therefore respectfully requests that he be ordered

released on home confinement, immediately.[1]

The law supports Rick's request. Rick's vulnerability to COVID-19 and the rampant

public health crisis are extraordinary and compelling reasons to order his release. The applicable

18 U.S.C. § 3553(a) factors and Policy Statements also weigh heavily in favor of his home

detention. Any delays further risk his life because ██████████████████████████████████

███████████████████████████████████ Mr. Koerber has twice been hospitalized with life-

threatening complications resulting from viral infections that were less dangerous than COVID-

19. And if he were to contract the disease, then continuing to detain him in FCI Terminal Island

deepens the risk of widespread exposure to the rest of the prison population and staff, and further

risks the life of Mr. Koerber. This court should therefore order that Rick be immediately released

on home confinement.

---

[1] Mr. Koerber seeks an indicative ruling from this court pursuant to rule 37 of the Federal Rules of Criminal Procedure because his direct appeal is currently pending before the Tenth Circuit Court of Appeals. Should this court decide that it would grant this motion, Mr. Koerber will seek a remand from the Tenth Circuit under rule 12.1 to allow this court to enter an order granting the relief. Mr. Koerber's counsel has conferred with the government about the proper procedural path for seeking relief. The government has authorized Mr. Koerber's counsel to represent the following: "The United States agrees that this Court has jurisdiction to issue an indicative ruling on a compassionate release request as contemplated by rule 12.1 of the Federal Rules of Appellate Procedure, although the United States reserves the right to assert any defense (including a jurisdictional one) to the availability of compassionate release itself."

**Background**

Rick has two autoimmune conditions that place him at high risk of severe illness or death from COVID-19. This risk makes his continued detention in a facility holding more than 1000 inmates inhumane, irrational, and needlessly risks converting his prison sentence to a death sentence. Rick should be safely and effectively confined at home.

1.      **The COVID-19 Global Pandemic Has Overwhelmed Global Health Systems and the United States' Federal Prisons**

In recent months, COVID-19 has "rampaged across the globe, altering the landscape of everyday American life in ways previously unimaginable."[2] This court is likely well aware of the scope of the pandemic, but as of April 9, 2020, the virus has sickened more than 1.4 million and killed nearly 90,000, globally.[3] The World Health Organization has declared it a pandemic,[4] the President has declared a national emergency,[5] and the Centers for Disease Control and Prevention has issued guidance about the disease's deadliness for certain high-risk categories of individuals.[6] Among those who are most at risk of death from the disease are individuals with underlying medical conditions including asthma and autoimmune conditions. Rick has both.

---

[2] *Thakker v. Doll*, No. 1:20-CV-00480 (M.D. Pa. Mar. 31, 2020) (Doc. 47 at 4) (ordering release of high-risk immigration detainees due to the dangers of COVID-19).

[3] Coronavirus Map: Tracking the Global Outbreak, N.Y. Times, https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited Apr. 9, 2020).

[4] Press Release, World Health Organization, WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – 11 March 2020, (March 11, 2020), *available at* https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[5] Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak, Proclamation No. 9994, 85 Fed. Reg. 15,337 (Mar. 18, 2020).

[6] People Who Are at Higher Risk for Severe Illness, Ctrs. for Disease Control, https://rarediseases.info.nih.gov/diseases/5870/autoimmune-hemolytic-anemia (last visited Apr. 6, 2020).

Prisons pose a unique risk during a pandemic of this scale. As of February 29, 2020, at the peak of the outbreak in Wuhan, China—the city where the COVID-19 originated—over half of all new infections were incarcerated persons.[7] On Rikers Island the rate of infection among incarcerated people is nearly seven times the rate of infection in New York City generally.[8]

The federal prison system has already experienced the death of at least eight inmates from COVID-19.[9] The facility that was housing five of the now-deceased inmates had previously reported at least 30 positive test results for inmates and staff, with 60 inmates in quarantine.[10] More recent reporting indicates that 42 inmates and staff have tested positive.[11] The facility has reportedly stopped testing because infection is so widespread.[12] The pandemic is a growing disaster in the prison system at a time when the public health system is already overwhelmed with a global pandemic. As of April 8, 2020, the Bureau of Prisons reports that 34 of its facilities

---

[7] Zi Yang, *Cracks in the System: COVID-19 in Chinese Prisons*, The Diplomat, https://thediplomat.com/2020/03/cracks-in-the-system-covid-19-in-chinese-prisons/ (last visited Apr. 6, 2020).

[8] Legal Aid Soc., Analysis of COVID-19 Infection Rate in NYC Jails (last visited Apr. 9, 2020), *available at* https://cutt.ly/RtYTbWd.

[9] Michael Balsamo & Michael R. Sisak, *Barr Orders Increase in Home Confinement as Virus Surges*, Assoc. Press, https://apnews.com/7ea9c8700570d812651f3e18375bad80 (last visited Apr. 6, 2020).

[10] Kimberly Kindy, *An Explosion of Coronavirus Cases Cripples a Federal Prison in Louisiana*, Wash. Post, https://www.washingtonpost.com/national/an-explosion-of-coronavirus-cases-cripples-a-federal-prison-in-louisiana/2020/03/29/75a465c0-71d5-11ea-85cb-8670579b863d_story.html (last visited Mar. 30, 2020).

[11] Clare Hymes, *Crisis at Oakdale: Coronavirus Cripples Federal Prison in Louisiana*, CBS News, https://www.cbsnews.com/news/coronavirus-fci-oakdale-federal-prison-louisiana-covid-19/ (last visited Apr. 9, 2020).

[12] Rosemary Westwood, *Second Federal Inmate Dies From COVID-19*, Nat'l Public Radio, https://www.npr.org/sections/coronavirus-live-updates/2020/04/01/825448006/second-federal-inmate-dies-from-covid-19 (last visited Apr. 2, 2020); Keegan Hamilton, *Third Inmate Dies From COVID-19 at Louisiana Prison as Entire Federal System Goes on Lockdown*, Vice News, https://www.vice.com/en_us/article/5dmend/second-inmate-dies-from-covid-19-at-louisiana-prison-as-entire-federal-system-goes-on-lockdown (last visited Apr. 2, 2020).

and 7 residential reentry centers have reported infections, with 253 inmates and 85 BOP staff testing positive for COVID-19.[13]

Prisons are not sealed off from the outside world. By their nature, people move in and out constantly—from correctional and medical staff, to family and attorneys, to those serving short sentences or finishing longer ones. BOP has implemented a 14-day lockdown, but people continue circulating through the facilities. Employees who are potentially infected but asymptomatic are still reporting to work, which allows the disease to spread from the prisons to the communities in which they are located. Failing to prevent and mitigate the spread of COVID-19 endangers not only those within the institution, but the entire community. That risk is not conceptual. It is already happening in Ohio, where the Governor has mobilized the National Guard to provide medical assistance to the Elkton Federal Correctional Institution.[14] Those are resources that should be used for civilian populations. The prisons should not create unnecessary pressures on an already overwhelmed system.

Indeed, the Department of Justice has recognized the risk that COVID-19 poses for the federal prison system. In recent weeks, Attorney General Barr has issued unprecedented guidance instructing the BOP to expand their use of home confinement in an attempt to minimize the degree of risk in the prisons.[15] After eight inmates died in federal facilities, the Attorney General's guidance became even more aggressive. He has now invoked the authority provided to

---

[13] COVID-19 Coronavirus, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Apr. 8, 2020).

[14] *Ohio National Guard Being Sent to Help Sick Inmates at Elkton Prison*, WKBN, https://www.wkbn.com/news/coronavirus/ohio-national-guard-being-sent-to-help-sick-inmates-at-elkton-prison/ (last visited Apr. 7, 2020).

[15] Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, Office of the Attorney Gen. (Mar. 26, 2020) (hereinafter "Barr Memo I"), attached as Exhibit A.

him in the CARES Act,[16] and based on that authority has expanded the cohort of inmates eligible for home confinement to include "all high-risk inmates—not only those previously eligible for transfer."[17] He also gave BOP discretion to determine on a case-by-case basis whether to suspend the prior requirement that all inmates released for home confinement be quarantined for 14 days. He even took the extraordinary measure of authorizing BOP to release at-risk inmates immediately for home confinement without electronic monitoring. The Attorney General's message is clear: non-violent inmates housed in facilities whose operations are materially affected by COVID-19 should be released immediately if they are at high-risk to the virus and have a suitable confinement plan. Rick is such an inmate, and should be released immediately to reduce risk to his life and to reduce the risk of uncontrolled disease and death in the prison.

In light of the Attorney General's guidance certain inmates should be released categorically. The nature of this disease and the speed with which it spreads is such that there is no justification for continuing to detain inmates (like Rick) who were convicted of white-collar crimes, are at high-risk to COVID-19, and have no history of violence. The public health system cannot afford for the government to wait until facilities are overrun with disease and death, as is happening in Louisiana, Ohio, and Connecticut. Doing so undermines the goal of the Attorney General's guidance and risks burdening the public health systems that are already struggling to respond adequately to the rate of infection among the civilian population.

---

[16] Coronavirus Aid, Relief, and Economic Security Act (CARES Act), § 12003(b)(2).
[17] Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 at 2, Office of the Attorney Gen. (Apr. 3, 2020) (hereinafter "Barr Memo II"), attached as Exhibit B.

2.     **Rick Is at Risk of Death While Serving a Sentence that this Court Has
       Acknowledged Has a "Real Chance" of Being Vacated**

Rick has been incarcerated since May 2019, for financial crimes relating to real estate

investments. He is serving a sentence of 170 months in prison and three years of supervised

release.[18] Rick has been told by prison staff that the BOP previously assessed his health and

assigned him a care level of ███████████████████████ Rick has been diagnosed with

███████████████ that, according to guidance issued by the Centers for Disease Control,

put him at "higher risk for severe illness from COVID-19."[19] These conditions are documented

with attached medical records and were mentioned in his presentence report and during his

sentencing hearing. Additionally, a doctor who had previously treated Rick recently confirmed in

a letter that ████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████,"[20]

         ████████████████████████████████████ █████████████████████

████████████████████████████████████████████████████████ █

---

[18] Transcript of Sentencing Hearing at 91-92.

[19] ████████████████████████████████████████████,
█████████████████████████████████████████████████
███████████████

[20] COVID-19 Risk Letter at 1, Tyler S. Carroll, M.D., Apr. 2, 2020 (hereinafter "Dr.
Carroll Letter"), attached as Exhibit D.

[21] *See* Medical Records re: ████████████████████ at 1-5, attached as Exhibit C; Dr.
Carroll Letter at 1; Declaration of Claud Rick Koerber in Support of His Motion to Dismiss for
Impermissible Delay at 17, *United States v. Koerber*, 2:09-CR-302 (D. Utah May 20, 2014)
(hereinafter "Koerber Decl."), attached as Exhibit E; Presentence Report at 16, *United States v.
Koerber*, 2:17-CR-00037 (D. Utah Oct. 16, 2019) (hereinafter "PSR"), attached as Exhibit F;
Transcript of Sentencing Hearing at 56, *United States v. Koerber*, 2:17-CR-00037 (D. Utah Oct.
15, 2019) (hereinafter "Sentencing Transcript"), excerpts attached as Exhibit G. Full Sentencing
Transcript will be provided on request.

[22] ██████████████████████████████████████
██████████████████████████████████████████████



Mar. 30, 2020).

[23] *See* Medical Records re: ██████████████ at 2; Koerber Decl. at 17; PSR at 16; Sentencing Transcript at 56.

[24] ████████████████████████████████████████████████

[25] *See* Medical Records re: ██████████████ at 1-2; Koerber Decl. at 17; PSR at 16; Sentencing Transcript at 56; Medical Records re: ██████████ at 1-2, attached as Exhibit H.

[26] *See* Medical Records re: ██████████████ at 1-5; PSR at 16.

[27] *See* Medical Records re: ██████ at 1-3, attached as Exhibit I; Dr. Carroll Letter at 1.

[28] *See* Medical Records re: ██████ at 1, 3; Medical Records re: ██████████████ at 2, 4.



Rick is 47 years old. As we learn more about COVID-19, the data appears to show that Rick's risk to the disease is nearly as high as those aged 60 and older, and that he is at high risk of severe illness or death if he becomes infected. Early reports indicated that individuals older than 60 were at greater risk. Individuals in that age-range appear to be at greater risk of death, but the risk to individuals at Rick's age are similarly severe. The CDC recently reported that as of March 16, 2020, 36% of hospitalized patients fell in the twenty-year age range of 65-84 years old. But the twenty-year age range of 45-64 years old accounted for 35% of hospitalized patients. Similarly, among patients admitted to intensive care units, 46% were between 65-84 years old,

---

[29] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[30] *See* Medical Records re ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at 2, 3.
[31] PSR at 16; Sentencing Transcript at 56-57; Dr. Carroll Letter at 1.

while 36% were between 45-64 years old.[32] When considering Rick's underlying health factors, his age presents great risk of severe illness or death if he were to contract COVID-19.

Indeed, the first federal inmate to die from COVID-19 was 49 years old, essentially the same age as Rick.[33] The second federal inmate to die from COVID-19, however, was 43 years old—four years younger than Rick. Although details are sparse at the time of this writing, the second inmate's medical profile is troublingly similar to Rick's—the media has reported that the deceased inmate "had long-term, pre-existing medical conditions which the Centers for Disease Control and Prevention lists as risk factors for developing more severe COVID-19 disease."[34] That is precisely Rick's medical history, and Rick is older than that inmate, which confirms that Rick is high risk and ideal for home confinement.

Rick is housed at FCI Terminal Island, in San Pedro, California. The present conditions in the prison are troubling. Rick learned that a staff member at the prison tested positive for COVID-19 as of April 5, 2020.[35] A member of the prison staff did not dispute the accuracy of that information when Rick's counsel mentioned it on a telephone call.[36]

---

[32] Severe Outcomes Among Patients with Coronavirus Disease 2019 (COVID-19) – United States, February 12-March 16, 2020, Morbidity & Mortality Weekly Report, Ctrs. for Disease Control, https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e2.htm?s_cid=mm6912e2_w (last visited Mar. 30, 2020).

[33] Rich Schapiro, *Inmate Dies After Contracting Coronavirus at Louisiana Federal Prison*, NBC News, https://www.nbcnews.com/news/us-news/inmate-dies-coronavirus-louisiana-federal-prison-n1171571 (last visited Apr. 2, 2020); *see also* Rachel Polansky, *First Inmate Death Related to Coronavirus at Eastern Ohio Prison*, WKYC-TV, https://www.wkyc.com/article/news/health/coronavirus/breaking-first-inmate-death-due-to-coronavirus-at-eastern-ohio-prison/95-d65b2656-f5f8-4f20-ab6d-e3ae023de2e4 (last visited Apr. 2, 2020) (the fifth federal inmate to die from COVID-19 was 53 years old).

[34] Westwood, *supra* note 12.

[35] Declaration of Dick Baldwin at 2-3 (Apr. 9, 2020) (hereinafter "Baldwin Decl."), attached as Exhibit K. Due to the prison lockdown, Rick cannot submit a declaration describing

Rick lives in a dorm holding just under 100 other inmates. He shares a two-man bunk bed, which is separated from the neighboring bunk beds by roughly 3 ½ feet. The bathrooms are smaller. Rick reports several other inmates exhibit symptoms consistent with COVID-19, including coughing and fevers.[37] And on April 8, 2020, Rick learned that two inmates were removed from his unit when it was discovered that they had temperatures of 104 degrees.[38]

A few inmates from his dorm work in the medical center each day. Those inmates sleep in the same dorm as Rick each night, where social distancing is impossible. Many inmates have resorted to sleeping with blankets over their head and face in an attempt to protect against infection. As for staff, there has been an increase in the use of masks in recent days. But it appears that masks are optional and some staff members choose not to wear masks while interacting with the inmates by touching their food, food trays, beds, and the like, and while searching the inmates through pat-downs. And ironically, the system-wide lockdown has increased Rick's risk of exposure. Prior to the lockdown, one or two staff would cycle through his quarters in the morning and another one or two staff would cycle through in the evening. But during lockdown, roughly 10-15 staff members cycle through each day.[39]

The current medical procedures at Terminal Island are inadequate and illustrate the prison's inability to properly respond to a pandemic of this scale. If an inmate begins to feel a fever or body aches, they are able to put in a "sick call." Typically, 12 or more hours after the inmate has put in a "sick call," a physician's assistant will speak briefly with the inmate—often

---

his own observations first-hand. If the court requires such a declaration, Rick respectfully requests an order requiring the prison to provide him with the resources necessary to file one.

[36] *Id.* at 3.
[37] *Id.*
[38] *Id.* at 6.
[39] *Id.* at 3-4.

for less than a minute. The physician's assistant will occasionally have the time to check the inmate's temperature at that time. But if the physician's assistant does not have time, he or she will make a plan with the inmate for the physician's assistant to return to take the inmate's temperature. Often, the physician's assistant does not return. Based on his observations of the prison's operations at this time, Mr. Koerber assumes the physician's assistants do not return because they are too overwhelmed with too many issues at this time. Mr. Koerber explained that there are two inmates in his section who are deeply concerned about their health and the prison's current response. Both inmates have submitted "sick calls" and have received no medical attention whatsoever. One of the inmates claims to have valley fever, which is a fungal infection whose symptoms include fever, cough, chest pain, chills, night sweats, and more. Mr. Koerber has observed him shivering and crying in bed at night. Whether this inmate's symptoms are from valley fever or COVID-19, his immune system appears to be compromised. And yet, he has received no medical attention.[40] The prison is reportedly not conducting COVID-19 tests and is instead simply evaluating inmates using chest x-rays.[41]

Of the roughly 15 inmates that Mr. Koerber knows submitted requests to be released on home confinement, he knows only one who has received a response. That one inmate has been approved for home confinement, and claims to have serious medical issues such as COPD, heart disease, diabetes, and more, and is over 65 years old. The inmate was supposedly told that he had been approved for home confinement on April 7, 2020, and that the prison was verifying his re-

---

[40] *Id.* at 4-5.
[41] *Id.* at 6.

entry plan, after which time he could be released. The prison explained that it may take 30 days

to verify the re-entry plan. Even so, the inmate has not been isolated or quarantined.[42]

Not only is Rick at high risk of severe illness or death from COVID-19, he is currently in

a high-risk location serving a sentence that this court has concluded has a real chance of being

vacated by his pending appeal. Specifically, this court stated: "[i]t may well be that the [Tenth]

Circuit is going to bounce this case if there be a conviction on the issue of the interpretation of

the statute . . . and it may well be that they won't bounce the case. But nobody here is going to be

willing to bet their last dollar as to what that decision is going to be. . . . I think there's a real

chance that the Circuit Court can toss this case."[43]

And this court previously explained that it believed Rick should be on release until the

conviction was upheld by the Tenth Circuit: "I'm not going to put him in jail pending appeal. . . .

There's no situation I can conjure up where he should be in jail pending a legitimate appeal when

there is a legitimate chance you have that you have a meritorious appeal. . . . You need to have

something definite from me. And we're going to go forward to the trial. We're not going to put

him in jail, so I'm giving you very definite information about that right now."[44]

But after the trial and prior to sentencing, the magistrate judge revoked Rick's release

based on his finding of probable cause that Rick had attempted to mislead the Oregon State

court—a determination that was based on the magistrate's mistaken belief that one cannot

---

[42] *Id.* at 5.
[43] Transcript of Status Conference at 38-40.
[44] *Id.* at 46, 49.

lawfully conduct business in the State of Utah with a lapsed business registration.[45] But that is not the law in Utah.[46]

Rick is at high risk of death from COVID-19. Even assuming his sentence for a non-violent offense will be upheld by the Tenth Circuit, this court should not allow the BOP to gamble with it becoming a death sentence when it can be served under safer conditions.

**3.      Rick Has Attempted to Exhaust His Administrative Remedies**

From March 27, 2020, to April 2, 2020, Rick (directly and also through counsel) made repeated verbal requests to consider releasing him for home confinement in light of his high risk to COVID-19. Rick (and his counsel) also made repeated requests for information about how BOP would evaluate these requests, given the imminent danger posed by the emergency. BOP provided no information.[47]

On April 3, 2020, Rick's counsel submitted a written request to consider him for home confinement.[48] FCI Terminal Island confirmed receipt of the request on April 6, 2020, and explained that Rick will be notified if the request is approved. When Rick's counsel sought general guidance as to the timing of that determination, the prison responded by providing the following non-response: "All Home Confinement referrals will be reviewed and submitted timely if deemed appropriate."[49] As explained in his request to the BOP, Rick is particularly vulnerable to COVID-19 due to his underlying health condition, he has a low security score, he

---

[45] May 31, 2019 Hearing Transcript at 133.
[46] *Murphy v. Crosland*, 886 P.2d 74, 78 (Utah Ct. App. 1994) (citing *Consolidated Mills & Feed Yards Co. v. Patterson*, 221 P. 159, 160 (Utah 1923)).
[47] Baldwin Decl. at 2-3.
[48] *Id.*; Letter to Warden Ponce, Apr. 3, 2020, attached hereto as Exhibit J.
[49] Baldwin Decl. at 3.

has no history of violence, he has a verifiable reentry plan where he will be much safer from

COVID-19 than he would be in a federal prison, and he poses no real danger to the community.

Due to the lockdown, Rick has no access to his case manager (whose office is in a

different building), and therefore, no feasible way to submit a request for home confinement

through the typical grievance process.[50]

**Argument**

This court should grant Rick's motion, ordering his immediate home confinement under

18 U.S.C. § 3582(c)(1)(A)(i), as amended by § 603(b)(1) of the First Step Act of 2018, Pub. L.

115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

The statute allows this court to order Rick's immediate release on home confinement,

"after considering the factors set forth in section 3553(a) to the extent that they are applicable, if

it finds that . . . extraordinary and compelling reasons warrant such [an order] . . . and that such a

reduction is consistent with applicable policy statements." *Id.* As set forth below, this court

should order Rick's immediate home confinement because extraordinary and compelling

reasons, the § 3553(a) factors, and applicable Policy Statements warrant such an order.

1.      **This Court Has Jurisdiction to Grant this Motion**

A threshold requirement for this motion is that Rick fully exhaust his administrative

remedies. The statute provides,

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion
> of the defendant after the defendant has fully exhausted all administrative rights to
> appeal a failure of the Bureau of Prisons to bring a motion on the defendant's
> behalf or the lapse of 30 days from the receipt of such a request by the warden of
> the defendant's facility, whichever is earlier, may reduce the term of
> imprisonment (and may impose a term of probation or supervised release with or

---

[50] *Id.* at 6.

without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—(i) extraordinary and compelling reasons warrant such a reduction . . . .[51]

Rick anticipates the government may argue this court lacks jurisdiction to consider the motion because Rick has not yet exhausted his administrative remedies. This court should reject that argument and exercise its jurisdiction to grant this motion.

First, Rick has attempted to exhaust the available remedies to address this situation. But BOP has demonstrated it is not in a position to provide meaningful relief given the scope of the emergency. Rick and his counsel repeatedly made verbal requests for the prison to consider him for home release, and officials either did not respond or expressly admitted that they did not know how the prison would evaluate home confinement requests relating to the COVID-19 pandemic. Despite the lack of guidance from BOP, Rick and his counsel submitted to the Warden a request for his release on home confinement. Contrary to Attorney General Barr's request to implement his guidance "as quickly as possible" because "time is of the essence,"[52] BOP has not yet made its determination. Simply put, to the extent an administrative remedy exists under these conditions, Rick has exhausted it.

Second, requiring exhaustion under these circumstances is futile and impracticable, and this court should not require it.  On March 26, Attorney General Barr instructed the BOP to prioritize home confinement in response to the pandemic, recognizing that there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer

---

[51] 18 U.S.C. § 3582(c)(1)(A).
[52] Barr Memo II at 2.

serving their sentences in home confinement rather than in BOP facilities.[53] Rick is clearly one such inmate. The BOP already has the authority to release Rick for home confinement. Yet, it has now been more than 10 days and the BOP has not provided any information about how it is implementing Barr's guidance or how it will evaluate Rick's eligibility, much less responded to Rick's specific requests. And more inmates are getting sick every day.

On April 3, Attorney General Barr issued additional guidance, aggressively expanding the BOP's authority to release at-risk inmates on home confinement because "time is of the essence."[54] That guidance reflects the urgent reality facing BOP—the disease is beginning to overtake facilities and poses grave risk of death throughout the system. Indeed, the new guidance grants BOP discretion to release at-risk inmates immediately, to be quarantined for 14 days at home rather than in a BOP facility.[55] The Attorney General has recognized that certain cases may require BOP to remove at-risk inmates in less than 14 days. A weeks-long exhaustion process is utterly unsuited to this event and requiring Rick to comply with it is futile and impracticable.

Third, the court can decide this motion under the historically recognized exceptions to the exhaustion requirement in light of the emergency pandemic. Courts throughout the country have waived the exhaustion requirement for emergency COVID-19 home confinement motions.[56] In the context of the mandatory statutory exhaustion requirement in the Prison Litigation Reform Act, there is a recognized exception to exhaustion where no remedy is effectively "available."[57] Similarly, in the habeas context, the Antiterrorism and Effective Death Penalty Act requires

---

[53] Barr Memo I at 1-2.
[54] Barr Memo II at 2.
[55] *Id.*
[56] *See, e.g.*, *United States v. Colvin*, No. 3:19-CR-179 (JBA) (D. Conn. Apr. 2, 2020); *United States v. Brannon*, No. 4:15-CR-80-01 (S.D. Tex. Apr. 2, 2020).
[57] *Ross v. Blake*, 136 S. Ct. 1850, 1855 (2016); *Rinaldi v. United States*, 904 F.3d 257, 266-67 (3d Cir. 2018).

exhaustion of state remedies to avoid procedural default, but procedural default likewise can be excused for equitable reasons.[58]

The "exhaustion" component of 18 U.S.C. § 3582(c)(1)(A) is not a true exhaustion requirement but rather a claims processing rule because it merely controls who can bring a motion for reduction in sentence. Regardless of who brings the motion, the court's authority and obligation to consider the motion, and the standards for doing so, remain identical. Just as recognized in the PLRA and habeas context, exhaustion under § 3582(c)(1)(A) should be subject to an equitable exception in emergency circumstances.

Moreover, the purposes of requiring exhaustion would not be advanced by ignoring equitable bases for excusing exhaustion. In other contexts, exhaustion rules serve to promote agency autonomy or federal-state court comity as well as to efficiently resolve a matter before it reaches the federal court.[59] Here, the BOP does not have the autonomy to grant a reduction in sentence. The BOP can only serve as a gatekeeper to bring the matter to the court's attention for the grant of relief. Just as in the habeas context and the PLRA context, therefore, defendants should be excused from pursuing exhaustion when the delay necessitated by seeking a BOP-filed motion first would cause undue hardship, as is the case here. Every day the number of confirmed cases of COVID-19 in prisons is rising. It is Rick's understanding that at least one staff member at Terminal Island has tested positive for COVID-19, so it is only a matter of time before the

---

[58] *See McQuiggin v. Perkins*, 569 U.S. 383, 393 (2013) (acknowledging "miscarriage of justice" exception to procedural default under AEDPA); *Holland v. Florida*, 560 U.S. 631, 648-49 (2010) (incorporating equitable tolling into AEDPA's one-year statute of limitations); *Christy v. Horn*, 115 F.3d 201, 206 (3d Cir. 1997) (determining exhaustion requirements can be waived if it would be futile).

[59] *See Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006); *McQuiggin*, 569 U.S. at 393.

virus infects the prisoners. And when it does, he will be at significant risk of medical

complication and death. The Court has authority to act now, and it should.

2.     **Rick's Vulnerability to the COVID-19 Pandemic Sweeping Federal Prisons Is an Extraordinary and Compelling Reason for His Home Confinement**

The rampant spread of COVID-19 is an event unlike any experienced in this country for

many generations. And the horrifying situations unfolding in the federal facilities in Louisiana,

Ohio, and Connecticut illustrate the rapidity with which the disease can outpace health protocols

and swamp prisons with disease and death. And judges around the country have released

defendants in light of the extraordinary risk posed by COVID-19 in correctional institutions.[60]

The virus is spreading throughout the system to many other facilities, including MDC

Los Angeles, which is less than 30 miles away from the facility where Rick is located.[61]

Lompoc, which is located less than three hours away has also reported a significant number of

cases.[62] The union representing Lompoc's prison staff has even filed a complaint with the

Department of Labor, alleging "[t]he federal government is failing to do everything it can to

protect workers who are on the front lines of this health-care crisis, and in some cases it is

willfully doing the opposite – exposing not only workers but vulnerable populations to this

---

[60] *See, e.g.*, *United States v. Foster*, No. 1:14-CR-0324 (M.D. Pa. Apr. 3, 2020); *United States v. Colvin*, No. 3:19-CR-179 (JBA) (D. Conn. Apr. 2, 2020); *United States v. Brannon*, No. 4:15-CR-80-01 (S.D. Tex. Apr. 2, 2020); *United States v. Grobman*, No. 18-CR-20989 (S.D. Fla. Mar. 29, 2020); *United States v. Powell*, No. 1:94-CR-316-ESH (D.D.C. Mar. 28, 2020); *United States v. Harris*, No. 19-CR-356 (D.D.C. Mar. 26, 2020); *United States v. Stephens*, No. 15-CR-95 (S.D.N.Y. Mar. 19. 2020).

[61] COVID-19 Coronavirus, Bureau of Prisons, https://www.bop.gov/coronavirus/ (last visited Apr. 8, 2020)

[62] *Id.*

deadly virus."[63] Indeed, the union's allegations corroborate Rick's observations about how Terminal Island is responding to the situation. And although it has not been included in BOP's official reports, Rick has been told that at least one staff member from Terminal Island has tested positive for COVID-19. He also reports many inmates appear to exhibit symptoms of the virus, such as persistent coughing. Most recently, he reported to his wife that two inmates were removed from his unit when it was discovered that they had temperatures of 104 degrees, which is a strong indicator of COVID-19 infection.

These conditions would be enough to trouble anyone. But for Rick, they pose a serious risk of death due to his ███████████████████. These are extraordinary and compelling reasons that warrant ordering his home confinement. Continuing to hold him at Terminal Island would be playing roulette with his life in the face of a deadly threat.

**3.      The § 3553(a) Factors Weigh Heavily in Favor of Home Confinement**

A sentence reduction is consistent with and supported by the factors in 18 U.S.C. § 3553(a), whose consideration is mandated by § 3582(c)(1)(A) "to the extent they are applicable." The applicable factors weigh in favor of Rick's home confinement.

Three of the § 3553(a) factors now carry more weight than at the time of sentencing: (1) "the history and characteristics of the defendant," (2) "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and (3) "the need for the sentence imposed . . . to provide the

---

[63] Janene Scully, *Union Raises Concerns About COVID-19 Outbreak at Lompoc Federal Prison Complex*, https://www.noozhawk.com/article/union_raises_concerns_about_covid_19_outbreak_lompoc_federal_prison_complex (last visited Apr. 9, 2020).

defendant with . . . medical care . . . in the most effective manner."[64] Each of the factors weigh heavily in favor of home confinement.

First, as detailed at length above, Rick's age and vulnerability to COVID-19 weigh in favor of extricating him from the federal prison where he is so vulnerable to many potential sources of infection. The CDC's guidance is clear—Rick is at high risk of severe illness or death if he catches COVID-19. And if he remains in prison, he will have no control over whether he is exposed. And indeed, even with the BOP's best efforts, the facility's efforts to prevent exposure may also fail, as it is failing in every community in the country.

Second, he is a non-violent offender confined in a low-security facility and poses a low risk of recidivism. Rick was convicted of financial crimes relating to real estate investments. He ceased conducting any such business prior to the indictment in 2009, more than a decade ago. He has no intention of ever conducting that type of business again or otherwise reoffending. Rather, once he is able to do so, he intends to seek employment as a laborer on one of the ranches near his family home in the Grouse Creek community, located in rural Utah.

Third, he poses no threat of violence to the community should the court order his home confinement. Rick has been in BOP's custody for roughly seven weeks. Prior to that, he was housed in the Weber County Jail, in Ogden, Utah, for several months. All told, he has been in custody for nearly one year. During that time he has had no disciplinary issues. He has not engaged in any violent or gang activities and has not incurred any BOP violations. And throughout his prosecution—which involved one indictment being dismissed, a jury trial ending in a hung jury, and a second jury trial leading to his conviction—he was on release on his own

---

[64] 18 U.S.C. §§ 3553(a)(1), (2)(D).

recognizance for roughly 10 years. He repeatedly was evaluated and found to pose no danger to the community. That is equally true today.

Indeed, Rick's home confinement would increase public safety, in light of the COVID-19 pandemic. Rick seeks home confinement in his family home, which is located in Grouse Creek, Utah. Grouse Creek is in rural northwestern Utah and is "nearly unpopulated."[65] His absence from the federal facility would further public safety. Confining him at home would remove him from the federal facility as another potential vector for the disease to spread. His ████████████ ████████████████████████████████████████████████, so if he were to contract COVID-19 while in prison, he would pose a serious health risk to Terminal Island's staff and inmates. Indeed, Attorney General Barr's memo reflects well-founded concerns about the federal prison system's vulnerability to a disease like COVID-19. He expressed concerns about the prisons becoming "petri dishes" for the virus.[66]

Rick's home confinement would present a significantly lower risk of contracting COVID-19 than if he continues to be housed at Terminal Island. At Terminal Island, Rick lives in a dormitory where he is in contact with high-density groups of inmates. He shares a bunk bed with an inmate and commonly finds himself in a room with a hundred people at any given time. Indeed, during his short time at Terminal Island, Rick has heard anecdotal reports about an outbreak of the parasitic mite, scabies, which has eluded the medical authorities at the facility for two years. It is understandable that a large facility housing hundreds of inmates faces serious

---

[65] Grouse Creek, Utah, Wikipedia, https://en.wikipedia.org/wiki/Grouse_Creek,_Utah (last visited Mar. 30, 2020).

[66] Alexander Mallin, *AG William Barr Pushes Expansion of Home Confinement to Reduce Prison Populations Amid Coronavirus*, ABC News, https://abcnews.go.com/Politics/ag-william-barr-pushes-expansion-home-confinement-reduce/story?id=69816504 (last visited Apr. 2, 2020).

medical challenges. But if the institution struggles to contain parasitic mites, it will certainly be vulnerable to a global pandemic that is crippling the hospital networks of New York City. Additionally, Terminal Island is located in southern California, which is a densely populated area of the country. The area is currently under a stay-at-home order and the State is reporting that as of April 7, 2020, there were nearly 17,000 confirmed cases in the State, with 442 fatalities.[67] As staff circulate in and out of the facility, chances for infection in the facility increase. And as fellow inmates circulate in and out for transfers, court dates, or any other reason, the chances for infection increase. The public health crisis is in a state of flux, so these pressures are sure to worsen in coming days and weeks. Indeed, by the time this request is reviewed the dire situation will almost certainly have become worse than it is at the time of this writing.

Grouse Creek, on the other hand, is sparsely populated. His family estimates there are fewer than 50 people currently living in the community. Grouse Creek has infrequent contact with the outside population, and as yet, no one in the community has become infected with COVID-19. As a ranching community, its members live naturally isolated lives, spending much of their day in the wilderness on their horses. Even so, Mr. Koerber's family has indicated that community members are self-isolating to ensure there cannot be a community spread.

Fourth, he has a reentry plan that will prevent recidivism and ensure his health and safety as well as the public's health and safety, which, as already provided to the BOP, is as follows:

Residence - Mr. Koerber would reside at ███████████████████
███████████████████████████████

---

[67] COVID-19, Calif. Dept. of Pub. Health,
https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx#COVID-19%20by%20the%20Numbers (last visited Apr. 9, 2020).

<u>Other Residents</u> - The other residents at the home would be his wife, J█████ K█████; his son █████████████; his daughter, █████████████; and his step-son, █████████.

<u>Community</u> - As explained above, his residence is located in a small rural community called Grouse Creek, Utah. The community is comprised of roughly 50 individuals, including his mother and his in-laws, who will all provide positive support and ensure successful reentry. The individuals in Grouse Creek are diligently self-isolating to protect each other from possible transmission and infection.

<u>Employment</u> - Once Mr. Koerber is permitted to seek employment, he intends to pursue employment as a laborer for one of the local ranchers in the Grouse Creek community.

<u>Managing Medical Needs</u> - All of Mr. Koerber's doctors, medical records, and medical history are located in Utah. Although Grouse Creek is located in rural Utah, he could be driven to clinics and hospitals in Salt Lake City for treatment, if necessary. His family also participates in a program with the local helicopter life-flight plan, through which he can obtain helicopter transport to a hospital in less than an hour.

<u>Conditions</u> - Mr. Koerber is capable and willing to abide by conditions relating to his home confinement. For example, he would submit to wearing an ankle bracelet in order to provide the government with 24-hour monitoring as described in 18 U.S.C. § 3624(g)(2)(A)(i)(I). To further ensure adequate monitoring, he would submit to check-in and report to authorities through weekly phone calls. He would also submit to remaining confined to his home at all times, except to travel for medical reasons, or any other activities described in § 3624(g)(2)(A)(i)(II) that the Director of the BOP may deem permissible. Finally, he is willing to submit to other conditions that the Director deems appropriate. *Id.* § 3624(g)(2)(A)(i)(III).

Fifth, severe illness from COVID-19 is a painful disease that requires the use of a ventilator to continue breathing. A sentence that includes such a painful illness or death would be disproportionate to the seriousness of the offense for which Rick was convicted, and would not serve to promote respect for the law or just punishment for the offense. To the contrary, failing to order home confinement in order to avoid inhumane treatment of non-violent high-risk inmates like Rick would disrespect the law and notions of justice.

Should this court order his release, his wife can arrange to pick him up from the Terminal Island facility at a time that can be coordinated with the facility, and as soon as possible. Alternatively, his undersigned counsel can arrange to pick him up. Rick's wife (or his counsel) will drive him directly to his family residence in Grouse Creek, Utah, where he will reside with his family during his home confinement. He will self-quarantine at home as long as necessary to ensure his health and safety and that of others. And he will obtain suitable, gainful employment. In sum, the § 3553(a) factors weigh heavily in Rick's favor.

**4.      Rick's Home Confinement Is Consistent with the Applicable Policy Statements**

The Sentencing Commission policy statement on reductions of sentences under § 3582(c)(1)(A) lists three specific categories of "extraordinary and compelling reasons" but expressly does not restrict what combination of factors can warrant release.[68] The comments expressly include a category for "Other Reasons," when there is "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."[69] The policy statement does not address a global public health crisis on the scale of the COVID-19 pandemic, but its thrust is clear—extreme health concerns constitute extraordinary and compelling reasons. Consequently, ordering Rick's home detention to reduce his risk of death from the global pandemic is favored by the applicable Policy Statements.

---

[68] U.S.S.G. § 1B1.13 n.1(A)-(D). The three specific categories are: (1) terminal illness of the inmate, or an irrecoverable serious physical, medical, or mental issue that prevents the inmate from providing himself with self-care within the prison; (2) age of the defendant, combined with a serious deterioration in physical or mental health because of the aging process; and (3) death or incapacitation of the caregiver of the inmate's minor children, or incapacitation of the inmate's spouse or partner. *See* U.S.S.G. § 1B1.13 n.1(A)-(C).

[69] *Id.*

**Conclusion**

Rick respectfully seeks an indicative ruling pursuant to Federal Rule of Criminal Procedure 37, indicating that this court would order Rick's immediate home confinement if the court of appeals remands for that purpose. Rick suffers from ███████████████ and other factors that make him vulnerable to serious consequences if he contracts COVID-19. And if he contracts the virus because he was exposed to it in a federal facility when he could have been confined safely at home, his prison sentence could very likely become a death sentence. COVID-19 has overwhelmed the country's medical system and is creating a public health crisis like this country has not seen for a century. Half measures will not be enough. The virus poses a serious threat to Rick's life and his sentence for a term of years should not become a death sentence when a safe, alternative form of confinement is immediately available.

DATED this 9th day of April, 2020.

ZIMMERMAN BOOHER

s/ Dick J. Baldwin
Michael D. Zimmerman
Troy L. Booher
Dick J. Baldwin
*Attorneys for Defendant Claud R. Koerber*

**Certificate of Service**

This is to certify that on the 9ᵗʰ day of April, 2020, I caused the foregoing to be served on

the following via CM/ECF:

> Aaron B. Clark (aaron.clark@usdoj.gov)
> Ruth J. Hackford-Peer (ruth.hackford-peer@usdoj.gov)
> Ryan D. Tenney (ryan.tenney@usdoj.gov)
> Tyler L. Murray (tyler.murray2@usdoj.gov)
> U.S. ATTORNEY'S OFFICE
> *Attorneys for Plaintiff United States of America*
>
> Robert K. Hunt (robert_hunt@fd.org)
> Scott K. Wilson (scott_wilson@fd.org)
> Daphne A. Oberg (daphne_oberg@fd.org)
> Bretta Pirie (bretta_pirie@fd.org)
> Jessica Stengel (jessica_stengel@fd.org)
> Kathryn Neal Nester (kathy_nester@fd.org)
> UTAH FEDERAL DEFENDER OFFICE
> *Attorneys for Claud R. Koerber*
>
> Mary Schuman (mary_schuman@utp.uscourts.gov)
> U.S. PROBATION/PRETRIAL
>
> Victim Witness Coordinator (candelaria.bennett@usdoj.gov)
> US Attorney's Office

s/ Dick J. Baldwin

**Exhibits**

Exhibit A:   Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic, Office of the Attorney General (Mar. 26, 2020) ("Barr Memo I")

Exhibit B:   Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 at 2, Office of the Attorney General (Apr. 3, 2020) ("Barr Memo II")

Exhibit C:   Medical Records re: █████████████

Exhibit D:   COVID-19 Risk Letter, Tyler S. Carroll, M.D., (Apr. 2, 2020) ("Dr. Carroll Letter")

Exhibit E:   Declaration of Claud Rick Koerber in Support of His Motion to Dismiss for Impermissible Delay, *United States v. Koerber*, 2:09-CR-302 (D. Utah May 20, 2014) ("Koerber Decl.")

Exhibit F:   Presentence Report, *United States v. Koerber*, 2:17-CR-00037 (D. Utah Oct. 16, 2019) ("PSR")

Exhibit G:   Excerpts of Sentencing Hearing Transcript, *United States v. Koerber*, 2:17-CR-00037 (D. Utah Oct. 15, 2019) ("Sentencing Transcript")

Exhibit H:   Medical Records re: ████████████

Exhibit I:   Medical Records re: ███████

Exhibit J:   Letter to Warden Ponce (Apr. 3, 2020)

Exhibit K:   Declaration of Dick Baldwin (Apr. 9, 2020)

# Exhibit A

Prioritization of Home Confinement as Appropriate
in Response to COVID-19 Pandemic, Office of the Attorney General
(Mar. 26, 2020) ("Barr Memo I")



**Office of the Attorney General**
**Washington, D. C. 20530**

March 26, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU PRISONS

FROM:        THE ATTORNEY GENERAL

SUBJECT:    Prioritization of Home Confinement As Appropriate in Response to
                    COVID-19 Pandemic

Thank you for your tremendous service to our nation during the present crisis. The current situation is challenging for us all, but I have great confidence in the ability of the Bureau of Prisons (BOP) to perform its critical mission during these difficult times. We have some of the best-run prisons in the world and I am confident in our ability to keep inmates in our prisons as safe as possible from the pandemic currently sweeping across the globe. At the same time, there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities. I am issuing this Memorandum to ensure that we utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in our custody.

## I.   TRANSFER OF INMATES TO HOME CONFINEMENT WHERE APPROPRIATE TO DECREASE THE RISKS TO THEIR HEALTH

One of BOP's tools to manage the prison population and keep inmates safe is the ability to grant certain eligible prisoners home confinement in certain circumstances. I am hereby directing you to prioritize the use of your various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. Many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing which inmates should be granted home confinement pursuant to this Memorandum, you are to consider the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

- The age and vulnerability of the inmate to COVID-19, in accordance with the Centers for Disease Control and Prevention (CDC) guidelines;

Memorandum from the Attorney General                                                      Page 2
Subject: Prioritization of Home Confinement As Appropriate in Response to COVID-19
       Pandemic

- The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

- The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment under this Memorandum;

- The inmate's score under PATTERN, with inmates who have anything above a minimum score not receiving priority treatment under this Memorandum;

- Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

- The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, will render an inmate ineligible for home detention. Other serious offenses should weigh more heavily against consideration for home detention.

In addition to considering these factors, before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risks of COVID-19 at the location in which the inmate seeks home confinement. We should not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. You should grant home confinement only when BOP has determined—based on the totality of the circumstances for each individual inmate—that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

## II.   **PROTECTING THE PUBLIC**

While we have an obligation to protect BOP personnel and the people in BOP custody, we also have an obligation to protect the public. That means we cannot take any risk of transferring inmates to home confinement that will contribute to the spread of COVID-19, or put the public at risk in other ways. I am therefore directing you to place any inmate to whom you grant home confinement in a mandatory 14-day quarantine period before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process should also be subject to location monitoring services and, where a court order is entered, be subject to supervised release.

We must do the best we can to minimize the risk of COVID-19 to those in our custody, while also minimizing the risk to the public. I thank you for your service to the country and assistance in implementing this Memorandum.

# Exhibit B

Increasing Use of Home Confinement at Institutions
Most Affected by COVID-19,
Office of the Attorney General (Apr. 3, 2020) ("Barr Memo II")



# Office of the Attorney General
## Washington, D. C. 20530

April 3, 2020

MEMORANDUM FOR DIRECTOR OF BUREAU OF PRISONS

FROM:          THE ATTORNEY GENERAL

SUBJECT:       <u>Increasing Use of Home Confinement at Institutions Most Affected by COVID-19</u>

The mission of BOP is to administer the lawful punishments that our justice system imposes. Executing that mission imposes on us a profound obligation to protect the health and safety of all inmates.

Last week, I directed the Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the dangers that COVID-19 poses to our vulnerable inmates, while ensuring we successfully discharge our duty to protect the public. I applaud the substantial steps you have already taken on that front with respect to the vulnerable inmates who qualified for home confinement under the pre-CARES Act standards.

As you know, we are experiencing significant levels of infection at several of our facilities, including FCI Oakdale, FCI Danbury, and FCI Elkton. We have to move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of these institutions. I would like you to give priority to these institutions, and others similarly affected, as you continue to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards. In addition, the CARES Act now authorizes me to expand the cohort of inmates who can be considered for home release upon my finding that emergency conditions are materially affecting the functioning of the Bureau of Prisons. I hereby make that finding and direct that, as detailed below, you give priority in implementing these new standards to the most vulnerable inmates at the most affected facilities, consistent with the guidance below.

I.    <u>**IMMEDIATELY MAXIMIZE APPROPRIATE TRANSFERS TO HOME CONFINEMENT OF ALL APPROPRIATE INMATES HELD AT FCI OAKDALE, FCI DANBURY, FCI ELKTON, AND AT OTHER SIMILARLY SITUATED BOP FACILITIES WHERE COVID-19 IS MATERIALLY AFFECTING OPERATIONS**</u>

While BOP has taken extensive precautions to prevent COVID-19 from entering its facilities and infecting our inmates, those precautions, like any precautions, have not been perfectly successful at all institutions. I am therefore directing you to immediately review all inmates who have COVID-19 risk factors, as established by the CDC, starting with the inmates incarcerated at FCI Oakdale, FCI Danbury, FCI Elkton, and similarly situated facilities where you determine that COVID-19 is materially affecting operations. You should begin implementing this directive immediately at the facilities I have specifically identified and any other facilities facing similarly serious problems. And now that I have exercised my authority under the CARES Act, your review should include all at-risk inmates—not only those who were previously eligible for transfer.

For all inmates whom you deem suitable candidates for home confinement, you are directed to immediately process them for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility, or, in appropriate cases subject to your case-by-case discretion, in the residence to which the inmate is being transferred. It is vital that we not inadvertently contribute to the spread of COVID-19 by transferring inmates from our facilities. Your assessment of these inmates should thus be guided by the factors in my March 26 Memorandum, understanding, though, that inmates with a suitable confinement plan will generally be appropriate candidates for home confinement rather than continued detention at institutions in which COVID-19 is materially affecting their operations.

I also recognize that BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large numbers of inmates in the community. I therefore authorize BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as BOP determines in every such instance that doing so is appropriate and consistent with our obligation to protect public safety.

Given the speed with which this disease has spread through the general public, it is clear that time is of the essence. Please implement this Memorandum as quickly as possible and keep me closely apprised of your progress.

## II.  **PROTECTING THE PUBLIC**

While we have a solemn obligation to protect the people in BOP custody, we also have an obligation to protect the public. That means we cannot simply release prison populations en masse onto the streets. Doing so would pose profound risks to the public from released prisoners engaging in additional criminal activity, potentially including violence or heinous sex offenses.

That risk is particularly acute as we combat the current pandemic. Police forces are facing the same daunting challenges in protecting the public that we face in protecting our inmates. It is impossible to engage in social distancing, hand washing, and other recommend steps in the middle of arresting a violent criminal. It is thus no surprise that many of our police officers have fallen ill with COVID-19, with some even dying in the line of duty from the disease. This pandemic has dramatically increased the already substantial risks facing the men and women who keep us safe, at the same time that it has winnowed their ranks while officers recover from getting sick, or self-quarantine to avoid possibly spreading the disease.

Memorandum from the Attorney General                                    Page 3
Subject: Increasing Use of Home Confinement at Institutions Most Affected by COVID-19

The last thing our massively over-burdened police forces need right now is the indiscriminate release of thousands of prisoners onto the streets without any verification that those prisoners will follow the laws when they are released, that they have a safe place to go where they will not be mingling with their old criminal associates, and that they will not return to their old ways as soon as they walk through the prison gates. Thus, while I am directing you to maximize the use of home confinement at affected institutions, it is essential that you continue making the careful, individualized determinations BOP makes in the typical case. Each inmate is unique and each requires the same individualized determinations we have always made in this context.

I believe strongly that we should do everything we can to protect the inmates in our care, but that we must do so in a careful and individualized way that remains faithful to our duty to protect the public and the law enforcement officers who protect us all.

Filed Under Seal

# Exhibit C

Medical Records re: ███████████████

Filed Under Seal

# Exhibit D

COVID-19 Risk Letter, Tyler S. Carroll, M.D.,
(Apr. 2, 2020) ("Dr. Carroll Letter")

Filed Under Seal

# Exhibit E

Declaration of Claud Rick Koerber in Support of His
Motion to Dismiss for Impermissible Delay,
*United States v. Koerber*, 2:09-CR-302 (D. Utah May 20, 2014)
("Koerber Decl.")

Filed Under Seal

# Exhibit F

Presentence Report, *United States v. Koerber*, 2:17-CR-00037
(D. Utah Oct. 16, 2019) ("PSR")

# Exhibit G

Excerpts of Sentencing Hearing Transcript,
*United States v. Koerber*, 2:17-CR-00037
(D. Utah Oct. 15, 2019) ("Sentencing Transcript")

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

3

4

   UNITED STATE OF AMERICA,        )
5                                   )
              Plaintiff,            )
6                                   )
         vs.                        )
7                                   )
   CLAUD R. KOERBER                 )   Case No:   2:17CR0037
8                                   )
              Defendant,            )
9    _____        )
                                    )
10                                  )

11

12

13

14

15

16

              BEFORE THE HONORABLE FREDERIC BLOCK
17
                     October 15, 2019
18
                    SENTENCING HEARING
19

20

21

22

23                    Reported by:
             KELLY BROWN HICKEN, RPR, RMR
24                   801-521-7238

25

                                                          1

1    part of the trial, where, you know, despite the fact that

2    these people gave him money directly and he gave money

3    directly back, he wrote an e-mail and said, hey, never mind

4    that.  You should consider all of your investments that have

5    been made in the McGuire Group.  And we asked the witnesses

6    about that, and they're like, no, I didn't know that.  I never

7    heard that.  That was news to me.  This is just an attempt to

8    distance himself and set him up so he can make the very

9    arguments that he's trying to make right now.

10            THE COURT:  Do you think there is anything about

11   his personal character that sort of suggests that I should

12   consider it in balancing the 3553(a) factors, is there

13   anything good you have to say about him?

14            MR. MURRAY:  Do I have anything good to say about

15   Mr. Koerber?  I don't doubt the statements that he is a kind

16   and attentive father.  I don't doubt that statements, and I

17   have no reason to doubt that he performed service in his

18   community up there where he's living in rural northwest Utah.

19   I don't doubt these things.

20            But what is troubling to me about those is that I

21   wish he would act that way all the time and not be so

22   deceptive with people and not -- because it clearly shows he

23   can conform his behavior to social norms and be honest when he

24   needs to be, when it benefits him, and he can show those kind

25   of characteristics, but he just hasn't done it.

43

1          But, Your Honor, to be fair, everyone is better

2   than the best thing -- the worse thing they've ever done.  But

3   Mr. Koerber's repeated pattern of deception particularly in

4   this case deserves a harsh sentence.

15:16:09  5          THE COURT:  Why don't we hear from Miss Nester, all

6   right?

7          Miss Nester, you've done brilliant work for your

8   client.  You know how much I admire your work.  You have a

9   tough road to hoe here.  I want to give you every opportunity.

15:16:24 10          MS. NESTER:  Thank you, Your Honor.

11          So if it's all right with Your Honor, I am aware

12   there are victims here that do wish to speak, so I do present

13   that to the Court and would ask that the Court give them that

14   opportunity.

15:16:37 15          THE COURT:  Are there any victims who wish to come

16   forward and talk?  Let me see a show of hands.  Well, come on

17   and step right up here.  Let the marshals sort of put you in

18   some orderly line, and you'll come one by one.  All right.

19          So you'll identify yourself, and let's have your

15:17:02 20   name, where you're hailed from, and I'm more than happy to

21   listen to you.  Go ahead.

22          MR. HUFF:  My name is James Todd Huff.  I'm from

23   Wyoming.  I am here because somehow my name made it onto the

24   victim list.  I'm here to clarify that I am not a victim, nor

15:17:26 25   have I been a victim.

44

1          THE COURT:  We're only here to hear from victims.

2    You don't consider yourself a victim; right?

3          MR. HUFF:  No.  But I'm on the victim list.

4          THE COURT:  You're on the victim list?

15:17:38  5          MR. HUFF:  Yes, I am.

6          THE COURT:  Okay.  So if you're not a victim so

7    maybe your name should be taken off the victim list, I

8    suspect.

9          MR. HUFF:  Okay.

15:17:48 10          THE COURT:  Thank you for coming.

11          Next?

12          MR. LONG:  My name is Klein Long.  And I don't

13    understand what you're saying, victims.  We were all victims

14    supposedly, right, if we lost money?

15:18:18 15          THE COURT:  You're asking whether I'm a victim?

16          MR. LONG:  No.  I'm asking, aren't we all victims

17    if we lost money?

18          THE COURT:  Listen to me.  Do you think you've been

19    victimized by this crime?

15:18:32 20          MR. LONG:  The first thing I want to say is I

21    refute the idea that the Wall Street rag considers Mormons

22    stupid.

23          THE COURT:  The Judge does not consider Mormons

24    stupid, and I'm more important than Wall Street, okay?  What

15:18:48 25    else do you wish to say?

1          MR. LONG:  Well, it comes across that they think

2     we're stupid.

3          THE COURT:  Are we hear to listen to victims?  If

4     you're not a victim, why are you talking to me?

15:19:00  5          MR. LONG:  Your Honor --

6          THE COURT:  Next please, Marshal.

7          MR. LONG:  If I lost money, then I'm a victim;

8     right?

9          THE COURT:  Thank you.  Marshal, next?  Thank you

15:19:06  10    very much.

11         Victims are people who want to complain about being

12    victims and want to speak to that.  That's your entitlement.

13    We are not here to hear speeches about anything else.  We're

14    here to keep an orderly sentencing proceedings.  Anybody else

15:19:26  15    who wishes to be heard who's a victim?

16         MR. ANDREASON:  Hello, Your Honor.  My name is

17    Wayne Andreason, and I am a victim.  I lost a considerable

18    about of money.

19         THE COURT:  You're a true victim.

15:19:43  20         MR. ANDREASON:  I suppose I am a true victim.  I

21    feel that the prosecutors did go after Mr. Koerber enough to

22    where they got him.  I do feel like -- had we -- let's say

23    there is a woman in the village and she was growing a great

24    garden and everyone wanted in on that and wanted to plant our

15:20:07  25    seeds in her garden and then it grew and we're all happy --

46

1          THE COURT:  So you're a victim who wants to forgive

2     Mr. Koerber and you would like me to go easy on him; right?

3          MR. ANDREASON:  That's exactly right, Your Honor.

4          THE COURT:  I get it.

15:20:17  5          MR. ANDREASON:  I feel like if this garden grows

6     really good and it starts growing and we feel frustrated and

7     embarrassed and broke and we lost money, that we feel it's

8     embarrassing, and we want to blame someone.

9          THE COURT:  How much money did you lose?

15:20:36  10          MR. ANDREASON:  Excuse me?

11          MR. WILSON:  How much money did you lose?

12          MR. ANDREASON:  $1.5 million.

13          THE COURT:  You're a disciple of the good Lord to

14     be so forgiving, and I respect that a great deal.  Anything

15:20:49  15     else you wish to say?

16          MR. ANDREASON:  Yeah.  I would like to say that if

17     sending Mr. Koerber to prison to get that money back I

18     probably would still be against it because I feel like even

19     though I was a victim I was an adult and that I vetted and

15:21:04  20     looked into things and -- anyway.  And so, yeah, here I am a

21     victim, but I want to ask Your Honor to --

22          THE COURT:  Sentencing is very difficult.

23          MR. ANDREASON:  Yes.

24          THE COURT:  I tell people I had a law clerk last

15:21:19  25     year that said, I will never become a district court judge

1    because I just cannot put somebody in prison.  Some people

2    just can't do it.  But, you know, I've taken an oath to

3    discharge my responsibility to courts of the law, that's what

4    I have to try to do.  It's the most difficult part of my job.

15:21:38  5          MR. ANDREASON:  Right.  And I understand that.  I

6    feel like that if I were on trial, you know, that I might not

7    want to admit to anything, either, because you want the

8    innocent plea.  And so naturally Mr. Koerber admitted that,

9    yeah, that was stupid, and I did that there.  So, yeah --

15:21:54  10          THE COURT:  I totally get it.  I get your drift.  I

11   understand what you're saying.  Thank you very much.

12           MR. ANDREASON:  And he might have felt some

13   remorse.

14           THE COURT:  I get what you're saying.  Thank you

15:21:58  15   for coming.

16           Anyone else wish to be heard?

17           MR. ANDREASON:  Anyway, that's what I would say.

18   Thank you.

19           THE COURT:  Thank you for coming.

15:22:05  20           Anybody else wish to be heard?  Your name?

21           MR. VAUGHN:  Good afternoon.  My name is Jason

22   Vaughn, and I am a victim.

23           THE COURT:  Are you a forgiving victim, also, I

24   take it?

15:22:25  25           MR. VAUGHN:  Jesus said forgive everyone.

48

1          THE COURT:  Do you think I should sentence

2     Mr. Koerber to a period of incarceration or not?

3          MR. VAUGHN:  I think you should not sentence him at

4     all.  I am a victim of these fraudulent prosecutors.

15:22:40  5          THE COURT:  How much --

6          MR. VAUGHN:  They have lied their whole way through

7     this trial and at my own trial that I was acquitted for.

8          THE COURT:  Stop and listen to me.  How much have

9     you lost?  We want to make a clear record.  You're a victim.

15:22:55 10   How much have you lost by Mr. Koerber?  You said you were a

11    victim.

12         MR. VAUGHN:  Yes.

13         THE COURT:  I just want the record to be clear.

14    How much money did Mr. Koerber --

15:23:04 15        MR. VAUGHN:  I had about 3 million placed there.

16    But I am --

17         THE COURT:  Just one second.  I want the record to

18    be clear you're testifying before a court of law.  So I want

19    you to state clearly so I have it down correctly.  You're

15:23:17 20   telling me that Mr. Koerber fraudulently took $3 million from

21    you?

22         MR. VAUGHN:  No, I'm not saying that.

23         THE COURT:  You lost $3 million?

24         MR. VAUGHN:  You use the word fraudulent, and no.

15:23:30 25        THE COURT:  So you're not a victim then.

```
 1              MR. VAUGHN:  I am a victim.

 2              THE COURT:  You gave your money voluntarily.

 3              MR. VAUGHN:  I am a victim of these people here.

 4    They are the fraudsters.  They are the liars.

 5              THE COURT:  Marshals, marshals, you can escort him

 6    out.  Thank you very much.

 7              You're inappropriate with your comments.  You can

 8    take him out.  Thank you very much.

 9              MR. VAUGHN:  Thank you for your service.

10              THE MARSHAL:  I'm asking you to leave.

11              MR. VAUGHN:  I know.  I've got my books right

12    there.  Let me take my books.

13              THE MARSHAL:  I'm asking you to leave right now.

14    Just leave right now, sir.

15              (Whereupon, a disruption occurred.)

16              THE COURT:  All right, folks.  The law allows any

17    true victims to come speak to the Judge Block.  Is there

18    anybody that falls into that category?  Please if you do be

19    relevant.  We understand that people have different opinions

20    about the law.  I respect that, but we're here to conduct an

21    orderly proceeding.  Any true victims wish to speak, you can

22    do that.  I don't want to hear speeches about antigovernment

23    or anti anything else.  All right.  Anyone else?

24              Thank you.  That completes this.

25              Ms. Nester, anything else you wish to say?
```

Timestamps: 15:23:39 (line 5), 15:23:54 (line 10), 15:24:15 (line 15), 15:24:31 (line 20), 15:24:45 (line 25)

1          MS. NESTER:  Yes.  Thank you.

2          Just so the Court knows, I've not met with any of

3    those victims prior to today.  I was not aware what they were

4    going to say.

15:25:02  5          THE COURT:  It's unusual that the defense would

6    call for victims.

7          MS. NESTER:  Well, I did know that they had a

8    victim that wanted to speak, but I had no idea what they were

9    going to say.

15:25:08  10         THE COURT:  It's unseemly.  I mean usually the

11   victims comes from the government.

12         MS. NESTER:  I agree.

13         THE COURT:  Not from the defense counsel.  Look --

14         MS. NESTER:  Not from me.

15:25:14  15        THE COURT:  -- I've been charitable.  I'm sorry I

16   went down that rabbit hole because we don't need to have that

17   disorder in my courtroom.

18         MS. NESTER:  I agree, Your Honor.

19         THE COURT:  And I'm really offended by that

15:25:24  20   behavior.  Anything else you wish to say?

21         MS. NESTER:  Yes, sir.  I do want to make it clear

22   I was not --

23         THE COURT:  Your apologies are accepted by the

24   Court.

15:25:29  25        MS. NESTER:  I absolutely was not involved in that

1    at all, so I apologize.

2           So, Your Honor, I think what we need to look at in

3    this case are two different ways for the Court to analyze the

4    incidents in the case.  One would be under the framework of a

15:25:48  5    departure, which Your Honor has talked about already, which

6    goes under the guidelines of the sentencing guidelines.  The

7    other would be to talk about your power and ability to vary

8    from the guideline range from whatever ground Your Honor

9    thinks is appropriate.

15:26:05  10          So I'd like to talk about the guideline departure

11   first.  I know that nowadays we have all kind of quit arguing

12   departures anymore because the variance does give you such a

13   broad authority.

14          THE COURT:  It doesn't matter.  It doesn't make

15:26:20  15   much difference.  I mean, I grant the variance, and I don't

16   have to deal with the nuances of the old law about the

17   departures.

18          MS. NESTER:  That's what I was going to ask.

19          THE COURT:  You can say whatever you want.  I'm

15:26:29  20   considering it all in my calculation as to what the right

21   sentence should be.

22          MS. NESTER:  Just to make the record, then, I'll

23   keep that super short.  Under the guidelines I frankly don't

24   argue them anymore, either, but I do think it's appropriate

15:26:41  25   under the statutory framework.  So we did raise several that

1    we did ask Your Honor to consider.

2           The government talked about having the guidelines

3    saying that family ties is not normally considered.  However,

4    it does consider family responsibilities.  And as Your Honor

15:27:05  5    knows, Mr. Koerber is the one person who is responsible for

6    taking care of his dependents.  His wife teaches their

7    children at home and does not have a stream of income.  He

8    also is supporting his mother who's extremely ill with

9    emphysema, and those are his responsibilities only.  If he

15:27:27 10    were to be sentenced to a lengthy period of incarceration

11    there would be a significant impact on his family's ability to

12    survive.

13           As Your Honor did acknowledge in the presentence

14    report the amount of assets, and really he is destitute at

15:27:48 15    this point, and the small amount of work he was able to do

16    supported his family.  So I do think under the departure

17    grounds --

18           THE COURT:  Let me interrupt.  I think all of those

19    things are appropriate factors for me to consider in my

15:28:03 20    3553(a) balance.

21           MS. NESTER:  Okay.

22           THE COURT:  And I will do that.

23           MS. NESTER:  Thank you, Your Honor.

24           The other thing I think that is appropriate under

15:28:09 25    the guideline framework would be Section 5K2.0, Pepper vs.

1    <u>United States</u>, which the case of Pepper, which as Your Honor

2    talks about post offense rehabilitation.  This -- sorry.  I'll

3    go slower.  This case is very unusual in that we have had an

4    opportunity to see how Mr. Koerber has continued to be a

15:28:35  5    productive member of society since the offense occurred.  It's

6    been over a decade, and we do have the benefit of watching

7    that Mr. Koerber has been able to support his family.  He

8    completely withdrew from any type of investment, any type of

9    real estate.  He went to an employee that was paid by an

15:29:00  10    employer wage and has lived that way.  He completely withdrew

11    from the public eye.  He gave up all of his success in the

12    radio industry, his success in the broadcast industry and was

13    able to go back into society and be productive.

14         A lot of times we don't have the benefit of that.

15:29:22  15    In most cases it's just kind of a gamble.  But in this case I

16    think it's been very clear that there's no chance that

17    Mr. Koerber will ever be frankly trusted by anyone in the

18    community because his reputation is destroyed forever.

19    There's no chance anyone's ever going to give him a dollar,

15:29:40  20    let alone just get a job is going to be hard enough.  So the

21    concern the Court may have that he may look toward trying to

22    start a new empire, that's just never going to happen.  So

23    that is one concern you don't have in this case that you might

24    have in another case like this.  So that is under 5K2.0, and

15:30:07  25    we do think that in this case that would justify actually a

1      departure under the statutory framework.

2              THE COURT:  You know basic rehabilitation?  Is that

3      what you're speaking about?

4              MS. NESTER:  I'm sorry.  I couldn't hear you.

15:30:16  5              THE COURT:  The basic rehabilitation over the last

6      several years?

7              MS. NESTER:  Yes, sir.

8              THE COURT:  That's what you relied upon?

9              MS. NESTER:  Under that section of the guidelines,

15:30:23 10     5K2.0.

11             THE COURT:  I'll consider that, as well.  Go ahead.

12             MS. NESTER:  Thank you, Your Honor.

13             Another section under the statutory framework would

14     be under Section 5H1.4.  Your Honor has already mentioned that

15:30:37 15    the physical condition --

16             THE COURT:  It's physical --

17             MS. NESTER:  Yes, sir.

18             THE COURT:  -- part of the guidelines.

19             MS. NESTER:  Yes, sir.  And again, that would

15:30:42 20    support, of course, a variance.  But it is also supported the

21     guidelines recognizes a legitimate concern.

22             THE COURT:  What are you saying about the fact that

23     the government says there's not a lot of evidence that they

24     have from medical sources about his physical problems?

15:30:56 25             MS. NESTER:  We did provide medical records to the

1    probation office, and we also signed a medical release.  And

2    it was our understanding that that had been confirmed.  I

3    don't want to speak for Ms. Schuman.  But that is the first

4    I've heard that we did not have sufficient --

15:31:11  5          THE COURT:  I've read the presentence report, and I

6    will accept that as factors I should consider.

7          MS. NESTER:  Okay.  The thing that's a little bit

8    scary about his condition.  He has two conditions that are I

9    think serious enough to talk about.  And one of them is an

15:31:27  10   autoimmune disease that is very serious when it occurs.  It

11   does cause you to go into the hospital, so we would certainly

12   ask that the Court take that into consideration.  It actually

13   has a reduced life expectancy when you have this disease.  We

14   described it in our memo.

15:31:47  15         The second issue he has is an issue where his body,

16   normally your body is able to -- when you have acid in your

17   stomach we have a way to stop it and it doesn't come into our

18   throats, and it doesn't come up into or esophagus.  He does

19   not have that ability, so if he lays down flat he can

15:32:07  20   asphyxiate and die.  While he's been incarcerated he has had

21   to have accommodations where he has to sleep against a wall so

22   that he won't perish in his sleep.  The concern would be that

23   if anything ever happened in a custodial setting where he was

24   forced to the ground against his will, which can happen

15:32:27  25   sometimes when security is an issue, it could be a life

1    threatening situation for him.  So we do raise that under the

2    statutory framework, as well, Your Honor, under 5H1.4.

3            The other issues that we have all connect to

4    variances.  And I would like to talk a little bit about the

15:32:51  5    unique nature of this case, which Your Honor has already paid

6    testament to and which we all acknowledge even through today.

7            So I think it's important that we recognize -- I

8    would take dispute with one thing that Your Honor said, and I

9    think Mr. Koerber is going to want to talk to you directly and

15:33:15 10    tell you directly from his heart.  But I would dispute the

11    fact that he's never accepted any iota of any responsibility.

12    I think in this case there is no question that Mr. Koerber

13    made some business decisions which were catastrophic.  They

14    caused good people who obviously are still very upset to lose

15:33:35 15    a lot of money.  People that he cared about, people that he

16    knew from his family, from his church, people that he cared

17    about.

18            And there is no question that Mr. Koerber

19    recognized and did all the way through that he made decisions

15:33:52 20    about the way he ran his business that harmed people that he

21    loves and that harmed people that he cared about, and for that

22    he truly has been remorseful.  And I think it's reflected

23    itself in multiple ways.  One way has been as soon as this

24    prosecution began Mr. Koerber came forward.  He brought every

15:34:12 25    document he ever had.  The reason that Mister -- that there

1    are thousands and thousands and thousands of Bates number

2    documents in this case is because Mr. Koerber opened up his

3    business and turned over every single document he had to the

4    investigators for the state.  He then went -- and when the

15:34:33  5    state declined to prosecute him after they looked at all of

6    his documents and when the FBI took over the prosecution,

7    Mr. Koerber went without his lawyer, Your Honor, we had a big

8    hearing about that, you'll recall that, he went and met with

9    the FBI for two days and answered every single question that

15:34:51  10   they asked him, and to this day has not been accused of being

11   untruthful for one moment in those conversations.

12           Not only that, but if you go back in time to when

13   the offense occurred Mr. Koerber didn't do what a lot of, what

14   you would say in Brooklyn, the classic Ponzi schemers do.  He

15:35:10  15   didn't empty his accounts, he didn't sell off his assets and

16   run to Jamaica.

17           THE COURT:  He has no money left.

18           MS. NESTER:  But what he did, Your Honor, is for a

19   year afterwards --

15:35:19  20           THE COURT:  He's minted of all sorts of coins.  I

21   have no idea how many.  I have no idea if they're buried

22   someplace.  I'm not going to punish him because of that.  But

23   certainly it shows that he did divert these monies through

24   these gold coins or silver coins which he kept.

15:35:35  25           MS. NESTER:  No, that's wrong.  He didn't keep

58

Filed Under Seal

# Exhibit H

Medical Records re: █████████████

Filed Under Seal

# <u>Exhibit I</u>

Medical Records re: ███████

Filed Under Seal

# Exhibit J

Letter to Warden Ponce, Apr. 3, 2020

# Exhibit K

Declaration of Dick Baldwin (Apr. 9, 2020)

Michael D. Zimmerman (3604)
Troy L. Booher (9419)
Dick J. Baldwin (14587)
ZIMMERMAN BOOHER
341 South Main Street, Fourth Floor
Salt Lake City, Utah 84101
mzimmerman@zbappeals.com
tbooher@zbappeals.com
dbaldwin@zbappeals.com
(801) 924-0200

*Attorneys for Claud R. Koerber*

UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **DECLARATION OF DICK J. BALDWIN** |
|     Plaintiff, | |
| v. | Case No. 2:17-cr-00037-FB-1 |
| | District Judge Frederic Block |
| CLAUD R. KOERBER, | |
|     Defendant. | |

I, Dick J. Baldwin, declare as follows:

1.      I am over the age of 18, of sound mind, and I have personal knowledge of the facts contained in this declaration, except to the extent that they have been described to me by my client who is unable to submit a declaration on his own behalf due to the federal prison lockdown. I describe the following to the best of my knowledge and recollection.

2.      I am counsel for Mr. Claud R. Koerber in the above-captioned matter.

3.      I am an attorney, duly licensed to practice in the state and federal courts of the State of Utah, along with the 10th Circuit Court of Appeals.

4.      Mr. Koerber is incarcerated in the Federal Correctional Institution at Terminal Island, located in San Pedro, California. When he first arrived, he was told he had been assigned a care level of 3 facility, indicating his health is a higher risk.

5.      Between March 27, 2020, and April 2, 2020, I attempted to communicate with the staff at FCI Terminal Island to request information about how the facility would be implementing the Attorney General's guidance to increase the use of home confinement in an attempt to minimize the spread of COVID-19 in federal prisons. I left multiple voicemails for various prison staff, sent multiple emails to the Warden's executive assistant, and spoke with Mr. Koerber's counselor. In those messages or conversations, I requested information about the process that would be implemented and also requested that Mr. Koerber be considered for home confinement as part of that process.

6.      On April 3, 2020, after receiving no meaningful response, I submitted a written request on Mr. Koerber's behalf. An electronic copy of the request was submitted by email. That same day, paper copies of the request were also shipped via Federal Express to the Warden, Mr. Koerber's case manager, and Mr. Koerber's counselor. Also that day, similar versions of the written request, prepared in his name, were shipped via Federal Express to Mr. Koerber so that he could submit them directly to the appropriate authorities according to the internal grievance process.

7.      On Sunday, April 5, 2020, Mr. Koerber, through his spouse, informed me that a staff member at Terminal Island had tested positive for COVID-19. I followed up with the prison by email and telephone. I received no response to my email that day. I did, however, speak with a member of the prison staff on the telephone. I was assured that the prison officials were

meeting to discuss their plan for implementing the Attorney General's guidance. I was also told that the team responsible for Mr. Koerber would be notified that I had requested he be evaluated for home confinement through the process they devised.

8.      While speaking with the member of the prison's staff, I mentioned that I had learned another staff member had tested positive. The staff person on the phone did not refute or deny that it was true. Nonetheless, BOP's official information indicates that no staff members at Terminal Island have tested positive.

9.      The next day, on April 6, 2020, the prison sent an email confirming that my written request had been received and would be considered. I followed up to ask for a rough estimate of the timeline. Specifically, I asked whether the review was expected to take a day or two, or if it would be a week or more. The prison eventually responded without providing any information, as follows: "All Home Confinement referrals will be reviewed and submitted timely if deemed appropriate."

10.     On the morning of April 8, 2020, I received an email communication from Mr. Koerber describing the conditions at the prison, as follows:

        a.      He explained that there are just under 100 inmates in the open dorm where he sleeps. He sleeps in a two-man bunk bed, which is separated from the neighboring bunk beds by roughly 3 ½ feet. And the bathrooms are smaller.

        b.      He explained that his unit sounds like the sick ward because many of the inmates have coughs and other symptoms.

        c.      He explained that a few inmates work each day in the medical center where other sick and quarantined inmates are held. The inmates who work in the medical center

return to the unit where Mr. Koerber sleeps each night, where social distancing is impossible. Many inmates have resorted to sleeping with blankets over their head and face in an attempt to protect themselves.

        d.     In the past few days, Mr. Koerber has observed an increase in staff members wearing masks. But it does not appear to be a requirement. Indeed, some staff members do not wear masks, including while interacting with inmates by touching their food, food trays, tables, beds, and the like, and searching inmates through pat-downs.

        e.     Mr. Koerber also explained that due to the prison being on lockdown, 10 to 15 staff cycle through the unit throughout the day, whereas prior to the lockdown, one or two staff would cycle through in the morning and another one or two in the evening. In other words, the BOP's lockdown and confinement procedures are not reducing exposure, but increasing it.

    11.    Mr. Koerber also described the current medical procedures as follows:

        a.     If an inmate begins to feel like they have a fever or body aches, they put in a "sick call."

        b.     Typically, 12 or more hours after the inmate has put in a "sick call," a physician's assistant will speak briefly with the inmate—often for less than a minute. The physician's assistant will occasionally have the time to check the inmate's temperature at that time. But if the physician's assistant does not have time, he or she will make a plan with the inmate for the physician's assistant to return to take the inmate's temperature. Often, the physician's assistant does not return. Based on his observations of the prison's operations at this time, Mr. Koerber assumes the physician's assistants do not return because they are too overwhelmed with too many issues at this time.

      c.      Mr. Koerber explained that there are two inmates in his section who are deeply concerned about their health and the prison's current response. Both inmates have submitted "sick calls" and have received no medical attention whatsoever. One of the inmates claims to have valley fever, which is a fungal infection whose symptoms include fever, cough, chest pain, chills, night sweats, and more. Mr. Koerber has observed him shivering and crying in bed at night. Whether this inmate's symptoms are from valley fever or COVID-19, his immune system appears to be compromised. And yet, he has received no medical attention.

      d.      Early in the day on April 8, 2020, Mr. Koerber explained that as far as he was aware, no one from his unit had been quarantined. Instead, all of the inmates were being confined to their quarters—the rooms with roughly 100 inmates sleeping 3 ½ feet apart.

      12.      Of the roughly 15 inmates that Mr. Koerber knows submitted requests to be released on home confinement, he claims to know only one who has received a response. But that one inmate has been approved. Mr. Koerber provided the following information about that inmate:

      a.      The inmate claims to have serious medical issues such as COPD, heart disease, diabetes, and more, and is over 65 years old.

      b.      The inmate was supposedly told that he had been approved for home confinement on April 7, 2020, and that the prison was verifying his re-entry plan, after which time he could be released. The prison explained that it may take 30 days to verify the re-entry plan.

      c.      Even so, the inmate has not been isolated or quarantined.

13.     Mr. Koerber explained that due to the lockdown, he has no access to his case manager (whose office is in a different building), and therefore, no feasible way to submit a request for his home confinement through the typical grievance process.

14.     In the evening of April 8, 2020, Mr. Koerber (through a telephone call with his wife) explained that two inmates from his unit were removed after they were found to have fevers of 104 degrees. Mr. Koerber claims the prison is not conducting tests for COVID-19 and instead only evaluates inmates with chest x-rays.

DATED this 9th day of April, 2020.

ZIMMERMAN BOOHER

s/ Dick J. Baldwin
Dick J. Baldwin
*Attorneys for Defendant Claud R. Koerber*