JOHN W. HUBER, United States Attorney (#7226)
AARON B. CLARK, Assistant United States Attorney (#15404)
RUTH J. HACKFORD-PEER, Assistant United States Attorney (#15049)
TYLER MURRAY, Assistant United States Attorney (#10308)
Attorneys for the United States of America
111 South Main, Suite 1800
Salt Lake City, Utah  84111
Telephone:  (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No.  2:17-CR-00037 |
| Plaintiff, | : | **UNITED STATES' OPPOSITION TO DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE AND REDUCTION OF SENTENCE UNDER 18 U.S.C. § 3582(c)(1)(A)(i) (INDICATIVE RULING UNDER F.R.CRIM.P. 37)** |
| v. | : | |
| CLAUD R. KOERBER, | : | |
| Defendant. | : | |
| | | Judge Frederic Block |
| | | Magistrate Judge Paul M. Warner |

A jury convicted Rick Koerber of running a massive Ponzi scheme that caused over $45 million in losses.  At this point, Koerber has only served approximately 10 months – roughly 6% – of his 170-month prison sentence.  Even so, since his incarceration on May 31, 2019, Koerber has made seven requests for release.  *See* ECF 612 (review of detention filed 7/22/2019), 625 (review of detention filed 8/23/2019), 629 (motion to revoke detention order, filed 9/29/2019), 638 (motion to stay detention made orally at sentencing on 10/15/2019), *United States v. Koerber*, Tenth Circuit Case No. 19-4147 motion for release pending appeal filed on 2/14/2020; *United States v. Koerber*, Case No. 19-4147, motion for rehearing (construed as motion to reconsider

motion for release pending appeal) filed on 3/23/20. All have been properly denied. In his latest filing—a 142 page missive—Koerber requests an indicative ruling that this Court would grant his request for compassionate release due to the COVID-19 pandemic. The instant filing—again, his seventh such motion for release—is just the latest in a long line of motions he has filed in a continuing effort to avoid or minimize confinement for his crimes.

While the COVID-19 pandemic is an unprecedented global crisis, it does not warrant Koerber's release. The United States is mindful of the concerns created by COVID-19, and the Bureau of Prisons ("BOP") is making extraordinary effort both to protect the inmate population and to address the unique circumstances of individual inmates. Koerber himself requested that BOP grant him relief from his sentence as part of BOP's efforts to deal with the crisis. The problem is that Koerber filed this motion before the BOP even had a chance to make any decision. The law disallows Koerber's premature motion, because the law makes clear that at this point that the BOP, not this Court, has jurisdiction to determine whether Koerber should be released to home confinement. Moreover, the BOP, with its medical staff and current information about Koerber's health condition, is in the best position to make the compassionate release determination. And the fact remains that Koerber is still a danger to the community, and the 3553 factors support his continued detention, the current pandemic notwithstanding. He therefore should not be released to home confinement.

## LEGAL FRAMEWORK

Koerber seeks an indicative ruling under Rule 37. Rule 37 provides that if "a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may (1) defer considering the motion; (2) deny the motion; or (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the

motion raises a substantial issue." F. R. Crim. P. 37.

Because of the pending appeal, this court does not have jurisdiction to grant Koerber's compassionate release. Therefore, this court is being asked to give an indicative ruling on whether it would grant the motion, which would then allow the Tenth Circuit, if it chooses under Fed. R. App. 12.1, to remand to the district court to enter its order. Although Koerber seeks an indicative ruling, for the reasons provided herein, the Court should deny Koerber's motion in its entirety.

## ARGUMENT

**1) Koerber's Motion for Compassionate Release is Premature**

On December 21 2018, Congress amended some of the procedures contained in 18 U.S.C. §3582(c)(1)(A)(i) by enacting Section 603(b) of the First Step Act of 2018 to allow a federal inmate to file a motion for compassionate release in the sentencing court. The compassionate release statute provides, in pertinent part:

> The court may not modify a term of imprisonment once it has been imposed except that—
> (1) in any case—
> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment ...

18 U.S.C. § 3582(c)(1)(A).

That process begins when the inmate files a request for compassionate release with the warden of the institution in which he is incarcerated—here, Terminal Island. The First Step Act allows the inmate to proceed directly to federal district court only if the warden does not respond to the request for compassionate release within 30 days of receipt. *See* 18 U.S.C. §3582(c)(1)(A)(i); *see also United States v. Raia*, -- F.3d --, 2020 WL 1647922, at *1 (3d Cir. Apr.

2, 2020) ("But although he asked BOP to move for compassionate release on his behalf, he did not give it thirty days to respond. So we will deny Raia's motion.").

Koerber's motion should similarly be denied because he has not exhausted his administrative remedies nor given the BOP 30 days to respond to his request. Koerber claims he has attempted to exhaust his administrative remedies, but admits that his written request for home confinement was submitted to BOP on April 3, 2020. He waited only six days before filing this motion on April 9, 2020. It is now April 15, 2020. Therefore, only 12 days—of the required 30—have passed and the Court should deny Koerber's motion on this alone. *Raia*, 2020 WL 1647922 at *2. Koerber has not given BOP its statutorily-required chance to evaluate his request.

Contrary to Koerber's assertion otherwise, the requirement that a defendant either exhaust administrative appeals or wait 30 days after presenting a request to the warden before seeking judicial relief is mandatory and must be enforced by the Court. To that end, where 30 days have not passed following presentation of a request to a warden, the statute "presents a glaring roadblock foreclosing compassionate release at this point." *United States v. Raia*, -- F.3d --, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020).

a) **The District Court Lacks Jurisdiction to Consider Koerber's Request Because Koerber Has Not Waited 30 Days For the BOP to Determine His Request For Compassionate Release**

Koerber argues that given the COVID-19 pandemic, requiring exhaustion is "futile and impracticable and the court should not require it." *United States v. Koerber*, 17-cr-37, ECF 639 Emergency Motion For Compassionate Release ("Motion for Release"), at 17. However, this Court does not have adjudicatory authority to grant Koerber's motion because the Court lacks jurisdiction to do so.

A judgment of conviction that includes a sentence of imprisonment constitutes a final judgment and may not be modified by a district court except in limited circumstances. *Dillon v. United States*, 560 U.S. 817, 825 (2010). As the Supreme Court has recognized, finality is an important attribute of criminal judgments, and one "essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989) (plurality opinion). Accordingly, it is well established that once a district court has pronounced sentence and the sentence becomes final, the court has no inherent authority to reconsider or alter that sentence. Rather, it may do so only pursuant to statutory authorization. *See, e.g.*, *United States v. Addonizio*, 442 U.S. 178, 189 & n.16 (1979); *United States v. Washington*, 549 F.3d 905, 917 (3d Cir. 2008); *United States v. Smartt*, 129 F.3d 539, 540 (10th Cir. 1997) ("A district court does not have inherent authority to modify a previously imposed sentence; it may do so only pursuant to statutory authorization.") (internal quotation marks omitted).

Consistent with that principle of finality, Section 3582(c) provides that a court generally "may not modify a term of imprisonment once it has been imposed," 18 U.S.C. § 3582(c), except in three circumstances, including as here, upon a motion for reduction in sentence under 18 U.S.C. § 3582(c)(1)(A). Given the plain language and purpose of the statute, the requirements for filing a sentence reduction motion—including the requirement that a defendant exhaust administrative remedies or wait 30 days before moving in court for compassionate release—are properly viewed as jurisdictional. *United States v. Graham*, 704 F.3d 1275, 1279 (10th Cir. 2013) ("Setting aside it's impropriety under § 3582(c), Graham's contention appears to lack merit.") (abrogated on other grounds by *Hughes v. United States*, 138 S. Ct. 1765).[1] Section 3582(c) states that a "court may

---

[1] Other courts have similarly recognized that the prerequisites for relief under Section 3582(c)(2), which allows a sentence reduction based on a retroactive guideline amendment, are jurisdictional. *See, e.g.*,; *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010); United

not modify" a term of imprisonment except in enumerated circumstances. 18 U.S.C. § 3582(c). It thus "speak[s] to the power of the court rather than to the rights or obligations of the parties." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 274 (1994) (citation omitted). That conclusion is reinforced by the historical powerlessness of the courts to modify a sentence after the expiration of the term at which it was entered. *See United States v. Mayer*, 235 U.S. 55, 67-69 (1914); *United States v. Welty*, 426 F.2d 615, 617-618 & n.8 (3d Cir. 1970). Section 3582(c) accordingly has been understood as conferring the jurisdictional authority that previously was lacking by providing express statutory authorization to modify otherwise final sentences.[2]

Even if the exhaustion requirement of Section 3582(c)(1)(A) is not jurisdictional, it is at least a mandatory claim-processing rule and must be enforced if a party "properly raise[s] it."

---

*States v. Williams*, 607 F.3d 1123, 1125-26 (6th Cir. 2010); *United States v. Auman*, 8 F.3d 1268, 1271 (8th Cir. 1993); *United States v. Austin*, 676 F.3d 924, 930 (9th Cir. 2012), *overruled on other grounds by United States v. Davis*, 825 F.3d 1014 (9th Cir. 2016); *United States v. Mills*, 613 F.3d 1070, 1078 (11th Cir. 2010); *see also United States v. Higgs*, 504 F.3d 456 (3d Cir. 2007) (canvassing history of judicial treatment of Rule 35 as jurisdictional and holding that Rule 35(a) and Section 3582(c)(1)(B) remain jurisdictional after *Bowles*). Other courts disagree. *See, e.g.*, *United States v. Johnson*, 732 F.3d 109, 116 n.11 (2d Cir. 2013); *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015).

[2]   We recognize that, in recent years, the Supreme Court has cautioned against imprecise use of the "jurisdictional" label, and explained that a statutory claim-processing rule, even if mandatory, is presumed to be nonjurisdictional absent a clear statement to the contrary. *See Fort Bend County v. Davis*, 139 S. Ct. 1843, 1848-50 (2019). A prescription is not jurisdictional merely because "it 'promotes important congressional objectives,'" *id.* at 1851 (quoting *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169 n.9 (2010)), and courts should not deem jurisdictional rules that "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times," *Henderson v. Shinseki*, 562 U.S. 428, 435 (2011). But whether a prescription is jurisdictional turns on Congress's intent, which is properly determined by the text, context, relevant historical treatment, and purpose of the provision. *Henderson*, 562 U.S. at 436. Here, the relevant factors indicate that Section 3582(c) sets forth a jurisdictional limitation on a district court's authority to modify a sentence, such that a district court lacks jurisdiction to consider a motion for compassionate release where the defendant has failed to satisfy the exhaustion requirement of Section 3582(c)(1)(A).

*Eberhart v. United States*, 546 U.S. 12, 19 (2005) (holding that Fed. R. Crim. P. 33, which permits a defendant to move for a new trial within 14 days of the verdict, is a non-jurisdictional but mandatory claim-processing rule.)  The United States raises the rule here, and—even during a global pandemic—it must be enforced.[3]

Koerber nevertheless argues that this Court may ignore the exhaustion requirement in light of the crisis presented by the coronavirus pandemic. That is incorrect.  While judicially created exhaustion requirements may sometimes be excused, it is well settled that a court may not ignore a statutory command such as that presented in Section 3582(c)(1)(A).  The Supreme Court recently reaffirmed this principle.  *See, e.g.*, *Ross v. Blake*, 136 S. Ct. 1850 (2016).

In *Ross*, the Court rejected a judicially created "special circumstances" exception to the exhaustion requirement stated in the Prison Litigation Reform Act of 1995 (PLRA).  That Act mandates that an inmate exhaust "such administrative remedies as are available" before bringing suit to challenge prison conditions. 42 U.S.C. § 1997e(a).  The Court rejected the "freewheeling approach" adopted by some courts of appeals, under which some prisoners were permitted to pursue litigation even when they had failed to exhaust available administrative remedies. *Id.* at 1855.  The Court demanded fidelity to the statutory text, explaining that the "mandatory language" of the exhaustion requirement "means a court may not excuse a failure to exhaust" even to accommodate exceptional circumstances. *Id.* at 1855–56. The Court stated:

> No doubt, judge-made exhaustion doctrines, even if flatly stated at first, remain amenable to judge-made exceptions. *See McKart v. United States*, 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies . . . is, like most judicial doctrines, subject to numerous exceptions").  But a statutory exhaustion

---

[3]   Indeed, even those courts that have concluded that the requirements of Section 3582(c)(2) are not jurisdictional still enforce the statutory prerequisites to relief. *See, e.g.*, *United States v. Taylor*, 778 F.3d 667, 670 (7th Cir. 2015) (recognizing that even if a court has the "power to adjudicate" a motion under Section 3582(c)(2), it may lack "authority to *grant* a motion . . . because the statutory criteria are not met") (emphasis in original).

>   provision stands on a different footing. There, Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to. For that reason, mandatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.

*Id.* at 1857.

That rule plainly applies to the statutory text here. Section 3582(c)(1)(A) unambiguously permits a motion to the Court only "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." The 30-day requirement to afford BOP the initial review of Koerber's request therefore cannot be excused.

While Congress indisputably acted in the First Step Act to expand the availability of compassionate release, it expressly imposed on inmates the requirement that they must first resort to their administrative remedies. And this is for good reason: The Bureau of Prisons conducts an extensive assessment for such requests. *See* 28 C.F.R. § 571.62(a).[4] As these procedures reflect, the Bureau of Prisons completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. Its assessment will always be of value to the parties and the Court.

This remains true during the present crisis. We do not underplay Koerber's concerns in any way. We believe this Court, like all citizens, is vividly aware that COVID-19 is a nefarious illness, which has infected large numbers of people and caused many deaths in a short period of time. BOP has accordingly taken significant measures in an effort to protect the health of the inmates in

---

[4]   *See also,* BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf.

its charge. BOP began planning for potential coronavirus transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control (CDC), including by reviewing guidance from the World Health Organization (WHO). The BOP continued to evolve its efforts to fight the virus. On March 13, 2020, BOP announced that it was implementing the Coronavirus (COVID-19) Phase Two Action Plan ("Action Plan") in order to minimize the risk of COVID-19 transmission into and inside its facilities. The Action Plan comprises many preventive and mitigation measures, including the following: all incoming inmates are screened, and staff are regularly screened; contractor visits are limited to essential services, while nearly all attorney, social, and volunteer visits have been suspended; inmate movements between facilities have been extremely limited; and institutions are taking additional steps to modify operations to maximize social distancing. On March 24, 2020, the BOP announced additional precautions and modified operations.[5] BOP has taken further steps as events require, including confining all inmates to their living quarters for a 14-day period beginning on April 1, 2020, in order to mitigate any spread of the disease.[6]

In addition, in recent days, BOP has been granted wider authority to designate inmates for home confinement in its toolkit of available measures. On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to

---

[5] The BOP's Modified Operations Plan is available at: https://www.bop.gov/coronavirus/covid19_status.jsp

[6] *See,* https://www.bop.gov/coronavirus/index.jsp

9

move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Further, Section 12003(b)(2) of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, permits the BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the Bureau of Prisons, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate." On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Unfortunately and inevitably, some inmates have become ill[7] and more likely will in the weeks ahead. But the solution is not to exclude BOP from reviewing applications for compassionate release. There are many challenging factors to consider during this unprecedented pandemic, and BOP should have the opportunity to assess those factors during the statutorily required review period. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced if any service), and

---

[7] As of April 14, 2020, 388 federal inmates and 201 BOP staff have confirmed positive test results for COVID-19, including 7 confirmed inmates and 2 confirmed staff members at FCI Terminal Island. *See* https://www.bop.gov/coronavirus/index.jsp for updated counts.

of supervision of inmates once released (at a time that the Probation Office has necessarily cut back on supervision, and in this district has ceased conducting home visits).

For all of these reasons, BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations based on an inmate's background and medical history, and more general considerations regarding the conditions and needs at particular facilities. The provision of Section 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also at this perilous time. As the Third Circuit stated, "[g]iven BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added—and critical—importance." *Raia*, 2020 WL 1647922, at *2. Thus, even if this Court could ignore jurisdiction and the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent BOP from engaging in that review.

**2) On The Merits, Koerber Has Not Shown "Extraordinary and Compelling Reasons" to Be Released to Home Confinement**

Koerber claims that because of his underlying health conditions, COVID-19 poses to him a serious risk of death. Koerber's assertions do not constitute "extraordinary and compelling reasons" required for compassionate release.

**a) Koerber's Request for Release Is Not Consistent with the Sentencing Commission's Policy Statement under USSG § 1B1.13**

Under controlling law, Congress has empowered the Sentencing Commission, not the district courts, to determine what constitutes an "extraordinary and compelling reason" to reduce a defendant's sentence.[8] Thus, by direct congressional mandate, the Sentencing Commission's

---

[8] First, in 28 U.S.C. § 994(a)(2)(C), Congress directed the Sentencing Commission to

policy statements set the parameters for any determination of whether a defendant's proffered reasons qualify as "extraordinary and compelling reasons," and compassionate release is only authorized if the court makes the initial finding that release is consistent with that policy statement.

Koerber's request is not consistent with the Commission's policy statement. That statement is set forth in USSG § 1B1.13. Echoing the compassionate release statement, § 1B1.13 states that a court may reduce a term of imprisonment if, after considering the §3553(a) factors, the court determines that: (1) "Extraordinary and compelling reasons warrant the reduction," (2) the "defendant is not a danger to the safety of any other person or to the community," and (3) the "reduction is consistent with this policy statement." USSG § 1B1.13.

Under USSG 1B1.13 note 1(A), a defendant is not entitled to compassionate release for any medical reason whatsoever—rather, the Commission has defined that term to mean a "terminal illness" or an illness that "substantially diminishes the ability of the defendant to provide self-care from within the environment of a correctional facility and from which he or she is not expected to recover."

Koerber does not claim any of these circumstances exists here. He does not claim to have a "terminal illness" or a "serious physical or medical condition" that interferes with his "ability . . . to provide self care." He does not allege that he has COVID-19 but relies solely on the possibility

---

"promulgate and distribute to all courts" "general policy statements" regarding "the appropriate use" of "the sentence modification provisions set forth" in the compassionate release statute. Then, in 28 U.S.C. § 994(t), Congress stated that the Commission, through its "general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A)," "shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples." Second, the compassionate release statute itself requires a district court to find that there are "extraordinary and compelling reasons" for release. Notably, the statute specifically requires the district court to find that the "reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

of becoming infected. Koerber is worried that he might contract a terminal or serious illness—COVID-19—in the future. As such, Koerber's claim is anticipatory.

Koerber's fears about contracting COVID-19 is not a "medical condition" that warrants compassionate release under the plain language of USSG 1B1.13, and, by extension § 3582 itself. Because Koerber's release is not consistent with applicable policy statements issued by the Sentencing Commission, his motion should be denied accordingly.

b) **Koerber Relies on Outdated Medical Records to Claim He Is At Heightened Risk of Developing COVID-19 Complications**

Koerber relies on only 5-pages of select, outdated medical records to claim that he has a heightened risk for COVID-19 complications. ████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████ To fairly decide this issue based on Koerber's motion, the Court

---

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

and the United States would need the benefit of a medical examination conducted by an independent physician—something that is impossible given the timeframes involved in responding to this motion. That is why the BOP, with its medical staff, is in the best position to determine Koerber's risks related to COVID-19 as well as his suitability for home confinement.

Moreover, Koerber argues that the present conditions he faces at Terminal Island are troubling and claims that the current response to the pandemic at Terminal Island is inadequate. He argues that the prison is not working actively on Attorney General Barr's initiatives, which include expanded home confinement in appropriate circumstances. He then identifies a number of first-hand observations in support of his claim. Release Motion at 9-11. He claims wearing masks is voluntary, and documents his perspective of how medical interventions are unfolding, and claims the prison is not conducting COVID-19 tests but is instead evaluating inmates using chest X-rays. The prison yard rumors Koerber repeats in his brief are myths, and the BOP is working to address this misreporting and misinformation.[10]

In fact, the BOP has previously dealt with disease outbreaks, and as identified above, has contingency plans in place for COVID-19. The BOP is following CDC and local health department guidelines related to testing of inmates. BOP prisons are following social distancing for both inmates and staff. *Id.* Recognizing that social distancing in a prison can be difficult, all staff and inmates have been issued cloth masks to wear. The prisons are performing pre-screening of all employees reporting to work and are conducting enhanced cleaning and disinfecting procedures. *Id.* Finally, the BOP is actively implementing AG Barr's COVID initiatives. *Id.*

---

[10] Correcting Myths and Misinformation About BOP and COVID-19, available at https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf

Between March 26, 2020, and April 13, 2020, the BOP has placed an additional 1022 inmates on home confinement.[11]

While the COVID-19 virus is new, health claims by prisoners are not. Reasonably necessary treatments are available in prison, and often times a prison setting will provide superior care than a defendant can obtain on the outside. *See United States v. Rodriguez*, 50 F. Supp 2. 717, 722 (N. D. Ohio 1999).

### c) Koerber Still Poses A Significant Danger to the Safety of the Community and Therefore Does Not Qualify For Compassionate Release

Frankly, Koerber also has a real credibility problem. His assertions, both about his own health, and about conditions inside Terminal Island, should not be believed. Dishonest behavior is, sadly, a hallmark of Koerber's history and character.

To begin, Koerber has been convicted of securities fraud, wire fraud, and money laundering based on a scheme in which he lied to investors--both about his profitability and about how he would spend their money. As the Court likely remembers, Koerber previously had also dishonestly raised investor money in Wyoming for a company called National Business Solutions, LLC ("NBS"). The Wyoming Securities Division found, among other things, that he failed to inform investors how he would spend their money and that the financial information he gave to investors "either contained untrue statements of material fact or omitted to state a material fact," in violation of Wyoming's securities laws. Despite this, he made a recent filing in the 10th Circuit Court of Appeals (in a prior motion for release) where he initially claimed to the Tenth Circuit that he never violated Wyoming's securities laws. After the government pointed out that Koerber previously stipulated that he had violated Wyoming laws, his attorney had to file an errata

---

[11] Current counts are available at: https://www.bop.gov/coronavirus/faq.jsp

admitting that Koerber had, in fact, violated these securities regulations. *United States v. Koerber*, Case No. 19-4147, 3/03/2020 Errata Sheet to Motion for Bail.

Additionally, Koerber has a history of attempting to deceive courts. In 2015, Koerber testified in proceeding involving his current wife's divorce. He attempted to deceive the court into believing that a payment had been made, when in fact it had not. After reviewing the evidence, the court found "Mr. Koerber's testimony regarding payment was not credible" and held Mr. Koerber's wife in contempt of court for willfully failing to make the payment.[12]

In 2016, Koerber again was involved in an attempt to deceive a court. That time, it involved his work as a paralegal on a criminal trial in Oregon. In that instance, Koerber attended trial proceedings as "Rick Koerber" but appeared on the witness list as "Claud R. Koerber", and he stayed in the courtroom in violation of the exclusionary rule. The court ruled that Koerber could not testify, and this deception was part of an Order to Show Cause proceeding against the lawyer for whom Koerber was working. *Id.*

███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
█████████████████████████████████████████

Finally, he participated in a scheme to deceive the Oregon Court of Appeals and his litigation opponent by employing a ruse to make it appear that he had timely appealed a judgment. In order to employ this ruse, Koerber backdated a dispatch notice, and purported to be a commercial delivery service in order to make it appear he had met the appeal deadline. This

---

[12] The United States has previously documented these attempts at deception in its Opposition Memorandum to a prior Motion to Review Detention. A more full factual account along with source documents can be reviewed at *Koerber*, ECF No. 620 Exhibits 1-6.

16

conduct resulted in his detention prior to his sentencing. *Koerber*, ECF 592. And the Oregon Court of Appeals likewise found that there was an attempt "to deceive this court regarding the filing and service of the notice of appeal in this case." *Fryberger v. Edwards*, Case No. A170347 at *6 (Oregon Ct. App. Oct. 30, 2019). The court also concluded that, despite Koerber's attempts to claim otherwise, Koerber was not a commercial delivery service for the purposes of the applicable statute. *Id.* at *7-8.

Koerber's history demonstrates a chronic problem of not telling the truth, particularly with courts before whom he seeks a favorable outcome. It is against this backdrop that the Court must view his current filing -- wherein he makes claims regarding health problems that leave him at a high risk of developing COVID-19-related complications, Terminal Island's lack of preparation for the COVID-19 pandemic, and BOP's purportedly poor response to COVID-19 generally, and his request for release specifically.

Finally, it is worth noting once more that Koerber has only served approximately 10 months of a 170-month sentence, roughly 6%. He now utilizes a global pandemic as the latest justification for his very premature release. As serious as the COVID-19 pandemic is, it cannot possibly be the case that the BOP should now release the prison population *en masse* onto the streets, especially at a time that the police are under enormous pressure, and at a time that the US Probation office in this district is unable to fulfill some of their core functions—including home visits.

**3) The 3553 Factors Strongly Weigh Against Koerber's Release**

The circumstances of Koerber's offense and his history of dishonesty warrant the lengthy sentence he received. His crimes were extensive and pervasive. He utilized shared religious ideals to convince his victims to invest and then callously used their money to aggrandize himself, leaving investors' finances in tatters. Moreover, there is a particular need in Utah to deter others from

committing similar crimes as Utah has the dubious reputation of being a hotbed for rampant fraud and white-collar crime. If the answer to this situation is to allow Koerber to spend more than 90% of his sentence on home confinement, it would cut against general deterrence in the most calculated of ways. Koerber was convicted on multiple counts and caused *substantial* financial hardship to his victims.

Moreover, Section 3553(a) requires the Court to consider whether the sentence "reflect[s] the seriousness of the offense, [] promote[s] respect for the law, [and] provide[s] just punishment for the offense." As detailed in the United States' sentencing memorandum, Koerber perpetrated a massive, pervasive fraud. Given Koerber's fraud, the losses he imposed on his victims, and his refusal to accept *any* responsibility for his misrepresentations and malfeasance, a sentence of home confinement would fail to do justice under any of these 3553(a) factors. Instead, the message would be that one can commit a massive fraud, lie to investors, run a Ponzi scheme, lose $45 million in a self-aggrandizing spending spree, and refuse to ever acknowledge such, but that sufficient punishment would still be simply to spend time with your family and work on a ranch. Justice requires that Koerber serve the full length of his term of incarceration.

Additionally, just as this Court in sentencing Koerber considered the unwarranted disparity factor, it should still consider the need to avoid unwarranted sentence disparities here now. If Koerber spends less than a year of his sentence incarcerated and then the vast majority—more than 90%—on home confinement, it will allow an unwarranted disparity in serving such a sentence. Moreover, it would be a grave injustice to the victims who faced significant financial hardship due to Koerber's crimes, who only in the last year have seen justice meted out. Koerber's 170-month sentence takes into account the sentencing guidelines, and the sentences of similarly situated defendants. It cannot be overstated that the BOP is in the best position to determine whether a

home confinement request should be granted. The BOP completes a diligent and thorough review, with considerable expertise concerning both the inmate and the conditions of confinement. This Court should allow the BOP to complete its assessment without upending its process and decision.

## CONCLUSION

The COVID-19 crisis is serious, and no one takes lightly concerns for the health and safety of *anyone* particularly at risk. But Koerber has a credibility problem, and his justifications for this seventh petition for release remain suspect, at best.

The Court does not have jurisdiction to consider Koerber's request, because the CARES ACT requires that Koerber give the BOP 30 days to consider his request, which he has not done. And even if the Court reached the merits of Koerber's request with an indicative ruling, the BOP has the most up to date information on Koerber's medical condition, and remains in the best position to evaluate Koerber's medical and housing placement needs.

In deciding this motion, the Court also cannot ignore Koerber's underlying conduct – running a Ponzi scheme that caused $45 million in investor losses as well as continuing, almost incalculable, emotional and psychological trauma. The 3553 factors justified Koerber's 170-month custodial sentence only six months ago. Those same considerations justify his continued detention now. To allow otherwise would completely undermine the seriousness of his offenses, as well as notions of just punishment and deterrence. Moreover, Koerber remains a danger to the community. As such, the pandemic notwithstanding, he should continue to be detained at Terminal Island.

DATED this 15th day of April, 2020.

                                                        JOHN W. HUBER
                                                       United States Attorney

                                                       */s/ Ruth Hackford-Peer*
                                                       TYLER MURRAY
                                                       AARON CLARK
                                                       RUTH HACKFORD-PEER